

**Vicki McKenney, et al.**
**vs.**
**Nicholas Mangino, et al.**
**Docket No. 2:15-cv-73-JDL**


**Videotaped Deposition of:**
**Kenneth Wallentine**
Date Taken: November 20, 2015


Alpine Court Reporting
Location in Salt Lake City and Provo
801-691-1000

Page 1

UNITED STATES DISTRICT COURT
District of Maine
-oOo-

VICKI MCKENNEY, individually; ) Docket No.
and VICKI MCKENNEY, as Next ) 2:15-cv-73-JDL
Friend of STEPHEN MCKENNEY, )
and as Personal )
Representative of THE ESTATE )
OF STEPHEN MCKENNEY, )
)
Plaintiffs, )
)
v. )
)
NICHOLAS MANGINO; and )
CUMBERLAND COUNTY SHERIFF'S )
OFFICE, and WINDHAM POLICE )
DEPARTMENT, )
)
Defendants. )
_____)

VIDEOTAPED DEPOSITION OF KEN WALLENTINE

Taken on Friday, November 20, 2015
At 9:05 a.m.

At Alpine Court Reporting Salt Lake City
243 East 400 South, Suite B-101
Salt Lake City, Utah 84111

Reported by: Emily A. Gibb, RPR, CSR, CCR

---

Page 2

1       A P P E A R A N C E S
2   For the Plaintiffs:
3       Daniel G. Lilley, Esq.
        DANIEL G. LILLEY LAW OFFICES, P.A.
4       39 Portland Pier
        Box 4803
5       Portland, Maine 04112-4803
        (207) 774-6206
6       dgl@danlilley.com
7
        For the Defendant Cumberland County:
8
        Peter T. Marchesi, Esq.
9       Wheeler & Arey, P.A.
        27 Temple Street
10      P.O. Box 376
        Waterville, Maine 04901
11      (207) 873-77771
        pbear@wheelerlegal.com
12
13      For the Defendant Town of Windham:
14      Edward R. Benjamin, Esq.
        Drummond Woodsum
15      84 Marginal Way
        Suite 600
16      Portland, Maine 04101
        (207) 772-1941
17      ebenjamin@dwmlaw.com
18
19  Also Present:
20      Byron Gibb, Legal Videographer
21
22          * * *
23
24
25

---

Page 3

1           I N D E X
2   KEN WALLENTINE                    PAGE
3   Examination by Mr. Lilley          5
4
5           * * *
6
7        E X H I B I T S
8   EXHIBIT    DESCRIPTION          PAGE
9   Exhibit B-1 - Photograph          222
10  Exhibit B-2 - Pages 172 through 175 from the   222
        Deposition of Nicholas Mangino
11
12  Exhibit B-3 - Still Shot from Video   222
13  Exhibit 1 - Force Science Institute Documents   **
14  Exhibit 2 - Force Science Institute Documents   **
15  Exhibit 3 - Force Science Institute Documents   **
16  Exhibit 4 - Force Science Institute Documents   **
17  ** Exhibits 1-4 were retained by Counsel. **
18          * * *
19
20
21
22
23
24
25

---

Page 4

1       P R O C E E D I N G S
2           -oOo-
3
4       VIDEOGRAPHER: This is the videotaped
5   deposition of Kenneth Wallentine in the matter of
6   Vicki McKenney, et al., versus Nicholas Mangino,
7   et al., being held at the office of Alpine Court
8   Reporting in Salt Lake City, Utah, on the 20th of
9   November 2015 at 9:05 a.m.
10      Will counsel please state their names and
11  who they represent for the record.
12      MR. LILLEY: My name is Dan Lilley. I
13  represent Vicki McKenney and the estate of Stephen
14  McKenney.
15      MR. MARCHESI: My name is Peter Marchesi. I
16  represent the Cumberland County defendants.
17      MR. BENJAMIN: My name is Ed Benjamin. I
18  represent the Town of Windham.
19      VIDEOGRAPHER: Will the court reporter
20  please swear in the witness.
21      MR. LILLEY: Hold on just a moment, please.
22      Here is the check, your check for a thousand
23  dollars that you requested.
24      (Handing check to witness.)
25      MR. LILLEY: Now you may swear the witness.

Page 5

1   Thereupon --
2          KEN WALLENTINE,
3   was called as a witness, and having been first duly
4   sworn to tell the truth, the whole truth, and nothing
5   but the truth, testified as follows:
6
7          MR. LILLEY:  And for our purposes, Madam
8   Court Reporter, would you please keep track of the
9   times we start and the times we break and come back,
10  lunch hour, and et cetera.
11         THE COURT REPORTER:  I will.
12         MR. LILLEY:  Thank you.
13
14             EXAMINATION
15  BY MR. LILLEY:
16     Q.  Good morning, sir.
17         What is your name?
18     A.  Ken Wallentine.
19     Q.  And, Mr. Wallentine, what town or city do
20  you reside in?
21     A.  Salt Lake City.
22     Q.  Okay.  And what is your occupation?
23     A.  I'm a police officer.
24     Q.  Okay.  Are you currently active in the
25  police department?

Page 6

1      A.  Yes.
2      Q.  What -- what department is that?
3      A.  I'm a special agent with the Investigation
4   Division of the Utah Attorney General.
5      Q.  Okay.  What are the duties and
6   responsibilities briefly of that job?
7      A.  That would depend on the particular
8   assignment within the organization.  My current
9   assignment involves operating a force training
10  center.
11     Q.  What does that mean, "force training
12  center"?
13     A.  A center where there is training about
14  force.
15     Q.  Well, okay.  Tell me more about what force
16  you're talking about.
17         What does it do?
18     A.  Force by law enforcement officers.
19     Q.  Well, can you be more specific as to what
20  kind of things you do with regard to training?
21     A.  Oversee the delivery of training to police
22  officers, state troopers, corrections officials,
23  deputy sheriffs, and others who visit the force
24  training center.
25     Q.  Do you -- is this restricted to this state,

Page 7

1   to Utah?
2      A.  I don't believe we've yet had anyone from
3   another state.
4      Q.  Okay.
5      A.  But I wouldn't use the term "restricted."
6      Q.  What would you use?  You're saying it's
7   not -- it's -- so far, you've only used it in Utah;
8   is that correct?
9      A.  I'm -- I'm saying I wouldn't use the term
10  restricted.  No one has ever told me that it's
11  restricted.
12     Q.  Well, sir, all I'm asking you, have you ever
13  taught any of these courses outside of Utah?
14     A.  The facility is a -- a -- a standing
15  facility, so it's a -- a building.
16     Q.  Okay.
17     A.  No.  I -- we -- we've not moved the building
18  outside of the state of Utah.
19     Q.  No, I'm sure you haven't.
20         Have you moved your teaching techniques out
21  of the state of Utah, out of the same auspices of
22  your position with the attorney general?
23     A.  No.
24     Q.  You were asked to bring many things to the
25  deposition here with you today.

Page 8

1          Do you recall?
2          MR. MARCHESI:  I'm going to --
3          THE WITNESS:  I do not.
4          MR. MARCHESI:  -- place an objection on the
5   record.  The request was made by a subpoena which was
6   provided to counsel but not served as required by the
7   rules, so I don't believe the witness is under any
8   rule-based or court-based compulsion to produce
9   documents.
10         Nevertheless, I've asked the witness to
11  bring with him his entire file in this matter.  My
12  understanding is that he has done that.
13  BY MR. LILLEY:
14     Q.  Okay.  So do you -- have you brought your
15  entire file in this matter?
16     A.  I have.
17     Q.  All right.  Is it here in this room?
18     A.  It is.
19     Q.  Where is it?
20     A.  It's sitting here behind me --
21     Q.  Okay.
22     A.  -- on the floor.
23     Q.  I think we're going to have to do an
24  inventory, if we can, of it.  So if you want to
25  start, we'll go through it, if we may.

1    Why don't we start by you explaining what
2 you have there and we'll see what we're going to need
3 copied, if anything.  Just explain to me what it is
4 and let me look at it briefly and I'll give it back
5 to you.
6    A.  The first set of documents appears to be
7 Defendant Windham Police Department's Responses to
8 Plaintiff's First Request for Production of
9 Documents.
10    Q.  May I see it?
11    A.  Certainly.
12    Q.  Okay.  Let's turn that over, if we may.
13    A.  The next set of documents appears to be the
14 Cumberland County Sheriff's Office Training
15 Documentation Form and documentation of training file
16 for Nicholas Mangino.
17    Q.  Thank you.  I'll look that over for a
18 moment.  Let me stop you for a moment.  I -- I've
19 looked it over briefly.
20       You've read that -- that document, the
21 training document manual?
22    A.  I --
23    Q.  For Mr. Mangino.  I'm sorry.
24    A.  I believe at one point, I looked at each one
25 of those pages.  I don't have any recollection of

1 that right now.
2    Q.  Okay.
3       MR. LILLEY:  I'm going to need a copy of
4 some of this stuff, folks.  I don't think I have
5 this.
6       MR. MARCHESI:  You've got all of it.
7       MR. LILLEY:  I'm going to need a copy
8 anyway.
9 BY MR. LILLEY:
10    Q.  With regard to the issues of use of force by
11 police officers, did you recall reviewing that in
12 particular since it's the subject of this case?
13    A.  By the preposition "that," if you're
14 referring to the stack of documents, my answer would
15 be the same as I gave you a moment ago.  At one
16 point, I believe I looked at every page in there.
17    Q.  Okay.  Do -- can you look up the Active
18 Shooter Response section for me for a moment?  We'll
19 continue on the other documents after this.  I'll
20 digress here for a moment.
21    A.  And is that the title of the document you'd
22 like me to be looking for?
23    Q.  Well, I'm looking at the index.  If you'd go
24 back to the front page, it refers to -- I believe --
25 I'd have to see it again because I don't have a copy.

1    A.  I see the words "Active Shooter Response" --
2    Q.  Yes.
3    A.  -- on this document.
4    Q.  Yes, that's what I'm looking for from --
5 from that index.
6    A.  Okay.  Okay.  (Witness reviewing documents.)
7 I reviewed a document.  I don't see a
8 document caption or title active shooter.  I see a
9 few documents where there's reference to concepts
10 associated with that phenomenon.
11    Q.  You see documents that are associated with
12 the concepts associated with active shooter response?
13    A.  Correct.
14    Q.  Well, that's what I was looking for.
15       So do you have -- have you made any effort
16 to -- to segregate those?
17    A.  Yes.
18    Q.  Okay.  Let me look at it, if I may.
19       And which are the ones that you've
20 segregated?
21    A.  They're -- turn -- turn down toward the
22 bottom.
23    Q.  I'm going to take this out.  I don't -- I --
24 I take it it's in no particular sequence --
25    A.  It is in sequence.

1    Q.  It is?
2    A.  Yes.
3    Q.  Okay.  Well, we'll try to keep it in
4 sequence.  Can you put it back in sequence?  Should I
5 shuffle it around?
6    A.  Probably not.
7    Q.  So I'm looking at the first portion that you
8 segregated in answer to my question.  Looks like Case
9 Law Update.
10       Do you agree?
11    A.  Yes, that's from a document titled 2014 Case
12 Law Update.
13    Q.  Okay.  And this essentially talks about
14 First Circuit courts -- well, at least the first one
15 is First Circuit Court of Appeals case, and then it
16 goes on to the cases from what I see; is that
17 correct?
18    A.  No.
19    Q.  No?  Okay.  Then you describe what it is.
20    A.  The page that you're looking at discusses
21 the Ricker case.  That was a decision by the United
22 States Supreme Court.  So I suppose --
23    Q.  I'm looking at the second page here where it
24 says First Circuit Court of Appeals.
25    A.  Yes, you -- you are correct that the second

1  page refers to First Circuit Court of Appeals.  You
2  are not correct, as you stated, that the first page
3  refers to the First Circuit Court of Appeals.
4      Q.  That's what I think I said, the second page.
5  That's all right.
6          In any event, the second page is the First
7  Circuit Court of Appeals, and these are cases that
8  you -- what did you conclude with regard to
9  Mr. Mangino's exposure to this material, if any?
10     A.  By -- by "this," do you --
11     Q.  This material that you've handed me and that
12 whole document, and now you've segregated out parts
13 of it, what is your understanding his familiarity or
14 his exposure to this material is in your review of
15 this case?
16     A.  Just insofar as segregation, I -- I realize
17 you've selected something out of there that I -- I
18 did not, and you're asking me questions about
19 something that I did not segregate --
20     Q.  No, sir.  I'm just asking what his exposure
21 is to the entire information.
22     A.  Let -- let me finish my answer, please,
23 before you --
24     Q.  Okay.
25     A.  -- clarify.

1      Q.  Yes.
2      A.  The portion you've picked out, I didn't pay
3  any particular attention to.  You have a page on the
4  top that refers to concepts involving active shooter,
5  and it would be my impression that Mr. Mangino would
6  have been provided that material in a course.
7          It's a -- the -- the front page of that
8  entire group is captioned as a course outline and
9  lists a couple of presenters at a time and date
10 indicating that it was a discrete course.  And
11 because it's in Mr. Mangino's files, I believe that
12 Deputy Mangino participated in that training.
13     Q.  Have you ever verified that with anybody?
14     A.  I have not.
15     Q.  You have -- you've interviewed him, have you
16 not?
17     A.  I have.
18     Q.  Did you ask him?
19     A.  I did not.
20     Q.  So you don't know whether he's read any of
21 this material whatsoever.
22     A.  I don't have any certain knowledge that he
23 did.
24     Q.  Do you have any knowledge that he did?
25     A.  No.

1      Q.  And these are essentially case -- cases from
2  the courts, No. 1, correct, so far?
3      A.  They're documents relating to cases from
4  courts, yes.
5      Q.  And then there are -- are there hypothetical
6  cases in here of events that may not have been
7  addressed by courts?
8      A.  I'd need to review the documents again --
9      Q.  Okay.
10     A.  -- to answer that.
11     Q.  Well, we'll --
12         In any event, did you -- when you
13 interviewed Mr. -- I'm going to put this back I think
14 the way I got it.  I hope at least.  Probably not,
15 but I'll -- I'll do my best not to mess it up
16 anymore.  And you can straighten it if you wish.
17         When you talked to Mr. Mangino, did you
18 determine what courses or training he had on the use
19 of deadly force similar to the issues that we're
20 looking at in this case?
21     A.  I discussed his law enforcement training
22 with him.
23     Q.  You did?
24     A.  I did.
25     Q.  And do you recall what specific training he

1  had with regard to the use of force in similar
2  situations that we face in this case?
3      A.  I recall that he told me that he completed
4  use of force training at the Maine Police Academy.  I
5  don't recall that I asked him about whether the
6  situations were substantially similar to this case or
7  not.
8      Q.  Well, do you know what the Maine police
9  academy taught for use of force when he took it?
10     A.  I have seen general outlines from the Maine
11 Police Academy on use of force and have a general
12 sense.
13     Q.  Do you have that among your materials?
14     A.  I do not.
15     Q.  Where did you look -- where did you see that
16 material?
17     A.  I've seen those documents in the past.
18     Q.  Can you recall any principles that they
19 espouse?
20     A.  I recall thinking that the Maine Police
21 Academy with respect to Fourth Amendment issues,
22 including use of force to effect detentions, arrests,
23 and seizures, was not inconsistent with that which is
24 taught throughout the country and -- and that which
25 is based on United States Supreme Court

Page 17

1  interpretation of constitutional law.
2     Q.  My -- my question is much more specific,
3  sir. I understand search and seizure and all those
4  issues that you've referenced.
5     Do you remember anything -- do you recall
6  anything in the materials you claim to have seen --
7     I take it this is over the years?
8     A.  Mm-hmm.
9     Q.  That's yes?
10    A.  Yes.
11    Q.  Yes or no here.
12      -- that dealt with the use of deadly force?
13    A.  Yes.
14    Q.  And what do you recall seeing from the
15  Maine -- is this the Maine criminal academy for
16  police officers?
17    A.  I -- I recall that the principles that were
18  outlined in the training materials were substantially
19  similar to those principles that are taught at other
20  police academies across the country and that are
21  premised on decisions the United States Supreme Court
22  interpreting --
23    Q.  That's not my question. Go ahead.
24    A.  -- constitutional law.
25    Q.  You should listen to my question. We're

Page 18

1  going to get through this a lot faster today.
2     Do you remember any specific principles that
3  you recall having reviewed some of the teachings of
4  the Maine Police Academy over the years with regard
5  to the use of deadly force, similar to the issues
6  that we're faced -- he was faced with in this case?
7    A.  When you use the word "principle," I
8  understand that to mean a teaching precept, and so my
9  answer would remain the same.
10    Q.  Well, sir, you haven't answered my question.
11  You just remember saying that -- you're saying that
12  they're consistent with the rest of the world or the
13  rest of the country.
14     I'm asking you, what -- what specific
15  principles that an officer could use on a day-to-day
16  basis when confronted with a situation similar to
17  this that you recall having reviewed somewhere over
18  the past from the Maine Police Academy?
19    A.  I -- I can't cite chapter and verse of any
20  particular training document from the Maine Police
21  Academy.
22    Q.  Let's continue your -- what else do you have
23  in front of you?
24    A.  Transmittal letter from Donna Campbell, a
25  paralegal at Mr. Marchesi's office.

Page 19

1    Q.  Okay. And then you have a -- several
2  videotapes, correct?
3    A.  I have electronic media.
4    Q.  Uh-huh. And what do you -- let me look at
5  that for a moment, if I may.
6     By the way, when did you receive this? Any
7  rough idea? Maybe the letter will give you a hint.
8    A.  Some of that material was received
9  November 2, 2015. Some of it was received prior to
10  that.
11    Q.  Have you looked at these?
12    A.  Yes, sir.
13    Q.  For instance, reaction versus reaction,
14  nonsurprise event.
15     Do you know what that is?
16    A.  I'd have to put it in the computer and play
17  to be certain, but I believe that that is a -- a
18  video recording of something that Mr. Tucker did.
19    Q.  That Mr. Tucker did? Oh, okay.
20     Have you looked at that?
21    A.  Yes.
22    Q.  So I'm assuming you received these at
23  various times, not all at the same time; is that
24  correct?
25    A.  That is correct.

Page 20

1    Q.  There's another one here that's entitled
2  "McKenney versus Melvin Tucker," video.
3     Is that the same or different than the other
4  video, if you can recall?
5    A.  I believe -- I believe the content to be the
6  same. There are a couple of different videos. One
7  is played on a -- a -- a DVD player that's native to
8  an Apple system. This one, I recall, is one that
9  worked in any -- well, it works in a computer with a
10  VLC player. One of the videos had some loud music
11  playing in the background as a soundtrack and one of
12  the videos did not have music playing.
13    Q.  Otherwise, were they similar?
14    A.  Yes. I didn't examine the metadata, but I'm
15  assuming that no one tinkered with that.
16    Q.  The -- the various cams from the cruisers,
17  Cook, Fournier, which I'm looking at, I take it
18  you've reviewed those?
19    A.  Yes, sir.
20    Q.  Have you ever discussed the -- those -- the
21  case with either of those officers?
22    A.  I have not.
23    Q.  Have you ever discussed the case with
24  Officer MacVane?
25    A.  I have not.

Page 21

1   Q.  Have you discussed the case with
2 Deputy Mangino?
3   A.  Yes, sir.
4   Q.  So you discussed not only his background and
5 training, but you discussed the -- what happened that
6 day essentially; is that correct?
7   A.  Yes, sir.
8   Q.  Did you -- when did you discuss it?
9   A.  I believe that it was early in the summer of
10 this year.
11   Q.  Okay.  Did you discuss it more than once
12 with him?
13   A.  No.
14   Q.  When you discussed it, where were you and
15 where was he?
16   A.  I do not know where he was at.  I was on the
17 telephone on a phone call with Mr. Marchesi and
18 Deputy Mangino and myself, and I was in -- I believe
19 it was La Pine, Oregon.
20   Q.  Okay.  Tell me about the discussion.
21   A.  I don't recall who initiated the call.  I
22 believe it was Mr. Marchesi.  He and I spoke briefly.
23 He introduced by telephone Deputy Mangino, and I
24 asked Deputy Mangino a number of questions.
25   Q.  Well, that's what I want to hear, sir.  I'd

Page 22

1 like to have the details of the questions and answers
2 so we can save time.
3   A.  I -- I can't recall precisely the questions
4 I asked him.  I asked him general questions about
5 what had happened, and I may have asked some
6 follow-up questions depending on his answers.
7   Q.  Okay.  Do you remember any of the questions.
8 Again, I'm not after exact words.  I'm simply asking
9 the gist -- asking you for the gist of the question
10 and the gist of the answer, not of course the exact
11 words.
12       What question did you ask -- what questions
13 did you ask him, and I want specific -- I want to be
14 exhaustive about this, and what answers did he give?
15   A.  I don't -- I don't --
16       MR. MARCHESI:  I'm going to object to the
17 form of the question.
18       Go ahead.
19       THE WITNESS:  I don't recall any -- any
20 specific questions that I asked him.  I asked him
21 questions about how the events unfolded.
22 BY MR. LILLEY:
23   Q.  What did he say?
24   A.  I -- I don't recall his specific answers.
25   Q.  Well, I'm not asking for specifics.

Page 23

1       In general, what did he say happened?
2   A.  In general, what he told me happened was
3 very consistent with the reports that --
4   Q.  No, no.  Sir, we're going to get along a lot
5 better if you answer my questions.
6   A.  Well, for the record, I don't have any
7 trouble getting along with most people, including
8 you.  I'm sorry that you're distressed.
9   Q.  When I -- when I say get along, we'll get
10 the deposition along, I guess.  I'm not asking to be
11 your best buddy.  I'm trying to get this thing over
12 with, and I would ask you to be responsive to my
13 questions when I ask for specifics.  I really don't
14 want generalities.  It's just going to take up a lot
15 of time.
16   A.  I -- I understand.  And, Mr. Lilley, you
17 interrupted me after about seven words, so you really
18 have no --
19   Q.  Right, because you're not answering my
20 question.
21   A.  As you have done again.  You really --
22   Q.  Okay.
23   A.  -- have no clue what my answer is going to
24 be.
25   Q.  Well, let's try to get your answer.  Then I

Page 24

1 won't have to guess.
2   A.  It would be more efficient if you would
3 allow me to answer --
4   Q.  Sir --
5   A.  -- and not, as you're doing again, interrupt
6 me.
7   Q.  Sir, please answer my question.
8   A.  Would you care to pose the question again?
9   Q.  Yes.  What questions did you ask that you
10 remember, in substance, not -- not precisely, and
11 what answers did you receive on that phone call?
12   A.  I asked him questions framed about the
13 events that happened, and I don't recall any specific
14 answers that he gave me.
15   Q.  How long was that telephone call?
16   A.  I believe it was in the neighborhood of
17 45 minutes.  It might have been as long as an hour.
18   Q.  And you're saying as you sit here you don't
19 remember one question or one answer in substance that
20 he and you exchanged in that dialogue that day?
21   A.  The events -- asked the question different
22 and my answer remains the same.  I asked him
23 questions about what happened.  I don't recall any
24 specific questions or any specific responses to
25 direct questions.

Page 25

1    Q.   Well, did you ask him why he shot this man?
2    A.   I may have asked that question.
3    Q.   Well, what -- what did he say?
4    A.   I don't recall any specific answers that he
5  gave me.
6    Q.   Did you ask him about his training?
7    A.   I believe that we discussed his training.
8  I'm not entirely certain.
9    Q.   Did you ask him about what specific training
10  he had with regard to the use of deadly force?
11    A.   I believe that we had a discussion about
12  whether he'd been to the police academy and what he
13  had been trained on there.
14    Q.   Did you ask him about whether he had any
15  training on the use of deadly force by a police
16  officer?
17    A.   I don't recall that specific question.
18    Q.   Did you ask him why he didn't use nonlethal
19  force in this situation?
20    A.   I don't believe that I did.
21    Q.   Did you ask him anything about Tasers?
22    A.   I may have asked him if he carried a Taser
23  and was certified in its use.  I don't recall whether
24  I did or not.
25    Q.   You didn't ask him questions like why didn't

Page 26

1  he consider that or did he consider that, things of
2  that nature?
3    A.   I did not.
4    Q.   So he simply told you what happened and you
5  asked no questions, at least no questions about that
6  in specific -- specifically that you can recall now.
7    A.   I asked him questions about what had
8  happened.  I may have asked follow-up questions.  I
9  don't recall any of the specific questions that I
10  asked him.
11    Q.   Did you tell him what you were going to do
12  for him in this case as his expert witness?
13    A.   I typically have a fairly routine dialogue
14  at the beginning of such an interview or telephone
15  call.  I -- I believe that I followed that dialogue
16  with him.
17    Q.   What's that?  What is the dialogue?  What is
18  the typical routine, rather?
19    A.   Well, almost always -- I think in fact in
20  every case that I can recall, the attorney is
21  participating, as Mr. Marchesi was in -- in this
22  case.  Because I don't know what Mr. Marchesi may or
23  may not have explained, I simply tell Mr. Mangino and
24  other people that I have been retained by the
25  attorney representing him and that I've been retained

Page 27

1  to examine all of the documents that have been
2  provided to me and then provide opinions on the
3  police actions that were taken in a particular case.
4    I explain that I don't have any particular
5  preconceived notions and that at the end of my
6  review, I submit a report to the Court.  That's
7  really -- but he's free to ask me any questions, and
8  at the end of that dialogue, I said, Do you have any
9  questions about my role and I, at some point, will
10  generally say, Mr. Mangino may interpose a clarifying
11  question or he may tell you not to answer one of my
12  questions and don't --
13    Q.   Mr. --
14    A.   Or, excuse me, Mr. Marchesi, and -- and
15  don't read anything into that.  That's just how the
16  process works.
17    Q.   And --
18    A.   That's typically what I tell him, and
19  sometimes I may say, you know, you may or you may not
20  see my report.
21    Q.   At that time, had you reviewed most of this
22  material before you talked to him?
23    A.   I -- I had received and reviewed a
24  substantial portion.  I don't think -- excuse me.  I
25  don't think I could give you a percentage as to how

Page 28

1  much of the material I reviewed.
2    Q.   I just said "most."
3    Did you do most of it -- did you -- had you
4  done most of the material review?
5    A.   I -- I don't know.  I don't think so
6  because, you know, some of the material that you've
7  already looked at this morning I received after that
8  date, so I obviously hadn't -- excuse me, had not
9  reviewed that yet.
10    Q.   Did you tell him that you were going to act
11  as his expert witness in this case when you talked?
12    A.   I wouldn't use that term.  No, I didn't.
13    Q.   Well, I want to know what you told him.
14    Are you telling me not to use the term or
15  you -- you don't want to use the term?
16    A.   No, I wouldn't -- I wouldn't -- I'm sorry.
17  That's a good -- that's a good clarification.
18    I would not use that term with -- with him.
19  I wouldn't try and use any kind of a possessive
20  pronoun.
21    Q.   You told him, I take it, that you're
22  reviewing the case and -- and if you found that there
23  was -- his actions were supportable or supported
24  under the law, that you would act as his expert
25  witness.

Page 29

1           Is that a fair statement?
2      A.  The philosophy behind what you're -- you're
3  expressing is -- is fair.  I wouldn't tell a police
4  officer that I'm her or his witness.  I -- I tell
5  them I've been retained by counsel.
6      Q.  Well, okay.  Had -- had you told
7  Mr. Marchesi at that point that you were going to act
8  as the expert witness for Mr. Mangino?
9      A.  I had agreed to -- to do services for
10 Mr. Marchesi by that point --
11     Q.  So I take it --
12     A.  -- yes.  Sometime before that, actually.
13     Q.  Right.  So I take it, then, when you -- when
14 you talked to Mr. Marchesi before that indicating you
15 were going to do the services, it was going to be to
16 support Mr. Mangino's position in this shooting,
17 correct?
18     A.  No.
19     Q.  Well, Mr. Marchesi is not going to keep you
20 on as his expert if you're not going to be supporting
21 his position, is he, sir?
22         MR. MARCHESI:  Objection to form.
23         THE WITNESS:  I would expect that he
24 wouldn't, but I can't answer for him.
25 ///

Page 30

1  BY MR. LILLEY:
2      Q.  At the time you talked to Mr. Marchesi,
3  which -- which predates the time you talked to
4  Mr. Mangino, am I correct?
5      A.  Yes.
6      Q.  Had you reviewed enough information that you
7  were confident that you could support their position
8  in this lawsuit?
9      A.  Based on the information that I had
10 received, by the time I spoke to Deputy Mangino and
11 Mr. Marchesi in that phone call, I had not yet
12 written my report, but I had formed preliminary
13 conclusions that are expressed in my report.  They
14 didn't -- they didn't change.
15     Q.  So you did -- you did conclude that you
16 could support their position on the information you
17 had, but you still needed to finalize that in a
18 report, maybe perhaps more specific.
19     A.  I -- I'm -- I'm not --
20     Q.  Is that a fair summary?
21     A.  It is, although I'm not sure ultimately what
22 position I'll take legally, but my --
23     Q.  Well, what --
24     A.  -- conclusions didn't change.
25     Q.  I -- I didn't hear the last part.

Page 31

1      A.  Well, when you -- when you say to me the
2  position, I -- I'm hearing in that phrase, you know,
3  what the legal theory and argument will be.
4          I don't know ultimately what that will be,
5  but I had seen enough documents to form some
6  preliminary conclusions and opinions.  And those
7  preliminary conclusions and opinions did not change
8  and they're reflected in my report.
9      Q.  Let me be more specific, then.
10         You had formed the opinion that Mr. Mangino,
11 from what you had prior to talking to him, was
12 justified in shooting Mr. McKenney; is that correct?
13     A.  Yes.
14     Q.  Now, when you say you told him that you
15 would be writing a report, "him" meaning Mangino,
16 and -- and -- and sending it to the Court, did you do
17 that?
18     A.  I -- I don't believe I said sending it to
19 the Court.  It goes to the Court, but I don't send
20 it.  That ultimately is Mr. Marchesi's role.
21     Q.  So Mr. Marchesi, you -- it's your
22 understanding, sends your report to the Court?
23     A.  Ultimately, if he uses my report.
24     Q.  Okay.  All right.  Where were we in our
25 inventory here?

Page 32

1      A.  So for purposes --
2      Q.  I'm going to look this over a little bit
3  later.  I don't want to take the time now, if I can,
4  so if you could keep it around, just describe, if you
5  will, what you have with you.
6      A.  Okay.
7          THE WITNESS:  Mr. Videographer, I just
8  knocked on my microphone.  I think I'm putting it
9  back in the same place.
10         Is that acceptable to you?
11         VIDEOGRAPHER:  (Thumbs up.)
12         THE WITNESS:  Thank you.
13 BY MR. LILLEY:
14     Q.  You're now looking at one -- one of two blue
15 binders.
16     A.  Correct.
17     Q.  Thank you.
18         If you'll describe what that is, first of
19 all, or does it --
20     A.  Okay.  The first -- the first document is
21 a -- I believe the -- the term is rough copy of a --
22 or a -- an uncorrected copy of a deposition that was
23 taken on November 2nd of Melvin Tucker.
24     Q.  Okay.
25     A.  That -- so this document will actually

Page 33

1    appear also in that other folder, although in the
2    other folder, it's on electronic media.
3        Q.   Now, let me stop you, if I may.  Go ahead
4    and finish what you're doing to -- to organize.
5        A.   Okay.
6        Q.   You read Mr. Tucker's deposition.
7        A.   Yes.
8        Q.   And you also saw his video, correct?
9        A.   I -- I've seen two versions of the video.
10   Only distinction being that one had music and --
11       Q.   Okay.
12       A.   -- but yes, I've seen -- I've seen the
13   video.
14       Q.   They're substantively the same, just one of
15   them has a musical introduction, as I recall; is that
16   correct?
17       A.   I think it has music playing through the
18   whole thing.  It's distracting.
19       Q.   You can listen to the other one, sir, when
20   it comes to court time.
21       A.   Right.
22       Q.   I'll -- I'll -- I'll assure you.
23       MR. MARCHESI:  Objection.
24   BY MR. LILLEY:
25       Q.   With regard to -- when you reviewed

Page 34

1    Mr. Tucker's deposition, I take it you did it with a
2    critical eye, did you not?
3        MR. MARCHESI:  Objection to form.
4    BY MR. LILLEY:
5        Q.   Do you know what I mean by that?
6        A.   I -- when -- when you talk about "critical
7    eye," I'm thinking applying -- of one who would apply
8    critical thinking skills and -- and you would be
9    correct.
10       Q.   So when you went through it, did you make
11   notes or make notes on a separate pad or on the --
12   the document itself?
13       A.   I did not.
14       Q.   You don't customarily do that?
15       A.   I -- I don't have a pen and -- for a number
16   of reasons, I don't write much.
17       Q.   Okay.  So any criticisms, critiques,
18   comments that you believe should be made on his
19   report, how do you preserve it so that you can
20   reference it later?
21       A.   Memory.
22       Q.   Okay.  So just simply by memory.
23       A.   Well, I have the -- the benefit of having
24   his report --
25       Q.   Right.

Page 35

1        A.   -- and -- or his deposition and -- and his
2    report and video in a couple different formats, so I
3    keep those with me.  And if this case should proceed
4    to trial, it's fairly likely I would look at his
5    deposition before trial.
6        Q.   Of course.  But what you had earlier found
7    to be perhaps questionable or at least that you
8    didn't agree with, those kinds of things, those would
9    be lost, I guess, to the -- to history because there
10   wouldn't be any record of them.
11       Do you agree with that?
12       MR. MARCHESI:  Objection to form.
13       THE WITNESS:  I -- they're not memorialized
14   in handwriting.
15   BY MR. LILLEY:
16       Q.   Okay.  What else do you have there, sir?
17       A.   This is a transmittal letter, again, from
18   Donna Campbell that transmits the file of Mr. Tucker.
19   And then there is what has been represented by me to
20   be the file of Mr. Tucker.
21       So do you want me to go through that
22   individually?
23       Q.   Well, no, you -- I don't think so.
24   That's -- when you say "file," these -- these are the
25   documents that he produced at deposition?

Page 36

1        A.   That's -- my understanding is that -- should
2    have thought before I printed it.
3        Yes.  So he has some of the same documents
4    actually --
5        Q.   Okay.  I don't need --
6        A.   -- that I have.
7        Q.   I probably don't need to look at those.
8    I -- I've looked at those, I believe.
9        A.   It's my understanding that you produced this
10   set of documents entirely in the recent past.
11       Q.   And, again, same question:  When you went
12   through the documents in addition to the report, the
13   documents would include whatever he had in his file
14   together with his deposition.
15       Did you make any notes, dictate any
16   memoranda, in any way memorialize any of your
17   thinking when you reviewed his materials?
18       A.   No.
19       Q.   Okay.  Then you'll do that from memory, too,
20   I guess, if you're called upon to do it again; is
21   that correct?
22       A.   It's even more likely that I would review
23   those materials before court.
24       The next --
25       Q.   Well, but you'll do it from memory of

1  whatever you might have found in the past --
2      A.  Yes.
3      Q.  -- rather than -- okay.
4      A.  Correct.
5      Q.  Than memorialized.  Okay.  Thank you.  Go
6  ahead.
7      A.  The next set of documents is in a tab
8  that -- that says "Complaint and Pleadings," and so
9  that's really what it is.
10         And then there's a rather slender -- so it's
11  removal and complaint and those sorts of things.
12         Then there's a slender stack here that's
13  correspondence, and this appears to be correspondence
14  between your office, you, and Mr. Tucker.
15     Q.  Okay.  Now -- yeah, go ahead.  And what is
16  the next inventory?
17     A.  So next we have a stack of -- where is my
18  pink -- there we go.
19         The -- you didn't ask.  The pink sheets are
20  just to keep families of documents separated.
21     Q.  I understand.
22     A.  So next we have a stack of policies or
23  they're titled "Standard Operating Procedures" of the
24  Cumberland County Sheriff's Office.  There are five
25  of them, I believe.

1      Q.  May I see those?
2      A.  Yes, sir.  (Handing document to Mr. Lilley.)
3      Q.  Now, with regard to these, these Standard
4  Operating Procedures, as you say, from the Cumberland
5  County Sheriff's Office, did you ever determine
6  whether or not Mr. Mangino had ever read these?
7      A.  I didn't ask him.  I can only presume, but I
8  don't have any certain knowledge.
9      Q.  Did you determine it in any way?
10     A.  No.
11     Q.  When you talked to him -- and I know that
12  it's very vague.  In fact, I think you have very
13  little memory, but perhaps this might jog your
14  memory.
15         When you talked to him on the telephone,
16  after you had -- strike that.
17         Had you reviewed these procedures before you
18  talked to him on the telephone?
19     MR. MARCHESI:  Objection to form.
20     THE WITNESS:  I -- I had.  I didn't have
21  them with me, but I had seen them before.
22  BY MR. LILLEY:
23     Q.  But you would -- you do this from memory.
24  You don't take notes.  Whatever that's in here, you
25  know what's in here from your memory.

1      A.  That's generally correct.
2      Q.  So when you talked to him on the phone, did
3  you -- did you -- do you remember whether you asked
4  him about any of these procedures?
5      A.  I -- I didn't ask him about any of the
6  policies.
7      Q.  Or procedures?  About the procedures --
8      A.  No.
9      Q.  Wasn't that an important part of your
10  analysis to determine whether or not this officer
11  followed Cumberland County Sheriff's Office standard
12  operating procedures?
13     A.  Whether he followed policies and procedures
14  of the office was certainly a consideration.
15     Q.  And you never determined whether he did?
16     A.  I didn't ask him about the policies and
17  procedures.
18     Q.  Did you use any policy and procedure in
19  particular of the five that you've handed me in
20  analyzing the -- the propriety of the shooting that
21  day?
22     A.  May I see them again?
23     Q.  Sure.  (Handing documents to witness.)
24     A.  I certainly looked at -- I certainly looked
25  at all of the policies.

1         One of them -- yeah.  So there's one titled
2  "Use of Force."
3      Q.  Okay.  Could I look at that?
4         And I take it --
5      A.  Yes.
6      Q.  -- you memorized it or you --
7      A.  Yes, you --
8      MR. MARCHESI:  Objection.  I object to the
9  editorial comment from counsel.
10     THE WITNESS:  You're -- you're incorrect,
11  but you're certainly welcome to look it.
12  BY MR. LILLEY:
13     Q.  No, I -- I said I take it you've either
14  memorized it or looked it over.  I didn't get to
15  finish my question.
16     A.  I -- I have.  I have looked it over
17  recently.
18     Q.  Okay.  But as we sit here, you don't know
19  whether or not Mr. Mangino has even read this
20  document; is that correct?
21     A.  I can't recall whether I have any
22  information on that point or not, sir.  So I don't
23  know as we sit here today.
24     Q.  Well, I mean, did you ever go through it and
25  say, well, now, look, let's look at Section 2 or

1   Section E or things of that nature with him?
2       A.  I -- I did not.
3       Q.  Did you ever ask him if he understood the
4   term "imminent"?
5       A.  I did not.
6       Q.  Or "immediate"?
7       A.  No.
8       Q.  At any time?
9       A.  No.
10      Q.  Okay.  I think I have these, so I'm not
11  going to waste time on this.  Thank you.
12      A.  Thanks.
13          So the next stack, I -- and I don't have a
14  divider page.  Oh, there we go.  Here it is.  I
15  didn't -- I thought there was one more in here.
16          So this next stack, which is rather large,
17  is the copy of the internal affairs investigation.
18  So this document, I reviewed this document.  This
19  document actually contains duplicates of a number of
20  other documents that you've already looked at and --
21      Q.  Yes.
22      A.  -- and others that I think you'll see here
23  in a few moments.
24      Q.  Did you -- did you participate at all in the
25  investigation for the Cumberland County or the

1   Windham Police Department?
2       A.  I did not.
3       Q.  Did they talk to you -- "they" meaning
4   investigators for the internal affairs of the
5   Cumberland County and -- with regard to this case,
6   did they talk to you at all or have you ever talked
7   to them at all?
8       A.  I have not.
9       Q.  And likewise, same question with Windham
10  Police Department?
11      A.  I have not.  To my knowledge, I've not
12  spoken with any of the officers other than
13  Deputy Mangino.
14      Q.  Okay.  I think I know what this is about, so
15  let me give this back to you and you can put it in
16  your order.
17      A.  Thanks.
18          So now the next stack of documents is a
19  series of transcripts of emergency dispatch calls,
20  911 calls, and some interviews of law enforcement
21  persons, and then there's transcripts of just various
22  related phone calls that went into the communications
23  center and were recorded by the police dispatch
24  center.
25      Q.  May I look at those, please?

1       A.  Sure.  (Handing documents to Mr. Lilley.)
2       Q.  All right.  And I take it your answer --
3   well, let me ask the question.  Withdraw the
4   beginning of that last question.
5           I take it you have not talked to any
6   dispatchers or nonpolice officers involved in this
7   matter; is that correct?  And -- and I say "this
8   matter."  The case as it unfolded back in
9   April 12th of 2014.
10      A.  I -- I have not, except obviously I've --
11  I've spoken to Mr. Mangino, that's --
12      Q.  Right.  Well, let's finish our inventory.
13          Let me stop you just for moment, however,
14  and digress while I think of it.
15          You've been retained by Mr. Mangino's
16  attorney, correct?
17      A.  I've -- I've been retained by Mr. Marchesi.
18  I -- I think his client is the county.  I don't know.
19      Q.  Okay.  Well, you've been retained by
20  Mr. Marchesi, then?
21      A.  Yes.
22      Q.  For the county of -- Cumberland County in --
23  in Maine.  I'm not trying to get technical --
24      A.  Sure.  I don't know that it matters.  I --
25  I -- whether it -- in some cases the county is a

1   distinct entity from the sheriff.  I don't know who
2   his ultimate client is.  I believe it is the
3   Cumberland County Sheriff.
4       Q.  You don't know who you're working for, but
5   you're getting paid by one of them, correct?
6       A.  I'm getting -- I've been retained by
7   Mr. Marchesi.  I don't know who he would title his
8   client as being.
9       Q.  Okay.  Do you -- are you also -- strike
10  that.
11          Have you been retained or asked to review in
12  any way the conduct of the Windham Police
13  Department's officers in this matter?
14      A.  No.
15      Q.  Have you ever talked to this gentleman here,
16  Ed Benjamin?
17      A.  Yes, sir.
18      Q.  When?
19      A.  This morning, maybe ten minutes prior to
20  your arrival.
21      Q.  About this case?
22      A.  No.
23      Q.  Have you ever talked to him at any other
24  time?
25      A.  I don't believe so.  I don't believe I've

Page 45

1   ever met him before.
2       Q.  Do you plan on, with regard to your
3   retain -- retention in any discussions you may have
4   had with Mr. Marchesi, to offer opinions with regard
5   to the propriety or impropriety of conduct by the
6   Windham Police Department officers?
7       A.  I've not been asked to do that to date.
8       Q.  Have you done it?
9       A.  No.
10      Q.  Have you made conclusions or critiques or
11  analysis of their conduct in this case with regard to
12  whether they comported with the law?
13          MR. MARCHESI:  I'm going to object and
14  instruct the witness not to answer to the extent that
15  any conclusions he reached are outside of the scope
16  of the expert witness designation --
17          MR. LILLEY:  Well, that's what I'm asking.
18  If you --
19  BY MR. LILLEY:
20      Q.  My question is, have you made any
21  conclusions or are you going to offer any opinions
22  with regard to the -- the Windham Police Department's
23  conduct in this case?
24          MR. BENJAMIN:  Well, I'll object.
25          MR. MARCHESI:  So you can answer the

Page 46

1   question to the extent that it asks you to disclose
2   any conclusions you've reached, critiques you've
3   made, et cetera, that you expect to offer in this
4   case.  And I would distinguish that from any
5   conclusions you've reached or critiques you've made
6   on your own as part of your review that you do not
7   expect -- you have not been asked to offer in this
8   case.
9           And to that extent, I would instruct the
10  witness not to answer.
11          MR. LILLEY:  That's -- that's inappropriate
12  to instruct him not to answer.  But we can take that
13  up later.
14  BY MR. LILLEY:
15      Q.  So let's look into this a minute so we don't
16  have to do this again.
17          With regard to the -- the events that
18  unfolded on the -- April 12th of 2014 leading to the
19  death of Mr. McKenney, have you made any conclusions
20  or any determinations of the propriety or impropriety
21  of the acts of the officers of the Windham Police
22  Department?  That's a simple yes or no.
23      A.  In -- the way the question is posed, I think
24  the answer is no.
25      Q.  And so I take it, then, the -- the question

Page 47

1   now, then -- the second question is maybe obvious,
2   but that you don't intend, unless somebody raises the
3   issue at trial or the judge -- and the judge permits
4   it, to offer any opinions as an expert witness about
5   the propriety or impropriety or the acts of the
6   Windham police officers; is that fair to say?
7       A.  That is a fair statement, sir.
8       Q.  Okay.  Let's look at the next blue folder,
9   if we can.
10      A.  The first document is a -- a copy of my
11  report.
12      Q.  Okay.  And let me stop you for a moment, if
13  I can, so we don't have to come back.
14      A.  Okay.
15      Q.  The -- what was your intent in writing this
16  report?  That's a broad -- broad question.  Meant to
17  be.
18      A.  To provide a report that is consistent with
19  Rule 26 of the Federal Rules of Civil Procedure for
20  purposes of Mr. Marchesi in defending the matter in
21  litigation.
22      Q.  And you expected -- it says the United
23  States District Court for the District of Maine.
24          This is a report that you prepared in its
25  entirety?

Page 48

1       A.  Yes.  I didn't look through it, but I --
2   it's out of my file.  I'm pretty sure that's all
3   that's in there.
4       Q.  I'm not saying you did the typing, but have
5   you prepared it on -- through the auspices of your
6   office, correct?
7       A.  I would have dictated it and --
8       Q.  Okay.
9       A.  -- and made corrections to it, but it's my
10  work and my work alone.
11      Q.  And -- yeah.  So it's done internally in
12  your office or whatever you have for a facility.
13      A.  Yes.
14      Q.  And it's signed by you.
15      A.  Yes.
16      Q.  Okay.  Thank you.
17      A.  Next, there's a transmittal letter from --
18  this is actually a letter from Mr. Marchesi to me,
19  dated May 22 of 2015, and it's a cover document, or a
20  transmittal document for a number of these pages that
21  follow.
22      Q.  All right.  So we can go down to the next
23  colored page.
24          Is that -- is that where you're going next?
25      A.  I'm not sure if I got this from -- at that

Page 49

1   time or not, but at some point, I was given then this
2   confidentially -- confidentiality agreement.
3       Q.  Well, let me just get this here.
4       A.  Okay.
5       Q.  Let me look at this for a moment.  Okay.
6   We've got the report.  I'm sorry.  That's already
7   been taken care of.
8       A.  Right.
9       Q.  Conclusion.  I'm going to need a copy of
10  this.  I don't believe I have a copy of this.
11      But let me ask you, and for this so we all
12  are talking about the same thing, this is a May 22,
13  2015, letter that was written to you by Peter
14  Marchesi.  And it talks about a pleasure speaking
15  with you.  This is in May of 2015.
16      Going back to your memory, is this prior to
17  your call with Deputy Mangino?
18      A.  Yes.
19      Q.  And I take it that -- it says, "It was a
20  pleasure speaking with you regarding the above
21  referenced matter."
22      I take it at that point you had agreed to
23  review documents, is that right, No. 1?
24      A.  I -- I had.
25      Q.  And had you reviewed any at that point?

Page 50

1       A.  I had not.
2       Q.  Had you -- but you had discussed the fact
3   pattern, I take it, with Mr. Marchesi.
4       A.  I had a -- a conversation with Mr. Marchesi
5   and he gave me the general facts, yes.
6       Q.  And as a result of giving you the general
7   facts, did you tell him that you thought you could
8   support the case, depending on what the documents,
9   follow-up documents showed?
10      A.  No.
11      Q.  Did you -- did you tell him about your
12  previous experiences as a expert witness?
13      A.  I did not.
14      Q.  Do you know how he came to select you as an
15  expert?  Of course, he didn't have to tell you, I
16  guess.
17      A.  He -- he did not.  And I don't know.
18      Q.  Did you tell him that you only testified for
19  police officers on their behalf or police
20  departments?
21      A.  No.
22      Q.  Is that a fact?
23      A.  At the present moment, it is.
24      Q.  Well, you say "the present moment."
25      It's been that way for years, hasn't it?

Page 51

1       A.  No.
2       Q.  No?
3       A.  (Shakes head.)
4       Q.  When's the last time you testified for a
5   plaintiff who sued a police officer for a wrongful
6   death?
7       A.  I'd have to look through my files, but it's
8   been more than four years.
9       Q.  And how many times have you testified for
10  plaintiffs who have sued police departments or police
11  officers for wrongful death?  More than that one?
12      A.  Yeah, I -- I -- yes, I'd have to look at my
13  employment records because that's how I can make the
14  tie.
15      Q.  Do you have any that come to mind now from
16  your memory?
17      A.  Sure.
18      Q.  Other than that one?
19      A.  Where a death -- where the person actually
20  died?
21      Q.  Where the person was killed, as in this
22  case, by a police officer.
23      A.  No.
24      Q.  Was there one?  Or even one?
25      A.  No.  The cases where I've worked on behalf

Page 52

1   of a plaintiff, I believe that are in my memory, I
2   believe they all ultimately survived.
3       Q.  That the plaintiffs survived.
4       A.  Yes.
5       Q.  And those are nondeadly force cases, are
6   they not?  They were cases involving dogs?
7       A.  Insofar the definition of -- death did not
8   result in any of those cases.
9       Q.  Okay.  What I'm trying to do is distinguish
10  between deadly force cases and nondeadly force cases.
11      Nondeadly force cases, I -- example, for me
12  at least, as a civilian here, would be a case
13  involving perhaps a -- a -- a dog that had attacked
14  somebody, the use of a Taser, the use of other
15  nonlethal weapons.
16      You've testified in those kind of cases,
17  have you not?
18      A.  Correct.  None of those -- none of the cases
19  on -- where I've testified on behalf of a plaintiff
20  or a person aggrieved by an officer's conduct before
21  an administrative tribunal, none of those cases have
22  involved shootings.
23      Q.  And why is it that you haven't testified on
24  behalf of a plaintiff for the last four years?
25      A.  Contractual obligations.

Page 53

1     Q.  What do you mean by that?
2     A.  I -- I recently transitioned my full-time
3  employment, but for more than four years, I don't
4  recall exactly how many. I have worked either full
5  time or part time for a company that employs -- maybe
6  a third of its workforce is comprised of either
7  active or retired law enforcement persons, and that
8  company has a policy that prohibits its employees
9  from performing expert witness work on behalf of
10  plaintiffs suing police departments, sheriffs'
11  offices, and so forth.
12     Q.  What's the name of that company?
13     A.  Lexipol.
14     Q.  Do you have a copy of that contract?
15     A.  I do not.
16     Q.  You don't have a copy of the contract you
17  signed?
18     A.  I -- I have a copy of my employment
19  contract.
20     Q.  Does it say it in the employment contract?
21     A.  It's not contained in the employment
22  contract.
23     Q.  Well, if it's not in the employment
24  contract, how -- how could it be binding? You're an
25  attorney, aren't you?

Page 54

1     A.  Yes. How could it be binding --
2     Q.  Yeah, I mean, if it's not in your employment
3  contract as -- as to the -- the specifics of your
4  employment and prohibition against any kind of action
5  or employment, it should be in your employment
6  contract, shouldn't it?
7     A.  Not necessarily.
8     Q.  Well, what -- what form does it take that
9  you don't have?
10     A.  I have been instructed orally as a condition
11  of my employment. There's also a nondisclosure and a
12  nonharm to client provision in a separate document
13  that's not part of my employment contract.
14     Q.  Let me see if I get this right.
15     So you're not supposed to disclose what you
16  just disclosed; is that right?
17     A.  No.
18     Q.  That's not right or --
19     A.  That's not right.
20     Q.  Tell me what that means, then. I -- I guess
21  I'm ...
22     A.  Well, I -- I certainly don't want to school
23  you in the law, but it seems to be that's what you're
24  asking.
25     I -- in -- I don't know about Maine. I

Page 55

1  think that's a collective bargaining state. This is
2  not. An oral contract, even an oral employment
3  contract, is binding in this state.
4     So I have very strict oral instructions from
5  that employer to not serve as an expert witness or a
6  consultant on a plaintiff's case.
7     Q.  Why --
8     A.  On --
9     Q.  Go ahead.
10     A.  Additionally, we have a written document in
11  the company that I don't remember the exact title,
12  but it's a nondisclosure, noncompetitive agreement
13  that also says we won't do anything that is -- I
14  don't remember exactly the words. I think it says
15  inimical to the interests of our clients or potential
16  clients which are law enforcement agencies.
17     Q.  So it would be inimical to your potential
18  clients to testify in a case for a plaintiff per se,
19  correct?
20     A.  I don't know. I know that I've been
21  instructed per se to not do that.
22     Q.  Well, we do have a -- binding contracts too.
23  But if there's an employment contract in our state,
24  and I believe in yours, the terms of that employment
25  contract, including any restrictions, are usually

Page 56

1  contained within that employment agreement.
2     Do you agree with that?
3     A.  No.
4     Q.  In any event, it's not in yours, correct?
5     A.  Correct.
6     Q.  And who's the person that told you this?
7     A.  Ron Wilkerson.
8     Q.  And what's his position?
9     A.  I don't know what he's doing right now.
10     At the time, he was the chief executive
11  officer of the company.
12     Q.  And the company, again, is named Lexipro?
13     A.  Lexipol, L-e-x-i-p-o-l.
14     Q.  And what does it -- what -- what does it do?
15     A.  Lexipol provides risk management services
16  and primarily operational policy manuals for law
17  enforcement agencies, custody facilities, and fire
18  services.
19     Q.  And risk management in the usual parlance,
20  at least in the insurance industry, is how to prevent
21  or reduce the possibility of getting sued for
22  liability, correct?
23     MR. MARCHESI: Objection to form.
24     THE WITNESS: That -- that's certainly a
25  major component of risk management.

BY MR. LILLEY:

1  Q.  So how long was that contract good for
2  restricting you from testifying for both sides?
3  A.  I don't know.  I've never really considered
4  the possibility of reaching it, but I'm confident
5  that it endures as long as my employment endures and
6  they continue to pay me.
7  Q.  Are you still employed by them?
8  A.  Yes.
9  Q.  And your job there is?
10  A.  I am the senior legal advisor, and my job is
11  primarily to consult on the development of use of
12  force policies, as well as to speak to groups such as
13  insurance pools, risk management associations, gee,
14  so police associations, those sorts of professional
15  groups and explain the services offered by Lexipol.
16  Q.  And you also speak to police officer groups?
17  Or more just chiefs?
18  A.  More to -- more to administrative groups,
19  but I certainly -- you know, certainly from time to
20  time, not necessarily in the capacity of working for
21  Lexipol, but I have spoken to -- to police groups.
22  Q.  So how did you obtain this joint defense
23  privilege confidentiality agreement signed by both --
24  both attorneys here, Mr. Benjamin and Mr. Marchesi?

1  Who gave it to you?
2  A.  I believe that it was sent to me in the mail
3  by Donna Campbell, Mr. Marchesi's paralegal.
4  Q.  And this is -- you understand what a joint
5  defense agreement is, I assume?
6  A.  I do.
7  Q.  And is it -- it's an agreement as it states
8  in the first paragraph, Undersigned counsel believes
9  that there is a mutuality of interest in a common,
10  albeit separate, defense of the respective clients
11  with regard to the proceeding.
12  I'm reading from that.  Did I get that
13  right?  I didn't get a copy.  That's under 1.
14  A.  Yes.
15  Q.  So I'll need copies of these two.  Let me
16  put these out.  I'll give these back to you.  I think
17  we can get the service here to do that today.
18  Now, where are we in our inventory here?
19  A.  I -- I believe that I had been speaking
20  about transcripts.
21  Q.  Okay.
22  A.  And then I think we stopped to talk about
23  that.
24  Q.  Yes.
25  A.  So -- so I -- I believe I've described this,

1  but this is a collection of miscellaneous phone
2  transcripts including -- well, there's phone
3  transcripts and I think -- I think that there are
4  live interview transcripts there.
5  Q.  Okay.  And this is not familiar either.
6  MR. LILLEY:  I will need this copied too.
7  MR. MARCHESI:  Let me see what this is
8  before we incur the expense.  Now, this is all from
9  the attorney general's office.  You have all this
10  stuff.
11  MR. LILLEY:  I don't have that version.
12  MR. MARCHESI:  Well, you -- you should
13  have --
14  MR. LILLEY:  I'm going to get copies of
15  that, and I'm paying for it.
16  MR. MARCHESI:  Okay.
17  MR. LILLEY:  This is my deposition.
18  MR. MARCHESI:  If you don't mind paying for
19  it, that's fine.
20  MR. LILLEY:  Of course I don't.
21  BY MR. LILLEY:
22  Q.  What do you have there next?  So I'm going
23  to get these copied.  Let's try to -- I'm going to
24  put these over here, but I'll give them back to you
25  as soon as possible.  I believe we can get them

1  copied today.
2  MR. MARCHESI:  Ken, if there's a way that
3  you'd like to --
4  THE WITNESS:  I've turned this sideways so
5  I'll know --
6  MR. MARCHESI:  Okay.
7  BY MR. LILLEY:
8  Q.  Okay.
9  A.  Honestly, the way I do my files, sir,
10  there's no great order other than I try to --
11  Q.  Okay.  Good.
12  A.  -- keep families of documents together.
13  Q.  So what do you have there next?
14  A.  Next is a -- a letter to you from Joseph
15  Thornton, a private investigator --
16  Q.  Okay.
17  A.  -- and some materials that he provided --
18  Q.  All right.  I know what that is.
19  A.  -- to you.
20  Q.  Yeah.  Okay.  Keep going.
21  A.  Next is an email relating to --
22  Q.  I'll put that -- I'll put that right there,
23  so you can --
24  A.  -- an email relating to the mobile
25  audio/video system in use.

1   Q.  Okay.  Okay.
2   A.  I think I got that out of order.
3   Q.  I don't have that either, so I'll put that
4  over here on the -- on the pile.
5       For the record, that's an email from Ed
6  Benjamin to P. Bare (phonetic), May 6, 2015.
7       What else do you have?
8   A.  The next is a Court filing, the initial
9  disclosures of Defendants Nicholas Mangino and
10  Cumberland County Sheriff's Office.  There are a
11  number -- a number of attachments in that.
12   Q.  Let me see here.  Oh, yes, okay.
13       Have you talked to any of the other
14  potential witnesses in this case?
15   A.  I don't --
16   Q.  You probably don't know who they are.
17   A.  Right.  I don't believe that I have.
18   Q.  Let me try that again because, I'm sorry,
19  you --
20       Have you talked to Mr. Gohn (phonetic), I
21  think he pronounces it?
22   A.  No.
23   Q.  He's been designated as an expert witness in
24  addition to you.
25   A.  No.

1   Q.  Have you read his report?
2   A.  That name doesn't ring a bell, so I don't
3  believe so.
4   Q.  Okay.  That's what I'm familiar with.
5   A.  The next stack is Defendant Nicholas Mangino
6  and Cumberland County office answer to plaintiff's
7  first set of interrogatories.  This may well be a
8  duplicate.  I don't know.
9   Q.  Okay.  Let me just look at it.  (Counsel
10  reviewing document.)
11       Yeah, I think I have that too.  I'll give
12  that -- hand that back to you.
13   A.  Next we have the Defendant Windham Police
14  Department's Responses to Plaintiff's First Set of
15  Interrogatories with a variety of attachments to the
16  interrogatories.
17   Q.  Did you read that?
18   A.  Yes, sir.
19   Q.  So you are reading information as it relates
20  specifically to the Windham Police Department,
21  correct?
22   A.  I read that document at some point.
23   Q.  Is that a yes?
24   A.  Insofar as that relates to the Windham
25  Police Department, that's a yes.

1   Q.  Thank you.  Okay.
2   A.  And then the last stack here is the Notice
3  of Claim, and I believe that there is a complaint.
4  I -- I didn't look through.  There may be an answer
5  as well, but that's just -- those are court -- court
6  pleadings.
7   Q.  This one is called a Notice of Claim
8  pursuant to the Maine Tort Claims Act?
9   A.  Yes.
10   Q.  And other such pleadings.  The answers are
11  contained within this group, and a Consent to
12  Removal, correct?
13   A.  Well, I didn't remember the Consent to
14  Removal, but I'm -- I'm sure -- sure it's there.
15   Q.  Did you -- did you read the attorney
16  general's investigation in this case?
17   A.  I -- I read the report that appeared to
18  originate from the attorney general, so I believe
19  that that's the document you're referring to.
20   Q.  That's -- did we -- did we look at that?
21  Because I didn't notice.
22   A.  It's in I think that stack there.
23   Q.  Okay.
24   A.  It's the one that has a lot of -- I said it
25  was about that thick.

1   Q.  Right.
2   A.  And it has a lot of duplication.  And, in
3  fact, this file has some duplication as well.
4   Q.  For the record, it's about 2 inches thick,
5  correct?
6   A.  Thereabouts.
7   Q.  And did you have any criticisms of the
8  attorney general investigations or any errors listed
9  of the criticisms?
10   A.  Nothing that -- nothing that comes to mind
11  that jumps up that I would characterize as -- as a
12  criticism.
13   Q.  You wouldn't have taken notes on that
14  either, given your custom and practice, correct?
15   A.  Correct.
16   Q.  And did you, in your reviewing of the facts
17  of the case from whatever source, find that any of
18  the facts that they concluded in their report were
19  erroneous?
20   A.  I don't recall reaching the conclusion of
21  any -- that they -- that they had reached any
22  erroneous facts.
23   Q.  And I think I just asked the question.
24  Forgive me if I'm repeating myself.
25       Their conclusions were not erroneous in your

Page 65

```
 1   view?
 2        A.  I don't believe so.
 3        Q.  You don't believe that they're erroneous.
 4        A.  Correct.
 5        Q.  Okay.  Now, your own report, have you -- I
 6   noticed -- strike that.  Let me start over again.
 7             In your report, as in many that we see from
 8   experts, including our own, you reserve the right to
 9   make corrections, changes, modifications depending on
10   subsequent information you may receive, correct?
11        A.  I -- I typically write that, so I'm pretty
12   sure I did in this case.
13        Q.  Okay.  Have you in fact made any subsequent
14   changes, modifications to the report that we just
15   looked at that was provided to the Court?
16        A.  I have not.  And, Mr. Lilley, when you are
17   at an appropriate time, I'm fairly confident the
18   videographer will give you about 80-minute high sign
19   here pretty quickly.
20             MR. LILLEY:  You want to take a break, sir?
21             VIDEOGRAPHER:  You've got ten minutes
22   remaining.
23             THE WITNESS:  Well, if you're going to go
24   somewhere in ten minutes, that's fine.
25   ///
```

Page 66

```
 1   BY MR. LILLEY:
 2        Q.  Well, I --
 3        A.  If not, let's take a break now.
 4        Q.  Well, I -- I was just going -- let me finish
 5   this up, and I'll take ten minutes.
 6        A.  That would be fine.
 7        Q.  Have you received anything such as
 8   depositions that have come out since your report that
 9   alters or in any way modifies your findings?
10        A.  No.
11        Q.  Have you seen any photographs or any kind of
12   material at all that you believe in any way changes
13   your position, even to the slightest degree?
14        A.  No.
15        Q.  Have you been asked by anybody, anybody in
16   this room other than me, to review your report or
17   update it in any fashion?
18        A.  No.
19        Q.  Do you intend to do that?
20        A.  Not based on what I've seen subsequent to
21   filing that report.  But, again, I --
22        Q.  Okay.
23        A.  -- I can't -- I suspect that there will --
24   I -- I believe that you have other depositions to
25   take.  I -- I -- I don't know.  I don't really talk
```

Page 67

```
 1   about strategy, but there may be other depositions.
 2   There may be other things that come to mind.  If I
 3   see those, they may change my views.
 4        Q.  Well, you've been furnished Mr. Mangino's
 5   partial deposition, correct?
 6        A.  I've seen a deposition.  I -- whether it was
 7   a rough or not, I don't know.
 8        Q.  Well, no, I'm not saying rough.  We didn't
 9   finish the deposition.  I'll leave it at that.
10        A.  Okay.
11        Q.  So he has a couple more hours to go.
12             But you have seen a good portion, I'm going
13   to submit to you, of his deposition, have you not?
14        A.  Yes.
15        Q.  And has that --
16        A.  To --
17        Q.  Go ahead.  I'm sorry.
18        A.  To -- to be clear, whether it's finished or
19   not, I've seen the document that -- that -- in its
20   entirety.
21             So when you say a portion, I want it to be
22   clear I've read the entire -- I -- I don't need to
23   continue reading what I have yet.
24             Does that make that clear?
25        Q.  Well, you don't know if -- if you need to if
```

Page 68

```
 1   you haven't read it.
 2        A.  Well, I don't -- I don't know if there's
 3   something to come in the future.  If there is, fine.
 4   But what -- what has been taken in deposition now
 5   I've had and I reviewed.
 6        Q.  And that hasn't changed your opinion
 7   whatsoever.
 8        A.  No.
 9        Q.  And you have -- I -- I -- have -- have you
10   seen the deposition of MacVane?  I'm not sure you
11   have, but I think you did.
12        A.  I have three copies.  I don't know how that
13   happened, but yes.
14        Q.  Did you read it?
15        A.  Yes.
16        Q.  And did that in any way change any of your
17   opinions?
18        A.  Did not.
19             MR. LILLEY:  With that, I think we can take
20   a break?
21             THE WITNESS:  Thank you, sir.
22             VIDEOGRAPHER:  This marks the end of Tape 1.
23   The time is 10:27.  We're off the record.
24             (Short recess taken.)
25             VIDEOGRAPHER:  This is Videotape No. 2 in
```

Page 69

1  the deposition of Kenneth Wallentine. The time is
2  10:42. We're back on the record.
3  BY MR. LILLEY:
4      Q. Let me turn to your background. Would
5  you -- I have your CV, and I don't want to go through
6  it all, but I do want to go through some of the
7  background that you have.
8          How long have you been -- let me start by
9  saying how long have you been in law enforcement,
10  going back to the beginning?
11     A. 1979.
12     Q. Okay. And you started as what?
13     A. I started as a -- as a cadet at the BYU
14  Police Department in 1979.
15     Q. The what -- the police department?
16     A. BYU, Brigham Young University.
17     Q. Okay. And you became a police officer when?
18     A. 1982.
19     Q. And what force?
20     A. Provo Police Department. Provo.
21     Q. Yeah, you'll -- you'll have to give me the
22  full --
23     A. Provo Police Department.
24     Q. Provo. And what's that? Is that a town?
25     A. That's a city here in Utah.

Page 70

1      Q. Okay. I'm not familiar with this area, as I
2  told you, this is my first trip to Utah, so --
3      A. It's --
4      Q. -- just give me the added -- added
5  information, please.
6      A. It's a city just south of here. Largest
7  city in the next county --
8      Q. Okay.
9      A. -- so ...
10     Q. And tell me, I don't want to go through
11  every -- every -- every -- because I have it in here
12  to -- to a degree, but I'd like to -- you -- you've
13  worked for the -- are these municipalities,
14  essentially? We call them municipalities. You call
15  them towns, I guess.
16          You've worked as a police officer, correct?
17     A. I've worked at different levels. A number
18  of years, I worked for a municipal police agency.
19     Q. Okay. And did you become a chief of police
20  in any agency?
21     A. Yes.
22     Q. Can you give me those offhand.
23     A. From 2005 until my retirement -- well,
24  retirement being in the context of a legal term, not
25  practical term, in 2014, I was the chief at the Utah

Page 71

1  Attorney General Investigation Division.
2      Q. Is that -- okay. So in that position, you
3  were -- what were your responsibilities and duties?
4      A. To oversee the various investigative
5  elements within the office of the attorney general,
6  to assist the attorney general in law enforcement
7  legislative initiatives. I -- I served as the
8  attorney general's representative on a number of
9  boards where the -- where the attorney general would
10  have a statutory appointment. I had budgeting
11  responsibilities and the -- the typical bureaucratic
12  responsibilities of a -- of a senior administrator.
13     Q. Were you deemed as an assistant attorney
14  general or a deputy attorney general?
15     A. I was --
16     Q. Or with another title perhaps?
17     A. Yes, I did have -- I -- I did have some
18  additional titles. I don't know that I'd say much in
19  terms of responsibilities --
20     Q. Okay.
21     A. -- but I -- I had been designated as an
22  assistant attorney general as well.
23     Q. So I take it the attorney general has
24  several, I would imagine, assistants in this state at
25  the time you were there?

Page 72

1      A. At the time I was there, the office was
2  comprised of the attorney general, a chief deputy,
3  12 chiefs, and then I don't know how many assistant
4  attorney generals.
5      Q. Okay. And did -- who has the -- in our
6  state, the attorney general has jurisdiction over
7  murder cases.
8          Does that apply in your -- in this state?
9      A. Not in the same way that it does in
10  New Hampshire and Maine and some of the Northeastern
11  states.
12     Q. Okay.
13     A. It's a -- it's a little different.
14     Q. And with regard to your job at -- with the
15  attorney general, first of all, who was the attorney
16  general at the time?
17     A. At the time I was appointed, the attorney
18  general was Mark Shurtleff. His successor was John
19  Swallow. His successor and the current attorney
20  general, my current employer, is Sean Reyes.
21     Q. And -- and this is essentially a civil
22  service job, not a political job, correct? Or is it?
23     A. The appointment was a nonpartisan, noncareer
24  service job, so --
25     Q. Okay.

Page 73

1    A. -- it's not -- in the context we use civil
2  service in Utah, a protected status, and the answer
3  is no.
4    Q. Okay.
5    A. But you didn't have to be of a particular
6  party.
7    Q. So I -- I guess I'm -- I'm confused about
8  what you do now.
9      Do you still have that job?
10   A. No.
11   Q. When did you give that job up?
12   A. April Fools' Day of 2014.
13   Q. Okay. And at that time you became --
14 what -- what did you do next for employment?
15   A. I -- the very next day, I started working
16 full time with the company for which I worked part
17 time for some years before that, and that's Lexipol.
18   Q. Okay. And do you hold any other positions
19 or did you?
20   A. I do now.
21   Q. And what is that?
22   A. I -- on November 2nd, I transitioned to a
23 full-time employment as a special agent for the
24 attorney general. I have some other part-time
25 responsibilities that bring some limited income.

Page 74

1    Q. Well, why don't you tell me what that --
2  that is.
3    A. Pretty boring. I am the chairperson of the
4  merit commission, the Peace Officer Merit Commission
5  of Greater Salt Lake County. And I'm the chair of
6  the Salt Lake County Deputy Sheriff Merit Commission,
7  and I am the administrative law judge for Park City
8  Municipal Corporation.
9    Q. So is there any significance to the peace
10 officer group that you're involved with? In other
11 words, what -- what does it mean, peace officer?
12 Does that mean police officer?
13   A. The --
14   Q. That's what they used to call them, an
15 officer of the peace.
16   A. Right. The -- in -- in Salt Lake County,
17 there are a couple of different but related law
18 enforcement agencies. The Unified Police Department
19 of Greater Salt Lake County, and that's -- I serve as
20 the chair of their merit commission. The merit
21 commission is called the Peace Officer Merit
22 Commission of Greater Salt Lake County. That entity
23 provides policing services for the unincorporated
24 areas of Salt Lake County and for a number of
25 incorporated municipalities within Salt Lake County

Page 75

1  that have entered into an agreement for mutual
2  policing.
3      So it's a -- it's a legislatively created
4  special service district.
5    Q. And are they called police --
6    A. They are called police officers.
7    Q. -- peace officers?
8    A. They're -- they're called police officers.
9  Peace officer is a term of art used in our state
10 statute.
11   Q. Which means?
12   A. Police officer.
13   Q. Okay.
14   A. So a peace officer -- a peace officer in
15 Utah under the law is a -- is the umbrella.
16     Under that, there may be law enforcement
17 officers, and that's what you think of as traditional
18 cops on the street, detectives and so forth. And on
19 the other side, there may be corrections officers or
20 special functions officers. So corrections officers
21 obviously work in jail. Special functions officers
22 may do ordinance enforcement, so forth.
23   Q. Okay. What -- what is your view of the role
24 of a police officer today?
25   A. Oh, my.

Page 76

1    Q. Briefly.
2    A. Thank you.
3      A law enforcement officer today is -- the
4  role really has not changed. The execution of the
5  role perhaps has. But it is in the grand sense to
6  serve and protect the public and maintain order
7  and -- and security in the course of serving the
8  public.
9    Q. Okay. Let me ask you: At some point, as I
10 understand it, you went to law school and received
11 your law degree and became a member of the bar; is
12 that correct?
13   A. Yes.
14   Q. And tell me about that.
15     When was that?
16   A. From 1987 to 1990.
17   Q. Okay. Where did you go to law school?
18   A. J. Ruben Clark Law School which is at
19 Brigham Young University in the south of us here.
20   Q. Okay. And did you do any legal work as a
21 result of your becoming a lawyer?
22   A. Yes.
23   Q. What type of legal work did you do?
24   A. I -- I practiced law in a large firm.
25 I've --

1     Q.  Give me some time frame, approximately.

2     A.  Okay.  So right after -- right after law

3  school, I clerked for a year on the court of appeals

4  here in Utah and then went -- after that for a year

5  and clerked for the Fifth Circuit Court of Appeals,

6  based in New Orleans.  I actually clerked for a judge

7  whose home office was in Houston.

8        After that, I practiced law at the biggest

9  firm here in town, a big firm, Parsons Behle Latimer.

10    Q.  What type of law did you practice there?

11    A.  I -- I primarily practiced employment law.

12    Q.  Did you -- I'm sorry.

13        Did you ever practice criminal law?

14    A.  I practiced criminal law in the context that

15  when a significant client or a client's family member

16  would have an encounter with the law, more often than

17  not, I became involved in that matter.  I practiced

18  criminal law in the more traditional sense.

19        After that position, I became -- I was

20  appointed to a position as chief deputy county

21  attorney in Uintah County, and I held that position,

22  I don't know, through about 2001.

23    Q.  How many years?

24    A.  Seven or eight.

25    Q.  So as a county prosecutor, did you handle

1  all types of prosecutions?

2    A.  No.

3    Q.  What did you do?

4    A.  Well, you know, that's -- that's not -- I

5  did -- occasionally I would take a turn at -- at city

6  court.  So I -- I handled some misdemeanor

7  prosecutions, but --

8    Q.  Well, the main thrust of your job.

9    A.  Well, the thrust of my job was to both

10  administer the offices as the chief deputy and also

11  to prosecute violent crimes and some drug crimes for

12  a period of time.  I -- I also helped create a drug

13  court and served in that drug court.

14        On occasion, I would take a rotation in a

15  misdemeanor court.  The only thing I never did, I

16  never practiced anything in the juvenile realm.

17    Q.  Have you ever prosecuted a police officer

18  for misconduct?

19    A.  With me as lead counsel?

20    Q.  Yes.

21    A.  Not in the criminal sense.

22    Q.  Okay.  What sense?

23    A.  Administrative.

24    Q.  Administrative -- okay.

25        Have you ever defended a police officer --

1    A.  Yes.

2    Q.  -- who was charged with criminal conduct?

3    A.  Yes.

4    Q.  As -- as county attorney?

5    A.  No.

6    Q.  As a private attorney?

7    A.  Yes.

8    Q.  And any involving deadly force?

9    A.  No.

10    Q.  Have you ever sued a police department or a

11  police officer for -- in -- in civil court for

12  damages?

13    A.  As counsel, no.

14    Q.  Well, what do you mean by that answer?

15  As -- in some other capacity?

16    A.  I -- I mean, I've never sued.  I've never

17  filed an actual lawsuit.  I've been a plaintiff.

18    Q.  You've been a plaintiff.

19    A.  Yes.

20    Q.  Tell me about that.  Plaintiff in cases in

21  which you've been sued?

22    A.  No.  A case in which I was a plaintiff.

23    Q.  You were the plaintiff.  Okay.

24        Against police officers?

25    A.  No, against a police department.

1    Q.  And -- and -- and the subject matter?

2    A.  Let me just cut to the chase.

3        So in about 1982, our police association had

4  some disagreement with the calculation of overtime

5  and the city declined to pay overtime, I believe it

6  was on court appearances.  I don't remember.  It's

7  been 30 years plus.

8    Q.  That's all right.

9    A.  So they brought around a form and said if

10  you sign this form, just know that you're actually

11  suing the city and you can't sue the city without

12  suing the chief.  So sign this if you think you're

13  going to -- if you want to be part of this.  Here's

14  what we think you're going to get out of it in terms

15  of dollars.  I did -- I got enough for a brand-new

16  set of tires for my 1979 Ford Pinto, and that was the

17  sum total of my experience as a plaintiff in civil

18  court.

19    Q.  So justice prevailed.

20    A.  I never really understood it.  I do now that

21  I'm a lawyer.

22    Q.  You cashed the check, though.

23    A.  You're dang right I did.

24    Q.  Okay.  In any event, did you -- have you

25  ever been involved in any other litigation concerning

1    police action? That's a broad question.
2    A. Yes.
3    Q. Other than you've testified to.
4    A. Yes.
5    Q. What did -- and what was that?
6    A. So I've served as a -- an expert witness in
7    cases where officers were accused of excessive force,
8    and I've -- I have been adverse to officers in those
9    contexts. I have spent a number of years as a bureau
10    chief in the Utah Department of Public Safety. And
11    one of the bureaus at some point that I oversaw was
12    the investigations bureau at Peace Officers Standard
13    and Training, which is typically referred to by its
14    acronym, POST. And overseeing the investigations
15    bureau meant, in some cases where there were positive
16    findings by investigators who worked for me, that I
17    would be the signatory complainant in an
18    administrative action to revoke that officer's --
19    Q. Okay.
20    A. -- certification or licensure as a police
21    officer.
22    Q. Okay. So -- well, let me just summarize it,
23    if I can. I want to be clear.
24    In terms of suing police officers for
25    misconduct, you've never done that.

1    A. No.
2    Q. In terms of prosecuting a police officer for
3    misconduct, you've never done that.
4    A. I don't believe that I have. I'm not
5    confident that that's the -- I don't recall.
6    Q. And with regard to any kind of expert
7    testimony -- I think you've already testified to
8    this. Forgive me for repeating -- you have not
9    testified -- you have not represented any plaintiffs
10    in cases involving suits against police officers for
11    the reasons you've stated.
12    A. Represented as in counsel?
13    Q. No. Excuse me. As -- as an expert witness.
14    I should have said. Thank you.
15    A. I have, although not in shooting cases.
16    Q. So your -- your contract permits you to do
17    that?
18    A. No. That was prior --
19    Q. Prior to the four years.
20    A. Correct. It's actually been -- I don't know
21    how many years, but yes, prior.
22    Q. And have you received any requests from
23    plaintiffs' attorneys in the last four years, let's
24    say, to review cases for them in anticipation of
25    litigation against law enforcement people?

1    A. Yes.
2    Q. And you've turned them down for the reasons
3    you've just given us?
4    A. Correct.
5    Q. Prior to that, you've been -- you say
6    you've -- you may have had a -- a case involving
7    deadly force, maybe one case, but you're not sure.
8    Am I correct on that?
9    A. Correct.
10    Q. And did you review other cases by police --
11    excuse me, by plaintiffs' lawyers, other than that
12    one case, in which they claimed -- or they were
13    looking for expert witnesses to testify in wrongful
14    death actions involving police officers using deadly
15    force? Any requests is the -- is the --
16    A. Well, I don't recall whether I -- I've --
17    I've had requests where I've reviewed cases with the
18    understanding that I wouldn't testify to them.
19    And I -- I don't know whether -- I don't
20    believe any of those involved deadly force.
21    Q. Okay. And finally, I -- I noted on our
22    Exhibit A that we also asked you -- just to be sure
23    we're being exhaustive about this, which is my intent
24    by asking you these questions -- that you produced
25    all the writings, recordings, notes, drafts,

1    memorandum, or any memorialization of any nature
2    involved in this case; is that correct?
3    MR. MARCHESI: Subject to the objection
4    previously indicated with respect to the manner of
5    requesting the document.
6    You can certainly answer the question.
7    THE WITNESS: I don't know that I saw that,
8    but I brought for you today at Mr. Marchesi's
9    request, my entire file.
10    I don't -- as you look at my hands, you may
11    see that there are bumps on my knuckles. I don't
12    write very much at all. I don't even have a pen. I
13    don't keep notes.
14    BY MR. LILLEY:
15    Q. Well, the -- the new iPhone, you can just
16    talk to into it.
17    A. I'm learning, actually, to -- to do that.
18    Q. And I shouldn't be instructing people on how
19    to use the iPhone, but I do know you can do that.
20    A. Well, I have grandchildren.
21    Q. Yeah.
22    The second paragraph of the Exhibit A, and
23    you can look at it if you want to, was any audio or
24    video.
25    You think you've given us everything you

Page 85

1    have?
2         MR. MARCHESI:  Same objection.
3         Go ahead.
4         THE WITNESS:  All audio and video that I
5    have is on the CDs --
6    BY MR. LILLEY:
7         Q.  Right.
8         A.  -- and it's in this packet here.
9         Q.  And sketches and diagrams and so forth,
10   you've given us or you probably don't have any, do
11   you?
12        MR. MARCHESI:  Same objection.
13        THE WITNESS:  I think I have one --
14        MR. LILLEY:  We understand you have a
15   continuing objection here, okay, rather than keep
16   interrupting, because you already accepted this.  I
17   disagree with you, but we understand you have a
18   continuing objection.
19   BY MR. LILLEY:
20        Q.  And you've -- you've taken -- I think your
21   last answer was you have -- there's nothing you
22   haven't produced.
23        A.  There -- there is not.
24        Q.  And -- but I -- I have to be specific here.
25   Pardon me for being so.

Page 86

1         Photographs, have you been given any or
2    shown any photographs, which I did not see in your --
3    in your portfolio here.  So the question is --
4         A.  I've been given photographs.  They're in my
5    portfolio.  I don't -- if you mean you didn't see and
6    you looked?
7         Q.  I didn't look carefully, sir.
8         A.  I didn't look, but there are some
9    photographs in here.  I have not seen any photographs
10   that are not in here.
11        Q.  Okay.  Photographs from the scene,
12   photographs of the positions of Mr. Mangino's car
13   relative to the house, have you seen any of those?
14        A.  Yes, and they're in there.
15        Q.  Okay.
16        A.  Now, you may not have seen all of them
17   because there -- some of them are on a disc, but
18   they're labeled.
19        Q.  Okay.  Now, with regard to your retainer
20   agreement, would that be contained in your
21   designation to the U.S. District Court, District of
22   Maine?  Is that -- do you consider that to be your
23   sum total of agreement, opinions, fee structure,
24   those things?
25        A.  I don't typically use a retainer.  So I have

Page 87

1    a -- a -- I think there's a paragraph in there about
2    fees, but I don't use a retainer agreement.
3         Q.  Right, there is.
4         With regard to payment to -- to you, at this
5    point, how much have you been paid?
6         A.  I don't recall.
7         Q.  Have any idea?
8         A.  I -- I don't.
9         Q.  I mean, that would be -- I think that would
10   actually be encompassed in our Exhibit A of writings
11   or things associated with this -- with this case.
12        So would you -- could you provide that with
13   us -- for us the -- the -- the -- the bills and the
14   amounts that you've been paid?
15        MR. LILLEY:  Are you willing to do that?
16        MR. MARCHESI:  I will consider that request
17   subject to the objection that's been previously
18   made on the record today.
19   BY MR. LILLEY:
20        Q.  You have bills, I take it, that were given?
21        A.  I do.
22        Q.  I would like to have those.  And any checks
23   or copies of them that you have, I would like to
24   have.
25        Would you provide that subject to your

Page 88

1    lawyer's advice -- or not your lawyer's, but the
2    lawyer that hired you's advice?
3         MR. MARCHESI:  Well, I -- I will have him
4    provide those to me, and I will make a determination
5    as to whether they should be produced.  And if not, I
6    will indicate that to you so you can pursue the
7    matter further.
8    BY MR. LILLEY:
9         Q.  The -- your -- I -- your -- your fee
10   schedule, just curious, I noticed it because we
11   talked about it a bit a few minutes ago.
12        As I understand it -- and I have -- do you
13   have a copy of your report?  I have one here if you
14   want it.  I can get mine or yours.  Take your choice.
15        A.  I know there's one somewhere.  I don't care.
16   If you've got it right here.
17        Q.  If it's easier, I'll do it right here.
18        I've got a book here with various documents,
19   some of which I'm going to use and some of which I'm
20   not.  I put it in this form for use of carrying.
21        I -- I'm showing you now your expert witness
22   designation of you and Mr. Gohn.
23        A.  Oh, okay.
24        Q.  So I think if you --
25        A.  I didn't do this.

22  (Pages 85 to 88)

1  Q.  I understand that.
2  A.  Okay.
3  Q.  But I think your report's right here.
4  A.  Here it is.
5  Q.  And that's under Exhibit A.
6  A.  Yes.
7  Q.  By the way, did you read Mr. Gohn's --
8  he's -- you're kind of lumped in with him, if I can
9  use that word, on the front page of this expert
10  designation.
11  Did you read any of the brief summary of
12  what he's going to testify to?
13  A.  I've not seen anything that he wrote.
14  Q.  Okay.  So you don't have an opinion one way
15  or the other whether his opinions are valid or
16  subject to critique or not.
17  A.  No.
18  Q.  Okay.  With regard to your report, then, I
19  think it's right in front of you.
20  A.  Okay.
21  Q.  And if I look at the second page of your
22  report -- that's not the same page.
23  Hold on just a moment.  Withdraw that.
24  Well, maybe you can find it.  I'm looking
25  for your fee schedule.  I thought it was at the

1  second page.
2  A.  It's usually toward the end, page 23.
3  Q.  Page 23.  There you go.  Thank you.
4  Your fee schedule on page 23 is $250 per
5  hour for examination of reports and documents.  Site
6  visits, interviews, administrative tribunal,
7  depositions -- deposition or court testimony with a
8  minimum of a thousand dollars -- a thousand --
9  minimum of a thousand dollars for deposition or court
10  testimony, correct?
11  A.  Yes.
12  Q.  And it -- then it goes on to say, I bill for
13  actual travel expenses and a travel fee of a thousand
14  dollars per day or part of a day for travel to
15  Western States and $1500 per day part day outside of
16  Western States; is that correct?
17  A.  Yes.
18  Q.  So you charge in addition to your -- your --
19  your depositions, let's say, or court testimony, at
20  250 an hour, you charge in addition to that days -- a
21  thousand dollars a day for your days you travel --
22  A.  I charge --
23  Q.  -- or 1500 if it's beyond.
24  A.  -- a flat fee for traveling in addition to
25  actual expenses depending on whether it's a state

1  contiguous to the Western States or not.
2  Q.  Yeah.  A thousand or $1500.
3  A.  Correct.
4  Q.  And that's per day of travel.
5  A.  Correct.
6  Q.  That's -- and so we're clear, that -- if you
7  fly in an airplane to Portland, Maine, that's a
8  thousand dollars, right?
9  A.  No.
10  Q.  Okay.  Then I can still probably use the --
11  a thousand dollars to get there and a thousand
12  dollars to come back, isn't it?
13  A.  No -- nobody is going to call Portland,
14  Maine, although it's a beautiful city with a
15  restaurant I really like, a Western State.  So that
16  would be $1500 --
17  Q.  Oh, 1500.  I'm sorry.
18  A.  Yeah.  To -- to -- to travel plus the actual
19  expenses plus the time spent working there.
20  Q.  Right.  Sorry.  I said a thousand.  It
21  should have been the correction was $1500 for the
22  travel -- for being on the plane all day.
23  A.  I would have been happy to come to Portland.
24  Q.  No, no.  I'm not -- I'm not -- I'm not
25  asking you for -- for your pleasure, sir.  I'm just

1  trying to get -- to be sure I understand your fee
2  schedule.
3  Okay.  Let's look at your report a little
4  bit, if we can.  Okay?
5  Now, do you agree with me that in general, a
6  witness, an expert witness particularly, conclusions
7  are only as good as the accuracy of the underlying
8  facts supporting it?
9  A.  I think that's a fair general proposition.
10  Q.  I mean, is -- is there anything about that
11  proposition you disagree with?
12  A.  No.
13  Q.  If you don't have the facts right, you
14  oftentimes can't get your conclusions correct, and
15  they could be fraught with error.
16  Do you agree with that?
17  A.  I agree.
18  Q.  Okay.  I'm -- I'm going to kind of go
19  through this, and I'm hoping to do this before lunch
20  and finish it before lunch, but let's see what we can
21  do.
22  On the first page of your report, you talk
23  about the things that you've been -- that's been
24  submitted to you and you've -- we've gone through, I
25  think, most of them.  Let me just be sure that with

Page 93

1  regard to the third or fourth down, where it says
2  Cumberland County office policy manual excerpts, I
3  think we talked about that, did we not?
4      A.  Yes, sir.
5      Q.  And you identified that.
6      A.  Yes, sir.
7      Q.  And with regard to the next line, Cumberland
8  County Office of Internal Affairs report, you
9  certainly have that in your possession and you've
10  reviewed that, correct?
11     A.  Yes, sir.
12     Q.  You -- you did not list your -- strike that.
13         With regard to the second page, you -- you
14  listed the report from the Maine Attorney General and
15  you've certainly looked at that, right?
16     A.  Yes.
17     Q.  And you have -- you have transcripts of
18  Zachary Welch, Cook, Mangino, Marion, and MacVane and
19  Fournier that you've looked at; is that right?
20     A.  Yes.
21     Q.  And that those -- when did you look at
22  those?  Do you know?  Perhaps they're not at the same
23  time, but a time frame, if you know.
24     A.  The -- the time frame would have been
25  sometime in -- most likely, June and early July of --

Page 94

1  of this past year.  I don't recall with any
2  specificity.
3      Q.  Of 2014, correct?  Or prior to writing the
4  report.
5      A.  Prior to writing the report.
6      Q.  Okay.
7      A.  I think that the report is dated July, if
8  I -- yes.  So certainly prior to July 24th.
9          MR. MARCHESI:  Of what year?
10         MR. BENJAMIN:  That's 2015.
11         THE WITNESS:  '15.  This year.
12         MR. LILLEY:  '15.  I'm sorry, I said '14.
13  Yes, '15.
14  BY MR. LILLEY:
15     Q.  So at the time you wrote the report, you had
16  everything, including the interview with
17  Deputy Mangino, personal interview that you -- is the
18  last entry on page 2, correct?
19     A.  Correct.
20     Q.  And that personal interview would be the
21  phone interview you've testified about, right?
22     A.  Yes, sir.
23     Q.  So let's turn to page 3.  And I'm going to
24  be asking you -- I've got some notes here.  I'm going
25  to be asking about some of the statements you've made

Page 95

1  and some of the conclusions you've drawn, and I'd
2  like to discuss them at least briefly.
3          When you -- looking at A on page 2, at the
4  very end of that first paragraph, you -- you make the
5  note -- you make the statement that Deputy Mangino
6  was accompanied by an unarmed nonpolice ride-along
7  passenger Zachary Welch, correct?
8      A.  Yes.
9      Q.  Do you know, sir, that whether or not
10  anybody at the scene knew that except Mr. Welch and
11  Mr. Mangino?
12     A.  I don't.
13     Q.  Did you ask him whether or not he had --
14  that was an authorized ride-along?
15     A.  No.
16     Q.  Did you ever determine whether it was?
17     A.  I never considered that question.
18     Q.  One of the issues later on in your report
19  you talk about is the danger or the possible danger
20  that the ride-along passenger presented, correct?
21     A.  We discussed that, yes.
22     Q.  And when Mr. Mangino was conversing by radio
23  with his fellow officers and other people, none of
24  them knew that he had a ride-along passenger.
25         Do you know that to be the case?

Page 96

1      A.  I don't know.
2      Q.  Is that of any significance that there's a
3  ride-along nonpolice officer at the scene of this
4  nature?
5      A.  It -- it is of significance.
6      Q.  What is the significance?
7      A.  As discussed in my report, that's another
8  person now known to be within a zone of danger.
9      Q.  Isn't it less than good law enforcement to
10  take a person, a ride-along person, to a scene in
11  which you've been informed that there's guns, perhaps
12  domestic violence, and perhaps somebody who's
13  mentally ill?  Is that good law enforcement practice?
14     A.  As -- as a general proposition, probably
15  not.  And there are a number of variants that would
16  increase or decrease or mitigate or even obviate the
17  danger involved.
18     Q.  Well, did you understand that Mr. Mangino
19  lived very close to the actual scene of the -- of the
20  shooting?
21     A.  No.
22     Q.  And that Mr. Welch's vehicle was in that
23  vicinity?
24     A.  I did not know how close it was.
25     Q.  In other words, I'm suggesting that the

Page 97

1  facts are that it would have been easy or at least it
2  would not have been difficult to drop Mr. Welch off
3  at his vehicle before attending a scene with
4  potential violence concerning firearms, mental
5  illness, and domestic violence.
6         Would that be -- wouldn't that be the better
7  practice?
8      A.  Again, I -- I suppose the additional
9  representation that the home and car were nearby
10 is -- is a factor, but there are -- there are a
11 number of circumstances and factors that could
12 mitigate, obviate, increase, or decrease the -- the
13 danger.  So it certainly would have been an
14 alternative.
15     Q.  Can you tell me anything that would have
16 decreased the danger of having a ride-along in those
17 circumstances?
18     A.  It -- it really depends on where the
19 ride-along is at in any given moment in the exchange
20 between persons.
21     Q.  Well, without -- what I'm suggesting is that
22 if the ride-along had not been there, then it would
23 not be an issue that would have to be concerned -- in
24 which Mangino would have to be concerned about.
25        Do you agree with that?

Page 98

1      A.  Yes.
2      Q.  And did you know that at the time that he
3  was -- Mr. Welch was riding along on that day, that
4  it was unauthorized by his department?
5         MR. MARCHESI:  Objection to form.  That's
6  not accurate.
7         THE WITNESS:  I -- I don't know that to be
8  the case.
9  BY MR. LILLEY:
10     Q.  And you certainly understand that the
11 information, if you -- I'm -- I'm kind of going along
12 with your report here, so if you want to go with me,
13 you can see where I'm going.
14        That the -- the two Windham police officers
15 and Mangino drove toward the McKenney residence.  I'm
16 on the second paragraph learned.  And they had
17 learned that the house described as full of guns.
18        That certainly heightens the possibility of
19 danger, does it not?
20     A.  It does.
21     Q.  Now, when you say -- for instance, the next
22 paragraph, Vicki McKenney told the dispatcher she
23 believed her husband would shoot himself, where --
24 where did you get that information?
25     A.  From the reports provided to me.

Page 99

1      Q.  And that would include her actual words,
2  would it not, that when she talked to the -- to the
3  dispatcher, 911 dispatcher?
4      A.  I don't remember exactly what she said, sir.
5      Q.  Is the more accurate statement that she said
6  that she believed her husband might shoot himself
7  because he was distraught over pain?  I mean, it's --
8  it's -- it's a nuance, but isn't it a different
9  nuance?
10        MR. MARCHESI:  Objection to form.
11        THE WITNESS:  I -- I don't recall what she
12 said, but you are correct, that is a nuance.
13 BY MR. LILLEY:
14     Q.  And -- and you know that -- I mean, I don't
15 want to mince words here.  Lawyers often get accused
16 of that.
17        But the difference between might and would
18 shoot himself, there is a difference, is there not?
19     A.  Yes.
20     Q.  Okay.  And let's move down, if we can, to
21 the next paragraph.  I'm not going to read the whole
22 thing here, I can assure you, but let's go down a bit
23 after and look and see about some other statements
24 that you made in your report on a factual basis.
25        Now, you understand, do you not, that in

Page 100

1  terms of Mrs. McKenney, that when the three officers
2  arrived, two first and one right behind them,
3  Mangino, that Mrs. McKenney was visible and -- and
4  either in the garage or partway in the garage and
5  partway out of the garage.
6         Do you understand that to be the case?
7      A.  Yes.
8      Q.  And the officers talked to her.
9      A.  (Nods head.)
10     Q.  Correct?
11     A.  Yes.
12     Q.  And they -- and they talked to her to see if
13 she was okay, if she was in good physical shape.
14        MR. MARCHESI:  Objection.
15 BY MR. LILLEY:
16     Q.  Among other things.
17        Do you -- do you understand that to be the
18 case?
19     A.  I -- I recall they spoke and I -- I don't
20 remember the exact words, but I think there was some
21 questioning or assessment of whether she'd been hurt.
22     Q.  And it was determined that she hadn't been
23 hurt, correct?
24     A.  Yes.
25     Q.  And that there was no domestic violence.

Page 101

1 There was more concern she had for her husband's
2 well-being. That was what they determined after
3 seeing and talking to her.
4          Do you agree with that?
5          MR. MARCHESI: Objection to form.
6          THE WITNESS: I -- I don't know that any of
7 them ever reached that specific conclusion.
8 BY MR. LILLEY:
9    Q.  Okay. Well, at least you know that they
10 didn't see that she was damaged or injured in any
11 way, correct?
12          MR. MARCHESI: Objection to form.
13 BY MR. LILLEY:
14    Q.  That's what I mean by that is there's no
15 broken bones. There's no bruises. There's no
16 indication of any kind of assault.
17    A.  I don't believe there was.
18    Q.  And she did tell him that she was worried
19 about his well-being, that she was afraid he was
20 going to commit suicide.
21    A.  Correct.
22    Q.  Now, if -- you understand that at that
23 particular point, that the officers, do you
24 understand, devised a plan to go in to where
25 Mr. McKenney was and confront him?

Page 102

1          MR. BENJAMIN: Object to the --
2 BY MR. LILLEY:
3    Q.  Let's start with that.
4          MR. BENJAMIN: Object to the form.
5          MR. MARCHESI: Join.
6          THE WITNESS: I'm not sure I -- I think you
7 said "devised a plan." I understand that the two
8 Windham officers spoke with one another and then
9 entered the home first independently.
10 BY MR. LILLEY:
11    Q.  Well, you understand all three of them did,
12 two by the garage door and one by the front door;
13 isn't that correct?
14    A.  Yes.
15    Q.  And you say in the next paragraph -- and I'm
16 just trying to figure out where you're getting your
17 information, and we'll go from there --
18 "Deputy Mangino could see that Officer Cook and
19 Fournier had their guns drawn."
20          That -- that's inaccurate, isn't it?
21    A.  I don't believe so.
22    Q.  Do you recall that -- that the -- there was
23 a plan according to the radio communications for them
24 to go in, and Officer Fournier, in fact, had his
25 Taser out and the other two had their guns drawn?

Page 103

1 Do -- do you know that to be the case?
2    A.  I don't recall.
3    Q.  Would that make a difference?
4    A.  Not at this point.
5    Q.  It sure would -- it sure would with regard
6 to accuracy, correct? Wait a minute. Let me go back
7 to that answer, "Not at this point."
8          What do you mean by not at this point?
9    A.  Not at that point that's being described and
10 that you've just read about.
11    Q.  Well, okay. If there was a plan, however
12 brief, that -- that Officer Fournier would go in
13 first and the other two officers would be behind them
14 or beside them or right in the same vicinity, and
15 that he would tase Mr. McKenney, that would be a
16 different factual pattern than you seem to have set
17 up in your -- in your report.
18          Do you agree?
19    A.  Yes.
20          MR. MARCHESI: Objection to form.
21 BY MR. LILLEY:
22    Q.  In fact, I believe that -- that the record
23 will show that what I've just suggested is the case.
24          MR. MARCHESI: I object to that.
25 ///

Page 104

1 BY MR. LILLEY:
2    Q.  If -- if I'm correct, was tasing a viable
3 option of nonlethal force in this case?
4          MR. BENJAMIN: I'll object to the extent you
5 didn't put a time frame on it in this whole event.
6          MR. LILLEY: These are all speaking
7 objections that are inappropriate.
8          MR. BENJAMIN: I'm just telling --
9          MR. LILLEY: You're suggesting answers for
10 this witness.
11          MR. BENJAMIN: What answer did I suggest by
12 asking you to say when?
13          MR. LILLEY: Time frames. Time frames.
14          MR. BENJAMIN: Yeah. Well, object to the
15 question.
16 BY MR. LILLEY:
17    Q.  What I'm asking you, sir, would -- would
18 that be a viable alternative to -- to lethal force?
19    A.  As -- as you phrased the question, one could
20 answer either yes or no.
21    Q.  Well, why -- why would it -- why would
22 you -- okay.
23          You're an expert in Tasers, too, aren't you?
24    A.  I've testified in Taser cases.
25    Q.  And you've taught Taser -- the use of Taser?

Page 105

1    A.  Yes, sir.
2    Q.  Both from a functional use and from a legal
3  use?
4    A.  Yes, sir.
5    Q.  And Tasers are -- are effective -- I'm going
6  to ask you to explain a little bit about Tasers.  But
7  they're effective in one -- in one option to 20,
8  25 feet maximum?
9    A.  That's exceedingly rare.
10    Q.  Well -- well, and I'm -- what do you mean
11  it's rare?
12    A.  I -- I mean the answer to your question is
13  yes, but it is exceedingly remotely rare --
14    Q.  Okay.
15    A.  -- if that is true.
16    Q.  Have you ever seen or have you ever taught
17  or have you ever heard -- I'll -- I'll keep the field
18  as broad as I can -- that the technique of going in
19  with a Taser with cover from one or two officers in
20  this case with their handguns, is a viable option for
21  a person acting as similar to Mr. McKenney?
22    MR. MARCHESI:  Object to the form of the
23  question.
24    THE WITNESS:  There can be circumstances
25  where an electronic control device is -- is prepared

Page 106

1  for deployment with other force options immediately
2  available, and that may include officers with a
3  handgun.
4  BY MR. LILLEY:
5    Q.  Right.  And in this case, if I'm correct
6  about the facts that they've now been developed, I'm
7  not sure you've been furnished with all of that yet,
8  there is a Taser in Mr. Fournier's hand as he goes in
9  and he's being covered by Officer Cook and
10  Officer Mangino with their handguns out, their
11  service revolvers.
12    Do you understand that to be the case?
13    MR. MARCHESI:  I object to form.
14  Mischaracterizes -- misstates the record evidence.
15  BY MR. LILLEY:
16    Q.  If that's the case, do you think that's a
17  viable option to deadly force?
18    MR. MARCHESI:  Are you asking him to assume
19  those facts as a hypothetical?
20  BY MR. LILLEY:
21    Q.  You understand the question?
22    A.  I think I understand the question.
23    Q.  I mean, is that at least a viable option
24  rather than resorting as a first resort to -- to --
25  to deadly force?

Page 107

1    A.  Understanding that I am very sure those are
2  not the facts, as -- as a hypothetical --
3    Q.  You're sure those aren't the facts that I
4  just said.
5    A.  Correct.
6    Q.  Okay.
7    A.  With that as a hypothetical, and given no
8  more flesh to the hypothetical, I would say no.
9    Q.  No what?
10    A.  No, that's not a reasonable -- question.
11    Q.  Why?
12    A.  A electronic control device should not be
13  either a primary or even a -- a secondary tool for a
14  person at close range who is holding a loaded weapon
15  in a confined and narrow area in low light conditions
16  without any form of ballistic shield for the other
17  officers and that -- the -- the narrow, confined
18  hallway is -- is simply a dynamic that makes the
19  cover, if indeed available, very ineffective and very
20  limited.
21    Q.  Well, if the two had their guns pointed or
22  at least in the -- pointed in the direction of
23  Mr. McKenney with Mr. Fournier taking the lead with
24  his Taser, that is an acceptable law enforcement
25  technique, is it not?

Page 108

1    MR. BENJAMIN:  Objection.  Misstates the
2  evidence.
3    MR. MARCHESI:  Objection.
4    THE WITNESS:  I do not believe so.
5  BY MR. LILLEY:
6    Q.  Okay.  So your -- your -- your -- your
7  problem, I guess is what you're saying, is that
8  there's simply no cover.  They have no cover under
9  those circumstances, correct?
10    A.  That's one of many issues.
11    Q.  Well, if that -- I mean, if they had -- if
12  they were in that same position with the Taser and
13  the other officers had their two guns and they're in
14  the house, if they were behind cover, that would at
15  least be a -- a possibility to make that a -- a
16  reasonable law enforcement option.
17    Do you agree with that?
18    A.  If they had effective ballistic shielding,
19  then that situation would change the dynamics and
20  that would be an option worth exploring.
21    Q.  Well, do you know that they've testified to
22  the fact that the officers were behind walls in a --
23  in a -- in a scooched down or in a position of being
24  on one knee but behind walls and looking around at
25  Mr. McKenney?

27 (Pages 105 to 108)

1     MR. MARCHESI: Objection to form.
2  BY MR. LILLEY:
3     Q. Do you know that that's what they've
4  testified to, both Fournier and Cook.
5     A. I -- I don't recall.
6     Q. That would certainly be cover, wouldn't it?
7     A. Absolutely not.
8     Q. It would not be cover.
9     A. No.
10    Q. Why not?
11    A. Well, I can speak to that on a number of
12 levels. Just aside from ballistics expertise, common
13 sense for anyone who's faced a .357 Magnum revolver,
14 the projectile can easily puncture multiple layers of
15 the construction materials typically used in
16 residential dwellings.
17       I can speak from personal experience having
18 seen a .357 caliber bullet and indeed a .38 caliber
19 bullet fired from a .357 Magnum revolver penetrate
20 multiple interior walls. It's -- it's like -- I
21 wouldn't say that it is as ineffective as tissue
22 paper, but it's not very far behind.
23    Q. But you understand that in -- in my
24 scenario, which I can use -- I guess, I'll use to
25 avoid all these interruptions as a hypothetical,

1  although I believe those are the facts, that in my
2  scenario, there's one person with a Taser, two are
3  covering him with a gun, and they at least have that
4  much cover.
5       Isn't that a time when the selection of the
6  Taser would be at least acceptable from a law
7  enforcement standpoint?
8     A. No.
9     Q. Well, you understand that Mr. McKenney was
10 not pointing the gun at either -- any of these
11 officers.
12       Do you understand that to be the case?
13    MR. MARCHESI: At what point in time?
14    THE WITNESS: In your hypothetical, I -- I
15 don't know that.
16 BY MR. LILLEY:
17    Q. Well, no --
18    A. I assume --
19    Q. It's not really a hypothetical that
20 Mr. McKenney never pointed the gun at any of the
21 three officers in the house.
22       Do you know that to be the case?
23    A. I believe I recall that someone stated that.
24    Q. So when you're saying that it's not a viable
25 alternative, you're suggesting that -- that while

1  he's not pointing the gun, that he has the ability to
2  do so.
3       Is that -- is that what you're saying? That
4  he could do so.
5     A. If -- if that's -- that wasn't what I was
6  saying, but if -- if you're asking me that question,
7  the answer --
8     Q. Well, I'll ask you that question.
9     A. Sure. Yes.
10    Q. But there was no indication that he ever
11 made any attempt to.
12       Do you know that to be the fact? In the
13 house I'm talking about. We'll -- we'll go to the
14 outside in a moment.
15    A. I don't believe that any of the officers
16 reported that he made an attempt to.
17    Q. So wouldn't that be a good time in -- in
18 addition to the fact that they had cover, that there
19 are two officers who have guns pointed in the
20 direction of the -- of the deceased --
21    MR. BENJAMIN: I'm going to object that
22 you're misstating the evidence right there.
23 BY MR. LILLEY:
24    Q. -- and that -- and that -- and that there's
25 a Taser within striking distance, perhaps, isn't the

1  added fact that that would contain the situation
2  within the house be a more -- would be a more
3  effective law enforcement maneuver?
4     MR. MARCHESI: Objection to form.
5     THE WITNESS: Taking that question as a pure
6  hypothetical with substantially flawed facts, the
7  answer is still no.
8  BY MR. LILLEY:
9     Q. Why do you say the facts are flawed when you
10 don't know them?
11    MR. MARCHESI: Object to form.
12 BY MR. LILLEY:
13    Q. I mean, in other words, he's objecting that
14 I'm not saying it right. But you don't -- you're not
15 aware that they've testified -- these officers had
16 testified that Fournier had a Taser in his hand, not
17 a gun? Because that's clear, sir, and you don't know
18 that from what I think you just answered.
19       Why do you say those facts are -- that fact
20 at least is skewed?
21    A. You -- you continue to use the word "cover"
22 and suggest that there's cover. I've explained why I
23 think you're fundamentally flawed in your thinking.
24    Q. No.
25    A. And -- and I'm not -- I'm just not going

1  to -- I'll answer your questions as long as you
2  understand that I believe that they are fantastic
3  hypotheticals and not reality.
4      Q.  Sir, I'm going to tell you -- you don't --
5  until I just asked you, you didn't know that Fournier
6  did not have a handgun drawn, he had a Taser in his
7  hand.
8      Do you agree?  You didn't know that before
9  the few minutes ago.
10     A.  I still don't know that to be the case.
11     Q.  It's uncontested.  I don't know if they'll
12 admit it, but it's uncontested.
13     So it changes your pattern, at least,
14 with three handguns drawn to two handguns and one
15 Taser, does it not?  If it's true.
16     A.  If it's --
17     Q.  If it's true.
18     A.  If it's true.  (Nods head.)
19     MR. MARCHESI:  Well, I -- I want to object
20 to the extent that you are suggesting that he has
21 said that there were three handguns drawn.  His
22 report will speak for itself.
23 BY MR. LILLEY:
24     Q.  Okay.  Let's look at it again, because I
25 guess this is going to get longer than I had hoped

1  for.
2      I'm reading at the bottom of the page,
3  "Deputy Mangino could see that Officers Cook and
4  Fournier had their" hand -- gun -- "handguns drawn."
5      Do you see where I'm reading?
6      A.  Uh-huh.
7      Q.  You have to say yes or no here.
8      A.  Yes.
9      Q.  And we know there's no dispute that Mangino
10 had his gun drawn.  Nobody disputes that.
11     Do you agree?
12     A.  I don't believe anyone disputes that.
13     Q.  So if that's true, then your statement is
14 wrong, is it not, sir, that Mangino had his gun
15 drawn, we know; Officer Cook had his gun drawn and we
16 know; and Fournier had a Taser, which we all know.
17     Do you accept that?
18     A.  I'll accept that for purposes of our
19 discussion.  I continue to maintain that your
20 hypothetical is fraught with fantasy.
21     Q.  And is that part of the fantasy, that he --
22 Fournier had a gun rather than a Taser?
23     A.  No.
24     Q.  Okay.  What's the part of my -- I've got to
25 know what this fantasy is about because I don't get

1  many of those.
2      What -- what fantasy do you -- do you
3  suggest my -- my hypothetical as?
4      A.  Twice after my answer about cover, you've --
5  you continued to use that in your hypothetical
6  questions.  I do not accept that any of the officers
7  at any point inside the house had cover --
8      Q.  Well, you said cover.
9      A.  That's the first -- I did not.
10     Q.  You said it was thin cover.
11     A.  I did not.
12     Q.  You didn't say they had cover?
13     A.  I did not.
14     Q.  Okay.  All right.  Let's not -- we don't
15 want to -- let me draw the "we don't want to."
16     Now, Mrs. McKenney, we know, is taken over
17 to a spot somewhere a couple hundred yards, I guess,
18 or I'm not sure which, maybe a hundred yards,
19 somewhere over around the cul-de-sac.
20     Do you know that to be the case?
21     A.  Yes.
22     Q.  She was taken over there for her safety.
23     Do you know that to be the case?
24     A.  I don't dispute that was one of the reasons.
25     Q.  Okay.  What were the others?

1      A.  I don't know.
2      Q.  And so she was no longer part of the -- of
3  the -- the scene, at least in terms of -- of someone
4  being possibly shot or hurt in some fashion.
5      Do you agree with that?
6      A.  No.
7      Q.  So you don't think she was taken the proper
8  place for safety?
9      A.  I don't think she was removed from the zone
10 of danger.
11     Q.  Okay.  You -- you think she should have been
12 removed further away?
13     A.  I don't think she was removed from the zone
14 of danger.  I haven't really given any consideration
15 to what the other two officers did.
16     Q.  Well, you -- you must have if you just told
17 me that you don't think she's in the zone of danger.
18     She's part and parcel of the scene, correct?
19     A.  I'm not sure what you mean by that.
20     Q.  Okay.  Well, put it this way:  She is taken
21 from that area and she's taken further away for the
22 purpose of putting her in a safer place, but you
23 don't think it's safe enough.
24     Is that your position?
25     A.  I haven't really thought through that

1 particular concept. I can tell you that I don't
2 believe that at the point that she is moved by -- by
3 the cruiser with Officer Fournier, I -- I don't
4 believe that she's out of the realm of danger.
5 Q. Okay. So when Officer Mangino kills
6 Mr. McKenney, you think one of the reasons is that he
7 was protecting her from being further in danger?
8 MR. MARCHESI: Objection to form.
9 MR. BENJAMIN: Yeah, object to the
10 foundation.
11 THE WITNESS: I'm not sure why you would say
12 that. I -- if I've said something -- you asked if I
13 thought that. I don't know what I've said that's
14 indicated my thinking on that.
15 BY MR. LILLEY:
16 Q. Well, I -- I guess you said she's not out of
17 the -- the realm of danger.
18 What I'm asking you is whether you think
19 that the use of force, deadly force by Mangino, was
20 partially justified in the fact that Mrs. McKenney
21 possibly could -- could get hurt where she was
22 positioned?
23 MR. MARCHESI: Objection to form and
24 foundation.
25 ///

1 BY MR. LILLEY:
2 Q. Is that what you're saying?
3 A. I'm saying that she certainly was still
4 within the -- in the proximity where she could have
5 been struck by one of Mr. McKenney's bullets.
6 Q. It would be pretty remote, wouldn't it, the
7 fact that she was that far away and the fact that she
8 was in a cruiser in the -- in the way it was
9 positioned and parked? Namely, it was head on or
10 pretty close to head on to where Mr. McKenney was
11 coming out.
12 A. I've not calculated the odds. I don't
13 know --
14 Q. Well, no, no, I'm not saying odds.
15 But it would -- it would -- it would be
16 pretty unlikely, wouldn't it, that she would be hurt?
17 A. I -- I don't know how likely or unlikely.
18 Q. Well, sir --
19 A. I haven't studied the facts with a -- an eye
20 toward assessing a -- a probability.
21 Q. Well, you -- you assess the probability
22 quite -- quite a bit in your report, don't you? You
23 assess the probability that my client was going to
24 shoot or use deadly force against Mr. Mangino. You
25 assess that probability, don't you?

1 MR. MARCHESI: Objection. Form.
2 THE WITNESS: Again, I -- I've not -- you
3 could say this for any of the possibilities or
4 probabilities. I'm not trying to put a number to
5 them. So to -- to say that something's remote, I
6 don't know.
7 BY MR. LILLEY:
8 Q. Well, I'm not asking for a number, but
9 you -- you get involved all the time with issues
10 called probable cause, don't you, in your career?
11 A. Certainly.
12 Q. Probable don't mean possible.
13 It means probable, doesn't it?
14 A. Yes.
15 Q. More likely than not I think we usually say;
16 is that correct?
17 A. Some uneducated lawyers do.
18 Q. Uneducated?
19 A. Yes, sir.
20 Q. What's your definition of probable cause?
21 A. It's certainly not what you just said.
22 There's a Texas versus Brown, majority of the United
23 States Supreme Court said in the 1960s --
24 Q. Oh, we say it all day long in civil cases in
25 our jurisdiction?

1 A. You may. I'm just telling you, you're --
2 Q. Let's --
3 A. -- dead -- dead wrong on the law as the
4 Supreme Court has articulated.
5 Q. Well, what's the difference between probable
6 cause and possible cause as a person with your
7 background?
8 MR. MARCHESI: I -- I want to object. I
9 guess I'll just object based on the form of the
10 question.
11 THE WITNESS: Yeah. There are -- there are
12 a few concepts in the law that are more difficult to
13 define than probable cause in the context of whether
14 there's probable cause to search or probable cause to
15 arrest. Nonetheless, we have direction from many,
16 many courts, including the United States Supreme
17 Court, where courts have said that a probability in
18 the terms of probable cause is more than a mere
19 possibility. It is a fair probability. It is
20 certainly not more likely than not and is a
21 relatively generous and low standard.
22 BY MR. LILLEY:
23 Q. But it is not possible cause. It's not
24 something could happen or may happen, correct? It's
25 something is more likely to happen. Do you prefer

Page 121

1 that?
2     A.  Something more --
3         MR. MARCHESI:  Objection.
4         THE WITNESS:  -- likely than a mere
5 possibility, sure.
6 BY MR. LILLEY:
7     Q.  Sure.  So -- but what you've done in this
8 case is you've said that Mangino had the right to
9 shoot Mr. McKenney because possibly he may have,
10 Mr. McKenney, shot Mr. Mangino, and Mr. Mangino -- do
11 you agree with that?
12     A.  I agree that you characterized what I've he
13 said that way.
14     Q.  No.  I'm -- do you agree with the
15 characterization that you have said in this case that
16 Mr. McKenney was shot because of the possibility that
17 Mr. McKenney may have turned his gun on Mr. Mangino?
18 In other words, you said that, did you not?
19     A.  I've said in this case that one of the
20 significant factors in Deputy Mangino's decision to
21 fire was the proximity and the armament and the
22 comportment of Mr. McKenney.
23     Q.  But you said more than that.  You said the
24 fact that he could possibly kill him.  As Mr. Mangino
25 testified, he said, I was afraid he might kill me.  I

Page 122

1 was afraid he was possibly going to kill me.  I
2 didn't know what was going to happen.  All of those
3 have been said by him.
4         MR. MARCHESI:  Well --
5 BY MR. LILLEY:
6     Q.  Those are -- those are contingencies, aren't
7 they, guessing on what this person might rather than
8 what he probably will do?
9         MR. MARCHESI:  I'm going to object to the
10 form of the question because you --
11         MR. LILLEY:  That's fine.  Object to the
12 form.  It's --
13         MR. MARCHESI:  No, excuse me.
14         MR. LILLEY:  -- as far as you can go.
15         MR. MARCHESI:  Excuse me, Mr. Lilley.  You
16 started the question by asking what this witness had
17 said and then you shifted to what others had said.
18 So if you want to ask this --
19         MR. LILLEY:  Okay.
20         MR. MARCHESI:  -- this witness what he said,
21 do that.  If you want to ask him his understanding as
22 to what others have said, ask him that.
23         But please be clear because the prior
24 question --
25         MR. LILLEY:  Those are not -- those

Page 123

1 objections are inappropriate.
2         MR. MARCHESI:  Well --
3         MR. LILLEY:  The only objection you're
4 permitted to do, and I've told you this so many
5 occasions, is to object to the form and that would
6 cover that.
7         MR. MARCHESI:  I appreciate your counsel,
8 Mr. Lilley --
9         MR. LILLEY:  Well --
10         MR. MARCHESI:  -- my objection stands
11 nonetheless.
12         MR. LILLEY:  Okay.
13 BY MR. LILLEY:
14     Q.  Well, then let's look at what Mr. Mangino
15 said.
16         You've looked at his deposition, have you
17 not?
18     A.  I have.
19     Q.  I'm going to have to dig this out.  Let --
20 let me do this after lunch, because I don't want to
21 waste time.  Let's continue with your report, and
22 then I'll come back to what Mr. Mangino said with
23 regard to probable cause, possibly, maybe, might, I
24 don't know.  I'll dig that out for you, his exact
25 words.  Okay?

Page 124

1         Let's go back to your -- your report.  I'm
2 still on page 3.  Let's just -- again, this may be
3 nuanced, and I don't want to nitpick here, but let's
4 look at the last paragraph of your report, and you
5 said it earlier in the answer you gave to one of my
6 questions.
7         "Deputy Mangino could see that Officer Cook
8 and Fournier had their handguns drawn.  The officers
9 and Stephen McKenney were in a dark passageway."
10         Where do you get the impression that it was
11 a dark passageway?
12     A.  From information in one of the reports that
13 indicated it was a low-light situation.
14     Q.  Right.  It wasn't dark, was it, sir?  I
15 mean, again, you -- are you putting a spin on that?
16 I mean, with all due respect, dark versus it wasn't
17 well lit is -- is a nuance that suggests something
18 that isn't true, doesn't it, in this case?
19     A.  No.
20         MR. MARCHESI:  Object to form.
21 BY MR. LILLEY:
22     Q.  Okay.  Now, you say -- let's move on to your
23 next page here, page 4.
24         And I think you made reference to it before,
25 you say, "Deputy Mangino urged the officers, Cook and

1    Fournier, to back out of the house to achieve a more
2    tactically sound position."
3        Now, that's what officers are taught to do,
4    correct?  When you're in a situation like this, if
5    you can do it.
6        A.   To achieve a more tactically sound position,
7    yes.
8        Q.   You're trying to turn the advantage, if
9    there is an advantage, of the -- of the subject or
10   the -- the suspect, we'll call -- a subject, I guess.
11   You're trying to turn that around in favor of the
12   officer, are you not?  That's what they're trained to
13   do.
14       A.   They're trained to -- to mitigate the -- the
15   risk, to --
16       Q.   Yeah.
17       A.   I don't know that I -- I never heard it
18   expressed in -- in gain the advantage, but they're --
19   they're certainly trained to do what they can to
20   mitigate the danger.
21       Q.   Well, if they mitigate the danger enough,
22   they may turn the things around till they have the
23   advantage rather than the suspect, right?
24       A.   That's certainly true.
25       Q.   Okay.  And one of the things they did and do

1    and are taught to do, all of the above, is to try to
2    put some distance between them and the suspect, as in
3    this case, correct?
4        A.   Officers, that's -- that's a current general
5    proposition, yes.
6        Q.   And -- and when they do that, they increase
7    their odds and decrease their risks, do they not?
8    When they just simply put a hundred feet, let's say
9    in this case, or approximately a hundred feet,
10   between the suspect and Mr. Mangino, correct?
11       A.   Typically, yes.
12       Q.   And the other things they do, as they try
13   to -- to -- in order to gain an advantage or mitigate
14   the -- the risk, as you say, they try to get a
15   firearm that is much more effective than the
16   suspect's firearm.
17       Fair statement?
18       A.   It's generally not a calculation of
19   balancing efficiencies of weapons, but they -- the
20   officers are taught in certain circumstances,
21   particularly those circumstances where events will
22   transpire at some distance, to transition from a
23   handgun to a long gun.
24       Q.   Because a long gun is far more accurate than
25   a -- than a pistol at, let's say, a hundred feet,

1    isn't it?
2        A.   Accuracy is one of the principal concerns
3    for that transition.
4        Q.   And when you put a hundred feet to 70 to a
5    hundred feet between you and you get your long gun
6    out -- is it an assault weapon?  I never know what
7    that --
8        A.   I -- I think CNBC and MSNBC --
9        Q.   I'm not talking about television.
10       Is it an assault weapon in your view?
11       A.   I don't use that term, but I -- I --
12       Q.   Okay.
13       A.   It's certainly one you hear Brian Williams
14   use on television.
15       Q.   He is back, I guess, isn't he?
16       A.   He's back.
17       Q.   Yeah, the -- but, in -- in fact, you know
18   that the advantage goes to the police officer who can
19   get his firearm and it's a -- it's a rifle with a
20   sight versus somebody who's got a pistol in his hand,
21   whatever the make is, or whatever size it is, who's
22   some hundred feet away who may have to shoot at the
23   officer.
24       Fair statement?
25       A.   Typically, the person with the rifle has the

1    ballistic advantage.
2        Q.   Okay.  So now with regard to Mangino, we
3    have two advantages that he has created, quite to his
4    credit.  He's put distance between him which is --
5    helps him get more of an advantage, or mitigate his
6    risk as you say, and he's -- he's got his rifle out,
7    which is going to be more accurate than the
8    suspect's.
9        Right so far?
10       A.   I believe that it -- it's going to be more
11   accurate.  I have no reason to believe it wouldn't
12   be.
13       Q.   Well, you know that -- that the training
14   with -- with firearms, that pistols are not very
15   accurate at a distance of over 50 feet, don't you?
16       A.   With a typical shooter and a typical pistol,
17   that's true.
18       Q.   And rifles are, however, very accurate at
19   50 feet.
20       Do you agree with that?
21       A.   Again, same qualifications, but as a general
22   proposition, absolutely.
23       Q.   So -- so the -- the mitigation of risk
24   works, at least in those two instances in this case,
25   do they not?  They did?

Page 129

1      A.   They're both -- they're both risk
2  mitigators, or as you put them, advantage makers,
3  yes.
4      Q.   And then you -- and then you've got the
5  thing called cover.  A cover is where the officer
6  seeks and finds a place to hide, if you will, so that
7  the suspect either can't know where he is or will
8  have a hard time shooting him because he's behind
9  a -- a rather beefy cover.
10     Do you agree?
11         MR. MARCHESI:  Objection to form.
12  BY MR. LILLEY:
13     Q.   When I say "beefy," I'm talking about the
14  engine of his car, as he points out.
15         MR. MARCHESI:  Same objection.
16  BY MR. LILLEY:
17     Q.   That's certainly an advantage when you can
18  get behind cover of that nature and the suspect is
19  standing out in the middle of the driveway.
20     Do you agree?
21         MR. MARCHESI:  Objection.  Form.
22         THE WITNESS:  I -- I agree with the latter
23  part of that, that -- that the engine block of a
24  typical vehicle does in fact provide several linear
25  feet, surface area, that are effective cover against

Page 130

1  a typical handgun bullet.
2  BY MR. LILLEY:
3      Q.   And so now you've got an officer who's not
4  only put the distance in there in between them and
5  increased his advantage by his rifle, but he's under
6  cover.
7      He's actually behind something that could
8  stop a .357 bullet, correct?
9          MR. MARCHESI:  Objection.  Form.
10         THE WITNESS:  I don't agree that he's under
11  cover.  I agree that he is behind something that has
12  several linear feet of ability to stop or deflect a
13  .357 caliber projectile.
14  BY MR. LILLEY:
15     Q.   You don't think that was pretty good cover?
16     A.   It's not being under cover, no.
17     Q.   Well, what do you define as being
18  undercover?  I mean, I -- I -- I'm not sure I know
19  where you're going with that, but what do you define
20  as being undercover?
21     A.   Well, the -- the term, isn't -- it's not
22  really just a term of art.  I mean, at least in the
23  law enforcement world has a quite well-defined
24  meaning.  And cover is something that will stop
25  bullets.  If someone's behind an -- an engine block,

Page 131

1  officers actually, at -- at least in -- in this state
2  and others that I've seen, I'm not sure about Maine,
3  but officers are trained to defeat that kind of
4  cover, when suspects take that kind of cover.  If one
5  is behind an engine block, one can't return fire, for
6  example.  An engine block is never -- never complete
7  cover for a person.
8      Q.   Well -- okay.  Right.  You finished?
9      A.   It's just not.
10     Q.   Well, it may not be complete, but it's
11  pretty darn good, isn't it?  An engine block between
12  you and the suspect who's out there some hundred feet
13  or so away, at least to start, with a handgun in the
14  wide open driveway?  You've increased your advantage
15  substantially at that point given the fact of
16  distance, cover, and a more accurate firearm, have
17  you not?
18     A.   At -- at that distance in those
19  circumstances, the engine block is a -- is a --
20  provides a pretty good piece of cover.
21     Q.   You've got -- you've got a lot of cover and
22  a lot more advantage than -- than the -- the shooter
23  who's walking down the driveway with a pistol and
24  absolutely open spaces, have you not?
25     A.   You have a lot more cover than the shooter.

Page 132

1      Q.   So at this particular point, you also know,
2  don't you, that -- and the studies show, you --
3  you -- you cite, I think, a person by the name of, is
4  it Tueller?
5      A.   Yes.
6      Q.   Did you -- and you've -- you've gone to some
7  of his classes and been certified by him?  Or
8  something?
9      A.   I don't know that I'd use the word
10  "certification."  I don't think that Mr. Tueller
11  teaches classes that carry the certification element,
12  but I have --
13     Q.   Okay.
14     A.   -- taught with him and been taught by him on
15  many occasions over the years.
16     Q.   Okay.  You certainly know that one of the
17  other factors that gives Mangino the advantage,
18  probably throughout this, but certainly in this
19  situation, is his age versus the age of the -- of
20  the -- of the suspect, or the subject let's call him,
21  as -- as Mr. Tueller points out in some of his
22  articles.
23         MR. MARCHESI:  Objection --
24  BY MR. LILLEY:
25     Q.   You agree?  Young man, old man.

1    MR. MARCHESI: Objection. Form.
2    THE WITNESS: I don't agree.
3  BY MR. LILLEY:
4    Q.  You don't agree that Mr. Tueller has
5  suggested that age, that the person who is holding
6  the suspect holding a gun, if he's 25 years old or if
7  he's 65 years old is more likely to be able to shoot
8  faster when he's 25 years old than when he's 65 years
9  old? Do you agree with that? Because that's what I
10  read actually Tueller --
11    A.  I -- I don't know that Mr. Tueller has ever
12  made that precise statement. Your question began
13  with the specifics about these two individuals, and I
14  don't know that to be the case, nor do I believe it
15  to be the case as a general proposition.
16    Q.  You don't know what to be the case? That --
17  that -- that the victim wasn't twice as old as the
18  police officer?
19    A.  I don't know that in this particular case,
20  that age is a significant factor and advantage or
21  disadvantage.
22    Q.  Well, I mean with all due respect, I'm not
23  going to ask you your age, but baseball players and
24  other sports people kind of quit playing in their 30s
25  sometimes, oftentimes because they're not as agile,

1  as strong and as quick as they were in their 20s.
2    Q.  Do you agree with that general proposition?
3    MR. MARCHESI: Objection.
4    THE WITNESS: Yes.
5  BY MR. LILLEY:
6    Q.  Well, doesn't it stand to reason, sir, that
7  at least from the age point of view, Mr. Mangino had
8  the advantage from the start?
9    A.  I -- I think that generally, that's probably
10  true. Whether it's specifically true in this case or
11  not, I do not --
12    Q.  Well, no, I -- I understand that. We're --
13  we're taking the general. We're taking the norm.
14  We're trying -- not trying to go around the edges,
15  but we know it's a proper -- okay. Withdraw that
16  comment.
17    And in terms of the firearms, which I forgot
18  to mention, we don't know -- well, we know now that
19  the firearm that -- that -- that the suspect had,
20  contained -- well, it -- it was capable of six shots,
21  correct, the -- the .357?
22    A.  I believe that it's capable of firing six
23  rounds without reloading.
24    Q.  And we know that Mangino had what I call a
25  clip. I guess -- what do you call the things that

1  you put in there that -- that hold the bullets,
2  magazines?
3    A.  Proper term would be magazine.
4    Q.  A magazine containing 30 bullets, did he
5  not?
6    A.  He had a 30-round magazine. I -- I suspect
7  he didn't have 30 rounds in it.
8    Q.  Well, I think he said he did, but --
9    A.  He may have.
10    Q.  But in any event, we'll -- we'll leave that
11  for him to ...
12    So even in terms of the number of bullets,
13  Mangino certainly had the advantage there, did he
14  not?
15    MR. MARCHESI: Objection. Form.
16    THE WITNESS: Assuming proper functioning of
17  both weapons, Deputy Mangino's rifle was capable of
18  firing more rounds without the manual act of
19  reloading than the revolver was capable of firing.
20  BY MR. LILLEY:
21    Q.  And to that extent, he had an advantage
22  because of that, correct?
23    A.  Yes.
24    Q.  Now, in addition to that, we know there are
25  at least two other police officers in the area, do we

1  not? During the time of the shooting.
2    A.  Yes.
3    Q.  And although you called it a loose
4  perimeter, I think -- I'll get to that in your
5  report.
6    Do you remember calling it a loose
7  perimeter?
8    A.  I don't.
9    Q.  I'll -- I'll look it up for you.
10    It is a perimeter. You -- correct?
11    MR. MARCHESI: Objection. Form.
12    THE WITNESS: When we get to that point, I
13  suppose you can talk about definitions, but there
14  is --
15  BY MR. LILLEY:
16    Q.  I'll take it out if you want. Go ahead.
17    A.  I'm sorry. There -- there is some element
18  of perimeter.
19    Q.  And -- and -- so perimeter is not really
20  relevant to this whole case anyway, is it?
21    MR. MARCHESI: Objection.
22  BY MR. LILLEY:
23    Q.  Let me add to the question.
24    Since Mr. Mangino -- Mr. McKenney never
25  exceeded the perimeter, such as it was, it's not

Page 137

1  really relevant to your findings, is it?
2      A.  The -- the concept of a perimeter of
3  containment is not really relevant here because
4  Mr. Mangino -- excuse me, Mr. McKenney never -- never
5  leaves the immediate area.
6      Q.  Okay.
7      A.  So in that -- that respect, I have to agree
8  with you.
9      Q.  Okay.  And you understand that Mr. Mangino,
10  according to the attorney general's report, from all
11  the evidence they found, including their -- the radio
12  communication, made no commands to Mr. McKenney from
13  the time Mr. McKenney was up -- outside the garage
14  for a time frame of 6 minutes and 25 seconds until
15  the shots were fired.  That was their finding.
16      Do you know that to be the case?
17      MR. MARCHESI:  Objection.
18      THE WITNESS:  I don't recall how they -- how
19  they put it.  I agree with you that -- that they were
20  unable to find any audio recording of any warnings
21  for a period of time.  If you say it was six minutes,
22  I -- it -- it -- I thought it was --
23  BY MR. LILLEY:
24      Q.  6.25.
25      A.  Yeah, that sounds correct.

Page 138

1      Q.  And it's advisable, isn't it, if possible --
2  you -- you teach this, don't you, to give commands to
3  people like Mr. McKenney to -- to drop the weapon
4  or -- well, drop the weapon or I'll shoot or some
5  kind of commands to -- to try to persuade him to
6  stop?  Do you agree that that's what you teach?
7      A.  The better command and the typical command
8  would be quite simply, Drop the weapon or drop the
9  gun.
10      Q.  Well, it might be simple, but it might be
11  more effective if you said, Drop the gun or I'll blow
12  your head off, wouldn't it?
13      A.  There's substantial evidence to the
14  contrary.
15      Q.  Oh, there is?  Okay.
16      But either one, nothing was said, at least
17  from the AG's investigation, for 6 minutes and
18  25 seconds by Mr. Mangino.
19      MR. MARCHESI:  I -- I -- object --
20  BY MR. LILLEY:
21      Q.  Do you agree?
22      MR. MARCHESI:  I -- excuse me.  I object --
23  BY MR. LILLEY:
24      Q.  You don't agree?
25      MR. MARCHESI:  -- that completely misstates

Page 139

1  the attorney general's conclusions.
2      Now, if you want --
3  BY MR. LILLEY:
4      Q.  Do you agree that if that's true, that
5  that's an exceedingly long time for Mr. Mangino not
6  to give this man some warning of what he should do or
7  perhaps the consequences of what if he doesn't do it
8  might occur?
9      MR. MARCHESI:  Object to the form of the
10  question.  Misstates the record.
11      THE WITNESS:  Again, I -- I'm -- I'm not
12  sure she got it on the record.  I didn't agree with
13  your last -- the -- the answer to your last question
14  is no, I don't agree.  I still don't agree --
15  BY MR. LILLEY:
16      Q.  Don't agree to what?
17      A.  That -- that you accurately stated the
18  facts.
19      However, in -- in the hypothetical that
20  there was 6 minutes and 25 seconds with no
21  communication whatsoever, recorded or not, generally,
22  that -- that's an -- an unduly long period of time.
23  There may well be circumstances in which that's
24  appropriate.  In this case, I would see nothing that
25  would have -- that would have made it appropriate.

Page 140

1      So if your hypothetical were true, I would
2  agree that that probably was not appropriate.
3      VIDEOGRAPHER:  Nine minutes remaining.
4  BY MR. LILLEY:
5      Q.  And let me ask you something:  When you
6  looked over the facts and looked over the -- the --
7  the videotapes and -- and you looked at -- and you
8  heard all the witnesses -- I say heard or saw their
9  testimony, do you understand that Mr. McKenney,
10  the -- the subject, never pointed his gun anywhere
11  but to the ground as he was walking toward Mangino?
12      MR. MARCHESI:  Object to form.
13      THE WITNESS:  No.
14  BY MR. LILLEY:
15      Q.  You don't agree to that?
16      A.  No.
17      Q.  What do you point to that would suggest
18  otherwise?
19      A.  The record.
20      Q.  Well, you've got to be more specific than
21  that.
22      A.  Statements in the record, statements from
23  officers telling Deputy Mangino that they thought
24  that Mr. McKenney was targeting him, statements from
25  Deputy Mangino and my viewing of the video when I can

Page 141

1 plainly see that what you have just said is simply
2 not true.
3    Q.  What did you see in the video that you -- to
4 support that answer?
5    A.  Mr. McKenney raising the firearm, pointing
6 the firearm directly down range and not at the ground
7 as you suggest might be the case.
8    Q.  Well, that's back at the house.  I'm talking
9 about when he left the house, walking down the
10 driveway.
11       Is there any evidence that he ever pointed
12 the gun anywhere but to the ground?
13    A.  I haven't seen anything in the record
14 that -- that can demonstrate to me --
15    Q.  So in order -- okay.  I'm sorry.
16    A.  That he's pointed the weapon directly at --
17 at Deputy Mangino.
18    Q.  Or even in his direction.
19    A.  I don't know that to be the case.
20    Q.  Well, is there any evidence you can point to
21 that he pointed his gun anywhere but to the ground
22 after he left the -- the -- the structure and
23 started -- as -- as Mr. Mangino said, nonchalantly
24 walked down the driveway with a gun dangling from his
25 arm.

Page 142

1    A.  After the point that he's -- that
2 Deputy Mangino hears the radio communication that
3 he -- that -- I believe it was Officer Fournier, I
4 may be mistaken, believes that Deputy Mangino was
5 targeted, as he's moving down the driveway, no.
6    Q.  Sir, I'm talking about after -- when the --
7 when -- when -- when -- you're changing my question.
8       I'm trying to get you to address the issue
9 of when -- when the suspect left the house area and
10 started walking down the driveway, nonchalantly,
11 quote/unquote, with a gun dangling by his side.
12       Do you have any evidence that he ever moved
13 the gun in any other -- other fashion?
14    A.  No.
15    MR. LILLEY:  Okay.  I'm going to move on to
16 a little other area, so I think we'll quit right now.
17 Thank you for your patience.
18    VIDEOGRAPHER:  This is the conclusion of
19 Disc 2.  The time is 12:06.  We're going off the
20 record.
21       (Break taken for lunch.)
22    VIDEOGRAPHER:  This is Tape No. 3 in the
23 videotaped deposition of Kenneth Wallentine.  The
24 time is 1:14.  We're back on the record.
25 ///

Page 143

1 BY MR. LILLEY:
2    Q.  Mr. Wallentine, before lunch, we were
3 talking about your deposition -- your deposition,
4 with -- your report.  And I think I was around
5 page 5, or at least that's where I want to go.  We
6 have talked about page 4 and I was going to page 5.
7       If you'd -- are you on page 5?
8    A.  It's open to page 5, so I think that's where
9 you left off.
10    Q.  Okay.  We -- we've talked about this before,
11 but let me read something to you and then ask you to
12 look at a couple of other documents.
13       On the beginning of the top paragraph --
14 beginning of the paragraph on top, I should say, it
15 says, "Stephen McKenney advanced toward
16 Deputy Mangino."
17       Let -- let me just stop for a second.  You
18 agree, do you not, that McKenney is walking down his
19 driveway?
20    A.  Yes.
21    Q.  And Mangino -- you keep saying advancing
22 toward him.
23       Mangino is off to the side of the driveway,
24 behind his vehicle, correct?  I'll show you some
25 pictures.

Page 144

1    A.  Yeah, it's -- it's to the side of the --
2 yes.
3    Q.  If -- if -- I'll -- my point is this:  If
4 McKenney kept walking and hadn't been shot, he would
5 walk down to the end and out his driveway, not
6 exactly toward Mangino necessarily.
7       Do you agree?
8    A.  I'm not sure what -- I -- I don't know
9 whether if he continued straight, he'd end up in the
10 street or not, but I don't think that he was walking
11 directly toward the deputy at that particular point.
12    Q.  Well, I mean, he -- and -- and -- and by the
13 way, that was his driveway, right?  He was lawfully
14 on the driveway.
15    A.  I -- sure.  It's -- I think it's a common
16 driveway.
17    Q.  Right.
18    A.  But I -- I don't contest that he had any
19 right to be there.
20    Q.  He had a legal right to be on the driveway.
21    A.  Sure.
22    Q.  And he had a legal right to have a handgun,
23 did he not?
24    A.  Don't know Maine -- I -- I don't know of any
25 reason under Maine law that he wouldn't.

1    Q.  How about federal law, like the Second
2  Amendment?
3    A.  Nah, I don't think he -- I have seen nothing
4  in this case to suggest that his gun rights were
5  restricted by state or federal law.
6    Q.  Therefore, he was legal in possessing a gun
7  by his side, dangling it, and walking down his own
8  driveway; fair statement?
9    A.  Sure.  As a general rule, yes.
10    Q.  And he -- you understand, do you not, that
11  he was not suspected of having fled any crime scene?
12    A.  I don't believe so.
13    Q.  And to your knowledge, that if anybody
14  checked, he had no criminal record.
15       Did you know that to be the case?
16    A.  I don't know that, but I believe that, and
17  I'm not sure why I believe that.  I -- I -- there may
18  be something in the record that suggested to me that
19  he had no criminal record.
20    Q.  Well, I'll suggest to you that he had no
21  criminal record, and I don't think these folks will
22  object.
23    A.  Yeah.
24    Q.  They might, but I don't think so.
25    A.  I think he'd been a school bus driver.

1    Q.  That's not a crime, is it?
2    A.  No, but it's indicative that he wouldn't
3  have a criminal record.
4    Q.  Okay.  Good.
5       So at least as -- in -- in -- in driving --
6  in walking down the driveway, as it were, prior to
7  him being shot, he was doing nothing illegally, was
8  he?  Or had not done anything illegal.
9    A.  Yeah, I -- I don't know that I considered
10  all of the prior conduct, but at that -- at that
11  moment, I think it's a fair argument that he wasn't
12  committing a crime.
13    Q.  It's a fair argument.  You won't concede to
14  it?
15    A.  It's not something that I've explored all of
16  the nuances and run it to ground, but I -- I think
17  you're right.
18    Q.  Well, I mean for -- I'm just trying to close
19  the door on this.
20       I mean, for instance, you wouldn't have
21  probable cause to charge him with a crime before he
22  got shot.
23    A.  Not based on what I know.  And I'm -- I'm
24  just trying to think of it now as a prosecutor.
25    Q.  Okay.  Or as a police officer.

1    A.  Sure.
2    Q.  That term is used by all of us.
3    A.  Yes.
4    Q.  And you have -- wear two hats, so you use it
5  in two capacities I -- I suspect; correct?
6    A.  (Nods head.)
7    Q.  Is that right?
8    A.  Yes.
9    Q.  Let's look at page 5, if we can.
10    A.  Okay.
11    Q.  And I just read something there that talked
12  about Deputy Mangino commanded and pleaded with
13  McKenney to drop his gun.  I didn't see anything in
14  the record about him pleading.
15       Did -- where did you get that?  Do you know?
16  I understood he told him to drop the gun when he was
17  up at the house.  But pleading?  Is that a word of
18  art or just --
19    A.  No, not necessarily.  I don't recall whether
20  that was a term that was used in the interview or --
21  or not, but I -- I don't recall, sir, where I --
22    Q.  Okay.
23    A.  -- what -- what is the source of my word
24  choice there.
25    Q.  And then you say, "McKenney looked toward

1  Deputy Mangino as Deputy Mangino shouted at least ten
2  times for McKenney to drop his gun."
3       Did I read that right?
4    A.  Yes.
5    Q.  Now, if I -- if you look in -- I've -- let
6  me just see if I can get it here.  Get it
7  straightened out.
8       If you look in that same book, I hope,
9  you'll find --
10    A.  The first half?
11    Q.  Yeah, the first -- just open to page 1 in
12  the first, which should be the AG's report.
13       Is it?
14    A.  It's --
15    Q.  The AG.
16    A.  Mine's a lot thicker, but I think this just
17  probably doesn't have all the exhibits.
18    Q.  Okay.  But in any event page 1 -- let me
19  find it myself -- is the office of the attorney
20  general.  It's a report on the use of deadly force by
21  Cumberland County Deputy Sheriff on April 12, 2014,
22  for the record, in Windham, correct?
23    A.  Yes.
24    Q.  Now, if you'd turn to page -- I believe it's
25  32 in that report.

Page 149

1      Do you see where the attorney general, as I
2  suggested in an earlier question that I was
3  challenged on, I believe, do you see where the
4  findings in that last paragraph, or some of the
5  findings at least of the attorney general's office
6  talks about time on -- after 1434?
7      A.  Yes, sir.
8      Q.  And it says -- in addition to the fact that
9  apparently the tape ran for a while, it -- it talks
10 about the specific time frames, one, two, three, and
11 four.
12     Do you see that?
13     A.  Yes.
14     Q.  It says, "It was 6 minutes and
15 25 seconds" -- I think that's 25.
16     A.  Yes, sir.
17     Q.  -- "from the last command made by
18 Deputy Mangino to Stephen McKenney for him to disarm
19 until the sound of the first report of Mangino's long
20 gun."
21     Did I read that right?
22     A.  Yes.
23     Q.  Do you disagree with that finding by the
24 AG's investigator?
25     A.  I disagree with it in the -- in -- insofar

Page 150

1  as that -- excuse me -- that one statement is
2  represented to be accurate.  I don't disagree in
3  context.
4      Q.  Well -- well, sir, what context do you need?
5  This is the context of -- let me withdraw the
6  question and rephrase it.
7      This is in the context of -- of timing from
8  at least the evidence that the attorney general had
9  when they exonerated Mr. Mangino, I -- I guess, from
10 at least criminal liability.  This was their
11 conclusion of their investigation, that he made no
12 commands to -- from -- to Mr. McKenney for
13 6.25 seconds.
14     Is there any context that you think has to
15 be added to that to make it more accurate?
16     A.  Yes.
17     Q.  And what would that be?
18     A.  The entire document -- excuse me.  I don't
19 know if I'm catching or finishing a cold, or both
20 actually.
21     The entire document is titled "Highlights
22 PO" -- police officer -- "James Cook WatchGuard WPD
23 Unit 12."
24     I'm confident that what that means is
25 that it's the WatchGuard dash camera recording

Page 151

1  system.  And so the context is that this particular
2  document is examining and reporting and giving
3  findings on what can be distinguished and identified
4  and heard on the audio track of the WatchGuard
5  audio/video recording system.
6      Q.  Okay.  And -- but this is done, then, by
7  Detective Michael Pulire I guess it is.  I don't
8  know --
9      MR. MARCHESI:  Pulire.
10     THE WITNESS:  Pulire.
11     MR. LILLEY:  Pulire.  Yes, Of course, that's
12 what I was going to say.
13 BY MR. LILLEY:
14     Q.  Anyway, he's the -- he's the attorney
15 general investigator, and these -- that is -- that's
16 a conclusion at least he's raised, correct?
17     MR. MARCHESI:  Object to the form.
18 BY MR. LILLEY:
19     Q.  I mean, appears to be.  It's in his report.
20     A.  That -- that's what it appears to be.
21     Q.  Okay.  And then it says it was 9 seconds
22 from the time police Officer Fournier radioed that
23 Steve was advancing on the -- Deputy Mangino until
24 the sound of the first report of Mangino's long gun.
25     Do you take any issue with that?

Page 152

1      A.  I don't.
2      Q.  Okay.  Then -- then let's go back a little.
3      So what you're saying is, is that the AG's
4  investigator coming to that decision is basing it
5  only on, in -- in your view at least, the -- the
6  WatchGuard radio system; is that correct?
7      A.  It's my understanding that this -- this
8  document -- this portion of the attorney general
9  investigation focuses solely on and is exclusively
10 related to that which may be heard from the audio
11 track of the WatchGuard audio/video recording system
12 that was in Officer Cook's -- inside his vehicle.
13     Q.  Well, it --
14     A.  That's my understanding.
15     Q.  Apart from speculating that there may be
16 other evidence, do you really have any evidence that
17 there was other evidence of his commanding this
18 subject?
19     A.  Yes.
20     MR. MARCHESI:  Objection to form.
21 BY MR. LILLEY:
22     Q.  And what is the other evidence?
23     A.  I was -- excuse me, statements from
24 Deputy Mangino that he continued to give commands to
25 drop the weapon, statements from Officer -- is it

1    officer or sergeant? But I think it's
2    Officer MacVane that he heard shouting that he
3    believed to be Deputy Mangino telling Mr. McKenney to
4    drop the gun that do not appear --
5         Q.  Okay.
6         A.  -- to be memorialized in this particular
7    document.
8         Q.  But MacVane said that when he -- when he
9    hears those kind of things, it's sometimes is out of
10   habit rather than out of reality.
11        Did you read that in his deposition?
12        A.  I did.
13        Q.  So that kind of gives one pause, doesn't it,
14   to say whether he really heard or it was something he
15   expected to hear?
16        MR. MARCHESI:  Objection to form.
17        THE WITNESS:  You know, I suppose -- I
18   suppose one could say that.  I -- I don't know.
19   BY MR. LILLEY:
20        Q.  Well, let me ask you this:  Do you make
21   credibility decisions when you testify as an expert
22   as to who's telling the truth and -- or who's more
23   accurate than -- than other witnesses?
24        A.  I don't -- I don't think that one could
25   completely escape credibility assessments.

1         Q.  Okay.  And so other than MacVane and the
2    person who's essentially on the hot seat here,
3    Mr. Mangino who says he did, you're willing to
4    suggest that that would be evidence that would
5    contradict the AG's investigation?
6         MR. MARCHESI:  Objection to form.
7         THE WITNESS:  No.
8    BY MR. LILLEY:
9         Q.  Let's move on to the -- the -- the other
10   issue that I -- I think I had marked there.  I --
11        A.  There was another tab -- another Post-it --
12        Q.  Yeah.
13        A.  -- note here, page 35.
14        Q.  Okay.  I was trying to get some of those
15   facts out if I could.  Oh, that was -- that was 32.
16        A.  You -- you were on page 32.  This other
17   Post-it note is on page 35.
18        Q.  Okay.  I'd like to have you look at
19   page 30 -- 35?  What have I got there?  Still have
20   jetlag.  Thirty-five.
21        Okay.  Let's look at page -- to wrap this
22   sequence up, at page 37, which is the Windham Police
23   Department log for Officer James Cook MVR Camera.
24        Do you know what that means?
25        A.  Yes.

1         Q.  If you look down at the entry of 622:17, do
2    you see where I am, second from the bottom?
3         A.  Yes.
4         Q.  And you can read above it if you wish,
5    but -- probably should start above it, the next
6    paragraph of 621:19.  W12 and W26.
7         Do you know the -- I'll -- I'll represent to
8    you those are Windham police officers.
9         A.  I -- I believe the W12 was Cook and W26 was
10   Fournier.
11        Q.  Okay.  I think you're quite right.
12        They speak with Vicki McKenney at the
13   entrance to the garage, and they get information
14   about the suspect's location, firearms, background.
15   And W12 asked dispatch for responding deputy's
16   location, which I think would mean Mangino.
17        Do you agree?  Fair reading of that?
18        A.  I believe so.
19        Q.  And then the next two entries are what I'm
20   mostly concerned about.  622:20 -- 622, rather, :17
21   says, CTY27 arrives.
22        That's Mangino, right?
23        A.  Yes.
24        Q.  The three officers devise their approach.
25        Do you see where I'm reading?

1         A.  I do.
2         Q.  And when I said they had a plan, that's what
3    I was referring to.
4         A.  All right.
5         Q.  So do you take any issue with the -- with
6    the transmissions here that seem to suggest that?
7         MR. MARCHESI:  Object to form.
8    BY MR. LILLEY:
9         Q.  In terms of its credibility?
10        A.  I -- I -- I don't.  I don't think these are
11   actual transmissions.  I believe these are
12   Sergeant Boudreau's --
13        Q.  Okay.
14        A.  -- conclusions as he listened to the
15   transmissions.
16        Q.  Do you have any reason to -- to believe that
17   they have -- they're not credible?
18        A.  I -- I don't.
19        Q.  Okay.  Then the next one is 622:46.  W12
20   asks W26 to prepare his Taser.
21        Do you see that?
22        A.  I do.
23        Q.  All three entered through the entrance at
24   the rear of the garage.  W12 announces police
25   department, and W26 calls out for Stephen to come

Page 157

1  out.
2       So do you still question my recitation of
3  the facts that, in fact, the device or the -- the
4  plan that was devised and carried out was that
5  Fournier was going to go in and did go in with his
6  Taser rather than his firearm?
7       A.  I don't question what you just said.
8       Q.  And just -- also let me ask you this:  Do
9  you recall that when they did go in, whatever
10  happened inside, they told Stephen two things:  One,
11  that they were -- they were going to help him; and
12  two, that they were going to call him.  And I -- you
13  can -- you flipped to the next page quite
14  appropriately.  It's on the top.
15      MR. BENJAMIN:  I'll object if you're saying
16  that's the only two things they told him.
17      MR. MARCHESI:  Join.
18      THE WITNESS:  I --
19      MR. LILLEY:  I'm not saying it's the only
20  two things.  I said --
21      MR. BENJAMIN:  You said they told him two
22  things.
23      MR. LILLEY:  I said they told him two
24  things.  They may have told him other things.  I'm
25  talking about those two things.

Page 158

1  BY MR. LILLEY:
2       Q.  Do you agree?
3       MR. BENJAMIN:  All right.  Thanks for
4  clarifying that.
5       THE WITNESS:  I -- I don't remember that
6  exact -- I -- I remember having something different.
7  So --
8  BY MR. LILLEY:
9       Q.  Well --
10      A.  -- if you want I can look at this.
11      Q.  Well, yes, I want you -- do you think
12  there's any suspect that this is not credible?
13      A.  No.  I'm saying I -- I remember them saying
14  something slightly different inside the house.
15      Q.  Well --
16      A.  Okay.  You know, you're right.  I -- when
17  you said call him, in my mind, I thought -- I was
18  thinking call out, but I -- I think you're referring
19  to telephone, and that's what I think happened, that
20  that was their intent and their effort.
21      Q.  Right.  But the only two -- he said there
22  were other things said, but I'm not --
23      A.  Correct.
24      Q.  -- interested in that.  They said -- they
25  said he had a gun, they thought, and all this other

Page 159

1  stuff.
2       But I'm interested in the two things they
3  told him so that at least we get an idea of the words
4  they used to the deceased.
5       A.  I -- I don't recall the exact words.  I do
6  recall one of the officers saying something like,
7  Stephen, we're here to help you; we want to get you
8  some help.
9       Q.  Okay.  At least the transmission, according
10  to this gentleman here, indicates he told him to put
11  the gun down and that he wants to get Stephen some
12  help.
13      Do you see that?
14      A.  I see it now.
15      Q.  So do you take any issue with the
16  credibility of that statement?
17      A.  No.  I believe that's what was said.
18      Q.  Okay.  And then on the next paragraph, after
19  said -- 27 says back out, I'm interested in the next
20  one.  W12 tells Stephen that they're going back
21  outside and they will call him in a moment.
22      Do you see that?
23      A.  I do.
24      Q.  And so do you think that's credible?
25      A.  I believe that's accurate.

Page 160

1       Q.  So at least with regard to this --
2       A.  Well --
3       Q.  Go ahead.
4       A.  I believe that's accurate.  At this point,
5  I'm not willing -- I don't recall whether it was Cook
6  or Fournier.  I don't know that it matters.
7       Q.  Okay.
8       A.  So when you say W12, I would agree that one
9  of the Windham officers said something like that.
10      Q.  Okay.  And -- and it's not important to me
11  particularly, although it does give -- it does assign
12  W12.
13      But be that as it may, you don't take issue
14  that he was told that by one of the officers, do you?
15      A.  No.
16      Q.  So the only thing that was ever told to this
17  man that we know of, apart from drop the gun and the
18  things that have -- that are clear here, with regard
19  to what the police were there to maybe do was, one,
20  to -- to help him; and two, to call him, at least on
21  a positive basis.
22      Do you agree?
23      A.  That's the only thing that was told to him
24  by the officers, correct.
25      Q.  Okay.  So neither of those occurred, did

Page 161

1  they? They didn't help him. They killed him, No. 1,
2  correct?
3      A.  One of the officers shot him.
4      Q.  And No. 2, they never called him on the
5  telephone.
6      A.  They never made phone contact.
7      Q.  And they had his number, didn't they?
8      A.  I believe at some point they obtained a
9  phone number from Mrs. McKenney.
10     Q.  They had his number, if you look closely at
11 the 911 call, because they obtained it from
12 Mrs. McKenney when she made the first complaint. She
13 gave them her landline number at her house.
14         Do you know that to be a fact?
15     MR. MARCHESI:  I object to your use of the
16 words "they" and "them" without any precision.
17 BY MR. LILLEY:
18     Q.  Gave it to the dispatcher.
19     A.  I don't know that to be the case.  I -- I
20 suspect that that would be typical, so I don't doubt
21 that that happened, if you represent it so.
22     Q.  I do represent it so.
23         And with regard to the getting it again,
24 which you're quite right, they -- they got it from --
25 Mr. Fournier actually got it from her as they were

Page 162

1  parked over by the cul-de-sac, correct?
2      A.  Yes.
3      Q.  She also asked if she could call him to
4  Officer Fournier.
5          Do you remember that?  If she could call
6  Stephen.
7      A.  I -- I remember that conversation.
8      Q.  And she -- and he -- and -- and she was
9  denied that opportunity; he said no.
10         Do you remember that?
11     A.  Correct.
12     Q.  Was that good police practice under these
13 circumstances not to allow the wife, perhaps to call
14 and deescalate the situation a bit?
15     MR. BENJAMIN:  Object to foundation.
16     THE WITNESS:  That -- that is a -- very
17 circumstance sensitive issue, but the general
18 teaching would be to not without some trained and
19 experienced crisis negotiator there to provide a
20 speaking script to the family member as well as the
21 ability for the crisis negotiator to listen so that
22 the crisis negotiator could help direct the
23 conversation, that's generally not a good idea.
24 BY MR. LILLEY:
25     Q.  Well, short of the fact that they never

Page 163

1  asked for a crisis negotiator, I don't believe, or at
2  least they never had one on the scene --
3      MR. BENJAMIN:  Object to foundation.
4  BY MR. LILLEY:
5      Q.  -- wouldn't that -- wouldn't that be second
6  best, to get some communication going with this man
7  who they thought may have mental problems?
8      MR. BENJAMIN:  Objection.
9      THE WITNESS:  That -- that's generally
10 recommended not to happen.
11 BY MR. LILLEY:
12     Q.  Not to happen.
13     A.  Not to happen.
14     Q.  The better -- the -- the better procedure is
15 what happened here in the last sentence of that
16 entry, "27 safety is going to get his long gun."
17         That's the better approach at this point?
18     A.  You're -- you're shifting into an entirely
19 different realm.
20     Q.  I'm -- I'm not.  I'm just in the same
21 paragraph of the -- of the communications.
22     A.  Yeah.  I -- the -- the sergeant who sometime
23 after the fact created a synopsis of things that he
24 heard in a recording has indeed placed that in the
25 same paragraph.  To that extent, you're accurate.

Page 164

1      Q.  And as a matter of fact, do you agree with
2  me that when they first went in, going back even to
3  the first confrontation, and I use the word
4  advisedly, they came into a building with a -- or the
5  home rather, this man's home, knowing that he had
6  lots of guns around, that he was -- perhaps had
7  emotional issues or mental issues, that perhaps this
8  was a domestic dispute matter, perhaps he was going
9  to commit suicide.
10         When they came in with their guns drawn, at
11 least two out of three of them we now know, isn't
12 that escalating the situation with a -- with a person
13 like this and his apparent background, rather than
14 deescalating it, guns drawn in this man's house?
15     MR. BENJAMIN:  I'm going to object to
16 foundation.
17         Go ahead.
18     THE WITNESS:  I don't know that I would --
19 I -- I just don't know that I'd reach that value
20 judgment on whether that was escalating or
21 deescalating.  It was sensible police procedure.
22 BY MR. LILLEY:
23     Q.  It was?
24     A.  Yes.
25     Q.  Well, doesn't that increase the stress on --

Page 165

1   on everybody, particularly the deceased here, to have
2   officers come into his house, if he's having mental
3   difficulty and it's possible suicide -- suicidal,
4   with guns drawn?  Isn't that a stress factor, an
5   increase in stress factor rather than a deescalation
6   factor?
7           MR. MARCHESI:  Objection.  Form.
8           MR. BENJAMIN:  Object to foundation.
9   BY MR. LILLEY:
10      Q.  Or maybe -- let me withdraw it.
11          Do you agree that the police officers when
12  they arrived on the scene of -- of similar kinds of
13  situations should try to deescalate the situation
14  rather than to escalate it as a general proposition?
15      A.  As a general proposition, deescalation is
16  preferable to escalation.
17      Q.  This certainly, you would admit, would you
18  not, sir, is not deescalating the situation, coming
19  in with guns drawn?
20          MR. BENJAMIN:  Objection.
21          THE WITNESS:  I -- I -- I'm not sure that I
22  would place that value judgment here.
23  BY MR. LILLEY:
24      Q.  Well, if somebody came in your house and had
25  their guns out, that would increase your stress level

Page 166

1   rather than decrease it, wouldn't it, sir, just on --
2   just those facts alone?
3       A.  In most circumstances, it would.
4       Q.  Okay.  Let's go back here to your report, if
5   we can, which I think I was on about page 5.
6           Just --
7       A.  Okay.
8       Q.  -- just so we understand, I don't -- it's a
9   matter of pride, I guess, and I hope you'll forgive
10  me, but I don't like to have suggestions that I'm not
11  stating the facts.  So let's look, if we can, at
12  the -- page 6.
13          On the No. 3, did you write, "Deputy Mangino
14  realized there was no effective safe zone, though the
15  officers held a loose perimeter.  McKenney had a
16  strong advantage of wide fields of fire, and he was
17  armed with a weapon capable of penetrating building
18  and walls and killing any of the neighbors or persons
19  walking or jogging in the surrounding woods and
20  pathways."
21          Are those your words?
22      A.  I wrote that.
23      Q.  Okay.  So there's where I got my loose
24  perimeter.
25          Do you understand that?

Page 167

1       A.  Uh-huh.
2       Q.  Do you remember --
3       A.  I do --
4       Q.  -- making that --
5           And let me just ask you a little bit about
6   the rest of the statement.
7           When you say "Mangino had no effective safe
8   zone," that isn't bad as in being behind the --
9   the -- the block of a -- of a -- of an engine behind
10  a vehicle --
11          MR. BENJAMIN:  Object to --
12  BY MR. LILLEY:
13      Q.  -- in the hidden manner.
14          That's pretty good cover, isn't it?
15          MR. BENJAMIN:  Object.
16  BY MR. LILLEY:
17      Q.  I mean, may not be perfect, but pretty good.
18      A.  Sure.  I -- I -- I really -- I mean, I'm
19  happy to visit that again, but I -- I'm -- I'm really
20  not going to be able to tell you anything other than
21  what I told you this morning.
22          It's -- it's effective cover for several
23  linear or even square feet.
24      Q.  Well, we're talking in this case
25  approximately 100 feet down to -- he shot him -- I

Page 168

1   believe the measurements are 69 feet from where
2   the -- where Mangino was.
3           That's a pretty -- pretty long distance, is
4   it not, under these circumstances?
5       A.  Sure.
6       Q.  And we've gone through it before, and I
7   don't want to go over -- plow old ground if we
8   can ...
9           But your statement, McKenney had a strong --
10  a strong advantage of wide -- of wide fields of fire,
11  what do you mean by that?
12      A.  He had the ability to pivot and fire into
13  any number of -- of directions.
14      Q.  There was nobody -- there's no evidence
15  whatsoever that at that time of the morning and in --
16  for the fact that the perimeter is whatever it is,
17  loose or otherwise, and the other police that are
18  there blocking off roads, there's no indication
19  whatsoever that anybody was walking in that area; is
20  there?  No evidence of --
21      A.  I've not seen any evidence that -- that
22  persons were identified that were walking in the
23  area.
24      Q.  Did you ever -- did you ever read anything
25  in which we -- we've asked other witnesses whether

Page 169

1  anybody in the area and they said no?  Did you hear
2  that -- did you read that in any depositions?  I
3  can't recall the source, but one of them, I know,
4  said it.
5      A.  I believe that some of them may have said
6  they didn't see anybody in the area, and I certainly
7  agree with that.
8      Q.  There was no bicycling -- what do you -- you
9  go on with neighbors walking or jogging and in
10  surrounding woods and pathways.
11          This is all pure speculation, isn't it?
12     A.  No.
13     Q.  It's not supported by any evidence, is it?
14     A.  I don't believe that any of the officers saw
15  anyone.
16     Q.  Well, do you have any evidence that there
17  was anybody there?
18     A.  I don't have anything to suggest that any of
19  the officers saw it.
20     Q.  So you don't have any evidence that there
21  was one soul in that area, do you, sir, other than
22  the folks that have been identified?
23     A.  I have as much evidence that the -- the
24  hundreds of people that live within the dozen homes
25  in the immediate area were not all evacuated and out

Page 170

1  of the area.  By the same token, I don't think any of
2  the officers saw them.
3      Q.  You have absolutely no evidence, do you,
4  sir, that there was anybody in the neighborhood
5  walking or jogging or in the area of the surrounding
6  woods and pathways?  It's simply absence of evidence,
7  and you're assuming the assumptions; isn't that
8  correct?
9      A.  I -- I will not disagree with your
10  characterization, although I -- I disagree with your
11  logic.
12     Q.  Well, what's wrong with my logic?
13     A.  Having -- having examined the area with --
14  within a -- a quarter mile, there are many, many
15  homes, cars and driveways, well-tended lawns, all of
16  which suggest that this is a substantially populated
17  area.  It is certainly reasonable to believe that not
18  all of the likely hundreds, if not certainly dozens,
19  of people who live in those many homes surrounding
20  had not all gone somewhere else far out of the range
21  of Mr. McKenney's weapon.
22          It is accurate, however, that none of the
23  officers saw anyone, they didn't see -- look through
24  windows or see that people had arisen to the sound
25  and the aroma of an automatic coffee pot or that they

Page 171

1  were exercising on a treadmill in one of the rooms in
2  their home or getting up to change the diaper on a
3  baby that had just woken up or feeding a -- child
4  in a highchair.  We don't know any of that.
5      Q.  Okay.
6      A.  However, your logic suggests that because no
7  one saw them, that they don't exist and --
8      Q.  No.
9      A.  -- they weren't there.
10     Q.  You're not listening to my --
11     A.  That I can't agree with.
12     Q.  -- my question.  My question talks about the
13  specifics, about people jogging, walking around in
14  the woods and in the pathways.
15          There's no evidence of that, is there?  I'm
16  not talking about people in their houses.  We'll get
17  to that, though.  But I -- I'm talking about what you
18  said here.  There's no evidence of that.
19          That's pure speculation, isn't it?
20     A.  There are a number of pathways through the
21  woods as well as jogging paths in the area.  None of
22  the officers saw anyone on those well-used paths.
23     Q.  Nobody saw anyone on those used paths,
24  right?
25     A.  I haven't been told that anybody saw anyone

Page 172

1  on those paths.
2      Q.  So you can't make assumptions, can you, sir,
3  without evidence?  Don't we live in an evidence-based
4  world, you and I as lawyers and you as a lawyer and a
5  police officer?  Evidence based.
6      A.  Mm-hmm.  Correct.
7      Q.  And with regard to the -- the home area,
8  were you aware that is a -- generally a retirement
9  community?
10         MR. BENJAMIN:  Object to foundation.
11  BY MR. LILLEY:
12     Q.  Just a simple question.  Yes or no?
13     A.  No.
14     Q.  And that the house next to the condo that
15  was -- that was owned by someone next to the
16  McKenneys was vacant because those folks were in
17  Florida.
18         You didn't -- did you ever find that out?
19     A.  I don't know that to be the case.
20     Q.  Okay.  So you -- right now, I'm going to
21  represent to you that it is the case.
22         You going to accept that?  I've been doing
23  pretty good now.
24         MR. MARCHESI:  Objection.
25         THE WITNESS:  I -- I don't know.  I recall

Page 173

1   there had been some recent conversation with those
2   folks, so I -- whether it happened door to door or
3   over the telephone, I don't know.
4   BY MR. LILLEY:
5      Q.  Well, those are the folks that he had --
6   McKenney had originally moved the -- the
7   air-conditioning for, wasn't it?  That caused his
8   back problem.  Do you know that to be the case?
9      A.  I don't know that that caused his back
10   problem.
11      Q.  Okay.
12      A.  And I don't know that it matters.  But I
13   know he moved an air conditioner.  I know that he was
14   in contact with the neighbors.
15      Q.  I'll suggest to you that that was the
16   neighbor, and the neighbors were in Florida.  And the
17   neighbor across the street was in Florida.  The one
18   next -- adjacent on a clockwise position.
19      Did you know that?
20      A.  I did not.
21      Q.  Okay.  Let's move on.
22      So I take it, sir, that your -- your point
23   is well taken, I would submit, that other people can
24   be shot if guns are shot where there are people.
25      Fair statement?

Page 174

1      A.  Yes.
2      Q.  But that could happen in any setting, in a
3   hunting setting, bird hunting, deer hunting.  I don't
4   know what you hunt for around here, but that's always
5   a risk, that stray bullets can hit people and do from
6   time to time; is that correct?
7      A.  Certainly the risk varies with the
8   circumstances --
9      Q.  Right.
10      A.  -- but it happens from time to time and
11   typically, this time of year, it's elk and -- and
12   deer.
13      Q.  Okay.  But we don't ban the hunting of those
14   animals because the fact that a bullet might stray
15   and hit and even kill somebody, do we?
16      A.  No.  We impose a -- a number of reasonable
17   and --
18      Q.  Right.
19      A.  -- fairly restrictive safety restrictions
20   that follow.
21      Q.  You indicate that -- on page 7 -- I'm moving
22   on fortunately.
23      On page 7, in the middle of the second --
24   first paragraph, you -- you admit -- you say -- let's
25   just read it.  It will be faster, I guess.

Page 175

1      You say about three lines down, "A
2   reasonable well-trained officer would consider these
3   facts and would recognize that a rifle is better
4   suited to address the threat presented."
5      That -- that essentially summarizes some of
6   our earlier -- your earlier answers, correct?
7      A.  Yes, sir.
8      Q.  And -- and you also say that in addition --
9   the last sentence there, or middle sentence there,
10   "In addition to his law enforcement training, Mangino
11   had extensive training with the patrol rifle through
12   his military service," correct?
13      A.  Yes, sir.
14      Q.  So he not only was trained as a police
15   officer at the academy, he was trained as a -- I
16   believe he was an Air Force reservist, correct?
17      A.  Yes.
18      Q.  Or at least in the service.
19      A.  I think it was reserve, yes, sir, or
20   National Guard.
21      Q.  And there's no reason to believe, is there,
22   that -- I mean, you don't know -- but there's no
23   reason to believe that Mr. McKenney had any kind of
24   training of intensity and of using firearms as
25   Mr. Mangino, at least using logic.

Page 176

1      MR. BENJAMIN:  Objection.  Foundation.
2      THE WITNESS:  I don't know.
3   BY MR. LILLEY:
4      Q.  Right.  You just don't have any -- any
5   information.
6      A.  I do not.
7      Q.  So apart from the age differences, there's
8   no -- you -- we never got any -- any particular --
9   outside of the fact that Mr. McKenney had rifles and
10   guns in his house, there is no indication that he had
11   any training on any of those, is there?
12      A.  Not of which I am aware.
13      Q.  Okay.  All right.  Now, on page 8, if we
14   could flip over there 8, there's a statement I -- I'd
15   like to ask you a few things about.
16      On the top of the page, you say, "Moreover,
17   he was specially trained in crisis intervention
18   techniques and communicating with persons."
19      What are you -- and you're talking about
20   McKenney, I believe, if you want to read before or
21   after.
22      What -- what do you base --
23      MR. LILLEY:  What?
24      MR. BENJAMIN:  Mangino.
25   ///

BY MR. LILLEY:

1  Q. Mangino. What do you base that on?
2  A. He had attended the crisis intervention
3  technique course.
4  Q. Okay. And did he have any experience or
5  training in a situation similar to this, ever in
6  your -- in -- in anything that you looked at?
7  A. That would depend on the curriculum that was
8  offered in the CIT course and whether that was
9  consistent with the national curriculum that is used.
10  Q. Do you have any evidence that he had any
11  training in the area in which he was -- which he
12  killed a man using lethal force?
13  MR. MARCHESI: Objection to form.
14  BY MR. LILLEY:
15  Q. Any -- any evidence whatsoever outside of
16  what we've talked about here in -- in terms of
17  Cumberland County SOPs and things of that nature.
18  A. Out -- outside of the training and the
19  instruction of policies that we've discussed here
20  today and that are in the record, no, I do not.
21  Q. But you don't know that he even read those
22  policies. We've already been through that, correct?
23  The policies we went through when we were doing the
24  inventory, we don't even know that he's ever even

1  read those.
2  Do you agree? You never determined it.
3  A. I don't know. I don't know that someone
4  doesn't know, but I don't know.
5  Q. Okay. Now, you cite in your -- in -- let's
6  move up to page 10 and skip a couple pages.
7  You cite in your report -- excuse me.
8  A. Do you want one of these, sir?
9  Q. Maybe I better. Thank you.
10  (Discussion held off the record.)
11  BY MR. LILLEY:
12  Q. You -- you -- on page 10 of your report, you
13  specifically talk about Mangino being instructed in
14  one of the Lieutenant Tueller's common maxim action
15  beats reaction.
16  Do you see that?
17  A. Yes.
18  Q. Top of the page there.
19  And it -- then you go on to say, "In my work
20  as a certified force" signist -- "force science
21  analyst."
22  You see where you're saying that?
23  A. Yes.
24  Q. That's what I was asking you about before,
25  were you certified, and you said you didn't know

1  whether you were or not. You -- you say you are in
2  your report, right?
3  A. No.
4  Q. No. Am I misreading it?
5  A. You are confounding facts.
6  Q. Okay. You tell me what --
7  A. Lieutenant --
8  Q. Explain it.
9  A. Yeah, so the force science program from
10  Mankato State University is the Force Science
11  Institute is operated by Bill Lewinski, Dr. Bill
12  Lewinski. It's -- it's separate and apart from
13  Lieutenant Tueller's --
14  Q. Oh, okay.
15  A. -- now retired, but former Lieutenant
16  Tueller's work.
17  So I -- I didn't know that you were going
18  this direction. I am certified through the Force
19  Science Institute as an analyst and -- and --
20  Q. Oh, okay.
21  A. But Lieutenant Tueller's courses are
22  separate. I can see how -- because they're in the
23  same paragraph that may have misled you.
24  Q. It may have, and I appreciate your
25  clarification.

1  So Tueller didn't certify you on anything,
2  but you were certified by Lewinski in the Force
3  Science group --
4  A. Correct.
5  Q. -- that he --
6  A. Yes, sir.
7  Q. -- has -- has done.
8  And what were you -- sorry.
9  A. I have a lot more of these --
10  Q. No, no, that's all right. One's enough.
11  MR. MARCHESI: He's just going to give you
12  enough until you choke on one.
13  MR. LILLEY: Yeah. I know. You got
14  something in this, haven't you? Because I put sodium
15  pentothal in your water. I just want you to know
16  that.
17  MR. MARCHESI: One way or the other, we're
18  getting out of here soon. One of you guys is going
19  to --
20  THE WITNESS: Well, the grand irony of that,
21  of course, is that -- that -- try to sell incredibly
22  restricted for purposes of lethal injection, but --
23  but I digress.
24  MR. LILLEY: Yes. Okay.
25  THE WITNESS: Anyway --

Page 181

1  MR. LILLEY: Let's hold on. Trying to get
2  through this. I appreciate it. And I'm guilty of it
3  too.
4  BY MR. LILLEY:
5  Q. So in any way, Dr. Lewinski -- who's
6  Dr. Lewinski?
7  A. Dr. --
8  Q. Not related to Monica, I assume.
9  A. No.
10  MR. MARCHESI: Put that on the record.
11  THE WITNESS: No. I'm -- I'm confident the
12  poor man is asked that a number of occasions.
13  Dr. Lewinski is a -- I -- I don't remember
14  what his exact degree is. He's -- he's a biomechanic
15  specialist professor at Mankato State University
16  and -- and operates a program at the university
17  called the Force Science Institute.
18  It's -- I'm sure you're familiar with it
19  because Mr. Tucker has referred to -- to their work,
20  but it's a -- it's an institute, and Dr. Lewinski
21  being an instructor that studies the application of
22  human performance factors to actions taken by law
23  enforcement officers and people they deal with.
24  BY MR. LILLEY:
25  Q. He's a psychologist, isn't he?

Page 182

1  A. I think that his degree is in psychology.
2  Q. And he's the guy that embraces, among
3  others, and I think you, the concept of action beats
4  reaction in law enforcement.
5  Am I right?
6  A. I -- I think he would express it slightly
7  differently, but I -- you'd have to ask him if he
8  would accept that statement, but I -- I suspect
9  that's accurate.
10  Q. In this case, action beats reaction does not
11  apply, does it?
12  A. I disagree.
13  Q. Given the -- well, let -- let me try to
14  tighten that question up a little.
15  Given the fact of the distances, the cover,
16  the -- the -- the -- the training of the police
17  officer, this isn't your typical test, at least as
18  far as I -- I've read it, of the -- the Force Science
19  Institute in trying to prove that action beats
20  reaction.
21  Do you agree with that? And I'll get a
22  little sharper on the question, if you want.
23  A. I mean, this scenario is not altogether that
24  far afield from testing that I haven't participated
25  in nor have I read the actual study results, but I --

Page 183

1  I've been exposed to testing that's been done at the
2  Force Science Institute that -- that's not altogether
3  dissimilar from the fact pattern that un -- unravels
4  here.
5  Q. Come now, sir. You know that the -- the
6  tests that are -- that -- that Lewinski and Tueller
7  before him have done generally consists of shooting
8  or assault within a 20, 21-foot confinement, No. 1,
9  correct?
10  A. Some do.
11  Q. All do, don't they, on the testing side?
12  A. I don't believe so.
13  Q. Are you familiar with any test whatsoever in
14  which Mr. Tueller or Mr. Lewinski ever tried the
15  action beats reaction test when the distance between
16  the shooter and the -- and the -- and the -- the
17  subject was greater than 50 feet?
18  A. I'm -- I'm not certain. I've seen some
19  testing done by Force Science at a longer distance.
20  I -- I don't know -- and, you know, frankly some of
21  the testing they've done at distances are irrelevant
22  to the analysis.
23  Q. Well, have you ever seen one, adding to
24  that, the test done in which one of the participants,
25  namely the police officer, was -- was behind cover

Page 184

1  which -- which either -- either Tueller or Lewinski
2  did?
3  One of the participants, the police officer,
4  is -- as -- is behind cover similar to what we have
5  here.
6  A. I believe a few years ago, I did see a -- a
7  video that demonstrated the scripting of part of the
8  study done by Force Science that involved the officer
9  being behind cover.
10  Q. Do you remember the result?
11  A. I don't.
12  Q. And that result, reaction being action, did
13  it not?
14  A. No.
15  Q. You sure?
16  A. Yes.
17  Q. And with regard to Tueller, his claim to
18  fame is he wrote an article in 1983, as I recall,
19  that said "How Close is Too Close?," correct?
20  A. No.
21  Q. Okay. What's his claim to fame?
22  MR. MARCHESI: Again, just -- you asked two
23  questions and the witness said no.
24  You asked what his claim to fame was and
25  then whether he wrote a study, so I'm not sure which

Page 185

1  the no was to. Perhaps we could get some
2  clarification on that.
3  BY MR. LILLEY:
4      Q. Sure. Clarify that for your --
5      A. Lieutenant Tueller wrote the article
6  published in S.W.A.T. Magazine, and the title is, I
7  believe "How Close is Too Close?" I believe it was
8  published in the spring of 1984. I don't recall
9  exactly the month.
10      I don't think that Lieutenant Tueller, were
11  he here today, would say that that is his claim to
12  fame.
13      Q. Okay. He might not say it, but that is in
14  fact what people have been -- the mantra that a lot
15  of police officers, including yourself, taught other
16  police officers; is that not true? Just simply
17  action beats reaction.
18      A. I've taught officers principles related to
19  that. I've used that expression.
20      Q. And you --
21      A. I --
22      Q. Go ahead.
23      A. I know Lieutenant Tueller and that -- I
24  certainly wouldn't say that's his claim to fame.
25      Q. Okay. His article, "How Close is Too

Page 186

1  Close?" isn't the most famous article in -- in recent
2  history in the police annals?
3      MR. MARCHESI: I object. Form and
4  foundation.
5      THE WITNESS: I -- I don't know.
6  BY MR. LILLEY:
7      Q. Well, okay. I mean, we don't have to -- I
8  don't want to beat that to death, but I would like
9  to -- you do agree that it's been an article that has
10  been -- had impact on various police department and
11  police training.
12      Do you agree that?
13      A. Yes.
14      Q. And, in fact, that's where the concept, the
15  phrase, the mantra action beats reaction was born.
16      Do you agree with that?
17      A. No.
18      Q. Where did that phrase come from, action
19  beats reaction, if you know?
20      A. I don't know.
21      Q. And at least so that we can get this out of
22  the way, with regard to Mr. Tueller, that experiment
23  was an experiment done with one person holding a
24  rubber knife, the other person having a gun with
25  blanks, and they were 21 feet apart.

Page 187

1      Do you agree?
2      A. Most of them were done in that fashion. The
3  test was repeated on a number of occasions with many
4  different participants.
5      Q. I'm talking about the original test in the
6  article action beats -- the original article "How
7  Close is Too Close?"
8      Isn't that the genesis of the whole concept
9  of action beats reaction?
10      A. I'm not -- not sure of the question.
11      I -- I don't think that's where the phrase
12  came from, and the article was published not based on
13  one person, and with a -- a gun loaded with blanks
14  and one person with a rubber knife.
15      Q. What was it based on?
16      A. As I just said, it was based on a number of
17  repetitions of a very similar scenario, as you've
18  described.
19      Q. At -- at a 20- to 21-foot distance, correct?
20      A. At a 21-foot distance.
21      Q. This distance here when my client was shot
22  was 69 feet according to the attorney general's tape.
23      Do you agree with that?
24      A. Yes.
25      Q. That makes it three times, does it not,

Page 188

1  longer distance between the shooter and the -- and
2  the -- and the deceased than that article?
3      A. Correct.
4      Q. And also, Tueller's article, the shooter was
5  not behind cover.
6      Do you agree with that?
7      A. Correct.
8      Q. And also in that article, the shooter did
9  not have a fire -- a -- a long gun.
10      Do you agree that?
11      A. Yes.
12      Q. And in the Tueller article, the deceased,
13  the faux deceased, the pretend deceased, was a well
14  trained officer with a -- with a firearm and with a
15  knife, that is -- am I making myself clear? Do you
16  understand --
17      A. The participants in the original assessing?
18      Q. Yes.
19      A. Yes.
20      Q. So what are the similarities that you see
21  between Tueller's original concept about how close is
22  too close, we'll leave it at that, and the facts of
23  this case? What's similar about it?
24      A. Lieutenant Tueller's original series of
25  experiments and his article really address a

1  different concept than -- than is involved in this
2  particular case.
3      Q.  Okay.  If that's the genesis for the concept
4  of action beats reaction, which you say in your
5  report here, do you not?
6      A.  I do not?
7      Q.  You do not?
8      A.  I do not.  And I just said a minute ago in
9  testimony I did not.
10     Q.  Okay.
11     A.  I don't believe --
12     Q.  I probably talk too much.  I should listen
13  more.
14         Go ahead.  I'm sorry.
15     A.  I don't believe that Lieutenant Tueller --
16  that Sergeant Tueller originated that maximum.  I had
17  heard it before and I believe he had heard it before.
18     Q.  Well, did Lewinski do it?
19     A.  I don't -- I don't know what the source of
20  that particular couplet is.  I don't -- I don't know.
21     Q.  Well, you've been certified by Lewinski.
22  Let me -- correct?
23     A.  Yes.
24     Q.  Let me ask you:  How does he conduct his
25  tests with -- in order to determine the length of

1  time it takes for a person to shoot another person --
2      A.  Hmm.
3      Q.  -- or the other person to shoot the police
4  officer, whatever issues that he's dealing with in
5  that -- in that -- in that inquiry?
6      A.  I -- I can only speak in generalities, and I
7  don't believe that I can speak with absolute
8  certainty of how he -- how he conducts the tests.  So
9  I -- I know that a couple of them that I've studied a
10  little more carefully, the first step for him is
11  to -- is to articulate and refine a hypothesis.
12  He'll circulate that hypothesis to some of his
13  colleagues in the field, and then he will design a --
14  a -- a testing plan, essentially a business plan for
15  how he's going to execute the test.  He'll take that
16  to his peers as well as to an institutional review
17  committee.  The institutional review committee --
18     Q.  Sir, sir, I'm -- you can keep going, but I'm
19  just after the test itself.
20         Have you seen one?
21     A.  Yes.
22     Q.  And what -- tell -- describe what they do.
23     A.  Well, I -- okay.
24     Q.  Just a typical one.  I -- I -- I've read
25  some of his stuff.

1      A.  Typically they are measuring discrete types
2  of movements, for example, a person seated, how
3  quickly a -- a person seated might take a weapon from
4  a -- a nonthreatening position as if a person were
5  seated in a car.  This is the one I --
6      Q.  All right.
7      A.  -- reserved in some detail.  Seated in a
8  car, turn -- the person might turn their head and
9  raise and fire a weapon from a seated position.
10         And contrast that, then, with the time that
11  the officer at the car window could retreat and draw
12  a weapon and return fire.  That's a -- that's not an
13  atypical execution of what is preceded by a fairly
14  complex and lengthy design and peer review plan
15  before the testing is ever done.
16         That test is typically repeated with a
17  control group that the -- the characteristics of the
18  control group are documented.  The characteristics of
19  the actor officers, the involved officers are -- are
20  documented.
21         Typically, the conditions are replicated
22  and -- and the testing is done at multiple events,
23  different -- or multiple times, different days.  And
24  then it goes out for review and publication.
25     Q.  Okay.  I'm just interested in the test

1  itself.
2      The test is done with -- both people have
3  firearms with -- that are not -- that have no active
4  ammunition in them, correct?
5      A.  Yes.
6      Q.  And it's usually done at fairly close range,
7  10, 15, maybe 20 feet.
8         Do you agree?
9      A.  Many of the tests are done at close range.
10     Q.  And do you know of any Lewinski has done
11  beyond 20 feet in -- in -- in trying to determine
12  whether action beats reaction?
13     A.  Again, I -- I know -- I believe that I've
14  seen testing that was done at greater distances.  I
15  don't remember what the hypothesis --
16     Q.  Okay.  Fair enough.
17     A.  -- under examination at that time was.
18     Q.  And they're done -- people are not under
19  cover.  They are face to face, correct?
20     A.  Some of them are, some are at -- at
21  180-degree angle, and some are at 360.
22     Q.  Under cover, behind cover, like -- like --
23     A.  Oh.
24     Q.  -- behind a car or behind a building.
25     A.  Again, I -- other than the answer I've given

1    you on that point, I -- I'm not aware of any.
2       Q.  And they're -- usually have similar weapons,
3    do they not?  Firearms, handguns, or rifles.
4    Sometimes they mix them up, but they usually have
5    handguns, that is the suspect and the police officer,
6    or do you know?
7       A.  I don't -- I -- I don't know.
8       Q.  And they use a -- what they call a -- I
9    think it's called a shot clock, do they not?  I
10   think I may have the wrong name, but it's where
11   you --
12      A.  Well --
13      Q.  -- push the buzzer and then people start
14   moving.
15      A.  Shot clock is one that speaks to a number of
16   instruments, but -- but there are shot clocks that
17   give an audible signal and -- and I've seen those
18   used.
19      Q.  Okay.  But normally, though, it's -- it's --
20   yes.  And -- and most of Lewinski's are done with a
21   shot clock, are they not?  That you've read about but
22   you haven't seen.
23      A.  I don't know about most.  A number are.  I
24   don't know about most.
25      Q.  And the -- and the -- and the idea is that

1    when the buzzer goes off, the person who has the --
2    the gun by their side, let's say, using that example,
3    I think -- I think he calls it bootleg, actually.
4       Do you recall him calling it that?
5      A.  One of the positions that he tests from a
6    seated position in a chair in the studio is -- he
7    refers to as bootleg.
8      Q.  No, I'm talking about standing up with a gun
9    by your -- by your calf.
10      A.  You can do -- yeah.  Okay.  You can do
11   bootleg either way.
12      Q.  Okay.
13      A.  But yes.
14      Q.  And -- and -- and that would be the
15   so-called -- the -- the -- the -- the hypothetical
16   suspect in -- in a case or -- or subject.
17       And the other officer would have his firearm
18   pointed right at the suspect, loaded gun, although it
19   would be obviously blanks, with his hand on the
20   trigger.
21       That would be the typical setup, would it
22   not, to determine whether action beats reaction under
23   those circumstances?
24        MR. MARCHESI:  Objection to form.
25        THE WITNESS:  I -- I don't know whether

1    Dr. Lewinski would say that's typical and whether
2    that in fact is typical given the -- the variety of
3    tests that he's done.
4       It -- it certainly represents one vein of
5    testing that -- that I've not participated in but
6    have seen videos of.
7    BY MR. LILLEY:
8      Q.  But -- but in -- in any event, do you at
9    least agree that the methodology is the same, that he
10   uses a -- a buzzer, usually, to go off, and then
11   the -- the suspect makes an effort to point the gun
12   and the barrel at the police officer?
13      A.  I -- I have seen a test like that executed.
14      Q.  And then the police officer responds by
15   pulling a trigger that activates the shot clock as to
16   when his shot is fired so you can determine who gets
17   there first, correct?
18      A.  Yes.
19      Q.  Now, does that principle work in every case?
20   Action meets reaction.
21      A.  I'm -- I'm not really sure what you meant by
22   every principle or every case, so I -- I --
23      Q.  Well, is it a principle that you teach
24   your -- your folks?  You -- you teach the law
25   enforcement people that action beats reaction, do you

1    not?
2      A.  I -- I teach them that as a scientific fact
3    that stimulus always precedes response.
4      Q.  Oh, come on, sir.  Now, you -- you -- you
5    don't teach them in those words, do you?  Don't
6    you --
7      A.  No.
8      Q.  -- teach them in terms of their guns, that
9    action beats reaction, if you have a person trying to
10   raise their gun while the other person has the gun
11   trained on them?
12      A.  By definition, I believe that's true.
13      Q.  The article that we furnished, and I assume
14   you've had an opportunity to look at it, that was
15   done by my expert in this case, Mel Tucker, have you
16   had an opportunity to look at that?
17      A.  No.
18      Q.  You haven't.  Well, maybe at the -- it's
19   only three pages.  Maybe at the break you can do it.
20       Do you have a copy of it?
21      A.  I do not.
22      Q.  Well, you -- you do now because I'll furnish
23   you one.  But let's not delay, so I'll -- I'll let
24   you -- you want to look at it later.
25       Let me ask you with regard to Mr. Tucker,

1  however, that he -- I'll -- I'll represent to you
2  that his article, "Action always beats reaction or
3  does it?" essentially are the findings that he made
4  by doing his experiment that I think you have looked
5  at, correct?
6     A. I've looked at the video he made.
7     Q. Pardon me?
8     A. I've looked at a video that he made.
9     Q. Okay. Do you think it's valid, the findings
10  that he came up with?
11     A. I think that the execution of his case study
12  leaves much to be desired.
13     Q. And what did -- what specifically do you
14  think needs to be added?
15     A. I didn't say anything needed to be added.
16     Q. Well, didn't he do essentially the same
17  thing that Lewinski has done in the past to come to
18  certain conclusions?
19     A. Oh, my. No. No, no, no, no, no. Not even
20  close.
21     Q. Well, you've got to tell me what the
22  difference is, then, because -- well, let -- let's go
23  through it.
24     At least with regard to Tucker, he got
25  together with another police chief and they -- for

1  this case, apparently, using this case as a impetus
2  for their experiment, they had a -- a clock that did
3  what I said it did, did -- did they not? When the --
4  when Tucker tried to raise his gun and the other
5  officer, Roy Taylor, had his gun pointed at Tucker,
6  the clock would go off each time each one of them
7  pulled the trigger.
8     You understand that to be the case so far?
9     MR. MARCHESI: Objection. Form.
10  Foundation.
11     THE WITNESS: No.
12  BY MR. LILLEY:
13     Q. You don't understand that to be the case?
14  Well, then tell me what you -- you understand the
15  experiment to be.
16     A. Well, in -- in his deposition --
17     Q. Tell me about the experiment itself. I'm
18  not talking about his deposition. I'm talking about
19  the experiment that you saw on videotape.
20     MR. MARCHESI: Mr. Lilley, you asked the
21  question. He can answer it however he wants. And if
22  he wants to refer to something, he can do that.
23     Please answer.
24     THE WITNESS: In his deposition, Mr. Tucker
25  stated --

1  BY MR. LILLEY:
2     Q. You can keep going there, sir. It's going
3  to be longer than a deposition if you don't answer my
4  question. I'm not interested in his --
5     MR. MARCHESI: Mr. Lilley, you're not going
6  to --
7     THE WITNESS: I can't answer your question.
8     MR. MARCHESI: -- make threats --
9  BY MR. LILLEY:
10     Q. You can't answer my question?
11     A. I can't.
12     Q. Why?
13     A. You won't let me.
14     Q. I want you to talk about the experiment as
15  you saw it, not about what he said about it in his
16  deposition.
17     Can you do that, or if you can't --
18     A. I -- I can. I'll -- I'll have to not refer
19  to any external sources.
20     MR. MARCHESI: No, no --
21     MR. LILLEY: That would be good.
22     MR. MARCHESI: -- actually -- no. No. I --
23     MR. LILLEY: No, no. There's no objection
24  permitted here.
25     MR. MARCHESI: There is.

1     MR. LILLEY: I'm asking this expert, and he
2  is an expert, to take the deposition -- not the
3  deposition but the videotape of the experiment my
4  expert did and comment on it. It's perfectly
5  appropriate.
6     MR. MARCHESI: Mr. Lilley --
7  BY MR. LILLEY:
8     Q. So if you can do that, sir -- we'll talk
9  about his deposition later, but I want you to tell me
10  with regard to his actual experiment that you saw on
11  the -- on the disc -- and you did see it, correct?
12  Correct?
13     A. My answer on that is just not going to
14  change from the five or six or seven times you've
15  asked me. Yes, I saw it --
16     Q. Okay.
17     A. -- once with music and once without.
18     Q. Okay. Well, then -- then what's your
19  criticism of it?
20     MR. MARCHESI: Okay. And now, Mr. Lilley,
21  I'm going to say something. You asked him to
22  comment. He --
23     MR. LILLEY: On the experiment.
24     MR. MARCHESI: Excuse me. When you -- you
25  can frame a question any way you want, and the

## Page 201

1  witness can give an answer any way the witness wants.
2  MR. LILLEY: No, he can't.
3  MR. MARCHESI: Actually, you're wrong about
4  that. Okay? So you asked him a question --
5  MR. LILLEY: I've asked him to give an
6  answer that talks about that, and he says he can
7  without -- but he would prefer to use external
8  information.
9  MR. MARCHESI: Okay. Okay. Let me know
10  when you're done, and then I'm going to speak until
11  I'm done.
12  MR. LILLEY: This is an interlude at 3. Are
13  we about finished?
14  VIDEOGRAPHER: Twenty-four minutes left.
15  MR. MARCHESI: Good ring tone.
16  MR. LILLEY: Pardon me?
17  VIDEOGRAPHER: We have 24 minutes left.
18  MR. LILLEY: Okay. He -- I want him to
19  answer just from the experiment, not from what
20  Mr. Tucker may have said about the experiment in the
21  deposition. Just from the experiment.
22  MR. MARCHESI: You don't get to limit his
23  answer.
24  MR. LILLEY: I do get to limit his answer.
25  MR. MARCHESI: I disagree, and I'm telling

## Page 202

1  this witness that he can answer the question any
2  way --
3  MR. LILLEY: Are you instructing him not to
4  answer?
5  MR. MARCHESI: I'm instructing him that he
6  is entitled to answer the question --
7  MR. LILLEY: Well, you're instructing --
8  MR. MARCHESI: -- using any information --
9  MR. LILLEY: You're obstructing this
10  deposition, as you do at around about this time of
11  every deposition I've had.
12  MR. MARCHESI: No.
13  BY MR. LILLEY:
14  Q. Let me ask you, sir: Can you comment on
15  the -- on the actual experiment itself? Do you feel
16  capable of doing that without reference to
17  Mr. Tucker's deposition or any outside source?
18  A. Sure. I can give a --
19  Q. Okay.
20  A. I can give an incomplete answer.
21  Q. Okay. And that's fine. And we'll complete
22  it as much as we can. And then these folks will have
23  an opportunity to ask you questions when I'm
24  finished.
25  Tell me what your position is with regard to

## Page 203

1  that experiment. And when I say "position," and I
2  want to make that -- what is your critique about that
3  experiment that you don't think it matches the
4  experimentation in any way of Mr. Lewinski?
5  A. If it were to match the experimentation done
6  by Dr. Lewinski, the -- a number of the factors that
7  I discussed earlier with respect to creation of a
8  hypothesis, peer discussion and peer review of the
9  hypothesis for validity as a principled hypothesis
10  that can be explored through the scientific method,
11  followed by then a return to the drawing table to
12  design and articulate in a way that others can read
13  and critique and experiment that then is capable of
14  execution and capable of repetition by other
15  similarly situated practitioners in that field, then
16  the experiment would be taken to an institutional
17  review committee that would review the proposed
18  experiment for a number of -- a number of different
19  issues, safety, the legality, copyright issues --
20  Q. Oh, come now, sir. I'm going to --
21  MR. MARCHESI: Please let him finish.
22  BY MR. LILLEY:
23  Q. I'm asking you about --
24  MR. MARCHESI: No. No.
25  ///

## Page 204

1  BY MR. LILLEY:
2  Q. -- the actual test itself.
3  MR. MARCHESI: Mr. Lilley --
4  BY MR. LILLEY:
5  Q. I understand what you're saying.
6  MR. MARCHESI: Mr. Lilley --
7  BY MR. LILLEY:
8  Q. Do you think you're finished?
9  A. I'm not even close to being finished.
10  Q. Go ahead.
11  A. The institutional review committee would
12  study a number of issues be it copyright, and perhaps
13  most significant, they would look at the validity of
14  the design for the experiment itself. The experiment
15  that would then be conducted using control groups --
16  and this would all be defined well in advance, and
17  a -- a minimum cohort would be studied.
18  Q. A what?
19  A. Minimum cohort.
20  Q. Okay.
21  A. A minimum cohort.
22  Q. What's that mean?
23  A. Well, I don't -- a minimum cohort is a --
24  in -- in science and in medical research, there are
25  studies. There are case series. There are different

Page 205

1 levels of scientific exploration.
2 And for a study to have any validity, there
3 need to be a number of participants tested in
4 precisely the identical fashion. And the cohorts'
5 limitations and abilities need to be discussed in the
6 paper.
7 So Dr. Lewinski would bring -- and -- and
8 I'm talking about something that anybody -- any
9 respectable scientist wanting to conduct an
10 experiment would follow these -- follow these steps.
11 I'm not a scientist. I don't do this work, but I've
12 read enough of them and talked to enough of them to
13 know that -- that they would say "psha" to anybody
14 who didn't do these core critical steps.
15 So then once the cohort is assembled under
16 very controlled conditions, testing for making sure
17 that there is -- they have minimized or eliminated as
18 many variables as possible, they would conduct their
19 testing. They would then do an analysis of their
20 test. They would circulate that analysis among peers
21 for peer review, and then ultimately, the paper would
22 be approved for publication.
23 I didn't see any of that process followed in
24 the -- in the information that I obtained solely from
25 the -- the video -- the video that was staged by

Page 206

1 Mr. Taylor and -- and Mr. Tucker.
2 Q. So -- so --
3 A. The -- the actual execution seemed puzzling
4 to me in that it -- it appeared to me that Mr. Tucker
5 was actually emotionally overwrought or was acting as
6 if he were emotionally overwrought when he hears the
7 stimulus of gunfire or at least when he -- in that
8 general area.
9 He controls, in that situation, something
10 that in a valid experiment someone else would be
11 controlling, and that's the activation of the actual
12 stimulus. Although, I'm not sure he understands --
13 in fact, I'm sure he's confused about this. But
14 he -- he's the one that's really starting the
15 sequence of events because he's the one who's
16 activating the device that makes the sound that then
17 triggers some kind of response from somebody.
18 Q. Who -- who's activating the stimulus?
19 Mr. Tucker?
20 A. It appears to me that Mr. Tucker is.
21 Q. Where do you get that information? There's
22 nothing on the -- on the videotape that would show
23 that, is there?
24 A. Oh, yes.
25 Q. Well, what is it?

Page 207

1 A. You can see the contracture of his muscles
2 as he activates the shot clock, which it appears
3 that -- I don't know. I don't want to impute any
4 motives to him, but it sort of appears he's trying to
5 hide it.
6 Q. Hide --
7 A. That he's trying to hide it.
8 Q. Hide what?
9 A. The shot clock.
10 Q. He's trying to hide it.
11 A. No. I said I don't want to cast aspersions,
12 but it appears that he's trying to hide it.
13 Q. Because you say his muscles do what?
14 A. The contracture of his muscles. You can see
15 arm movement.
16 Q. Do what -- do what and what do they mean?
17 A. It appears to me that he's triggering the
18 sound, that he's the one holding the shot clock.
19 Q. Okay. And therefore, that the -- well, you
20 are, and you're saying that it appears to you that
21 he's doing this dishonestly, correct?
22 A. I didn't say that.
23 Q. But that's what you're saying, isn't it, in
24 substance?
25 A. No.

Page 208

1 Q. You're -- you're saying that he's trying to
2 skew the results by -- by controlling and causing the
3 stimulus whenever he pleases.
4 Isn't that what you're saying?
5 A. I believe that he controls the stimulus
6 whenever he pleases.
7 Q. And if he doesn't control the stimulus, if
8 someone else is -- is -- is -- is causing the -- the
9 beep to go off, would that allay your concerns?
10 A. That would begin -- that would be one of
11 many, many factors that could help remedy the defects
12 in the study.
13 Q. Well, if -- if that is the case, that
14 somebody else pushes the button, so to speak, that
15 causes the noise to cause him to raise his firearm,
16 do you think if -- if those are the circumstances and
17 the case, that his conclusions are valid?
18 A. No.
19 Q. Why not? Apart from what you've already
20 said.
21 A. There are a number of other criticisms that
22 don't fit the scientific method here.
23 Q. Scientific method?
24 A. Sure.
25 Q. These police officers are dealing in the

Page 209

1  scientific method.
2      A.  I --
3      Q.  Is that what --
4      A.  I'm sorry.  I misunderstood.  I thought you
5  were asking me about Mr. Tucker's experiment design.
6      Q.  I was.
7      A.  Yeah.
8      Q.  Not the design.  I'm just asking if you
9  thought the experiment --
10     A.  Insofar as a security guard and a retired
11 police chief are conducting something that's being
12 videotaped, I don't think they're acting
13 scientifically.  If that's what you're suggesting, I
14 agree.
15     Q.  And you think that Lewinski does?
16     A.  Yes.
17     Q.  Are his experiments peer reviewed?
18     A.  Yes.
19     Q.  You sure of that?
20     A.  I know that a couple that I have seen have
21 been peer reviewed.
22     Q.  Okay.
23     A.  I've read the documentation.
24     Q.  So would you rather modify your answer to
25 say a couple that you know of have, but otherwise,

Page 210

1  you don't know, do you?  They all haven't, have they?
2      A.  I don't know all the research that
3  Dr. Lewinski has conducted.  There --
4      Q.  Let's look at --
5      A.  Don't cut me off.
6      Q.  I'm sorry.
7      A.  Knock it off.
8      Q.  I'm sorry, sir.  I didn't -- I wasn't
9  looking at you.  I didn't know you hadn't finished.
10 Relax.
11     A.  Just -- just as if I don't know all the
12 research conducted by anyone else, I cannot sit
13 here -- no one can sit here other than Dr. Lewinski
14 and say that all of his research has been peer
15 reviewed.
16     Q.  Let me show you one of Dr. Lewinski's tests
17 from the Force Science Institute that you have been
18 certified by and ask you to -- there's two pages.  I
19 got this on the Internet, by the way, so there's no
20 secret source here.  There's three pages, actually.
21 And they're -- as you can see, they're all under the
22 Force Science Institute that we've been talking
23 about.  Some of them are not relevant, but the first
24 three, I think are helpful.
25     MR. BENJAMIN:  Can we identify it for the

Page 211

1  record if you haven't brought copies for us.
2      MR. LILLEY:  I brought a copy for the
3  deponent.  I haven't gotten a copy for you because I
4  didn't have time, to be honest, but if you want to
5  stop --
6      MR. BENJAMIN:  Are you going to make it an
7  exhibit so we can get it?
8      MR. MARCHESI:  Yeah, of course.
9      MR. BENJAMIN:  All right.
10     MR. LILLEY:  Oh, yeah, it will be an
11 exhibit.  It's in this booklet.  We'll be sure that
12 anything I talk about is in there.  If you want to
13 stop and look at it, you can.  Otherwise, I think
14 it's fairly --
15     MR. BENJAMIN:  No.  Let's proceed.
16     MR. MARCHESI:  Actually, I -- I -- if you're
17 going to show it to my witness and nobody's seen it
18 before, I'd like to look at it before the witness,
19 please.
20     MR. LILLEY:  Sure.  Is it time to take a
21 break?
22     VIDEOGRAPHER:  You've got about 14
23 minutes --
24     MR. LILLEY:  Well, let's -- let's hold off
25 and we'll do it at the break and that will save some

Page 212

1  time.
2      MR. MARCHESI:  Sure.
3      MR. LILLEY:  But this is it.  Well, wait a
4  minute.  I've got to use some other stuff in here,
5  but I'll give it to you of course.  Sorry I didn't
6  make a copy.  Just didn't have the time, things
7  change at the last minute.
8  BY MR. LILLEY:
9      Q.  Let me give you this.  I'll do another one.
10 Maybe this will end earlier for reasons other than
11 mine.
12     A.  I have Sucrets in the car, if you'd prefer
13 those.
14     Q.  Let me see here.  I want to show you under
15 Tab 70, and this is --
16     MR. LILLEY:  Again, I haven't -- you guys --
17 you all -- everybody has these photographs.  I just
18 put a number here, and those will also be part of the
19 exhibits.
20 BY MR. LILLEY:
21     Q.  But this is a photograph that I assume
22 you've seen before.
23     What -- what number is on the side there?
24     A.  Ninety-four.  I believe that I have.
25     Q.  And it gives you an approximation of where

1  everybody is.  I'm going to look over your shoulder
2  because it never made my book either.  At least in
3  terms of the vehicle -- this is taken by the
4  police -- the body, and the house, correct?  Just as
5  a general --
6      A.  Correct.
7      Q.  -- orientation.
8          And do you agree with me at least it appears
9  that the body is a little less than halfway down the
10 driveway?
11     A.  So it would seem.
12     Q.  Okay.  Do you have -- let me just look at
13 this, and I'll help you get through this for the next
14 14 minutes and maybe faster, maybe not.
15         This is another picture of it.  It's
16 Exhibit 145, which will be part of the record.  You
17 see there it's kind of a exhibit that looks like a
18 somewhat aerial or drone position up above the
19 ground.
20         Do you see where the body is covered up?
21     A.  I do.
22     Q.  And you see the police car -- two police
23 cars, one on the right, one on the left, correct?
24     A.  The sheriff's car's on the left.  The police
25 car's on the right.

1      Q.  Right.  And you see you get a -- do you get
2  a -- a feeling for the distance that Mr. Mangino shot
3  McKenney.  That's 70 -- 69 feet I'll represent to
4  you, according to the AG's office approximately, I'm
5  sure.
6      A.  I -- I believe their measurment seems to be
7  accurate.
8      Q.  And at that -- you see how open the area is
9  at that time, the time that he was shot?
10     A.  I do.
11     Q.  There's really nothing that he was -- could
12 or at least -- maybe he could, but he was not under
13 any -- behind any cover as opposed to the county
14 sheriff's car.
15         Do you agree?
16     A.  "He" -- "he" being Mr. McKenney?
17     Q.  Right.
18     A.  No, he was not.
19     Q.  Let me just look at yours again to see if --
20 if it made it into -- I guess it didn't.  This isn't
21 numbered.
22         These two exhibits are not numbered, but I
23 will refer to them as the -- the -- I can number
24 them.  Let me just -- let me just put an A and a B on
25 them so there's no question.

1          VIDEOGRAPHER:  Ten minutes remaining.
2          MR. LILLEY:  Thank you.
3  BY MR. LILLEY:
4      Q.  Under A, we have a -- a picture of
5  Mr. McKenney's firearm.
6          Do you see that?
7      A.  I do.
8      Q.  Do you recall Mr. MacVane testifying that he
9  either kicked that or removed that in some fashion
10 away from Mr. McKenney?
11     A.  I -- I think he said kicked.  I don't recall
12 specifically.
13     Q.  Okay.  That is poor -- poor police work to
14 kick a firearm that is cocked in that position, is it
15 not?
16         MR. BENJAMIN:  Object to form.
17 BY MR. LILLEY:
18     Q.  It's reckless.
19     A.  I -- I probably would have picked it up, but
20 picking it up then contaminates the fingerprints.  So
21 there's a couple of conflicting values there.
22     Q.  Well, there are other ways to get it besides
23 putting your hands on it.
24     A.  That depends how much of a hurry you're in,
25 I suppose.

1      Q.  Well, Mr. McKenney was dead, so he probably
2  wasn't going to use it.  But in any event --
3          MR. BENJAMIN:  Object to form.
4  BY MR. LILLEY:
5      Q.  -- you can do it with a -- with a pencil.
6  You can do it with gloves.  You can do any number of
7  things, can't you, sir?
8      A.  Yeah.
9      Q.  Just asking --
10     A.  There are other methods.
11     Q.  And the danger is if you kick it, it might
12 go off.
13     A.  That's a possibility.
14     Q.  Look at the next picture, if you will, the
15 picture before that.
16     A.  B?  It's labeled B?
17     Q.  Yes.
18         That picture, B, is the picture that we have
19 of Mr. Mangino testifying that that was the time he
20 felt -- we stopped the videotape, you may have
21 recalled this in his deposition, asked him to tell us
22 where it was that he claimed that Mr. McKenney had
23 pointed the firearm either at him or in his
24 direction.  That is the photograph that he picked
25 out.  I'll represent that to you.

1     Do you think that looking at that
2  photograph -- and that's the one that Mangino
3  identified, not -- not anyone else.
4     Do you think that that firearm, as you see
5  it in the photograph, is pointing at anybody outside
6  of the sky?
7     A.  Not at that moment.
8     Q.  And that's the moment, as I said, that he
9  said captured the gun being pointed in his direction.
10     MR. MARCHESI:  I -- I object to that.
11  Mr. Mangino has not even yet had the opportunity to
12  read and sign his deposition.
13     MR. LILLEY:  He can read and sign it all he
14  wants. It's in there and it's clear. I'll -- I'll
15  send you the -- the deposition or I'll dig it out.
16     MR. MARCHESI:  I -- I just simply
17  objecting to the question --
18     MR. LILLEY:  Okay.
19     MR. MARCHESI:  -- just on foundation.
20  BY MR. LILLEY:
21     Q.  If that is true, had -- you did not have
22  the benefit of that -- the -- the picture, did you,
23  or -- or that video at the time you reviewed this
24  case?
25     A.  I saw the video in which, very similar to

1  this picture, Mr. McKenney points a gun and
2  (indicating) in this motion, and --
3     Q.  This is where --
4     A.  -- I think it's taken from this moment right
5  there --
6     Q.  This is --
7     A.  -- I believe.
8     Q.  This is where Mangino, I'll represent to
9  you, said he believed that he was pointing at him,
10  not later when he brings it down and not earlier when
11  he has it in a different position.
12     With that in mind, assuming that I'm
13  right -- I'll represent to you that I believe I am,
14  and I'll dig it out if I have to, if there's time
15  enough -- would the fact that the gun is pointing in
16  the direction it's pointing in give you any pause to
17  believe that Mangino thought the gun was pointing in
18  his direction from the house?
19     MR. MARCHESI:  I object to the question as
20  lacking in foundation and misrepresenting record
21  evidence.
22     You can answer based upon the assumption or
23  the hypothetical that the attorney has posed.
24     THE WITNESS:  Well, this -- this picture,
25  which I believe to be taken from a frame in a

1  video --
2  BY MR. LILLEY:
3     Q.  I just told you where it came from. It
4  was -- came from the frame in the video identified by
5  Mangino as depicting where he pinpoints that
6  Mr. McKenney was pointing the gun in his direction.
7     A.  Okay.
8     Q.  And I'm asking you, sir, if -- if that's all
9  he's got, do you have some concerns about his version
10  of at least this particular claim that McKenney
11  pointed the gun at him from the house?
12     MR. MARCHESI:  Same objection, and I will
13  ask that counsel allow the witness to complete his
14  answer before interrupting.
15     THE WITNESS:  No.
16  BY MR. LILLEY:
17     Q.  Let's look at -- oh, here it is right here.
18     MR. LILLEY:  I'm going to have to mark this,
19  then. Let's take B, and we'll have it marked with --
20  as -- I'm going to have you do this because you've
21  been skating over there.
22     B-1, B-2, and B-3, and that purports to be
23  the -- not only the picture, but Mr. Mangino's
24  deposition referring to the picture and the time
25  element. It's highlighted in the transcript. You'll

1  see, by the way, so that we -- I can anticipate
2  a problem here, that the original tape said 8 rather
3  than 6. It was misread by me from the distance I was
4  from, but all of the other pictures are -- are 8 and
5  that's a -- rather 8 and that's -- it's either 8 or a
6  6. But it's -- it's the one he identified.
7     MR. MARCHESI:  So just to make sure I'm
8  clear, on page 174 of the current unread version of
9  the Mangino deposition where it says 6.31, you're
10  suggesting that that's inaccurate --
11     MR. LILLEY:  I'm told that it's an 8 and I
12  misread it.
13     MR. MARCHESI:  Well --
14     MR. LILLEY:  All of the other -- the -- all
15  of the other video is 8, and he's identified other
16  spots, so it's clearly not any substantive error.
17     MR. MARCHESI:  Then you would be very
18  correct that there's -- in anticipating an issue, and
19  that -- simply add that to the objection if you're
20  suggesting that the time reference --
21     MR. LILLEY:  Well, you didn't read the third
22  document. Maybe this will help you.
23     If you can see that, which is the original
24  one, it says 8:31. Can you see it? You don't want
25  to look at the truth?

Page 221

1      MR. MARCHESI: Mr. Lilley, your editorial
2  comments are unnecessary.
3      MR. LILLEY: It says right -- 8:31 there.
4  If you want to get a magnifying -- do you have a
5  magnifying glass here?
6      MR. MARCHESI: Mr. Lilley, I'm not going to
7  be answering your questions.
8      (Pause in the proceedings.)
9      MR. LILLEY: Just so we can clear this up,
10 Mr. Marchesi, because I don't want to make this a
11 big -- yeah, there you go.
12     It says 8:31. It's the same picture. This
13 is the transcript which, unfortunately, I said 6:31
14 because of my eyes are getting a little weak. And
15 this is the real picture. You can see they're the
16 same.
17     And if you want to look through that, and
18 you don't have glasses, you don't have to wear --
19     MR. BENJAMIN: I don't wear glasses. I
20 don't need them.
21     MR. LILLEY: Can you see that? Can you see
22 it?
23     MR. BENJAMIN: I'm fine.
24     MR. LILLEY: Huh?
25     MR. MARCHESI: Mr. Lilley, what we don't

Page 222

1  know is whether the frames that you are representing
2  and the frames that Mr. Mangino was referring to are
3  in fact those frames.
4      So at this point, there's in my judgment, a
5  lack of foundation --
6      MR. LILLEY: I understand. I understand.
7      MR. MARCHESI: -- in addition to the other
8  objections that I've raised which are noted.
9      MR. LILLEY: The other objections I think
10 have been solved by the evidence I've just given you.
11 And so those -- I'm going to need copies of those
12 because those are my only copies.
13     That would be B-1, 2, and 3, is it?
14     (Exhibit B-1, Exhibit B-2, and Exhibit
15     B-3 were marked for identification.)
16     MR. MARCHESI: And I'm objecting to all of
17 these, particularly B-2, because the transcript has
18 not yet been read and signed. It's not final.
19     MR. LILLEY: The transcript, just for the
20 record, as you understand, is only to -- any
21 nonsubstantive issues in which there's an error. You
22 can't change the substance.
23     MR. MARCHESI: That is absolutely --
24     MR. LILLEY: Pardon me?
25     MR. MARCHESI: That is absolutely untrue --

Page 223

1      MR. BENJAMIN: You're making that up.
2      MR. MARCHESI: -- just the opposite.
3      MR. LILLEY: I'm not making that up.
4      MR. MARCHESI: Of course you are. Either
5  that or you're misapprehending the substance of the
6  rule.
7      MR. BENJAMIN: Are we taking a break now?
8      VIDEOGRAPHER: I have twenty seconds left.
9      MR. LILLEY: Yeah, we're taking a break.
10     VIDEOGRAPHER: Going off the record. It is
11 2:43.
12     (Short recess taken.)
13     VIDEOGRAPHER: This is Tape No. 4 in the
14 videotaped deposition of Kenneth Wallentine. The
15 time is 2:55. We're back on the record.
16 BY MR. LILLEY:
17     Q. If you'll look at Tab 75 in the book I tried
18 to put together here, or you did. I -- my office
19 did, I should say.
20     You see we have a -- an article here,
21 "Canada warned about controversial police shooting
22 expert."
23     Do you see that?
24     A. I do.
25     Q. Have you read that before?

Page 224

1      A. No.
2      Q. Did you know that -- that he was declined,
3  that they -- I'm going to say throw him out because I
4  think that's what it says of Canada because of his
5  less than accurate testimony they found, at least
6  in -- in Calgary, Canada?
7      MR. MARCHESI: I object. Form. Foundation.
8  Hearsay. All rules of evidence.
9      THE WITNESS: I don't know anything about
10 it.
11 BY MR. LILLEY:
12     Q. Don't know anything about it?
13     A. (Shakes head.)
14     Q. This is a case that when he testified that
15 the police was -- were justified that -- in shooting
16 the suspect, but they shot him in the back.
17     Have you heard about that case up in Canada?
18     MR. MARCHESI: You're asking him about
19 Lewinski being disqualified?
20     MR. LILLEY: Of course I am. That's what
21 the article is about.
22     MR. MARCHESI: I object.
23     THE WITNESS: I -- I see that it's dated
24 2013. I -- you know, I -- perhaps I heard something.
25 I don't know. Nothing comes to mind right now.

56 (Pages 221 to 224)

BY MR. LILLEY:

Q. Have you read anything about the prosecutor in the -- in the -- a federal court saying that Mr. Lewinski was suspect in terms of his credentials and his ability to testify to some things he has testified in courts of law about in general?

MR. MARCHESI: Objection. Form. Foundation. Hearsay. Relevance.

THE WITNESS: No.

BY MR. LILLEY:

Q. Or -- and -- and have you heard anything from the -- the Los Angeles prosecutor? Have you ever read any -- any comments he made on articles -- in articles that suggest that he felt that Lewinski was going way over the -- line in terms of some of his opinions?

MR. MARCHESI: Same objection.

THE WITNESS: No.

BY MR. LILLEY:

Q. Do you think he's the top guy in the field of law enforcement with regard to the use of force?

MR. MARCHESI: Objection. Form. Foundation. Relevance.

THE WITNESS: No.

///

BY MR. LILLEY:

Q. Who do you think is besides yourself?

A. I'm certainly not on top. What -- in -- in what particular aspect?

Q. Deadly force --

A. The human --

Q. -- similar to what we're dealing -- dealing with here.

Testing and -- and -- and scientific approaches to seeing what works and doesn't work in cases of confrontation that we had in this case. Who's the guru?

MR. MARCHESI: Objection. Form.

THE WITNESS: I -- you know, I don't know. There -- there are a number -- there are a number of folks out there that cross different disciplines. But of the people who -- who deal specifically in the science of biomechanics and human factors, I -- I don't know who I would say is at the -- very top.

BY MR. LILLEY:

Q. Had you -- before this case, had you heard of Mel Tucker?

A. Yes.

Q. Okay. Do you -- did you know -- do you know him, either by person or by reputation?

A. I don't believe we've ever met.

Q. Do you know what his reputation is in the field of law enforcement?

A. I -- I -- I don't know that he's active in the field of law enforcement. I don't know. I really haven't heard that much about it.

Q. Well, I mean, he has been. He's semiretired now, like I guess you're aware. I'm not sure.

You've never heard anybody comment about whether he was capable in the field or any of that or not capable as the case may be? I'm talking about his reputation.

A. Not -- sure. Not that I recall.

Q. Okay. If you'll take a turn back, if you will, to -- I think it's the very first -- the --

A. The pictures?

Q. Yes. The Force Institute pictures.

A. Oh, these?

Q. Yes.

A. Okay.

Q. The first one is called the bootleg position that we talked about.

Do you remember that?

A. Yes, I do.

Q. And you understand the bootleg position is

where the -- in this case, it happens to be a police officer in this -- in this experiment. Well, let -- let me read it to you and ask you some questions.

Description -- this is on the -- the Force Science Institute. This is Mr. Lewinski's company, correct?

A. I don't believe that it's a company. I don't know.

Q. Or -- or business.

A. I don't believe that it's a business. I believe that it's part of the -- the university system there, the institute is part of the university.

Q. Well, he heads this up.

Do you agree?

A. I -- I think he does. That's my understanding.

Q. And -- and he's the one that got you certified through the Force Science -- Force Science Institute, limited, did he not?

A. I don't recall seeing the term -- doesn't matter, but I don't believe he actually administered the tests that I took, but I don't know.

Q. Was -- was he involved in your certification?

Page 229

1     A.   Yes.  He was one of the instructors in the
2  course that I took.
3     Q.   The description here is, The bootleg
4  position is the name I have given -- this is
5  Mr. Lewinski -- the weapon placement position."  And
6  we've talked about that.  Officers will, for a
7  variety of reasons, pull their weapon from" the --
8  "their holster and place it behind their strong thigh
9  so that it is not readily visible but it is readily
10  available.  Because it is used by street officers,
11  the movement of the weapon from behind the thigh to
12  the common firing position was measured.  The
13  officers were instructed to place the weapon in
14  position behind the thigh, and when a buzzer went off
15  to as quickly as they could raise the weapon to an
16  extended arm firing position, get a sight picture and
17  fire one round.
18     Do you see that, where I'm reading?
19     A.   Correct.
20     Q.   And -- and then he has put down that -- the
21  times.  And under that is, Action.  Raise the weapon,
22  acquire sight picture, fire one round -- excuse me,
23  again.  I'm so sorry for this, but I -- I can't --
24  can't do much about it -- average time was .92
25  seconds.

Page 230

1     Do you see --
2     MR. MARCHESI:  Okay.  I --
3  BY MR. LILLEY:
4     Q.   Do you see where I'm reading?
5     MR. MARCHESI:  I'm objecting to the use of
6  this document.  It's never been shared before.
7  Copies haven't been provided to counsel, and there's
8  no foundation as to whether what you're showing this
9  witness is complete, what context it was made in, and
10  it's clearly hearsay.
11     So I think it's entirely inappropriate.  I'm
12  certainly going to allow the witness to answer the
13  questions, but I will state that objection, and I
14  will reiterate it with respect to each and every
15  question regarding these documents.
16     MR. LILLEY:  Let -- let me follow up on
17  that.
18  BY MR. LILLEY:
19     Q.   You -- you recognize Lewinski as a -- as an
20  authority in the field of law enforcement generally,
21  do you not?  And there are others, but he is one, is
22  he not?
23     A.   No.
24     Q.   He's not a -- he's not an expert?
25     A.   Not generally in the field of law

Page 231

1  enforcement, no.
2     Q.   Well, what is he an expert in?
3     A.   Human factors involved in -- in
4  confrontations, principally deadly force
5  confrontations.
6     Q.   Okay.
7     A.   But this is a guy who would know nothing
8  about -- some of the things you asked me about
9  before, like probable cause, search and seizures --
10     Q.   Oh, no, no, no.  I -- I'm talking about his
11  research and his development and his teaching in the
12  area of deadly force.
13     He's certainly a -- an authority in that
14  area, is he not?
15     A.   I certainly would recognize him as an
16  authority in the area of force science, but police
17  science generally --
18     Q.   Okay.  I see a distinction.
19     A.   -- no.
20     Q.   And the kind of thing we just read about,
21  the bootleg position and -- that -- that the -- the
22  shot clock and the average time, those are things
23  you've actually seen him do or seen that institute
24  do; is that correct?  At least in the car setting,
25  automobile setting.

Page 232

1     A.   Correct.  I have not seen this particular --
2  I mean, I --
3     Q.   Okay.
4     A.   I recognize the format of this document, but
5  I've not seen --
6     Q.   All right.
7     A.   -- this particular activity.
8     Q.   This -- by the way, it's on the Internet.
9     In the second page, if you'd turn the page,
10  it's a follow-up.  It's the next test that he
11  performs, "Officer-Subject Interaction" it's called.
12  And it has some measurements here.
13     A.   Hold on.  I -- the next --
14     Q.   Oh, you may have --
15     A.   The next page is not what I have.
16     Q.   Then let's -- oh, boy.
17     Let me see what the next page is.  Yeah --
18  that's it.
19     A.   Is it this one?
20     Q.   I'm sorry, it's the third page.
21     A.   Okay.
22     Q.   We had it mispaginated.
23     So your third page, my second page, so the
24  record will be clear, "Officer-Subject Interaction."
25  It says, "The officer-subject interactions are almost

Page 233

1  unlimited.  A sample is included here to clarify,
2  illustrate the relationship between the two as well
3  as the general and dramatic difference
4  between a motion that is in action, subject to
5  movement, and the catch-up reaction motion to the
6  officer."
7        Did I read that right?
8        MR. MARCHESI:  Same objection as previously
9  noted.
10       You may answer.
11       THE WITNESS:  Yes.
12  BY MR. LILLEY:
13     Q.  And if you look down at the bottom frames,
14  the timing with trigger pull reaction, that would be
15  the other half of the team in this experiment, the
16  person who has the gun on the suspect, the timing
17  he's got down for that is .54 seconds.
18       Do you see that?
19       MR. MARCHESI:  Same objection.
20       THE WITNESS:  I see that.
21  BY MR. LILLEY:
22     Q.  If you do the math, these .92 and .54, these
23  are milliseconds, I guess, aren't they?
24     A.  It's 5/10 of a second roughly or 54/100 of a
25  second.

Page 234

1     Q.  Right.  Are they called milliseconds?
2     A.  Ninety-one --
3     Q.  I'm not sure to be honest with you.
4     A.  No, hundreds.  The milliseconds would be out
5  to the next --
6     Q.  Okay.
7     A.  -- the -- the next -- I'm not a math guy,
8  but the next place.
9     Q.  Okay.  Well, in any event, with regard to
10  Mr. Lewinski's experience, at least as he's published
11  it on the Internet, it takes the shooter, otherwise
12  known as a police officer in the -- in the -- in the
13  scenario, 54 seconds to -- to shoot the suspect.  And
14  the suspect 92 seconds to aim and fire at the
15  officer.
16       Do you understand the difference?
17       MR. MARCHESI:  Same objection.
18  BY MR. LILLEY:
19     Q.  This is Lewinski now.
20     A.  In -- okay.  Well, in two -- so what you
21  have here are some synopsis of -- and there are far
22  more intensive documents associated with these, but
23  the first one, for example, to have -- there isn't an
24  officer and a suspect here.  Here it's simply --
25     Q.  Two officers.

Page 235

1     A.  Not in the -- not in the first one.
2     Q.  Well, the officer -- the officer in the
3  first one has a gun.  He happens to be a police
4  officer.
5       They're usually done with police officers,
6  aren't they?
7     A.  Some of them are, and -- and some are done
8  with -- he's -- he's taken people out of the
9  community, and he's also used college students in his
10  psychology classes.  They're the easiest guinea pigs
11  to get.
12     Q.  Right.  He uses students and -- and some
13  other folks.  These are actually trained police
14  officers, though.  So presumably they would be a
15  little faster on the draw, so to speak.
16       Do you agree?
17       MR. BENJAMIN:  Object to foundation.
18       MR. MARCHESI:  Join the objection.  As well
19  as the objection previously noted.
20  BY MR. LILLEY:
21     Q.  In other words --
22     A.  I don't --
23     Q.  -- the person that's got the gun down by his
24  side, similar, I'm going to suggest to you, that --
25  that Mr. McKenney had it, is a trained police officer

Page 236

1  as opposed to a civilian.
2       Do you understand that to be the case?
3       MR. MARCHESI:  Same objections.  Please let
4  the witness answer.
5       THE WITNESS:  I -- I don't recall whether --
6  I've seen more intensive documentation of this
7  particular activity, and I don't recall whether this
8  man is a police officer or not and --
9  BY MR. LILLEY:
10     Q.  Well, hold on, hold on.
11       MR. MARCHESI:  Please let him finish his
12  answer.
13  BY MR. LILLEY:
14     Q.  Are you finished?
15     A.  No.
16       And in this one, I will tell you that it is
17  my understanding -- this is just a -- this is a --
18  kind of a gross synopsis pamphlet, like it's my
19  understanding this man was not involved in this
20  activity.
21     Q.  Now hold on, sir.  All I'm doing is -- is --
22  is -- is suggesting to you that your -- your --
23  Mr. Lewinski who wrote this, I'll tell you, and
24  there's an article that goes with it that goes into
25  who he recruited, which I think you're right -- he

Page 237

1  suggested, by the way, that he recruited people,
2  students who were students at the police academy, but
3  students. In this particular case, he used a police
4  officer, as he says here, I -- I take him at his
5  word, to -- to be the -- the so-called suspect. And
6  see how fast he could raise his -- his gun. That was
7  when the -- when the buzzer went off. That's all
8  that that first page purports to do.
9      Do you understand that?
10 A. I do.
11     MR. MARCHESI: And same objection.
12 BY MR. LILLEY:
13 Q. And then with regard to the next page, this
14 officer, the trigger pull reaction sighted, that
15 means he's got the sights -- his eye on the sights
16 similar to, I would suggest to you, Mangino had in
17 our case, to pull the trigger to a reaction to an --
18 to the other person pulling a gun takes 54 seconds.
19     Do you understand that that's his finding?
20     MR. MARCHESI: Same objection.
21     THE WITNESS: I don't know that that's what
22 the parenthetical sighted means, and I don't know, as
23 I stated, that this individual pictured here, which
24 you said is a police officer, I don't know --
25 Q. Well, it says it.

Page 238

1  A. I don't know if, A, he's a police officer,
2  and I don't know, B, if he participated in this
3  activity.
4      I believe from seeing the videos that he did
5  not.
6  Q. Okay. Who did not?
7  A. The man who is pictured here above the
8  caption that you just read.
9  Q. Okay. You -- you -- if you look at the
10 bootleg position, the very first document, it says in
11 there, assuming we can believe what he says, the
12 officers that -- that -- he did this more than once
13 with other people. And if you want to look at the
14 study, I -- I don't have time to provide it today nor
15 did I do any more than read it. I didn't print it
16 out.
17     The officers were instructed to place the
18 weapon in a position behind the thigh, and when a
19 buzzer went off to as quickly as they could raise the
20 weapons to an extended position, firing position, get
21 a sight picture, and fire one round.
22     You understand that's what it says at least.
23     MR. MARCHESI: Same -- same objection.
24     MR. LILLEY: I understand your objection.
25 Why don't you just leave it --

Page 239

1      MR. MARCHESI: On top of that, Mr. Lilley,
2  you've just indicated that you don't have time to
3  provide the witness with the article. So you're
4  asking him to comment on one limited part of it while
5  you're acknowledging that you have reviewed but are
6  denying the witness the opportunity to review the
7  whole of it.
8      MR. LILLEY: No, I haven't done any such
9  thing. First of all, I didn't print it out, and it
10 goes on to other kinds of things in the other
11 pictures such as high ready, the so-called Hollywood
12 high guard, and things that were not relevant.
13     MR. MARCHESI: Well --
14     MR. LILLEY: So I don't -- I don't apologize
15 for that. This is simply his picture of his
16 experiment, and he summarized it himself,
17 Mr. Lewinski.
18     MR. MARCHESI: And you're asking this
19 witness to comment on it without providing him the
20 whole of it.
21     MR. LILLEY: Well, it's --
22     MR. MARCHESI: I'd add that to the objection
23 previously --
24     MR. LILLEY: It's provided in the -- in the
25 Squibb, too, and it's not very complicated. He says

Page 240

1  what it is, and he says what he got for time.
2  BY MR. LILLEY:
3  Q. Assuming that that is in fact a action
4  versus reaction -- assume for the moment with me, and
5  I'm not asking you to agree with me if you don't.
6  You can certainly have that reservation -- at least
7  on this, the average time for the person -- the
8  police officer would react to the -- to the suspect
9  raising his weapon and firing one round, the officer
10 has a 2 to 1 advantage, does he not?
11     MR. MARCHESI: Objection. Same basis.
12 BY MR. LILLEY:
13 Q. At least on these pictures.
14     MR. MARCHESI: Same objection.
15 BY MR. LILLEY:
16 Q. And I strongly suggest you'd look online and
17 you'll see this is not a secret document.
18     MR. MARCHESI: Same objection.
19     MR. LILLEY: Why don't you just simply
20 object to this whole area and then we don't have
21 to --
22     MR. MARCHESI: I'm going to object on a
23 question-by-question basis.
24     MR. LILLEY: All right. I'll assume you
25 object to every question. How's that?

Page 241

1    MR. MARCHESI:  No.  I'll make my objections
2 as I see appropriate.
3    THE WITNESS:  As you ask, it's -- it's not
4 quite that simple.
5    For example, what you have here is a sighted
6 trigger pull response, which may or may not be
7 analogous to a novice shooter, of .54 seconds.
8    What you see here is a -- what is purported
9 to be a sighted picture from a -- some people call
10 that bootleg.  That's -- as he points out, that's the
11 name he gave the -- the position.
12 BY MR. LILLEY:
13    Q.  We talked about it earlier today.
14    A.  Sure.  And you see the range of .55 to
15 point -- 1.88.  So --
16    Q.  No, no, no.  Hold on.  Hold on, sir.
17    A.  Please let me finish my answer.
18    MR. MARCHESI:  Please allow him to finish.
19    THE WITNESS:  So really -- really in at
20 least -- at least in one of the scenarios described
21 on your synopsis of the research activity here, the
22 distinction between the subject action and the
23 officer reaction, if you want to take these two very
24 different designed, different -- executed at
25 different times and different peoples and different

Page 242

1 controls research that's reported only in the
2 synopsis here, you're talking about one situation and
3 the other.  The difference of 1/100 of a second.
4 BY MR. LILLEY:
5    Q.  Sir, are you trying to be fair in this
6 deposition?  Are you trying to be intellectually
7 honest?
8    A.  I -- I am.  What I'm trying to do is hold
9 you to intellectual honesty.
10    Q.  Well, then let's try it?
11    A.  Okay.  Let me --
12    Q.  It's says the average time --
13    A.  Let me finish my answer to that.
14    What I'm trying to is hold you to the
15 intellectual honesty of recognizing the -- and -- and
16 probably through no fault of your own, but someone
17 has pulled for you, or you have pulled, synopses of
18 standalone experiments conducted at different times,
19 different people, different controls with different
20 actions, and you're trying to take an overlay now and
21 say, well, in this particular situation, I draw the
22 conclusion and I compare it to the conclusion I draw
23 on this particular situation.  But you have to
24 recognize that in both situations, there's a range.
25    Now, you've given me the range in one of

Page 243

1 them, .55 seconds.  So half of a second, essentially,
2 to 1.88 seconds.  In the other one, I don't see that
3 you've provided me a range.
4    Q.  Sir --
5    MR. MARCHESI:  Please let him finish.
6    THE WITNESS:  So I don't know whether this
7 is an average or whether this is one individual.
8 BY MR. LILLEY:
9    Q.  Then look at the words "average time" above
10 92 seconds.  It's not the low and the high, sir.
11 You're misstating it, not me, when we talk about
12 intellectual honesty.
13    A.  Sure.
14    Q.  If you look at it, it says the action.
15 Let's go through it word by word.
16    The action is "Raise the weapon, acquire
17 sight picture, fire one round."  Then there's a box
18 that says "Average time."  Not low time and high time
19 as you try to suggest, but the average time is
20 .92 seconds.  That means there probably were some
21 above and some below.
22    Do you agree that's what average
23 generally would mean in this context.
24    MR. MARCHESI:  Same objection.  Same
25 objection.

Page 244

1    THE WITNESS:  I agree that you just captured
2 the essence of the problem.
3 BY MR. LILLEY:
4    Q.  Right.  Well, the essence of the problem is,
5 sir, is you're -- you're trying to suggest 92 seconds
6 is the low, but it's the average --
7    A.  No.
8    Q.  -- isn't it?
9    Okay.  In any event, I'm not going to argue
10 and spend a lot more time on this except to suggest
11 to you that the average time of these -- these
12 different studies, and you -- if you want to look at
13 how many there were and how they averaged it, who the
14 people they got, you may do so.
15    This is what he put out on his -- his
16 website, that the 92 --
17    MR. MARCHESI:  Okay.  Is that a question?
18    MR. LILLEY:  I'm not finished yet.
19    MR. MARCHESI:  All right.
20 BY MR. LILLEY:
21    Q.  92 seconds in one and 54 seconds and the
22 officer who has the trigger pull reaction.
23 Regardless of if -- you know, whoever is on the other
24 side, whether he's an old man, a young man, a -- a
25 SWAT team person or -- or uneducated in the use of

61 (Pages 241 to 244)

1  firearms, the person who has the gun on him, the
2  trigger pull reaction, the Mangino trigger pull
3  reaction is .54.  That's the point of the -- of
4  the -- of the study that I'm trying to suggest to
5  you, suggested in this kind of a case, a reaction
6  beats action, not the other way around as the mantra
7  has been for years.
8      MR. MARCHESI:  I object --
9  BY MR. LILLEY:
10     Q.  Do you understand that?
11     MR. MARCHESI:  I object to Counsel's
12 question.  To the extent it is a question, it
13 appears --
14 BY MR. LILLEY:
15     Q.  Do you understand that, sir?
16     MR. MARCHESI:  -- to be well suited for
17 closing argument.
18     THE WITNESS:  I -- I do understand that
19 somewhere in that narrative, you captured the
20 important point.  And that is, when you said the
21 difference in these different studies, because what
22 they are, again, is synopses of different studies
23 conducted under different times, different people,
24 different controls, different objectives, and you're
25 correct, the average time in one, which you've given

1  me is .92.  The range in that same one is .55 to
2  1.88.
3  BY MR. LILLEY:
4      Q.  Okay.
5      A.  What you've not given me in a totally
6  unrelated and distinct and separate study done under
7  a different time under different controls, different
8  people and different purposes, is you've not given me
9  an average.  You've given me a number here, and --
10 and as I said, I'm quite confident this man was not
11 involved in this activity.  So I'm not sure what this
12 means.  I get it, it was on the Internet, but there's
13 also --
14     Q.  Okay.  Well --
15     A.  -- on the Internet somebody will tell you
16 that -- that there are people living on Mars.
17     Q.  Okay, sir, and maybe that's what Lewinski
18 believes, but all I can tell you -- and perhaps
19 that's why he's not allowed to testify in Canada.
20     But all I can tell you, sir, is that this
21 comes from his study, and I will send this article,
22 the whole article, I'll go back and print it off, and
23 I'll send it to your counsel.  And your counsel can
24 decide what he wants to do with it.
25     But I can assure you that if there's a

1  trial, we'll be coming back to this.  And I hope I
2  won't hear that you didn't have enough information.
3      MR. MARCHESI:  Objection.
4      THE WITNESS:  You'll probably hear who's on
5  first, what's on second.  I don't know who's on
6  third --
7  BY MR. LILLEY:
8      Q.  Probably I will --
9      A.  -- because that's what this is.  And -- and
10 by that time, maybe someone can help you sort out why
11 there's a problem --
12     Q.  Maybe you ought to read the article first
13 before you criticize my interpretation of it.  Don't
14 you think that would be a good idea?
15     MR. BENJAMIN:  Provide it to us.
16     MR. LILLEY:  Well, you've got a -- you've
17 got a computer.  I don't think you need any more than
18 those -- I don't think Lewinski is going to put these
19 pictures out and -- and suggest something other than
20 what he said.
21     MR. MARCHESI:  Well, that's why we have
22 rules of evidence, so we don't --
23     MR. LILLEY:  That's right.  And I can't wait
24 until they're in effect, and then maybe you'll be
25 subjected to it and we won't hear so much from you.

1  BY MR. LILLEY:
2      Q.  Okay.  So let's move on.  Now --
3      MR. MARCHESI:  Do you charge more or less
4  for the entertainment value?
5  BY MR. LILLEY:
6      Q.  Now, with regard to this whole area of
7  timing, do you know -- or did you -- did you
8  determine from your analysis in this case how long it
9  was that Mr. Mangino was behind his truck and had his
10 rifle trained in the direction, if not directly on to
11 Mr. McKenney, in terms of probably seconds or
12 minutes?
13     MR. MARCHESI:  Objection.  Form.
14 Foundation.
15     You can answer.
16     THE WITNESS:  Sure.  I -- I -- I considered
17 a timeline of evolving events.  I can't tell you from
18 memory today what that -- what that particular
19 envelope of time was.
20 BY MR. LILLEY:
21     Q.  Well, I mean, do you at least agree that
22 Mr. Mangino's firing against Mr. McKenney was not one
23 of those situations that are sometimes referred to as
24 split-second decisions?
25     A.  I'm honestly not sure what that means,

Page 249

1    but --
2        Q.  Well, let me --
3            MR. MARCHESI:  Please let him finish.
4    BY MR. LILLEY:
5        Q.  You want me --
6        A.  But -- but this was not -- this was not like
7    many cases where courts have used the term "split
8    second" to mean that a -- a stimulus arises and the
9    officer is required with no other information
10   available to make a decision in a split second.
11       Q.  Right.  Because, in fact, Mr. McKenney,
12   we've said so many times, was walking down his
13   driveway, nonchalantly with his gun dangling to his
14   right side for a number of seconds, if not a
15   number -- or perhaps even a minute or two.
16           Do you agree?  From what you're review is?
17           MR. MARCHESI:  Objection to form.
18           THE WITNESS:  He was walking down his
19   driveway with his gun held at his side, and I cannot
20   tell you the precise number of seconds.  I think we
21   can figure that out, but I don't remember what it is.
22   BY MR. LILLEY:
23       Q.  Okay.  Well, one officer, Officer Fournier,
24   I think testified -- he didn't testify, in his
25   interview, I can't remember the source, that he

Page 250

1    thought it was -- from where -- from where McKenney
2    got.  Now, he only got down the driveway, in my view,
3    around a third of the driveway, maybe 40 percent,
4    that at that point, from the time he left the house
5    walking down the driveway, whether it was toward
6    Mangino or just at the end of the driveway, was
7    approximately nine seconds.
8            Do you recall that?
9            MR. MARCHESI:  Objection to form.
10   BY MR. LILLEY:
11       Q.  I'll submit to you --
12       A.  It's somewhere in that neighborhood.
13       Q.  Okay.
14       A.  I don't know whether it's in the interview
15   or the report.  I haven't seen his deposition,
16   however.
17       Q.  And then Mr. Mangino makes the decision
18   because he's very scared, as he said, he doesn't know
19   what's going to happen, and he thought he possibly
20   might be the victim of lethal force, decides that
21   he's going to shoot him.
22           So it's not on a split-second basis on that
23   basis.  Do you agree?
24           MR. MARCHESI:  Objection.  Form.
25           THE WITNESS:  I -- I agree.

Page 251

1    BY MR. LILLEY:
2        Q.  And have you looked at -- let me ask you:
3    It occurs to me, if Mr. McKenney -- strike that.
4            If there was no probable cause to -- to
5    arrest or -- Mr. McKenney for a crime, then how can
6    there be probable cause to believe that lethal force
7    is going to be used against you as an officer --
8            MR. BENJAMIN:  I'll object to -- I'll
9    object.
10   BY MR. LILLEY:
11       Q.  -- meaning unlawful force?
12           MR. BENJAMIN:  I'll object to the force of
13   the question because that's a legal test.
14           MR. MARCHESI:  Objection to form.
15           MR. LILLEY:  I'll change it to -- to deadly
16   force.
17           MR. MARCHESI:  Same objection.
18           MR. BENJAMIN:  Same objections.
19   BY MR. LILLEY:
20       Q.  If he's not guilty of a crime, there's no
21   probable cause of that, how can there be probable
22   cause to shoot him?
23           MR. BENJAMIN:  Same objection.
24           MR. MARCHESI:  Same basis.
25           THE WITNESS:  I -- I'm not sure how to

Page 252

1    answer that, because as I've said, and I think you
2    and I both understand quite well, we're -- we're now
3    creating an admixture of legal doctrines.  As far as
4    I know, there are no jurisdictions in which the
5    deadly force statutes, certainly our -- our courts
6    have not talked about legitimate deadly force as
7    being assessed by a probable cause standard.
8    BY MR. LILLEY:
9        Q.  Well, probable cause to believe that he's in
10   imminent danger of a victim of deadly force.
11           Isn't that what they say?
12           MR. BENJAMIN:  Same objection.
13           MR. MARCHESI:  I object.  The standard is
14   reasonable belief not probable cause.
15           MR. LILLEY:  Please don't interfere with my
16   deposition.  You've got an objection, you can object
17   to the form.
18           MR. BENJAMIN:  I'll object that you're
19   making up a --
20           (Clarification by the Reporter.)
21           MR. BENJAMIN:  -- legal test.
22           MR. LILLEY:  Now, you're --
23           MR. BENJAMIN:  -- that doesn't exist.  It's
24   the basic premise to your question.
25           MR. LILLEY:  Let's me just see here.  There

Page 253

1  are too many books.
2      THE WITNESS:  Well, I suppose you could
3  always go the route of Mr. Marchesi and have
4  everything on a thin little piece of --
5      MR. LILLEY:  Yeah, that's probably the way
6  to go.
7      MR. MARCHESI:  This is the route of Don
8  Leach.  Until I met Don Leach, I came with all my
9  books like Mr. Lilley did.  But as you know Don as I
10  do, it's all on the laptop.  And he's far more adept
11  than I'll ever be.
12      MR. LILLEY:  The problem is I've missed
13  the --
14      MR. MARCHESI:  What are you looking for,
15  Dan?
16      (Pause in the proceedings.)
17  BY MR. LILLEY:
18      Q.  Let's turn to -- let's turn to the -- do you
19  have the photographs there that -- yes, you do.
20      Can you turn to -- they've marked it 71, and
21  these appear -- appear to be -- and, again, I got
22  these off the Internet, but these apparently are
23  authored by you.  They're -- they're -- they look
24  like -- well, you -- you look them over.
25      Do you see your initials on all these?  KRW,

Page 254

1  is that your initials?
2      A.  It is.
3      Q.  It looks like some training exercise that
4  might have been handled by you in 2010, the date is.
5      Do you recognize those as having been
6  authored by you?
7      A.  I believe so.  I think it looks like it's
8  all mine.
9      Q.  And it says "Use of Force Chief Ken
10  Wallentine."
11      Is it tine or teen?
12      A.  Tine.
13      Q.  Tine.  And the Utah Attorney General, and
14  that's the gentleman you work for -- several
15  gentlemen that you work for, correct?
16      A.  Correct.
17      Q.  And what is this anyway, Mr. Wallentine?
18      A.  This, I believe, is a basic presentation to
19  go along with a course presented in basic training at
20  the Utah police academy.
21      Q.  Okay.  Now, we understand, do we not,
22  that -- I know this is basic, but I think it should
23  be in the record.
24      The taking of another human being's life is
25  homicide or murder, generally, correct?

Page 255

1      MR. MARCHESI:  Objection.
2      THE WITNESS:  Well, among my cousins of
3  doctors, you'll find a pathologist.  It's homicide.
4  It's not necessarily murder.
5  BY MR. LILLEY:
6      Q.  Okay.  Homicide.  I'm -- and there are --
7  there are justifications, war and self-defense and
8  police and all that.  But generally, taking another
9  human being's live is homicide.
10      A.  Homicide is a manner of death.  Murder is a
11  legal conclusion.
12      Q.  Okay.  And if there's no justification, the
13  legal conclusion would be murder, would it not?
14      MR. MARCHESI:  Objection.  Form.
15      (Clarification by the Reporter.)
16      THE WITNESS:  In some circumstances.  I'm
17  sorry.
18  BY MR. LILLEY:
19      Q.  In some circumstances?
20      A.  Okay.
21      Q.  Well, I'm going to leave that there because
22  I don't want to get into that.
23      Let's -- let's look at some of these.  Are
24  these PowerPoints that -- looks to me like
25  PowerPoints for your presentation.

Page 256

1      A.  I don't know whether they were PowerPoint or
2  the -- the Word Perfect equivalent.
3      Q.  But you're teaching --
4      A.  Slide shows.
5      Q.  Okay.  You're teaching this to law
6  enforcement people of some kind, correct?
7      A.  I could have been or someone -- there are a
8  number of instructors that teach at the police
9  academy.  Someone else may have used my materials.
10      Q.  But they -- they were authored by you.
11      A.  I haven't gone through each page, but I
12  wouldn't expect that anybody changed my materials.
13      Q.  Well, they might have, but I don't -- I
14  didn't, I can tell you.
15      But if they say 2/10 KRW, can we assume at
16  least that it's your work product?
17      A.  Sure.
18      Q.  So let's go through a couple of these, if we
19  can.  The first one says "Objectives."
20      And it looks like you're taking about
21  definitions, and I -- I don't want to go through all
22  of these, I can assure you.  But you say in your
23  second list of objections [sic] you say, "How close
24  is too close?"
25      Do you see that?

Page 257

1    A.  I do.
2    Q.  That's Tueller's famous article, isn't it?
3    A.  It is.
4    Q.  So you teach Tueller in these courses?  You
5  teach some of his -- his concepts or his -- his --
6  his information?
7    A.  In 2010, I taught to the objectives defined
8  by the police academy staff, and that was part of it.
9  So yes, I -- if I taught this class in 2010, I'm
10  pretty sure I discussed that.
11    Q.  And it says "Reporting force:  Questions to
12  answer."  You then have a -- bullet that says
13  "Avoiding liability for the use of force."
14        So I take it you're telling the police or
15  some law enforcement of some kind how to avoid
16  getting sued for using force, or at least that's what
17  the --
18    A.  Not really.
19    Q.  -- PowerPoint would suggest.
20        No?
21    A.  PowerPoint might suggest that, correct.
22    Q.  What would it be suggesting, then, when it
23  says "Avoiding liability for use of force"?
24    A.  Conducting themselves in -- in a way that
25  they're not ever exposed to liability.

Page 258

1    Q.  Okay.  Then you go on to the next one that
2  has a can on the top of it.  It says "Whoop ass."
3    A.  Mm-hmm.
4    Q.  Are these -- these little cans and -- and
5  jokes on the side, an effort to keep the class alive
6  or open or --
7    A.  It's typically a warm afternoon with
8  brand-new recruits --
9    Q.  Okay.
10    A.  -- that don't -- they would rather be out
11  driving cars with sirens.
12    Q.  Okay.  So you want to have a little levity,
13  a little humor with your --
14    A.  Sure --
15    Q.  -- your deadly force classes; is that
16  correct?
17    A.  This is not a class on deadly force.
18    Q.  Okay.  "Justification, it says, the next
19  one, "means that a person is exempt from criminal
20  liability," you say, right?  You've got a quote,
21  justification.
22        Am I reading it right?
23    A.  Sure.
24    Q.  And then you say "Justification excuses an
25  officer from general consequences of the use of

Page 259

1  force," right?
2    A.  Right.
3    Q.  It sounds like it's a case involved with use
4  of excessive or use of force by a police officer.
5        Is it?
6    A.  It's a fairly direct, although synopsized
7  and perhaps simplified quote from 76-2-402 of the
8  Utah Code Annotated.
9    Q.  Well, it doesn't say any of that, I guess,
10  but you know that to be the case; is that correct?
11    A.  Yes.  This is an outline that follows a set
12  of objectives and -- and teaching objectives that are
13  defined by the police academy.
14        The next slide, for example, is a direct
15  quote.
16    Q.  Is this --
17    A.  But you're correct, there are no quotation
18  marks.
19    Q.  No.  I said the first one, there were
20  quotation marks around justification.
21    A.  Around one word, sure, because that's a
22  new -- a new concept for many young police recruits.
23    Q.  Justifying killing somebody?  Using deadly
24  force?
25        MR. BENJAMIN:  Objection.

Page 260

1        THE WITNESS:  The -- legal concept of
2  justification which has a very narrow and precise
3  meaning as opposed to perhaps the vernacular used by
4  most nonlegally trained folks.
5  BY MR. LILLEY:
6    Q.  Okay.  The next one is about arrests.  We
7  won't --
8        No one was trying to arrest anybody before
9  this man was killed, correct?
10    A.  I don't believe so.
11    Q.  And then you talk about "Deadly force is
12  force likely to cause death or serious bodily
13  injury."
14        You do use the word "likely."  You -- that
15  is your word, right?
16    A.  It is not.
17    Q.  It is not your word?
18    A.  No, sir.
19    Q.  Okay.  Well, whose word is it?  You said
20  you -- you wrote these.
21    A.  I did.
22    Q.  I mean, when I say "your word," this is a
23  word that you used in your presentation, right?
24    A.  I can't -- I think this is 76-2-404(a) --
25    Q.  Sir, sir.

Page 261

1    A.  I'd have to get the statute.  But, again,
2 that is a direct quote from the statute.  The next
3 page has a direct quote.
4    Q.  Hold on, sir.  Let's not go there.
5    MR. MARCHESI:  Please allow him to finish.
6 BY MR. LILLEY:
7    Q.  No, no, no.  We're going to stay with this
8 one.
9    A.  When you say my words, I --
10    Q.  I'm saying you using likely.  That's all I'm
11 saying.  Simple as that in this?
12    A.  I did.  I accurately copied language from a
13 law book.
14    Q.  And -- and that's what the law book says,
15 both in apparently Utah and in the -- the federal law
16 too; is that correct?  The case law.
17    A.  There are some variants, I think, in federal
18 courts, but that -- that's pretty close.
19    Q.  And then beside that, you have a little joke
20 here, double suicide, strychnine filled chocolate
21 truffles, make your love last forever, correct?
22    A.  Mm-hmm.
23    Q.  Yes?  You have to say yes or no.
24    A.  Yes.
25    Q.  I'm not going to go through them all.

Page 262

1    Let's not do the next one or the next one.
2 The next one talks about force in defense of
3 person -- any reasonably -- any force reasonably
4 necessary force -- excuse me, any reasonably
5 necessary force, and then you talk about no general
6 duty to retreat.  I'm just doing -- let me see if I
7 can pick one here that I can ask you about.
8    And then you talk about deadly force may be
9 used when reasonably necessary to prevent death or
10 serious bodily injury, and under that you put, "Not
11 if you provoke the force."
12    What do you mean by that?
13    A.  I meant to synopsize, and I think I
14 accurately did, the Utah Code because this is a
15 presentation on Utah law presented to Utah law
16 enforcement.
17    Q.  It's also the same law, is it not, on the
18 national level?  Or do you think Utah is different?
19    A.  I -- I don't know.  But you're asking me
20 about specific word choice, and I'm telling you that
21 I used words in this presentation to teach Utah law
22 to people that are going to be tested --
23    Q.  I understand.
24    A.  -- to be tested on concepts and, frankly,
25 tested on language that is very similar to what's

Page 263

1 here.
2    Q.  Okay.  And I don't care what the source is.
3 I'm just suggesting to you that the source -- that --
4 that the law that you're talking about is the same in
5 the federal system as it is in Utah, is it not?
6    A.  Okay.
7    Q.  Is that -- do you agree?  You don't have to
8 agree with me if you don't agree with it.
9    A.  I --
10    Q.  Don't agree just 'cause it's getting late in
11 the day.
12    A.  I think that it is the same.  Certainly
13 these materials were not designed to talk about the
14 federal law in other -- or -- or law in other states.
15    Q.  Well, you talk about the federal law in
16 there.  As we go down the road, we're going to see.
17    A.  You'll get to a point, yes.
18    Q.  Yeah.  So you talk about federal law in this
19 presentation.
20    A.  Sure.  Not the -- all of these --
21    Q.  No, no, no.
22    A.  All of these slides that you're talking
23 about are largely quotes or paraphrases from Utah
24 Code.
25    Q.  That doesn't mean they're unique to Utah and

Page 264

1 not applicable to Maine or the -- all the other 50
2 states, does it?
3    A.  I -- I suspect that most states, outside of
4 Louisiana, have statutes that are some -- are --
5 are -- are very similar.
6    Q.  And then there's the defend your home which
7 I'm not going to discuss.
8    MR. BENJAMIN:  Can I ask a question?
9 BY MR. LILLEY:
10    Q.  And then there's --
11    MR. BENJAMIN:  Are we going to get a copy of
12 the --
13    MR. LILLEY:  Sure, you can --
14    MR. BENJAMIN:  You keep saying the next one,
15 the next one, the next one.  We're going to have a
16 whole -- none of them are being marked.  They're not
17 really identified, lots of them.  This is going to be
18 impossible to understand.
19    MR. LILLEY:  I'm -- I'm -- I'm giving you
20 the top part of these every time, and these are an
21 expert witness that -- that he's hired and he's, I
22 think, responsible for whatever this guy has written.
23    MR. MARCHESI:  No, you're responsible for
24 identifying --
25    MR. LILLEY:  Forced to arrest or stop or

66 (Pages 261 to 264)

1   escape, that's another one, the next one, and that --
2   you can identify it that way, Ed. Okay?
3   BY MR. LILLEY:
4       Q.   That's -- there's no escape issue in this
5   case, correct?
6       A.   No, there's not. Again, quote from Utah
7   statute. 'Cause there's no issue, I'm not really
8   sure why you're asking me about it.
9       Q.   Well, sir, sir --
10      A.   But you're right, there's no issue.
11      Q.   I'm asking you because I want to know what
12  you teach --
13      A.   Okay.
14      Q.   -- so that I really want to know that if
15  your teaching conforms to your deposition and some of
16  the statements you've made here. Because what we
17  just decided, and I think you decided because you're
18  the deponent, that these laws are universal in the
19  sense that they're federal law, state law, and
20  probably apparently Utah law.
21          And all I'm trying to do is see if what you
22  teach is what you said in this case to support this
23  man as an expert witness. That's my purpose.
24      A.   I see. And I agree that you are correct
25  that you concluded that the Utah law is identical to

1   federal law. I did not.
2       Q.   Do you know of any difference in this area
3   of -- of deadly force? Do you know of any -- any
4   significant difference?
5           MR. MARCHESI: Objection. Form.
6           THE WITNESS: Yes.
7   BY MR. LILLEY:
8       Q.   And what is that?
9       A.   I'm -- I'm not aware that it is a -- a
10  federal requirement, although I think it's prescribed
11  in a number of cases, to give a warning prior to use
12  of deadly force. That's a statutory requirement in a
13  number of states, including Utah.
14      Q.   Okay. Any other differences?
15      A.   Not that I can think of off the top of my
16  head.
17      Q.   Is refusing to obey an officer's command to
18  drop your weapon a justification in and of itself to
19  shoot that person?
20          MR. BENJAMIN: Objection. Foundation.
21          MR. MARCHESI: Join.
22          THE WITNESS: With that abstract, no.
23  BY MR. LILLEY:
24      Q.   Let me get the next one. And this does say
25  Utah Code, and it has some interesting language.

1   When making an arrest or preventing an escape and the
2   officer reasonably believes -- this is called Utah
3   Code 76-2-402 -- and the officer reasonably believes
4   that deadly force is necessary to prevent the arrest
5   from being defeated by escape and the officer has
6   probable cause to believe that the -- the suspect has
7   committed a felony involving death or serious bodily
8   injury.
9           Let me stop there.
10          So we do use probable cause, at least you do
11  in Utah.
12          MR. MARCHESI: Why are we talking about Utah
13  law in a case governed by federal law.
14          MR. LILLEY: Relevance is not an issue here.
15  Hold your -- hold that for the courtroom when we have
16  rules of evidence.
17          MR. MARCHESI: We don't have them here?
18          MR. LILLEY: We do not.
19          MR. MARCHESI: Oh, that's interesting. I
20  wasn't aware of that.
21          MR. LILLEY: Well, we have some, but we
22  don't have the same as we do in court. You know
23  that. You should know that. Even up in Waterville
24  they know that. Go ahead. You're always talking
25  about country boy stuff, read the rules.

1           MR. MARCHESI: Okay.
2   BY MR. LILLEY:
3       Q.   Okay. What do we have here? Is that --
4   that's probable cause to believe the suspect has
5   committed a felony. That's the probable cause, the
6   same probable cause we talked about earlier today.
7           MR. MARCHESI: Objection.
8           MR. BENJAMIN: I'm going to object 'cause
9   you're mischaracterizing. You're dealing -- dealing
10  with an escape situation now.
11          MR. LILLEY: Yes.
12          MR. BENJAMIN: That's not --
13          MR. LILLEY: It's an escape situation. I'm
14  dealing with probable cause. Now, you're arguing
15  with me about questions and you shouldn't be.
16          MR. BENJAMIN: You're saying it's the same
17  thing we talked about earlier, and it's not.
18          MR. LILLEY: I'm saying it's the same
19  concept, probable cause.
20          MR. BENJAMIN: No, it's not.
21          MR. LILLEY: Well, you're wrong.
22          MR. BENJAMIN: It's --
23          MR. LILLEY: If you believe that, fine.
24  Save it for sometime when it's relevant.
25          MR. BENJAMIN: No, I'll make my objections

Page 269

1  when I feel like it.
2      MR. LILLEY:  Yeah, I'm sure you will.  You
3  both do.
4      MR. MARCHESI:  That's our job.
5      MR. LILLEY:  No.  Your job is to follow the
6  law.
7  BY MR. LILLEY:
8      Q.  The officer has probable cause to believe
9  the suspect has committed a felony.
10     That's not in this -- in this particular
11  case, I think I -- was my last question.
12     Is it or isn't it?
13     A.  You know, I got to tell you, when I sat down
14  to look at this case, I truly did not take the Utah
15  law from five years ago and apply Utah law five years
16  ago to this case.  So I haven't thought these issues
17  through, but making a legal conclusion on something I
18  haven't been asked to opine on today --
19     Q.  Well --
20     A.  -- I'll tell you that I think that your
21  understanding of Utah law is -- as you apply it to
22  the facts of this case, I think you've just made an
23  accurate statement.
24     Q.  Okay.  Then the next statement is, sir, one
25  that does apply to -- to this case, I think, but let

Page 270

1  me ask you because you're the expert.
2      The officer has probable cause to believe
3  the suspect poses a threat of death or serious bodily
4  injury to the officer or others.
5      Let me stop there.
6      That certainly is the standard, isn't it,
7  nationally?
8      MR. MARCHESI:  Objection --
9      MR. BENJAMIN:  Object.
10     MR. MARCHESI:  -- form.
11     MR. BENJAMIN:  Go ahead.
12     THE WITNESS:  I -- I've not seen the Court
13  phrase it that way.
14  BY MR. LILLEY:
15     Q.  Okay.
16     A.  But I'll --
17     Q.  Go ahead.
18     A.  And -- and I don't know -- I mean, I looked
19  at a few other states.  I -- I can tell you I've
20  looked at Arizona's deadly force statute relatively
21  recently.  It doesn't quite read like this.  I -- I
22  looked at California's.  It doesn't quite read like
23  this.  I -- I don't know Maine's.  I can't speak to
24  every statute in all 50 states.
25     Q.  No, I understand, sir.  And I'm not -- this

Page 271

1  isn't a gotcha or surprise thing.  What I'm doing is
2  talking to you about the concepts you must have
3  thought about when you decided that this man was
4  justified in killing my client.  That's why I'm
5  asking you about it.
6      So I think you have thought about these
7  concepts, and I'm going to ask, didn't you think
8  about concepts that included probable cause to
9  believe that the suspect posed a threat of death or
10  serious injury when you reviewed this case and came
11  to your conclusion?
12     MR. MARCHESI:  I object.  Legal standard is
13  a reasonable belief, not probable cause.
14     MR. BENJAMIN:  And it's been asked and
15  answered.
16     MR. MARCHESI:  Multiple times.
17     THE WITNESS:  I certainly considered the
18  basis that Deputy Mangino had to use deadly force.
19     What I did not do is I did not think about a
20  situation of preventing an escape and whether all of
21  these sections of Utah Code 72-2-402, and that's not
22  entirely accurately because there's actually a
23  subsection from which this is directly quoted.  I
24  didn't think about that, so no.
25  ///

Page 272

1  BY MR. LILLEY:
2      Q.  You didn't think about it.
3      Okay.  And you haven't heard other cases not
4  involving escape that -- in which the Court uses
5  probable cause to believe that the suspect poses a
6  threat of death or imminent, actually -- they usually
7  say that, you don't have that in there, but bodily
8  harm, imminent death or bodily harm?
9      A.  I -- I don't have that because that's not
10  written into the Utah Code when it comes to escape.
11  But if you want to let me take a look at a court case
12  that you're referencing --
13     Q.  Well --
14     A.  -- off the top of my head, I can tell you
15  I'm not familiar with courts that use the language
16  you've just quoted.
17     Q.  That -- that use the term "probable cause."
18     A.  In the context that you just quoted.
19     I think that I have read a case in the past
20  dealing with an escapee who was injured when he was
21  going over the fence at the Utah State Prison where
22  this language is quoted, and I think the Court may in
23  that case use this language.  I don't remember.
24     Q.  Okay.  The next -- the next PowerPoint I'm
25  going to call on, then, is -- that appropriate to

1    call them PowerPoints?
2      A.  You can.  I -- I think it was a Word Perfect
3    thing, but I don't care.
4      Q.  Well, okay.  Let's leave it at that, then.
5      It says "Deadly force warning," and you've
6    written under just one bullet, "If feasible, a verbal
7    warning should be given prior to any use of deadly
8    force."
9      A.  Correct.
10     Q.  And is that your belief?
11     A.  Again, it's -- it's both -- it is my belief,
12    and it's also a quote from Utah law.
13     Q.  And it also applies to federal law, does it
14    not?
15      MR. BENJAMIN:  Objection.  Form.
16    BY MR. LILLEY:
17     Q.  Or do you know?  If you don't know, say so.
18     A.  Generally.
19     Q.  Then you've got something called general --
20    excuse me.
21      The next one -- next one is entitled "Deadly
22    focus" -- I'm sorry.  Let me start over again.
23      MR. LILLEY:  How long have we got left?
24      VIDEOGRAPHER:  You have 35 minutes.
25      MR. LILLEY:  Okay.  I'm going to try to

1    finish.
2    BY MR. LILLEY:
3     Q.  "Deadly force summary," it's entitled.  It
4    says, "General rule" -- you wrote this -- "deadly
5    force may be used" -- am I right when I say you wrote
6    this?
7     A.  I'm somewhat embarrassed to admit that what
8    I did is I took -- so what follows in the tab, the
9    students at that time -- it's no longer true, but the
10    student at that time would have had to have memorized
11    this section in order to successfully fill in the
12    blank question on a test they had to pass.
13      So did I write this?  Yes.  I took from
14    someone else.
15      Do I believe this as an accurate summary of
16    Utah law for police academy students?  I do.
17     Q.  And, in fact, they have to memorize it,
18    you're saying, in order to pass their course.
19     A.  I'm -- I'm saying that they have to -- I
20    don't remember the exact blanks, but they have to --
21    they've got to fill in the blank and write poses or
22    presents a threat of death or serious bodily injury.
23    And then I think it says and deadly force is -- and I
24    think the next blank is reasonably necessary.  I -- I
25    don't remember, but in 2000 --

1     Q.  You just said they had -- sorry.
2     A.  Sure.  In 2010, there was a
3    fill-in-the-blank question that if they memorized
4    what I put on the screen, and I might have even given
5    them a hint in class, they passed that question.
6     Q.  Okay.  Let's look at what they had to
7    memorize and what you wrote.
8      "Deadly force summary.  General rule, deadly
9    force may be used.  Anytime there is probable cause
10    to believe the suspect poses a threat of death or
11    serious bodily injury and deadly force is reasonably
12    necessary to meet that threat."
13      Did you write those words?
14      MR. MARCHESI:  Objection.  Form.
15      THE WITNESS:  I don't think I wrote them
16    originally, but I certainly put them in my
17    presentation.
18    BY MR. LILLEY:
19     Q.  And if you used the word probable cause that
20    these students have to memorize in order to pass your
21    course.
22      MR. MARCHESI:  Same objection.
23      THE WITNESS:  Not my course, not my test,
24    not my learning objectives, not my outline, and not
25    my words, but yes.

1    BY MR. LILLEY:
2     Q.  And so you did use probable cause here just
3    in deadly force summary.  This isn't a escape
4    situation or a recent crime situation.  This is the
5    general rule, you -- you've got it under deadly force
6    may be used anytime there is probable cause.
7      MR. MARCHESI:  Same objection.
8    BY MR. LILLEY:
9     Q.  Just so we're clear that you're using that
10    concept in teaching people that have to memorize it.
11      MR. MARCHESI:  In the context of Utah law.
12    BY MR. LILLEY:
13     Q.  In the context that you said, quite obvious.
14     A.  You -- you are correct that in the
15    context -- and you'd kind of have to go back to how
16    you started.  In the context of teaching the students
17    about the principle of justification under the
18    criminal code in the state of Utah, they must, as
19    part of their criminal law class, pass this course.
20    And as part of their criminal law class, they ought
21    to be able to recite that.
22     Q.  And the next one is called "Tennessee versus
23    Garner."
24      That's a seminal decision in this area, is
25    it not?

Page 277

1    A.  It is.
2    Q.  And you talk about the Supreme Court and
3  that you give -- I take it the language there would
4  be language that they used in that.  That's an old
5  case, is it not?  That's in the '80s, as I recall.
6    A.  1976.
7    Q.  '76.  Even older than I thought.
8      That, I take it, is --
9    A.  I mean --
10    Q.  -- we called it horn -- we used to call it
11  Hornbook law.
12    A.  Right.  And black letter.  I may be wrong.
13    Q.  Black letter.
14    A.  I think it is, yes.  I don't think that's a
15  quote from the Court, but -- but that --
16    Q.  Well --
17    A.  -- it's an accurate statement of -- of
18  generally what the course is.
19    Q.  Okay.  Let's look at it.
20      The Supreme Court suggested, the Supreme
21  Court of the United States you're talking about,
22  right?  So it's not -- nothing unclear on the record
23  about this.
24    A.  Correct?
25    Q.  The people that decided Tennessee versus

Page 278

1  Garner, correct?
2    A.  Correct.
3    Q.  "The Supreme Court suggested that there are
4  three circumstances when an officer can use deadly
5  force.  If the officer is threatened with a weapon,
6  if the" officer -- "officer has probable cause to
7  believe that the suspect poses a threat of serious
8  physical harm or the death to the officer or
9  another."
10      Let me stop there.
11      The -- the Tennessee versus Garner Court
12  used that very phrase that we've been bantering about
13  here, probable cause, to believe that the suspect
14  poses a threat of serious physical harm, did they
15  not?
16      MR. MARCHESI:  Objection.  Form.
17      THE WITNESS:  I don't know.  Did they?
18  BY MR. LILLEY:
19    Q.  You said so here, I think, or at least
20  represented it to these people that have to memorize
21  these quotes.
22      MR. MARCHESI:  Objection.  Form.  The
23  decision says what the decision says.
24  BY MR. LILLEY:
25    Q.  Correct?

Page 279

1    A.  I don't --
2    Q.  Okay.
3    A.  I don't know.
4    Q.  Let's go on.  It's the same -- it's the same
5  block here that we're looking at.
6      "If the officer has probable cause to
7  believe that the suspect has committed a crime
8  involving threatened or actual serious physical harm
9  or death."
10      So those are the circumstances in which the
11  Court, as you say, suggested that the police officer
12  can use deadly force, correct?
13    A.  In the context of the overall discussion,
14  again, applying Utah law to our criminal --
15    Q.  No, no, no, no, sir.  This is Tennessee
16  versus Garner, right?  The federal -- the United
17  States Supreme Court, not -- not Utah, correct?
18      You keep -- you -- look, you -- you -- you
19  can -- you're entitled to your opinion, sir, but
20  you're not entitled to your own facts.
21      Do you understand that?
22      MR. MARCHESI:  Objection.
23      THE WITNESS:  Let me know when you want me
24  to answer the last question.
25  ///

Page 280

1  BY MR. LILLEY:
2    Q.  Well, let me -- let me withdraw the last
3  question and say it.
4    A.  Okay.
5    Q.  Do you agree that what you're saying under
6  this big heading, Tennessee versus Garner, that the
7  Supreme Court of the United States uses the words
8  probable cause in two of your subpoints, one, to
9  believe that the suspect poses a threat of serious
10  physical harm or death to the officer or another, and
11  the second one used it if the officer has probable
12  cause to believe that the suspect has committed a
13  crime involving threatened or actual serious physical
14  harm or death.
15      Did you in fact mean to convey to these
16  students that that's what Tennessee versus Garner
17  said, not Utah or any other state jurisdiction?
18    A.  What I meant to convey to the students -- if
19  you go back and understand, what you have here is a
20  course on Utah law.  What I meant to convey to the
21  students is here's the doctrine of justification,
22  here's the Utah statutes, and now we get to the
23  United States Supreme Court and you'll see that the
24  United States Supreme Court principles are reflected
25  in Utah statutes.

70  (Pages 277 to 280)

Page 281

1    Q.  Okay.  And they include the word probable
2  cause --
3    A.  I don't remember whether they do or not.
4    Q.  But you put it there.
5    A.  Did I?
6    Q.  Well, it's right in front of you.
7    A.  Yes, it is.
8    Q.  On two occasions, correct?
9    A.  Yes.
10    Q.  Let's move over to the next one.  It's
11  called Graham versus Connor.  Graham versus Connor,
12  you tell the -- the students in this PowerPoint that
13  a three-part test to measure reasonableness of
14  force -- of force in a civil lawsuit against an
15  officer.  And -- and not a Monday morning
16  quarterbacking.  And the third one is measured by
17  standard of reasonable officer at the scene.  And
18  under that you put the severity of the crime.
19  There's no crime in this case.  We've already talked
20  about that ad nauseam, correct?  There's no crime
21  that Mr. McKenney had perpetrated that you can
22  discern from your review of the case?
23    MR. MARCHESI:  Objection.  You're misreading
24  that.
25  ///

Page 282

1  BY MR. LILLEY:
2    Q.  Is that correct?
3    MR. MARCHESI:  Objection.
4    THE WITNESS:  I'll agree certainly with the
5  ad nauseam comment.  I haven't looked to see
6  whether -- I didn't evaluate this case under Maine
7  law to determine whether Mr. McKenney --
8  BY MR. LILLEY:
9    Q.  Sir --
10    A.  -- had committed a crime or not.
11    Q.  -- when you evaluated whether the officers'
12  conduct was reasonable, you must have considered
13  whether the suspect had committed a crime, hadn't
14  you?
15    A.  Sure.
16    Q.  And you said before that there was no
17  probable cause to arrest him for a crime and that he
18  hadn't.
19    Isn't that a summary of your testimony?
20    A.  That is accurate.
21    Q.  Now, the second one is whether the suspect
22  presents an immediate threat to officers or of the
23  public, and the word "immediate" is something that
24  you gleaned from Graham versus Connor, correct?
25    A.  I may have.  I don't recall what the

Page 283

1  decision is.
2    Q.  Well, that -- they say that in that
3  decision, don't they?
4    MR. BENJAMIN:  Objection.
5    THE WITNESS:  My answer stands.
6  BY MR. LILLEY:
7    Q.  That is the law, then.  How about that?
8  Whether they say it or not, that it has to be an
9  immediate threat.
10    You agree?
11    MR. BENJAMIN:  Objection.
12    THE WITNESS:  I think they -- they may use a
13  different word.  I don't remember.
14  BY MR. LILLEY:
15    Q.  Is that the law --
16    MR. MARCHESI:  Objection.
17  BY MR. LILLEY:
18    Q.  -- that officers only have -- they have a
19  three-part test and one of them is that the suspect
20  presents an immediate threat --
21    MR. MARCHESI:  Objection.
22  BY MR. LILLEY:
23    Q.  -- to the officer or the public?  Is that
24  part of the -- of the rule?
25    A.  So the most recent discussion, of course, is

Page 284

1  not --
2    Q.  No, no, no.
3    A.  No, sir, you -- you asked me what the law
4  is.
5    Q.  I'm asking you whether or not that's --
6    A.  No.
7    Q.  -- what the Court said.
8    A.  You did not.  If you want to ask --
9    Q.  Well, let me withdraw that --
10    A.  If you want to ask -- you asked me what is
11  the law?  So let me answer that.
12    Okay.  The United States Supreme Court very
13  recently --
14    Q.  I'm not -- I'm not interested in that, sir.
15    A.  Then don't ask the question what is the law.
16    Q.  Okay.  I -- I'm sorry.  I withdraw.
17  Apparently it was too broad.
18    If you're talking about the recent case from
19  the Supreme Court, that's a case involving a fleeing
20  suspect, is it not?
21    A.  It's not.  I'd be happy to discuss it with
22  you --
23    Q.  Well, I'd rather not discuss it with -- with
24  the -- with the limited time we have.
25    A.  All right.

Page 285

1       Q.  It is not the situation and the fact pattern
2  in this case, is it, sir?
3       A.  Nor was it similar to Tennessee versus
4  Garner or Graham versus Connor.
5          MR. BENJAMIN:  Objection.
6          THE WITNESS:  You're correct.
7  BY MR. LILLEY:
8       Q.  And then you talk about poor reporting.  I
9  don't know if I have -- yeah, you're right there.
10  Good.
11          Use of forced continua.  Promote reporting
12  conclusion not facts.  This is entitled "Poor
13  reporting."
14          What's use of force continua briefly?
15  Because our time's getting short.
16       A.  In the early part of the 1960s, a
17  Los Angeles police captain wrote a paper in which he
18  proposed assessing a teaching force according to a
19  use of force letter that -- that led to a number of
20  continua -- continuum that were progressive,
21  primarily linear, sometimes escalating on an X and Y
22  axis, methods for teaching assessment of -- of force.
23  There has been an academic discussion going on for a
24  number of years, still quite a vibrant discussion
25  with the current -- with the Civil Rights section of

Page 286

1  the United States Department of Justice and it has to
2  do with should we use use of force continua or should
3  we teach a different system for law enforcement
4  officers based on the objective -- objective
5  reasonableness language of Graham versus Connor?
6          So use of force continua, this section that
7  you're about to get into deals with a theory of or
8  promoting the theory of doing away with use force
9  continua, something that at this time was new in the
10  state of Utah.  Many agencies, many officers would
11  have been familiar with --
12       Q.  I really have to cut you off here because
13  I -- that's way beyond the scope of my question.  But
14  I understand.
15       A.  Well --
16       Q.  And -- and essentially the continuum is --
17  and you wrote an article on this that I read
18  somewhere along the line.  The continuum is
19  essentially using the least amount of force to the
20  greatest amount of force, is that -- and you do one
21  step at a time.  That was my understanding.
22          MR. BENJAMIN:  I'll -- I'll object.
23  BY MR. LILLEY:
24       Q.  Is that correct?
25          MR. MARCHESI:  Join the objection.  Are you

Page 287

1  talking about some --
2  BY MR. LILLEY:
3       Q.  Well, I've got it in here.
4       A.  Yeah, that -- and that's the challenge.  And
5  that's the challenge is that many people read that
6  and they -- they jump to that conclusion --
7       Q.  Okay.  Well --
8       A.  -- because that's the easy thing to derive
9  from it.
10       Q.  So I -- I had it wrong.
11       A.  No.  I -- I'm telling you what you -- you
12  had was what most people conclude from that teaching
13  model, and it -- it's probably not -- I -- and if you
14  read my article, you know that I don't think that's
15  the best model for teaching assessment of force.
16       Q.  You used to teach it and you've decided it's
17  not effective.
18       A.  Well, the Utah police academy used to teach
19  it as a requirement.
20          I made the -- I was the one who -- who
21  really started that fire to get rid of it.  And this
22  course was presented at that time of transition.
23  That's why as you go through here, you'll see an
24  extensive discussion.
25       Q.  Okay.  Before I leave that, when it says

Page 288

1  under "Contrast," you've got assaultive actively
2  resisting.  These are the kind of things -- I -- I'm
3  reading this, I may be reading it wrong, that you're
4  suggesting to the police officer, the new recruit or
5  whoever you're talking to, that they -- this is the
6  kind of thing that they should report in their -- in
7  their cases where they have deadly force issues,
8  correct?
9       A.  No.
10       Q.  Okay.  Well, when it says I will kill you,
11  assuming a fighting stance, thousand-yard stare,
12  closing distance, clenched fists, scanning the area
13  are you -- I -- I know you're talking about
14  reporting, what the officers should report rather
15  than conclusions, I think you said.
16       A.  Precisely.
17       Q.  And the fact of the matter is, what you're
18  telling him is to report these things that are clues,
19  or cues I should say, cues to the fact that a person
20  may be gearing up to shoot you.
21          Is that an oversimplification, perhaps, but
22  isn't that what you're going for?
23       A.  It's close.  What we're looking for here is
24  the contrast.  So if an agency has a use of force
25  continuum, it typically will say a person is behaving

Page 289

1    with assaultive or active resistance. That doesn't
2    tell me much.
3         So I'm encouraging officers now to assess
4    and report in more detail what you call cues, I like
5    that term, and -- and that's where we -- that's
6    where this discussion is centered.
7         Q.   And if you like the term, sir, isn't that
8    one of the big missing elements in this case for
9    Mr. Mangino, that walking down the road with a gun
10   dangling at his side, nonchalantly, he presented no
11   cues that he was going to fire his weapon at
12   Mr. Mangino? Isn't that the hole in the case?
13        MR. BENJAMIN:  Objection.
14        MR. MARCHESI:  Objection. Foundation.
15        THE WITNESS:  I -- I disagree with your
16   characterization.
17   BY MR. LILLEY:
18        Q.   Tell me what cues there were other than him
19   walking down the road with a gun dangling to his side
20   pointed to the ground and walking nonchalantly.
21        What were the cues that caused him to shoot
22   him when he did?
23        A.   He --
24        MR. MARCHESI:  Objection.
25        THE WITNESS:  Sorry. He'd been provided by

Page 290

1    other officers that their belief was that
2    Mr. McKenney was targeting him. He had been called
3    to a situation where the dispatch gave him and the
4    other officers information to lead them to believe
5    that there was an emergent situation, that
6    Mrs. McKenney was very -- very concerned, that she
7    reported that she feared that he might use the weapon
8    on himself.
9         They had walked into the home and he --
10   Mr. McKenney had been given commands by the other
11   officers to put the gun down. Mr. McKenney had been
12   told on a number of occasions to put the gun down,
13   albeit some of them had been recorded, some had not.
14        All of those -- all of those factors had to
15   be present in Deputy Mangino's mind. He can't just
16   exclude everything he knows about what's happened in
17   the nanoseconds prior to firing.
18        Q.   But the justification has to be at the time
19   of the firing, not some historical basis.
20        Do you agree with that?
21        MR. MARCHESI:  Objection.
22        THE WITNESS:  As a general proposition, yes.
23   There -- there are some -- there are some limiting
24   factors there, but generally, yes.
25   ///

Page 291

1    BY MR. LILLEY:
2         Q.   And I'm asking you, my -- my -- my question
3    was more specific.
4         What were the cues that McKenney gave
5    Mangino from the time he started walking down the
6    driveway to when Mangino shot him to death? What
7    were the cues? Give me one.
8         A.   He's walking toward Deputy Mangino with a
9    weapon having ignored commands to drop the weapon and
10   having a history now of nearly ten minutes of
11   noncompliance and being armed and being nonresponsive
12   and violent.
13        Q.   Walking down the driveway. I'm trying to
14   get you to answer that question --
15        A.   I understand.
16        Q.   -- not what happened historically.
17        Because I take it you agree with me from
18   your last answer that you can be in the line of fire
19   or have deadly force directed in your -- directed at
20   you at one point, and that can subside and it -- and
21   the facts can change as the day wears on. I mean,
22   things wax and wane, do they not, in these situations
23   from time to time?
24        A.   Sure.
25        Q.   Okay. So it's the time of the shooting

Page 292

1    that -- that -- that is the time that we want to
2    freeze-frame what was going on to determine whether
3    there was justification, don't we?
4         MR. MARCHESI:  I object to that.
5         THE WITNESS:  No.
6    BY MR. LILLEY:
7         Q.   Well, what were the cues, then, from the
8    time this man, McKenney, let's say it took him nine
9    seconds, as somebody estimated, I think it was
10   Fournier, going down to where he was shot to death?
11   What were the cues that -- that McKenney gave to
12   Mangino or anybody else at that time?
13        MR. MARCHESI:  Objection. Asked and
14   answered.
15   BY MR. LILLEY:
16        Q.   From the time he left the building heading
17   down the driveway --
18        MR. MARCHESI:  Same --
19   BY MR. LILLEY:
20        Q.   -- not anything before.
21        MR. MARCHESI:  Same objection. He just
22   answered that a moment ago.
23        THE WITNESS:  I -- I can answer that
24   question as a hypothetical because, really, to answer
25   that fairly requires the hypothetical that we vacuum

Page 293

1  out of all of the officers' minds what they had
2  observed about Mr. McKenney --
3       MR. LILLEY: Can we stop all these bells and
4  whistles over here with these cell phones. It's
5  distracting and it's rude.
6  BY MR. LILLEY:
7       Q. Go ahead, sir.
8       A. So vacuuming all that information out, he's
9  closing on a deputy with a deadly weapon.
10      Q. And that's the only cue?
11      A. That's the only cue in the hypothetical.
12      Q. And -- and -- and he -- all of that history
13  that you're excluding, if you put that back in, then,
14  Mangino would have been justified in shooting him at
15  the time he was at the house. After -- after the --
16  let me -- let me -- let me sharpen that question now
17  because it's vague, and I apologize.
18          Then Mangino would have been justified in
19  shooting him under the justification that the law
20  provides because he was in imminent fear of deadly
21  force from the time Mr. McKenney was in the house and
22  coming in and out of the house after they had
23  confronted him earlier in the day; is that correct?
24      MR. MARCHESI: Objection.
25      THE WITNESS: Well, those aren't the facts,

Page 294

1  certainly, but there are a number of points at which
2  a -- an officer might reasonably have concluded that
3  it was appropriate to shoot at -- at a number of
4  junctures. For example, where Mr. McKenney has
5  raised the weapon, similar to what you've shown us in
6  the one photograph, when he is starting to walk and
7  he's been given multiple commands to drop the weapon.
8  But none of that happened. That -- that's not when
9  it happened.
10  BY MR. LILLEY:
11      Q. That's not when what happened?
12      A. That's not when he was shot.
13      Q. No. And what I'm saying is after that
14  happened, what are the cues that Mr. McKenney gave to
15  Mangino to justify him believing he was all of a
16  sudden or -- that there was some killing that was
17  going to happen, some deadly force against
18  Mr. Mangino? The cues walking down the driveway.
19      A. Again, taking the hypothetical of removing
20  all of the information the officers knew prior to
21  Mr. McKenney walking down the driveway with a loaded
22  weapon, having been given commands to drop the
23  weapon, failing to do that and continuing to advance
24  on Deputy Mangino and his vehicle, none others.
25      Q. So -- so for -- okay.

Page 295

1          So from what you're saying, then, as soon as
2  Mangino gave him the commands to drop the weapon and
3  that's when -- when the -- McKenney's at his house
4  and Mangino's down at his car, correct?
5      MR. MARCHESI: Objection.
6      THE WITNESS: There were a number --
7      MR. MARCHESI: That's not correct.
8      THE WITNESS: There were a number of
9  points -- I can't --
10  BY MR. LILLEY:
11      Q. Okay.
12      A. -- identify the precise geography, but
13  there --
14      Q. Never mind.
15      A. -- there were a number of points at which
16  Mr. McKenney was given the command to drop his
17  weapon.
18      Q. And as soon as he didn't do that, you're
19  saying that the officer was justified in shooting,
20  correct?
21      A. I'm -- I'm saying that are a number of
22  points at which it may have been reasonable. I've
23  not analyzed those hypotheticals.
24      Q. Well, you have to in order to make a
25  decision about whether or not this -- this officer

Page 296

1  acted properly, don't you?
2      A. I disagree.
3          I just haven't -- really, I suppose, you
4  could create hundreds, if not thousands, of
5  hypotheticals at different points in time, and I've
6  not analyzed each point in time in a hypothetical
7  question.
8      Q. Because the problem is if you don't have
9  cues, then you're predicting, you're guessing that
10  this man could possibly kill you, that he could
11  possibly or might kill you. But you don't have the
12  ability to say he'll probably kill you because you
13  got no cues.
14          Do you agree with that statement?
15      MR. MARCHESI: Objection. Form.
16      THE WITNESS: I don't know that I agree with
17  that. I -- I think where you're going, I agree that
18  if a Muslim fundamentalist terrorist or a bank robber
19  kicked that door in right now and there's a window
20  there and started pointing a weapon at you and pulled
21  the trigger back and shouted at you or I yelled at
22  him to drop the gun, I can't predict whether he'll
23  shoot you or not just because he doesn't like your
24  shirt. I happen to like it quite a bit.
25          However, if he did that, sir, I would shoot

Page 297

1  him, not being able to predict with a hundred percent
2  accuracy whether he would kill you or not.
3  BY MR. LILLEY:
4  Q.  I would too if he's pointing the gun at me,
5  but the gun was never pointed at Mangino.
6      Isn't that the missing element also?
7  A.  Even if he --
8      MR. MARCHESI:  Objection.
9      THE WITNESS:  Even if he came in and started
10 to point the gun at you, sir, I'd certainly --
11 BY MR. LILLEY:
12 Q.  Well, if he started to, that might also be
13 justified.
14     But Mr. McKenney never started to use the
15 gun in any fashion when Mangino shot him dead.  Those
16 are the facts, are they not?
17 A.  Okay.
18 Q.  Okay means yes?
19 A.  I -- the weapon was not pointed at
20 Deputy Mangino at the time Mr. McKenney was shot.
21 Q.  And so your problem is that you're
22 predicting that -- that -- and Mangino is predicting,
23 as he says in his deposition and in his statement to
24 the AG's office, that he thought the guy might or
25 possibly -- and he uses both words, and I'll show you

Page 298

1  if you wish -- kill him.  But he doesn't say that he
2  probably will kill him because he has no cues that
3  that's going to happen.  That's how we decide what
4  people may or may not do, isn't it, sir?
5      MR. MARCHESI:  Objection.  You're misstating
6  the standard which is a reasonable belief.
7      THE WITNESS:  Insofar as -- you know, you're
8  stating a -- a very accurate proposition, and that is
9  that we predict what people are doing based on cues.
10 There you go.
11 BY MR. LILLEY:
12 Q.  Right.  And there aren't any.
13 A.  Well, I disagree with you.
14 Q.  Well, except that he's got a gun and he's
15 walking down, but he hasn't pointed it at anybody and
16 he gets executed.
17     MR. BENJAMIN:  Objection.
18     MR. MARCHESI:  Join.
19 BY MR. LILLEY:
20 Q.  Let me withdraw that and suggest to you that
21 even if McKenney started to raise his gun under the
22 situation that Mangino was in, Mangino had good
23 cover, maybe not perfect, he had the rifle or the --
24 the sights pointed on him.  Mangino was still
25 really -- would not really be in imminent danger

Page 299

1  under the circumstances of the distance, the rifles,
2  the age, the things we talked about earlier.
3      Do you agree with that?
4  A.  No.
5  Q.  Okay.  Look at -- go through a couple more,
6  if you will.  Got to get to our --
7  A.  Which page number?
8  Q.  I'm aiming for 5 if I can.
9  A.  What's the page number?
10 Q.  The one with the little kid with a gun --
11 A.  Page number on the bottom?
12 Q.  Oh, yes, 26.  I'm sorry.
13 A.  Okay.
14 Q.  Here I'm getting a little punchy.
15     This is a -- a -- a PowerPoint that says
16 "How close is too close?"
17 A.  Yes, sir.
18 Q.  And that's his book.  Tueller's book, right?
19 Or his article really.
20 A.  Yes.
21 Q.  And in fact it says "Developed in
22 March 1983."  You're wrong.  It wasn't '84.  Or maybe
23 he published in '84.  It doesn't matter.  Let me
24 withdraw that last statement.  I'm sorry I made it.
25 A.  Can I phone a friend?

Page 300

1  Q.  "Developed in March of 1983 by Lieutenant
2  Dennis Tueller of the SLCPD, firearms trainer and
3  world-class pistol champion."
4      You say that.  Those are your words, right?
5  A.  Yes.
6  Q.  "At what distance does the suspect with an
7  edged or impact weapon present a threat?"
8      What do you mean by that?
9  A.  So that was the question that was posed to
10 then-Sergeant Tueller.  At -- at what distance should
11 I have my weapon out and ready to fire, and
12 Sergeant Tueller's response was to the person who
13 asked the question, I don't know.  And that's why he,
14 with Carol Mays and Foster Mayo and a few other
15 people, designed -- designed the exercise that he --
16 that he performed.
17 Q.  It's called the 21-Foot Rule, isn't it?
18 A.  It is not.
19 Q.  It -- you sure it isn't?
20 A.  Oh, I am certain beyond anything.
21 Q.  If I gave you an article in which Tueller
22 says that it's the -- called the 21-Foot Rule, would
23 you -- would it change your mind?  I can tell you
24 there is one.
25 A.  You know, I'd be very surprised.  I -- I

Page 301

1  have been in a number -- Dennis Tueller and I have
2  taught firearms courses together, and I've been in a
3  number of classes where he has said, I never said it
4  was a rule.  It's a principle.
5      Q.  Well, whatever it is, it's a 21 -- the --
6  the distance -- the point is the distance was 21 feet
7  that he was doing the testing on with a man with a
8  pretend knife and a man with a pretend gun, correct?
9      A.  It's not entirely accurate.  He -- it
10 doesn't matter that it was a real gun with blanks.
11 He did exercise this at a number of distances,
12 including 30 feet, including greater distances,
13 closer distances.  And his conclusion was that in the
14 majority, the slight majority of the cases, a person
15 standing and holding an impact weapon, that is a club
16 or a stick, a pool cue, or an edged weapon, a box
17 cutter or razor or a knife, could launch an attack
18 and could strike the officer prior to the officer
19 delivering two effective rounds, or at the same time
20 the officer fired, meaning that the officer is firing
21 at the same time that the officer is being stabbed/or
22 struck.
23     Q.  And what he says, and I'll quote from his
24 article, Dennis Tueller, "How Close is Too Close?
25 "We have done some testing along those lines recently

Page 302

1  and have found that an average healthy adult male can
2  cover the traditional seven yard distance" -- 7 yards
3  is --
4      A.  21 feet.
5      Q.  -- 21 feet -- "in a time ... (you guessed
6  it) about one and one-half seconds.  It would be safe
7  to say then that an armed attacker at 21 feet is well
8  within your Danger Zone."  Quote/unquote.
9          You have it there if you want to read it.
10 It's on number --
11     A.  No.  I -- I think you're probably quoting
12 from his original article.
13     Q.  I am.
14     A.  Okay.
15     Q.  Isn't that what I should be doing?
16     A.  Sure.
17     Q.  And that became known -- this finding became
18 known, whether he said it or not, became known in
19 the -- in the profession of law enforcement as the
20 21-Foot Rule.  Whether you like it or not, that was
21 what it was known, correct?
22     A.  I think Mass Ayoob used that term but others
23 don't, myself included.
24     Q.  Okay.
25         THE WITNESS:  Remind me, and I'll tell you

Page 303

1  how to spell Mass Ayoob.
2  BY MR. LILLEY:
3      Q.  Okay.  Let me ask you if you agree with the
4  following statement:
5          The traditional use of force continuum
6  begins with officers presence, recognizing that the
7  authority and presence of a uniformed officer may
8  introduce some compulsion into a situation.
9          Do you agree with that?
10     A.  Yes.
11     Q.  And that drawing a gun adds force, and
12 pointing a gun at a person adds even more force.
13         Do you agree with that?
14     A.  I do.
15     Q.  Does that include force against Mr. McKenney
16 when he was in his house and two officers were -- had
17 their guns drawn against him?
18         MR. BENJAMIN:  I want to -- okay.  Drawn --
19 drawn, not pointed.  That's your question, right?
20         MR. LILLEY:  Yes.
21         MR. BENJAMIN:  Okay.  Never mind.
22         MR. LILLEY:  Thank you.
23         THE WITNESS:  You just said drawn, correct,
24 in your question.
25 ///

Page 304

1  BY MR. LILLEY:
2      Q.  Yeah.
3      A.  Yeah.  I think --
4      Q.  Drawing a gun and force and pointing --
5  pointing a gun at a person adds even more force.
6      A.  Sure.  I agree with both those statements.
7      Q.  And so when those officers came into
8  Mr. McKenney's space with drawn guns, he increased
9  the pressure and the adds force to the situation,
10 in -- in my view, escalating that.  I'm adding that.
11 That wasn't said here.
12         Do you agree with that statement that I've
13 now added my little editorial to?
14     A.  I agree with that -- with your editorial
15 addition.
16     Q.  And -- and it's also said in -- in -- you
17 recognize this as an article you wrote?
18     A.  No.
19     Q.  You also say in your article -- I'll -- I'll
20 give you the numbers.  It's No. 72.
21         VIDEOGRAPHER:  Eight minutes remaining.
22         MR. LILLEY:  Oh, I'm not going to finish
23 that in eight minutes.
24 BY MR. LILLEY:
25     Q.  It's on page 2 of 5 that you wrote an

1    article called "Use of Force." I think that's you.
2        Is that your article? That's your picture,
3    isn't it?
4        A. That's interesting. That's my picture. It
5    postdates the article. But yeah, I wrote --
6        Q. Well, I got it off the Internet, sir, and
7    that's my best source of law enforcement information
8    is --
9        Did you write the article or didn't you?
10       A. I did, and that's my picture. I was
11   skinnier.
12       Q. You've grown much more handsome, I might
13   suggest.
14       A. I did. I remember --
15       Q. Now that we're talking --
16       A. -- I remember the discussion.
17       Q. Now, let's go back to this.
18       In the -- in the page 2 of 5, you say about
19   this third paragraph in the middle of the paragraph,
20   The Court -- and you're talking about cases. Let me
21   get -- be sure I got the right case. I believe
22   you're talking about McDonald versus Haskins --
23       A. Correct.
24       Q. -- a Ninth Circuit case.
25       A. Seven.

1        Q. Seventh.
2        The Court stated that the display of weapons
3    and the pointing of firearms directly at persons
4    inescapably involves the immediate threat of deadly
5    force, correct?
6        A. Correct.
7        Q. And the failure to do that, as in this case,
8    doesn't reach the standard, does it, sir? They don't
9    reach the level of deadly force?
10       MR. MARCHESI: Objection. Form.
11   BY MR. LILLEY:
12       Q. Because they didn't -- he didn't point the
13   gun at anybody. Assume for the moment he didn't
14   point the gun at anybody if you don't believe that to
15   be the fact. This is your article.
16       A. It is. And the Haskins case isn't about
17   that. The Haskins case is -- is not about what
18   you're talking about.
19       Q. Well, sir --
20       A. I don't know whether --
21       MR. MARCHESI: Please let him finish.
22       THE WITNESS: So you're -- I agree with your
23   proposition --
24   BY MR. LILLEY:
25       Q. It's mine -- it's yours, not mine.

1        A. Sure. I -- I agree with your proposition
2    that the use and display of a weapon is an increase
3    of force. In Haskins, there -- there wasn't any --
4    any shooting. This was -- and this whole discussion
5    here -- this -- this whole discussion followed --
6    it's a follow-on to an earlier discussion about when
7    it is that an officer may be civilly liable for
8    merely pointing a gun. And in this case, Haskins, if
9    I recall right, it's a kid, an eight or nine year old
10   or ten-year-old kid who's in a home and an officer
11   uses some aggressive language and says something
12   like, I will blanking shoot you and points a gun.
13       There's no injury, and so the question is
14   can you have a cause of action under Section 1983
15   where there's no injury but there is a threat and a
16   display of a weapon.
17       So that's when the Court's talking about
18   involving a threat of deadly force, the Court is
19   talking about this officer's verbal threat to use
20   force.
21       Q. I understand what you're saying.
22       A. If I recall the case correctly, and I
23   believe I do.
24       Q. But what I'm saying to you, sir, is that
25   you've cited that case, you've cited another case

1    called Robinson versus Solano County.
2        A. County. That's a Ninth Circuit case.
3        Q. That's a Ninth Circuit case. And these are
4    your words, The Court stated that the display of
5    weapons and the pointing of firearms directly at
6    persons inescapably involves the immediate threat of
7    deadly force.
8        Let me continue. You're quoting from the
9    Court.
10       A. Correct.
11       Q. This is the Court's language put on this
12   article by you. You understand that.
13       A. Sure.
14       Q. And it goes on to say, Such a show of force
15   should be predicated, said the Court, on at least a
16   perceived risk of injury or danger to the officers or
17   others based upon what the officers know at the time.
18   These are the very ingredients relevant to an
19   excessive force inquiry. End of quote. Correct?
20       A. Sure.
21       Q. And so the point is whether it's directly on
22   your articles thesis, the point you're making here in
23   citing the Supreme Court -- or the circuit court
24   rather, is that -- is the display -- it's pointing --
25   not the display. I -- I just said the opposite --

Page 309

1 pointing of the firearms directly at persons. This
2 is the -- the very ingredient or at least one of them
3 relevant to excessive force inquiry. That's what
4 you're saying in this article in citing the Court,
5 right?
6        MR. MARCHESI: Objection.
7        THE WITNESS: Not really, but I get where
8 you're going with it. That's not the issue in this
9 whole -- you've got one article out of a series of
10 discussions, and that's not the issue in this
11 discussion. It's not the issue in this article.
12 BY MR. LILLEY:
13    Q. Well, sometimes --
14    A. That is an accurate quote, I believe, from
15 the Court.
16    Q. And I'm just saying that the opposite of
17 that, where -- where a person does not point a gun, a
18 firearm directly at a person, they haven't risen to
19 the point where you can use excessive force because
20 there is no inescapable conclusion that there's
21 immediate threat.
22        Do you agree to that?
23        MR. MARCHESI: Object to the form of the
24 question. It talks about perceived risk.
25        MR. BENJAMIN: Join.

Page 310

1        THE WITNESS: I -- I don't -- I can't agree
2 that what you're talking about in the McKenney case
3 is the opposite of an officer being held civilly
4 liable or at least whether a cause of action lies in
5 Section 1983 --
6        (Clarification by the Reporter.)
7        THE WITNESS: Section -- Title 42,
8 Section 1983, whether a cause of action lies for
9 liability when the officer points a weapon in the
10 absence of any perceived threat and uses language
11 that is threatening language. That's what this --
12 that's what Haskins is about. It's similar to
13 Solano. It's what the -- the Holland case, which is
14 also cited in here, Tenth Circuit case is about.
15 This isn't about shooting.
16 BY MR. LILLEY:
17    Q. We can learn from Supreme Court in other
18 cases on dicta and other things that are not directly
19 related to the facts of the case, can't we, as
20 lawyers?
21    A. Sure.
22    Q. And that's really what you're doing. You're
23 bringing the principle that we're talking about that
24 applies to this case in through -- I know you have
25 another goal for your article, but you cite it as

Page 311

1 something the Court said in those cases that apply to
2 all cases, don't they?
3    A. I cited --
4        MR. MARCHESI: Objection.
5        THE WITNESS: -- as you said, dicta Hebdo
6 case to try to advance a particular argument that had
7 nothing to do with shooting.
8        VIDEOGRAPHER: A minute and a half.
9 BY MR. LILLEY:
10    Q. Had nothing to do with shooting? Sorry.
11    A. This is not --
12    Q. You just got done saying the Court said
13 pointing a gun at anybody is -- is -- is -- is deadly
14 force.
15    A. Correct.
16    Q. So it is about shooting, isn't it?
17    A. No. The case in --
18    Q. I'm not talking about the case. I'm -- what
19 the Court said.
20    A. Okay. What the Court said is in a case that
21 has nothing to do about shooting.
22    Q. So it's dicta.
23        MR. MARCHESI: Objection.
24        THE WITNESS: I'm saying that -- that this
25 is not a case where anyone was ever shot --

Page 312

1 BY MR. LILLEY:
2    Q. Then why did you cite it?
3    A. -- that was not the issue.
4        Because the -- this -- this entire article,
5 as I've pointed out now several times, is not about
6 shooting. It's a whole different discussion in the
7 force realm.
8        MR. LILLEY: Okay. I guess we're probably
9 at the end of that tape. I think we're going to have
10 to go a little longer, gentlemen. Sorry, but doing
11 my best.
12        VIDEOGRAPHER: We're going off the record.
13 It is 4:25.
14        (Short recess taken.)
15        VIDEOGRAPHER: This is Tape No. 5 in the
16 videotaped deposition of Kenneth Wallentine. The
17 time is 4:38. We're back on the record.
18 BY MR. LILLEY:
19    Q. We're reaching the end here, sir. I keep
20 promising that, but I mean it.
21    A. Look at the bright side. If you only go
22 14 minutes, you only get billed for six hours.
23    Q. True.
24    A. You go 15, you hit the 7-hour portion. So
25 take what time you need, as long as I'm home by 6.

78 (Pages 309 to 312)

Page 313

1    Q.  I've put in front of you the statement --
2    A.  This?
3    Q.  Yes, the statement of Mr. Mangino, which I
4  assume everybody has --
5    A.  It's the attorney general statement.
6       MR. MARCHESI:  Yeah.
7  BY MR. LILLEY:
8    Q.  From the attorney general, and -- and I want
9  to talk a little bit about the statements that he has
10  made and ask you what impact, if any, you considered
11  that on your conclusions.
12       If you'd -- if I can find it at this late
13  hour.
14       If you look at Mr. Mangino's testimony going
15  back -- I think we should start probably -- just a
16  second -- at -- let me see here.  Hold on just a
17  moment.  I'll give you the page number.
18    A.  Okay.
19    Q.  Before I -- I'm looking at page 26 of that
20  statement.  It says on the bottom on Browns & Myers,
21  Inc.
22       Do you have that?
23    A.  I do, and I'm on page 26.
24    Q.  Okay.  Before we get there, do you -- I -- I
25  wasn't sure I understood completely your answer about

Page 314

1  hiding or getting cover behind the engine block.
2    A.  Okay.
3    Q.  Were you suggesting that the .357 Magnum
4  bullet could go through the engine block?
5    A.  I was not.  I don't believe that it can.
6    Q.  Okay.  So if you -- if you start on page 26,
7  I'm going to ask you about a couple of -- of
8  statements that Mr. Mangino made to the attorney
9  general, and this was done, I believe, quite soon
10  after.  Let me just get the time frame.
11       It says April 18th, and the -- and the
12  shooting was on the 12th.  So this was done six days
13  later.
14       MR. MARCHESI:  I just want to indicate for
15  the record that I think all the parties have found
16  some errors in the transcription of the statements to
17  the attorney general.  Counsel, you're certainly
18  welcome to examine the witness based on the
19  statement, but --
20       MR. LILLEY:  Thank you.  I really appreciate
21  it.
22       MR. MARCHESI:  -- I reserve the right at the
23  appropriate time to --
24       MR. LILLEY:  Change it?
25       MR. MARCHESI:  -- to rely on the actual

Page 315

1  audio recording to correct any errors.
2       MR. LILLEY:  I'm going to assume the AG's
3  office transcribed it accurately.
4  BY MR. LILLEY:
5    Q.  So if you look at page 26, and this is the
6  area that I'm interested in getting some feedback
7  from you.
8       And it's -- it's talking about -- PG is the
9  AG investigator, I believe.  And -- and NM is
10  Mr. Mangino.
11       So I'm starting at -- to -- to look on
12  page 34, and I'll have a few pages thereafter, and
13  I'm going to try and keep it fairly narrow.
14       MR. BENJAMIN:  Are we --
15  BY MR. LILLEY:
16    Q.  Are you on the right page?
17    A.  Did you say --
18    Q.  Twenty-six?
19    A.  -- 34?  Okay.  Twenty-six.  I -- I'm sorry.
20  I thought you said 34 after that.
21    Q.  Do you have 26?
22    A.  I have 26.
23    Q.  So in the middle, you know, about a third of
24  the way down, Mangino says, At some point after the
25  suspect stopped --

Page 316

1    A.  Starts.
2    Q.  -- starts walking down the driveway, I am
3  like, okay, he is coming at me.  I don't remember if
4  I get it over -- if -- it over the hood or it was
5  almost like I kind of creeped around the side of the
6  car by where the full bumper is and I popped up a
7  little over the hood.  I had my front sights on him
8  now.  He made it, I would -- I would say halfway down
9  the driveway, and I said, I'm not letting him get any
10  further because I know my training said action beats
11  reaction, and he has got a firearm and it is already
12  pointed at me.  He -- I know -- I don't know.  I'm
13  scared for my life.  I'm thinking -- I am thinking
14  that he's coming to kill me.  And then he says, I
15  have a civilian ride-along.  But let me stop there if
16  I can and I'll pick it up after.
17       Do you understand at least from that
18  statement a fair reading is that at some point when
19  the suspect starts walking down the driveway, he,
20  meaning Mangino, has his front sights on him?  Did
21  you consider it that way when you evaluated it?
22    A.  I believe that -- I did consider it that
23  way.
24    Q.  Okay.
25    A.  Excuse me.

Page 317

1     Q. And -- and did you understand that he had
2 made a conscious decision that he was not going to
3 let him get any further down the driveway?
4     A. That's certainly what you can take from
5 this.
6     Q. Now, that doesn't sound like fear of the use
7 of imminent force by -- by -- by -- by the subject,
8 Mr. McKenney. But we haven't read it all yet, but at
9 least at that point, he seems to be saying, does he
10 not, that he's going to fire at this guy if he goes
11 by some perhaps imaginary line down the driveway.
12     Is that a fair reading that you concluded
13 when you looked at it?
14     MR. MARCHESI: Objection. Form.
15 Foundation.
16     THE WITNESS: I -- I read this to believe
17 that he was prepared at this point to fire.
18 BY MR. LILLEY:
19     Q. Well, I understand that. He's got his
20 sights on him, right?
21     A. Well, at least intermittently he does.
22     Q. Well, it doesn't say intermittently, does
23 it?
24     A. It does not.
25     Q. It says, I -- so I might just stick to what

Page 318

1 was said rather than what we --
2     A. All right. It says that I had my front
3 sights on him now, so --
4     Q. So he's -- he's ready to shoot, correct? At
5 least if you take him at his word.
6     MR. MARCHESI: Objection. Form.
7 BY MR. LILLEY:
8     Q. Do you agree?
9     A. I -- I don't know that. What I do know is
10 that at one slice of time, he had his front -- front
11 sights on him.
12     Q. Well, okay. So you believe from what --
13 what I've read so far that he took his sights away
14 from him at some point? I'll -- I'll read more.
15     A. Okay.
16     Q. You -- at least at this point, when he
17 starts to walk down, he says at the -- at the top, At
18 some point after the suspect starts walking down the
19 driveway -- at some point, we don't know exactly
20 where it is -- I had my front sights on him now.
21     At least at this -- when he's walking down
22 the -- the driveway at some point after he starts,
23 this police officer has the -- the rifle sights on
24 the suspect, correct?
25     A. The front sights, yes.

Page 319

1     Q. And -- okay. Is there some difference
2 between the front -- I mean, I know there's a
3 difference between the front sights and the back
4 sights, but what do you take the "I had my front
5 sights on him" to mean? Anything in particular or
6 just simply the sights?
7     A. I -- I take it to mean that he's generally
8 aiming the rifle at him. He may see through the
9 front sight. That's what my interpretation is here.
10 That -- that's not necessarily the same as having the
11 sights aligned.
12     Q. So if he were going to fire, he would want
13 to align them if he's following generally cape --
14 proper police action?
15     A. If -- if he -- if he's following -- if he's
16 behaving consistently with best practices and
17 firearms training and has the time, it would be
18 better to align the sights, correct.
19     Q. Okay.
20     A. Excuse me.
21     Q. So he says, Because I know my -- said
22 that -- my attorney said action beats reaction, and
23 he's got a firearm, and he says it's already pointed
24 at me.
25     And did you -- so you took that to mean that

Page 320

1 only his front sights were there because he says, I
2 had my front sight on him now; is that correct?
3     MR. MARCHESI: Objection. Form.
4     THE WITNESS: I -- I don't know. And -- but
5 I interpreted that to mean that he was looking
6 through his front sight.
7 BY MR. LILLEY:
8     Q. He says, I'm scared for my life. I'm
9 thinking he's coming to kill me.
10     Is -- is fear alone justification of the law
11 for shooting a person to death --
12     MR. MARCHESI: Objection --
13 BY MR. LILLEY:
14     Q. -- by a police officer?
15     MR. MARCHESI: Objection. Form.
16 BY MR. LILLEY:
17     Q. Fair alone.
18     A. No.
19     Q. I'm going to move forward a little bit
20 because he's going back to the house, and we've gone
21 over that quite a bit.
22     A. Which page?
23     Q. I'm moving to -- well, let's -- the -- the
24 bottom of page 27. The question is -- is --
25     "I said drop the gun. I yelled to him,

Page 321

1    Drop the gun, drop the gun.  I have no idea
2  how many times I said it, but I must have
3  said it at least ten times.
4      "Did you get a reaction from him?
5      "ANSWER:  No.
6      "QUESTION:  Did he look in your
7      direction?
8      "ANSWER:  No.  It was a vacant stare.
9      Yeah, he would be looking in my direction.
10     He would just keep looking around" and it
11     was -- "but he was very pale.  Just like I
12     was not receiving your message.  I'm not
13     acknowledging you."
14     Did you take into account that it appears
15  that he might be suggesting that either this --
16  Mr. McKenney didn't hear him or didn't perceive what
17  he was saying when he said anything to him, from
18  dropping your weapon to anything else he might have
19  said?
20     A.  I considered that Mr. McKenney may not have
21  cognitively processed it.
22     Q.  And that's a problem, isn't it, when you --
23  when you just don't know and you're not getting cues
24  from the dropping the gun command, you get nothing
25  but -- I think he says later on a stare, a

Page 322

1  thousand -- was it a thousand mile stare, whatever
2  that phrase was.
3      That's the problem, isn't it?  If you're not
4  getting a response, it may be because there's no --
5  he's not processing any particular thoughts or
6  communications?
7      MR. MARCHESI:  Objection.  Foundation.
8      THE WITNESS:  Generally it would be better
9  to have some response, yes.
10  BY MR. LILLEY:
11     Q.  Yes.
12     So what I'm suggesting is that by his not
13  dropping the gun, maybe -- at least one option -- one
14  possibility is that he either didn't hear it or
15  didn't understand it.
16     A.  I don't know --
17     MR. MARCHESI:  Objection.  Calls for
18  speculation.
19     THE WITNESS:  I -- I don't know whether he
20  heard or understood.
21  BY MR. LILLEY:
22     Q.  And I'm asking you this as an experienced
23  police officer.
24     You've -- you've --
25     A.  That's --

Page 323

1      Q.  -- seen these situations --
2      MR. MARCHESI:  Same objection.
3  BY MR. LILLEY:
4      Q.  -- before, correct?
5      A.  I could -- yeah, sure.  That -- that's
6  possible.
7      Q.  Okay.  And if you'll turn to page 28, he
8  says -- after -- so how many -- if you had to again,
9  I didn't understand this.  Yeah, maybe ten times.
10     You see where I am at the top?
11     A.  Yes.
12     Q.  Throughout this event.
13     Yeah.  And that while he is coming out
14  of the garage and going back in.  He said,
15  Coming out of garage, you know.  He was
16  walking towards Cook, and I'm telling him to
17  drop the gun.  But I don't honestly know.
18  I -- excuse me.  He is -- I don't -- honestly
19  I don't know how many times.  But I was
20  yelling him -- at him several times to drop
21  it.
22     Is that the -- the area that you say that
23  he -- you concluded that he told McKenney to drop the
24  gun while he was walking down the driveway?
25     A.  There are a number of points at which

Page 324

1  Deputy Mangino, including this point, tells -- I
2  believe at least ten times, tells Mr. McKenney to
3  drop his gun.
4      Q.  But that's while he's coming out of the
5  garage and going back in, this question says, and
6  that Mangino says, Coming out of the garage.  You
7  know, he's walking towards Cook.
8      That's not when he's coming down the
9  driveway.  Do you understand that?
10     A.  I do understand that.
11     Q.  So you believe that there are other times
12  that he said to drop the gun?
13     A.  Yes.
14     Q.  And then finally, on page -- down further,
15  just so that this is in the record, Mangino said,
16  So -- so he made it halfway down the driveway.  He
17  was just walking nonchalantly.
18     You see where I got that word?
19     A.  I do.
20     Q.  I observed the firearm in his --
21  in his -- I believe it was in his right hand
22  by his leg, you know, just dangling it with
23  his arms.
24     Do you see that?
25     A.  I do.

1    Q.  And then he says, That is when I shot
2  him because I wasn't going to let him get any
3  further to cause any harm -- I think it
4  should be -- to my civilian rider or any
5  fellow people around. I knew that I needed
6  to take action because my life was in danger.
7  I was scared.
8      Do you conclude from that, that he shot him
9  because he had drawn the line at some point he wasn't
10  going to let him go by and that he had premeditated
11  that?
12      MR. MARCHESI:  Objection. Foundation.
13      THE WITNESS:  I -- I concluded that he made
14  the decision to shoot him because he felt that that
15  was the -- the appropriate time for him to shoot.
16  BY MR. LILLEY:
17    Q.  Well, I understand that, but that he drew
18  the line at where he was walking in his own mind and
19  wasn't going to let him get any further --
20      MR. MARCHESI:  Same objection.
21  BY MR. LILLEY:
22    Q.  -- rather than because he was in fear of
23  imminent use of deadly force?
24    A.  I don't -- I don't believe that that was his
25  mindset.

1    Q.  Well, you don't believe it.
2      What do you base it on?
3      Do you want to stop and do something --
4    A.  Everything that I've seen in the case.
5      No, I'm just going to send a two-word
6  response.
7      Everything that I've seen in the case.
8    Q.  The -- the -- the fact of the matter is that
9  you don't know, do you?
10      MR. MARCHESI:  Objection. Asked and
11  answered.
12      THE WITNESS:  I -- I don't know what
13  Deputy Mangino was thinking at that moment, but --
14  BY MR. LILLEY:
15    Q.  But he's telling you what he's thinking,
16  isn't he? He's telling this investigator six days
17  later --
18    A.  Sure.
19    Q.  -- that this is what he was thinking, I'm
20  not going to let him get any further because of my
21  life was in danger; I was scared.
22      Those are his words, aren't they?
23    A.  They are.
24    Q.  That's the reason he shot them, isn't it?
25      MR. MARCHESI:  Objection. Foundation.

1  BY MR. LILLEY:
2    Q.  Pure and simple, what he said he did six
3  days afterwards. Those are the reasons he shot
4  him --
5      MR. MARCHESI:  Objection.
6  BY MR. LILLEY:
7    Q.  -- aren't they?
8      MR. MARCHESI:  Are you asking for
9  speculation --
10      MR. LILLEY:  No, I'm asking him to draw that
11  conclusion. He's analyzing this as your expert.
12      MR. MARCHESI:  Objection stands.
13      THE WITNESS:  Taking that one -- one
14  paragraph, I believe that you've accurately stated
15  what's in that one paragraph.
16  BY MR. LILLEY:
17    Q.  Well --
18    A.  I do -- I do, however, not -- I'm not able
19  to ignore everything else that I've seen in this
20  case, which has a number of other inputs into
21  Deputy Mangino.
22    Q.  And then if you look at page 29 so that we
23  ensure our factual basis, because you recall you
24  agreed with me if the factual basis is not accurate,
25  the opinions that you own cannot be accurate,

1  correct?
2    A.  I don't think that's precisely what you
3  said. I think you said that the -- if the facts are
4  different, the opinions might be different, and
5  that's what I agree with.
6    Q.  So the actual facts are what's important
7  for -- to support your opinion, correct? And I don't
8  think we have to go over this again. I think you've
9  already answered, but go ahead.
10    A.  All right. What -- what is important to me
11  is the facts that were available to Deputy Mangino.
12    Q.  That's right. And I'm talking -- that's why
13  I'm going right into his transcript of what he said
14  six days later.
15    A.  You are, but the actual facts may in fact
16  include things that we discover after the fact not
17  known to Deputy Mangino.
18      So when you say "actual facts" --
19    Q.  Well, okay.
20    A.  -- that's not accurate.
21    Q.  When I say actual facts, when he says he was
22  scared to death, he was afraid he was going to lose
23  his life or danger of losing his life, do you have
24  any reason to doubt that?
25    A.  I do not.

Page 329

1    Q.  So if you turn to page 29, the investigator
2  says:
3        You were -- so you were giving ver --
4  verbal commands when you did that as well.
5        And he says:
6        I don't remember.
7        Did you take that into account as to whether
8  or not he was accurate on any of the verbal commands
9  given that answer?
10   A.  I did.
11   Q.  And then he says:
12       Again, I don't remember if I gave verbal
13  commands as he was in the driveway, but I
14  could have.  But I don't remember a whole lot
15  as he started walking down the driveway.
16       So do you -- did you take that to mean that
17  whether he gave verbal commands or not, which are not
18  on the recordings, as you know, of the police radios,
19  that he's not even sure he gave it?  Did you conclude
20  that?
21   A.  Did I conclude that --
22   Q.  From what he said here, that he's not sure
23  that he -- he doesn't remember.  I don't remember.
24   A.  I think at this moment, he didn't remember
25  in response to that question.

Page 330

1    Q.  You think his memory came back later?
2        MR. MARCHESI:  Objection.
3  BY MR. LILLEY:
4    Q.  This is some time later.
5        Do you think that his memory reappeared?
6        MR. MARCHESI:  Objection.  Foundation.
7  Form.
8        THE WITNESS:  I --
9  BY MR. LILLEY:
10   Q.  From information here, sir, not from -- from
11  speculation.
12       MR. MARCHESI:  Same objection.
13       THE WITNESS:  I can answer that question.  I
14  don't know that I can answer it from what's on this
15  page.
16  BY MR. LILLEY:
17   Q.  Well, no, but is there other information
18  later on that gives you some confidence that he ever
19  gave verbal commands or at least ever gave verbal
20  commands when the man's walking down driveway, which
21  is an issue in this case?
22   A.  Sure.  There are other statements from other
23  persons as well as other statements from
24  Deputy Mangino that he gave verbal commands that lead
25  me to believe that he did, in fact.  I believe that

Page 331

1  at this moment, he did not remember that.
2    Q.  And you think his memory came back, then?
3        MR. MARCHESI:  Same objection.
4  BY MR. LILLEY:
5    Q.  I guess you have to, if you think that his
6  memory here was not right and later on, he had a
7  memory of something he couldn't remember six days
8  later, right?
9        MR. MARCHESI:  Objection.  He's identified
10  other sources of evidence from the record.
11       MR. LILLEY:  I'm talking about Mangino.
12       MR. MARCHESI:  Well, that wasn't your
13  question before.  That wasn't --
14       MR. LILLEY:  Please.
15       MR. MARCHESI:  -- in your question before.
16       THE WITNESS:  Sure.  I wouldn't -- I simply
17  wouldn't use those terms because unlike the -- the
18  recording that the videographer has, many people have
19  a misperception that memory works as a videotape.  It
20  simply does not.  So to say it came back later, I --
21  I don't think I would say that.
22       To say that one may have a different recall
23  at different moments with different stimulus and
24  different questions in different context, certainly.
25  That happens all the time.

Page 332

1  BY MR. LILLEY:
2    Q.  And talking with different people, sometimes
3  that suggests certain facts that may either be true
4  or may be the result of suggestion.
5        Do you agree with that?
6    A.  That's a possibility.
7    Q.  Mr. Mangino, from what I understand, and let
8  me ask you if you understand the same thing, has
9  never given a statement to the police or anyone else
10  in which he wasn't represented by a lawyer who was
11  present.
12       Do you agree with that?
13       MR. MARCHESI:  Objection.  Form.
14  Foundation.
15       THE WITNESS:  I -- I don't know.  I --
16  BY MR. LILLEY:
17   Q.  You understand he had a lawyer during this
18  interview.
19   A.  I would not be surprised if he did, so --
20   Q.  Paul Reagan?
21   A.  On page 2, it says Paul Reagan is there.
22  Now, I'm assuming from the context that -- I'm
23  assuming from the context that he's Mr. Mangino's
24  lawyer.  I don't know that to be the case.
25   Q.  All right.

1    A.  Well, yeah, I still -- I -- I don't know.
2    Q.  Okay.  So at the bottom of page 30, he
3  says -- the investigator says -- I'm saying
4  investigator because I can't pronounce his last name:
5        So what is the weapon that you chose
6     when you set up your perimeter?  That is the
7     gun that you had and that is the one you
8     fired?
9        And he says on the next page, 31:
10       Anytime we set up a perimeter, always go
11    to the long gun.  It's far more accurate.  I
12    have more distance if I need to.  You know,
13    everything is based off my training.
14       So at least he thought he was setting up a
15  perimeter and that's -- and he gave the reason he
16  used the long gun.
17       Any disputes with that?
18       MR. MARCHESI:  Objection.
19       THE WITNESS:  I -- I don't know that he
20  thought there was a perimeter set up.  Certainly,
21  based on his training, I think he thought that's the
22  direction it was heading.
23       And I -- I agree that it's common in police
24  training that when a perimeter operation is executed,
25  typically, typically officers are counseled to use

1  long guns.
2  BY MR. LILLEY:
3    Q.  And then he's asked what his target area is.
4  He says:
5        Center around the site as far as
6     shooting him.  That center mass that all
7     officers are taught to shoot at, not -- not
8     like in the movies to wound.
9        Is that correct?
10   A.  Well, officers are typically taught to shoot
11  center mass.
12   Q.  Okay.  And then he says:
13       I was trained to shoot at center mass.
14    I put my front sight on the center mass, and
15    when I shot my first shot -- it said he
16    almost sloped around.  I'm not sure what that
17    means -- and nothing happened.
18       So apparently, whatever his front sights
19  were doing, he shot looking through his front sights.
20       Do you believe he probably used his entire
21  sight or what's your take on that?
22       MR. MARCHESI:  Objection.  Foundation.
23       THE WITNESS:  I -- I don't know.
24  BY MR. LILLEY:
25    Q.  Okay.  Did you consider it in your analysis?

1    A.  I -- I did.
2    Q.  And what did you -- what -- what position
3  did you take if you had to take one?
4    A.  I -- I didn't reach a conclusion.
5    Q.  Okay.
6    A.  I considered that -- earlier you talked
7  about looking through the front sights.  Considered
8  the fact that he had military, excuse me, training
9  with a not dissimilar rifle.
10   Q.  Okay.  And then he says:
11       So my -- my -- my training says
12    eliminate the threat.  The threat is still
13    there.  So I brought my front sight up again,
14    and I just started another round, and that's
15    when I saw him hit the ground.
16       So his front sight is working pretty good,
17  isn't it, if he can hit this target with at least a
18  second shot?
19       MR. MARCHESI:  Objection.  Form.
20  BY MR. LILLEY:
21    Q.  Is that a fair conclusion to make?
22       MR. MARCHESI:  Same objection.
23       THE WITNESS:  It -- it is.  It's certainly
24  not a -- I mean, that's -- that's -- doesn't allow
25  for all possibilities, but it's pretty likely.

1  BY MR. LILLEY:
2    Q.  Okay.  And when it says, "My training says
3  eliminate the threat," his training may say it, but
4  the law doesn't say it, does it, eliminate the threat
5  if you have a threat similar to this?
6       MR. MARCHESI:  Objection to form.
7       THE WITNESS:  I'm not --
8  BY MR. LILLEY:
9    Q.  The law doesn't support that, does it?
10       MR. MARCHESI:  Same objection.
11       THE WITNESS:  I -- I've not seen those words
12  in statute or cases.
13  BY MR. LILLEY:
14    Q.  No, you've seen the words that we've been
15  unfortunately going over and over again about
16  immediate threat of deadly force.
17       That's the standard in general, isn't it?
18       MR. MARCHESI:  Objection.  It is not.
19       THE WITNESS:  I've -- I've seen different --
20       MR. LILLEY:  You're interfering with this
21  deposition and you're making comments that are
22  inappropriate.  I hate to have to go back to the
23  judge this time again because this time, I think
24  you're going to have to pay for some of this.
25       MR. MARCHESI:  Dan, you've threatened that

Page 337

1    every time we've had a disagreement.  Keep doing it.
2         MR. LILLEY:  Oh, no.  It's going to happen
3    one of these days, my friend.  You can't get away
4    with this forever.
5         MR. MARCHESI:  When's the last time -- never
6    mind.
7         MR. LILLEY:  Anyway, let's go ahead.
8    BY MR. LILLEY:
9         Q.  What -- with regard to eliminating the
10   threat, that's just not the law, is it?  You can't --
11   there's no justification to shoot someone when a
12   police officer is saying to eliminate the threat
13   period.
14        MR. MARCHESI:  You know, I -- I object.
15   BY MR. LILLEY:
16        Q.  Do you agree?
17        MR. MARCHESI:  I'm going to -- very -- I'm
18   going to very shortly instruct the witness not to
19   answer.  He has not been designated to offer opinions
20   on what the law is, nor would any expert witness, to
21   my knowledge, be allowed to do so.  That's the
22   province of the Court.
23   BY MR. LILLEY:
24        Q.  Do you agree?
25        MR. MARCHESI:  Same objection.

Page 338

1         THE WITNESS:  My answer stands.  I've not
2    seen those terms used in either statute or judicial
3    decisions in that precise phraseology.
4    BY MR. LILLEY:
5         Q.  And then if you go over to page 32 of his
6    statement to the AG's office -- no, I'm sorry.  Let's
7    keep going.  Withdraw that.
8         When -- as soon as Mr. Mangino left the
9    house before -- before he goes down -- before he gets
10   his gun, you understand that he was very excited and
11   that he sprinted down to get his firearm?
12        A.  I suspect he moved quickly.  I don't know --
13        Q.  Okay.  Well, let's look at what he said.  On
14   page 33, So you guys -- back -- I'm -- I'm about the
15   seventh line down.
16        Backing up to when you first went in the
17   residence and you exited, how long before he
18   exited the house?  I mean, if you had to
19   guess, did you have enough time to get to
20   your --
21        And he answers:
22        Well, I sprinted to my car, and as you
23   could imagine, I was very excited.
24        Do you take any issue with that?
25        A.  Nope.

Page 339

1         Q.  And with regard to the -- and then he says
2    later on, just down the page a few more lines:
3         Emotionally excited, however you want to
4    say.  I -- I hit him -- I hit the unlock
5    button, I told Zach.
6         And then the investigator says:
7         Meaning that you were afraid because
8    this guy had a gun?
9         ANSWER:  I was afraid and knew I needed
10   to arm myself and set up a perimeter and, you
11   know, get myself in a safe position if he
12   came out with the firearm.
13        Do you see where I'm reading?
14        A.  I do.
15        Q.  And he didn't come out with a firearm, we
16   know factually now, do we not?
17        MR. MARCHESI:  He did or did not?
18        MR. LILLEY:  He did not come out with
19   firearm and point it at anybody.
20        MR. MARCHESI:  Objection.
21        MR. LILLEY:  He had a firearm in his hand.
22        MR. BENJAMIN:  Objection.  Mischaracterizes.
23        MR. MARCHESI:  Mischaracterizes the
24   evidence.
25   ///

Page 340

1    BY MR. LILLEY:
2         Q.  He did not come out with a firearm to point
3    it at anybody in his direction.
4         Do you agree?
5         A.  Okay.  I -- I saw where you read.  I don't
6    see what you've added.
7         Q.  Okay.
8         A.  So if you've added something, it's not where
9    you read.
10        Q.  Well, no, no, no, sir.  No, I've added a
11   question.
12        A.  Okay.
13        Q.  I've read and then added a question.
14        I was afraid and I needed to arm myself
15   and set up a perimeter and, you know, get
16   myself in a -- in safe position if he came
17   out with that firearm.
18        Do you see where I'm reading?
19        A.  I do.
20        Q.  Now, at that time, the firearm was dangling
21   by the side of Mr. McKenney.
22        Do you understand that to be the case?
23        MR. BENJAMIN:  Objection.
24        MR. MARCHESI:  Objection.  Foundation.
25        THE WITNESS:  I understand that at some

Page 341

1    point, Mr. McKenney came out with that firearm and
2    that it was by his side.
3    BY MR. LILLEY:
4        Q.  Right.  And so when he says "get myself in a
5    safe position if he came out with that firearm," he's
6    suggesting, is he not, the cover that he finally
7    accomplished in the event that -- that McKenney
8    raised in some fashion the firearm in his direction?
9    Do you read it that way?
10       MR. MARCHESI:  Objection.  Foundation.
11       THE WITNESS:  I think I understand what
12   you're asking.  I -- I read that he predicted,
13   reasonably so, that if Mr. McKenney came out of the
14   house with the firearm, if he came out into where the
15   officers were, that finding a safe position, finding
16   cover would be part of what he ought to do.
17   BY MR. LILLEY:
18       Q.  But he -- you understand the facts are that
19   he went down after they were all in the house, he
20   sprinted down and got his firearm, before McKenney
21   every walked down the driveway.
22       Do you understand that's the sequence?
23       A.  Yeah.
24       Q.  So he had his firearm in a safe position
25   prior to McKenney coming down the driveway.

Page 342

1        Do you agree with me that those are the
2    facts?
3        MR. MARCHESI:  Objection.  Form.
4        THE WITNESS:  Sure.  I think there's some
5    point where Deputy Mangino is in a relatively safe
6    position, and he has his rifle.  And at some
7    interlude, then Mr. McKenney comes out of the house
8    and starts walking down the --
9    BY MR. LILLEY:
10       Q.  Right.
11       A.  -- driveway with his gun.
12       Q.  That's all I'm trying to get.
13       The sequence is he's in a safe place with
14   his firearm in place and that McKenney hasn't started
15   walking down yet.
16       Do you understand that to be the sequence?
17       A.  I -- I -- my answer stands.  That -- that's
18   what I just said.
19       Q.  Is that a yes?  I'm sorry.  Just to make it
20   clear, I want to be sure that's a yes.  I take it it
21   is, but I --
22       MR. MARCHESI:  Well, the answer --
23       THE WITNESS:  Well, you --
24       MR. MARCHESI:  -- is what the answer is.
25       THE WITNESS:  You -- You rephrased my

Page 343

1    answer.  But what I said was that Deputy Mangino ran
2    down the driveway.  He -- he retrieved a rifle.  He
3    got himself at one point into a relatively safe
4    position, anticipating, predicting, the word you used
5    earlier, predicting that Mr. McKenney might come out
6    of the house armed with that firearm.  And that's
7    exactly what happened.
8    BY MR. LILLEY:
9        Q.  And he says on page 34, to follow up on
10   that, I'm just going by sequence.  That's the next --
11   well, let's just read the next so I don't get accused
12   of taking it out of context.
13       Sure.  And then he says:
14       So I grabbed my firearm and my extra
15       mag.  I remember dropping like another thing
16       of my car because I was emotionally excited.
17       Do you see where it says that?  Turning over
18   to --
19       A.  I do.
20       Q.  Okay.  And then he says at the last end of
21   that sentence:
22       I knew there is a possibility --
23       particularly concerned about that word, sir,
24       when I ask you the question.  I knew there is
25       a possibility that he might come out after us

Page 344

1    now.
2        Do you see where I'm reading?
3        A.  I do.
4        Q.  The possibility and might does not rise to
5    the standard of imminent -- being in imminent danger
6    of deadly force, does it?
7        MR. MARCHESI:  Objection.  Form.
8    BY MR. LILLEY:
9        Q.  If it's a possibility and it may happen --
10       MR. MARCHESI:  Same.
11   BY MR. LILLEY:
12       Q.  -- rather than it's probable to have?
13       MR. MARCHESI:  Same objection.
14       THE WITNESS:  In the abstract, something
15   that is a mere possibility, placing that down on
16   the -- on the lower scale of something that is
17   impending, something that is near certain, that --
18   and that certainly is not a high probability.  I
19   mean, we can quibble over --
20   BY MR. LILLEY:
21       Q.  There's not any probability.  It's a
22   possibility.  He uses a word -- he uses a word that
23   doesn't reach to probability.  Doesn't even use
24   possibility.
25       MR. MARCHESI:  Objection.

86 (Pages 341 to 344)

Page 345

1　　　THE WITNESS: I think most math professors
2　would tell you that all probabilities include
3　possibilities --
4　BY MR. LILLEY:
5　　　Q. Sir --
6　　　A. -- and vice versa.
7　　　Q. Sir, I'm not looking at math here. I'm
8　looking at the fact that he used two words that are
9　very equivocal.
10　　　Do you -- do you agree? Namely, I knew
11　there was a possibility that he might come out after
12　us.
13　　　That suggests that it's on the possibility
14　side, not the probability side.
15　　　Do you agree with what I just said?
16　　　MR. MARCHESI: Same objection. And I --
17　his -- he just answered that question, even though
18　you didn't like the answer.
19　　　THE WITNESS: I agree, as you said, that he
20　used two words that are equivocal.
21　BY MR. LILLEY:
22　　　Q. And then he says in the next -- very next
23　statement, and when the -- when the investigator says
24　Sure:
25　　　He might start shooting at us. I don't

Page 346

1　know. Quote/unquote.
2　　　Do you see where I'm reading?
3　　　A. I do.
4　　　Q. That's not the stuff that you can use to
5　justify shooting another person, another human being
6　to death by a police officer, is it, sir, that he
7　might start shooting? I don't know.
8　　　MR. MARCHESI: Objection. Form.
9　　　THE WITNESS: There are many circumstances
10　in which one may be justified in using deadly force
11　where one -- the adversary might start shooting.
12　BY MR. LILLEY:
13　　　Q. But the problem is --
14　　　A. I understand he says I don't know. He did
15　not -- and I -- I suppose this is the crux of your
16　question, Deputy Mangino did not have any certainty
17　at that moment that he was about to be shot.
18　　　Q. And without that certainty, not complete
19　certainty, because if there are cues and he goes for
20　the gun, he can shoot him.
21　　　But without that certainty, he hasn't
22　arrived at the point yet where he meets the
23　justification standard under the law, does he, sir,
24　at least with -- with saying what he said there?
25　　　MR. BENJAMIN: I'm going to object to the

Page 347

1　foundation because I think your question -- at this
2　point, he's still in the house.
3　　　MR. MARCHESI: And I'm going to join that
4　objection.
5　　　MR. LILLEY: Please, please, please.
6　　　MR. MARCHESI: We're certainly not at the
7　point of the shooting.
8　　　MR. LILLEY: You're -- you're making
9　comments that are inappropriate.
10　　　MR. BENJAMIN: You're asking if he could use
11　deadly force at a time that deadly force wasn't even
12　used. You're conflating those two things together.
13　　　MR. LILLEY: Please, please. You know
14　that's improper, Ed. I expect better from you.
15　　　MR. MARCHESI: But not me?
16　　　MR. LILLEY: But not you.
17　　　MR. MARCHESI: All right. Well, then I join
18　his objection.
19　　　MR. LILLEY: Great.
20　BY MR. LILLEY:
21　　　Q. I mean, he's just too far short of
22　imminent -- fear of imminent use of deadly force
23　against him, isn't he?
24　　　A. When --
25　　　MR. MARCHESI: Same objection.

Page 348

1　BY MR. LILLEY:
2　　　Q. Right here, when he says, I knew there was a
3　possibility he might come out after us, he's talking
4　about this particular time about possibilities and
5　might. It's -- it's tentative, isn't it?
6　　　A. You're right. You -- you know, you're
7　right, because at this moment, at this moment, he
8　can't see any threat. Mr. Mangino, Deputy Mangino
9　can't see any threat, so he ought not to be shooting
10　at a person who's not there. So --
11　　　Q. So he says --
12　　　A. -- I agree to that.
13　　　Q. -- in the next statement he might start
14　shooting at us, I don't know, right? He keeps saying
15　the same kinds of things to say, I just can't predict
16　from what I see, isn't he?
17　　　A. That -- that's true. He is expressing here,
18　I think, a true fact that he is not able to predict
19　what will happen in the future. I think you're
20　correct.
21　　　Q. And -- and -- and -- and not being able to
22　have some prediction or cues that it's going to be
23　some sinister situation in which there is deadly
24　force, he's not justified in shooting at that point,
25　at least, is he?

1      A.  I agree that at the point that I think
2  you're talking about, he's not justified in shooting.
3      Q.  Now, let's -- let's go to -- to -- let's
4  move ahead a little bit.  I'm almost finished with
5  this.  I keep saying that, but it's really true, I
6  think.
7         Just -- okay.  No, it's too late for that.
8  Too late in the day.
9         Okay.  There is one other point I want to
10  make -- or I want to have you make with me, if you
11  will, if you will agree.  And that is the fact that
12  there were two shots fired.  Then I will definitely
13  be done.
14      A.  Which page?
15      Q.  Let me look a second.  Hold on.
16      MR. MARCHESI:  If it helps, Dan, I'll
17  stipulate there were two shots fired.
18  BY MR. LILLEY:
19      Q.  Let me see where they are in my notes.  Here
20  they are.  Excuse me just a second.  I want to be as
21  clear as I can.  Sorry.  Too much paper.
22         The -- what he said was, I believe -- if I
23  can find it, is that -- and I'll -- I'll look for it
24  if I -- it's in there, but I'm not sure I can find it
25  in the time we have allotted, so we'll see what we

1  can do.
2         He said that after he -- my -- this is by --
3  from memory, that after he fired his first shot,
4  he -- he saw that -- that that shot had missed.
5         You know that shot had missed, correct?
6      A.  I -- I believe that to be accurate.  And
7  I -- like Mr. Marchesi, my independent recollection
8  is there was two shots fired.
9      Q.  And that he then -- he had his sights down
10  to some degree from what I read from his testimony
11  that I can't find at the moment, but I will, if we
12  have to, and he then put the -- the -- and this is
13  done very quickly of course -- a backup, and he --
14  he -- Mr. McKenney at that point did not raise his
15  gun or do anything from the evidence in this case.
16         Do you understand that to be the case?
17  After the first shot.  I know it was very close to
18  the second.  But there's no indication that McKenney
19  took any aggressive action, even after he was shot
20  at.
21         Do you agree with that from your review of
22  the matter?
23      A.  I -- I think that's a fair statement.
24      Q.  And on the second shot, he said -- and I
25  think I've already quoted it -- that his training

1  told him, and he shot him the second time because he
2  was told he had to eliminate the threat.
3         Do you remember my just reading that?
4      A.  I think he --
5      Q.  Said his training --
6      A.  -- said that his training had taught him to
7  eliminate the threat.  I remember you reading that.
8      Q.  So the second shot, the fatal shot, was a
9  premeditated shot, was it not?
10      MR. MARCHESI:  Objection.  Foundation.
11  BY MR. LILLEY:
12      Q.  He thought about it.  His training told him
13  to do this and he shot him the second time, not
14  because he was in fear of his life, but he wanted to
15  eliminate the threat, whatever that means, in his
16  mind.
17      MR. BENJAMIN:  Objection to form.
18      MR. MARCHESI:  Same objection.
19      THE WITNESS:  That -- that wouldn't be my
20  conclusion.
21  BY MR. LILLEY:
22      Q.  What would your conclusion be?
23      A.  That he perceived that he was faced with a
24  threat of deadly force.  He responded to that threat.
25  I don't believe that his statement that -- about his

1  training afterwards suggests in any way that he
2  premeditated that shot with -- with an eye to
3  eliminating.
4      Q.  That's what he said.
5      A.  I understand what's -- the way you read it.
6      Q.  You don't take him at his word?
7      MR. MARCHESI:  Objection.
8  BY MR. LILLEY:
9      Q.  He said, I shot the second time because my
10  training taught me to eliminate the threat, didn't
11  it?
12      A.  You accurately read the transcript, and I've
13  given you my best answer, but I could rephrase it.
14  It will be pretty much identical.
15      Q.  Well -- all right.
16      MR. LILLEY:  I think I'm finished.  Let me
17  just check.  I think that's all I have.  I leave it
18  to my noisy friends over here now to ask real
19  questions.
20      MR. MARCHESI:  All right.  Well, I'm going
21  to actually suspend the deposition and leave it open.
22  It's 5:20.  The witness has indicated his absolute
23  drop-dead time to leave is 6.  Plaintiff's counsel
24  has produced a lot of material today that has not
25  been provided to defense counsel, either prior to

Page 353

1  today or during the deposition which is going to
2  require me to review that.  So rather than trying to
3  rush through it and not complete it in any event,
4  I'll simply leave the deposition open for my
5  questioning.  I'm not sure how much the seven
6  hours --
7       MR. LILLEY:  My deposition is closed if you
8  don't have any questions.
9       MR. MARCHESI:  No, I'm -- I have the right
10 to ask questions.
11      MR. LILLEY:  No, you don't have any such
12 right at all.  You're full of shit, so my --
13      MR. MARCHESI:  Get that on the record.
14      MR. LILLEY:  My -- my deposition is closed.
15 If you want to leave your deposition open, I think
16 you're going to have to go to the Court.
17      MR. MARCHESI:  No.  I'm -- I'm taking the
18 position that the deposition is open.
19      MR. LILLEY:  I don't care what position
20 you're taking.  The deposition is closed.
21      MR. MARCHESI:  If we could speak one at a
22 time.
23      MR. LILLEY:  And if you want to question,
24 it's now 20 after, we're well -- are we still within
25 the seven-hour frame?  The court reporter is

Page 354

1  indicating.
2       How much more time do we have -- any rough
3  idea?
4       (Discussion held off the record.)
5       (Pause in the proceedings.)
6       MR. LILLEY:  Okay.  So I'm concluding the
7  deposition in which there's plenty of time to --
8  it's -- I have no objection to going as long as it
9  takes, and I'm within 29 minutes of the deadline,
10 since we seem to talk in those things in this case.
11 And I invite you both to question him.
12      MR. MARCHESI:  Well, I appreciate the
13 invitation, and I'll accept it, but not at the
14 present time.  The primary problem that I have, and I
15 want the record to be clear, is that there have been
16 a number of rather lengthy documents referred to by
17 plaintiff's counsel today, copies of which were not
18 provided to defense counsel.  I've not had an
19 opportunity to review those.  And prior to asking
20 questions of this witness, I need the opportunity to
21 do that.
22      There's, more importantly than the
23 29 minutes left in the deposition, because I don't
24 believe I'm bound by that, there are 36 --
25      MR. LILLEY:  No, I don't believe you are.

Page 355

1  You can go on all night if you --
2       MR. MARCHESI:  There are 36 minutes left
3  before this witness has indicated at the beginning of
4  the day, he has other engagements, and I'm going to
5  honor that.
6       And so my position is simply that the
7  deposition is suspended pending reconvening it at an
8  appropriate time under appropriate circumstances for
9  purposes of me making any inquiry that I feel is
10 appropriate.
11      Other than that, I guess I'll turn it over
12 to Ed, and then before we go off the record, although
13 we don't have to do this with the witness, I would
14 like to attempt to identify as accurately as
15 possible, exhibits and then nonexhibit documents that
16 were referred to during the deposition.
17      MR. LILLEY:  Well, the court reporter and I
18 have already talked about that.  We're going to work
19 that out, so we'll get all the deposition exhibits
20 put together, and we can either put them in the
21 transcript -- do you want them in the transcript or
22 shall we send them directly?
23      MR. MARCHESI:  As I say, I'd first of all
24 like to give Ed the opportunity to say anything he
25 wants to say.  But beyond that, there are nonexhibit

Page 356

1  documents that were referred to and showed to the
2  witness, and I want the record to reflect exactly
3  what those are so we're clear.
4       MR. LILLEY:  Let's understand each other.
5  Any document referred to is a document that should be
6  in this record and will be.  I put them in a form to
7  be able to lug all this stuff out here without any
8  other help, and so I've had to do it that way.
9       With regard to the -- whatever I used here
10 with your expert designee, all of the information I
11 received I got on the Internet, and I'm sure that
12 you, with the contact and since you hired this
13 gentleman, could get any information or anything he
14 authored quite easy.  I had to do it the hard way.  I
15 know of no requirement that I have to give you his
16 writings in advance of my cross-examination of your
17 expert.
18      I wouldn't have to do it at trial, and I
19 anticipate that there's a good possibility that
20 his -- his -- his testimony will be elicited at trial
21 by videotape.  So I don't think that there's anything
22 left open.  As far as I'm concerned, the deposition
23 is closed, and if you want it open, I'm going to
24 suggest to you that we'll have to go to the Court.
25      MR. MARCHESI:  Well, that's fine.  I

Page 357

```
 1    would --
 2         MR. LILLEY:  Ed.
 3         MR. MARCHESI:  -- indicate that there are
 4    documents not authored by this witness that you
 5    referred to, and there's no way I would have known
 6    what those were in order to have had the opportunity
 7    to retrieve them from the Internet.
 8         MR. LILLEY:  Okay.  Fair enough.  There were
 9    a couple of documents that I used that are on the
10    Internet, and they're -- they're documents by these
11    well-known folks that have been referred to and are
12    well known in the area of -- of the use of guns in
13    these situations.
14         Lewinski is all over the Internet and the --
15    Tueller -- Tueller is the same and was referred to
16    specifically in your -- in his designation or his --
17    in his report.  I believe Lewinski was, but I can't
18    recall for sure.
19         MR. MARCHESI:  Okay.
20         MR. LILLEY:  So all of this has been known
21    to you, and I took those names and just simply went
22    into the Internet to see what I could find.  You have
23    the same opportunity, and a far superior opportunity
24    because he's your paid witness.
25         MR. MARCHESI:  All right.  I'm not going to
```

Page 358

```
 1    say anything further.  I simply reserve the right to
 2    develop my argument further should the need be
 3    necessary.
 4         MR. LILLEY:  That, you certainly have.
 5         MR. MARCHESI:  Ed?
 6         MR. BENJAMIN:  And I'm not going to ask any
 7    questions at this point, but I also join in the --
 8    just the concern that --
 9         MR. LILLEY:  Is that a me too kind of
10    joinment?
11         MR. BENJAMIN:  Well, I'm just -- I can speak
12    for myself if you'd let me.
13         MR. LILLEY:  Well, I just want to know what
14    you just said.  I join in means me too, right?
15         MR. BENJAMIN:  I join in the concern that
16    there have been things put before the witness that
17    you pulled off the Internet that wasn't -- that we
18    weren't provided, that we weren't provided even
19    today.  I'm still -- as I told you on the break, I'm
20    still trying to get things you used for MacVane's
21    exhibit -- deposition two weeks ago --
22         MR. LILLEY:  That has nothing to do with
23    this.
24         MR. BENJAMIN:  -- that you were supposed to
25    give us.  So I don't have any questions at this
```

Page 359

```
 1    point.  That's all.
 2         MR. LILLEY:  Fine.
 3         MR. BENJAMIN:  I understand the witness has
 4    to leave.
 5         VIDEOGRAPHER:  We're going off the record
 6    it's 5:28.
 7         (Discussion held off the record.)
 8         MR. MARCHESI:  Hard copy.  The whole kit and
 9    caboodle.
10         (Exhibit 1, Exhibit 2, Exhibit 3, and
11         Exhibit 4 were marked for
12         identification.)
13         MR. MARCHESI:  For the record, what I have
14    as formal deposition exhibits are Exhibits 1, 2, 3,
15    and 4 which are documents from the Force Science
16    Institute, and Exhibit B-1, B-2, and B-3.  B-1 is a
17    still photograph of a frame from a videotape, B-2 is
18    four pages from the deposition transcript, and B-3 is
19    another still frame from a video videotape.
20         MR. LILLEY:  Which you have copies of.
21         MR. MARCHESI:  And in addition, from the
22    notes I made, there were documents identified as
23    pages 94 and 145 from a binder that Mr. Lilley had, a
24    PowerPoint or Word Perfect slide presentation with
25    the notation 2010 KRW, and documents that were at Tab
```

Page 360

```
 1    No. 72 of a binder that Mr. Lilley produced dated.
 2         MR. LILLEY:  You'll have copies of all of
 3    those.
 4         MR. MARCHESI:  We will have or we do have?
 5         MR. LILLEY:  You will.
 6         MR. MARCHESI:  Will have.
 7         MR. LILLEY:  I used them here.  You will
 8    have copies of all those since you requested them.
 9         MR. BENJAMIN:  You're still on the record.
10    You might want to stay in the room.
11         MR. MARCHESI:  And if there are other
12    documents that are identified in the record that have
13    not been given exhibit numbers on behalf of my
14    clients, I -- I request plaintiff's counsel provide
15    us with a copy of those forthwith.  The deposition
16    will remain open.
17         (This deposition was concluded at
18         5:38 p.m.)
19              * * * * *
20
21
22
23
24
25
```

Page 361

1   Case. McKenney vs. Mangino
    Case No.: 2:15-cv-73-JDL
2   Reported By: Emily A. Gibb, RPR, CSR, NV CCR 709
    Date Taken: Friday, November 20, 2015
3
4              WITNESS CERTIFICATE
5       I, Ken Wallentine, HEREBY DECLARE:
6       That I am the witness in the foregoing
    transcript; that I have read the transcript and know
7   the contents thereof; that with these corrections, I
    have noted this transcript truly and accurately
8   reflects my testimony.
9   PAGE-LINE      CHANGE-CORRECTION      REASON

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  No corrections were made.
18      I, Ken Wallentine, deponent herein, do
    hereby certify and declare under penalty of perjury
19  the within and foregoing transcription to be true and
    correct.
20

21      _____
    Ken Wallentine, Deponent
22  SUBSCRIBED and SWORN to at _____
    _____, this _____ day of _____, 2015.
23
        _____
24          Notary Public
25

Page 362

1            REPORTER'S CERTIFICATE
2   STATE OF UTAH      )
                       )
3   COUNTY OF UTAH     )
4
5       I, EMILY A. GIBB, a Certified Shorthand
6   Reporter and Registered Professional Reporter, hereby
7   certify:
8
9       THAT the foregoing proceedings were taken
10  before me at the time and place set forth in the
11  caption hereof; that the witness was placed under
12  oath to tell the truth, the whole truth, and nothing
13  but the truth; that the proceedings were taken down
14  by me in shorthand and thereafter my notes were
15  transcribed through computer-aided transcription; and
16  the foregoing transcript constitutes a full, true,
17  and accurate record of such testimony adduced and
18  oral proceedings had, and of the whole thereof.
19      I have subscribed my name on this 9th
20  day of December, 2015.
21
22      _____
23          Emily A. Gibb, RPR, CSR, CSR
24
25

**A**

**$1500** 90:15 91:2
91:16,21
**$250** 90:4
**a.m** 1:18 4:9
**abilities** 205:5
**ability** 111:1
130:12 162:21
168:12 225:5
296:12
**able** 133:7 167:20
276:21 297:1
327:18 348:18,21
356:7
**absence** 170:6
310:10
**absolute** 190:7
352:22
**absolutely** 109:7
128:22 131:24
170:3 222:23,25
**abstract** 266:22
344:14
**academic** 285:23
**academies** 17:20
**academy** 16:4,9,11
16:21 17:15 18:4
18:18,21 25:12
175:15 237:2
254:20 256:9
257:8 259:13
274:16 287:18
**accept** 114:17,18
115:6 172:22
182:8 354:13
**acceptable** 32:10
107:24 110:6
**accepted** 85:16
**accompanied** 95:6
**accomplished**
341:7
**account** 321:14
329:7
**accuracy** 92:7
103:6 127:2 297:2
**accurate** 98:6 99:5

126:24 128:7,11
128:15,18 131:16
150:2,15 153:23
159:25 160:4
163:25 170:22
182:9 214:7 224:5
269:23 274:15
277:17 282:20
298:8 301:9
309:14 327:24,25
328:20 329:8
333:11 350:6
362:17
**accurately** 139:17
261:12 262:14
271:22 315:3
327:14 352:12
355:14 361:7
**accused** 81:7 99:15
343:11
**achieve** 125:1,6
**acknowledging**
239:5 321:13
**acquire** 229:22
243:16
**acronym** 81:14
**act** 28:10,24 29:7
63:8 135:18
**acted** 296:1
**acting** 105:21 206:5
209:12
**action** 54:4 81:1,18
178:14 182:3,10
182:19 183:15
184:12 185:17
186:15,18 187:6,9
189:4 192:12
194:22 195:20,25
196:9 197:2
229:21 233:4
240:3 241:22
243:14,16 245:6
307:14 310:4,8
316:10 319:14,22
325:6 350:19
**actions** 27:3 28:23
83:14 181:22

242:20
**activates** 195:15
207:2
**activating** 206:16
206:18
**activation** 206:11
**active** 5:24 10:17
11:1,8,12 14:4
53:7 192:3 227:4
289:1
**actively** 288:1
**activity** 232:7
236:7,20 238:3
241:21 246:11
**actor** 191:19
**acts** 46:21 47:5
**actual** 79:17 90:13
90:25 91:18 96:19
99:1 156:11
182:25 200:10
202:15 204:2
206:3,11 279:8
280:13 314:25
328:6,15,18,21
**ad** 281:20 282:5
**add** 136:23 220:19
239:22
**added** 70:4,4 112:1
150:15 197:14,15
304:13 340:6,8,10
340:13
**adding** 183:23
304:10
**addition** 36:12
61:24 90:18,20,24
111:18 135:24
149:8 175:8,10
222:7 304:15
359:21
**additional** 71:18
97:8
**Additionally** 55:10
**address** 142:8
175:4 188:25
**addressed** 15:7
**adds** 303:11,12
304:5,9

**adduced** 362:17
**adept** 253:10
**adjacent** 173:18
**administer** 78:10
**administered**
228:22
**administrative**
52:21 57:19 74:7
78:23,24 81:18
90:6
**administrator**
71:12
**admit** 113:12
165:17 174:24
274:7
**admixture** 252:3
**adult** 302:1
**advance** 204:16
294:23 311:6
356:16
**advanced** 143:15
**advancing** 143:21
151:23
**advantage** 125:8,9
125:18,23 126:13
127:18 128:1,5
129:2,17 130:5
131:14,22 132:17
133:20 134:8
135:13,21 166:16
168:10 240:10
**advantages** 128:3
**adversary** 346:11
**adverse** 81:8
**advice** 88:1,2
**advisable** 138:1
**advisedly** 164:4
**advisor** 57:11
**aerial** 213:18
**affairs** 41:17 42:4
93:8
**afield** 182:24
**afraid** 101:19
121:25 122:1
328:22 339:7,9
340:14
**afternoon** 258:7

**AG** 148:15 315:9
**AG's** 138:17
148:12 149:24
152:3 154:5 214:4
297:24 315:2
338:6
**age** 132:19,19
133:5,20,23 134:7
176:7 299:2
**agencies** 55:16
56:17 74:18
286:10
**agency** 70:18,20
288:24
**agent** 6:3 73:23
**aggressive** 307:11
350:19
**aggrieved** 52:20
**agile** 133:25
**ago** 10:15 88:11
113:9 184:6 189:8
269:15,16 292:22
358:21
**agree** 12:10 35:8,11
56:2 92:5,16,17
97:25 101:4
103:18 108:17
113:8 114:11
116:5 121:11,12
121:14 128:20
129:10,20,22
130:10,11 132:25
133:2,4,9 134:2
137:7,19 138:6,21
138:24 139:4,12
139:14,14,16
140:2,15 143:18
144:7 155:17
158:2 160:8,22
164:1 165:11
169:7 171:11
178:2 182:21
186:9,12,16 187:1
187:23 188:6,10
192:8 195:9
209:14 213:8
214:15 228:15

235:16 240:5
243:22 244:1
248:21 249:16
250:23,25 263:7,8
263:8,10 265:24
280:5 282:4
283:10 290:20
291:17 296:14,16
296:17 299:3
303:3,9,13 304:6
304:12,14 306:22
307:1 309:22
310:1 318:8 328:5
332:5,12 333:23
337:16,24 340:4
342:1 345:10,15
345:19 348:12
349:1,11 350:21
**agreed** 29:9 49:22
327:24
**agreement** 49:2
55:12 56:1 57:24
58:5,7 75:1 86:20
86:23 87:2
**ahead** 17:23 22:18
33:3 37:6,15 55:9
67:17 85:3 136:16
160:3 164:17
185:22 189:14
204:10 267:24
270:11,17 293:7
328:9 337:7 349:4
**aim** 234:14
**aiming** 299:8 319:8
**air** 173:13 175:16
**air-conditioning**
173:7
**airplane** 91:7
**al** 4:6,7
**albeit** 58:10 290:13
**align** 319:13,18
**aligned** 319:11
**alive** 258:5
**allay** 208:9
**allotted** 349:25
**allow** 24:3 162:13
219:13 230:12

241:18 261:5
335:24
**allowed** 246:19
337:21
**Alpine** 1:20 4:7
**alternative** 97:14
104:18 110:25
**alters** 66:9
**altogether** 182:23
183:2
**Amendment** 16:21
145:2
**ammunition** 192:4
**amount** 286:19,20
**amounts** 87:14
**analogous** 241:7
**analysis** 39:10
45:11 183:22
205:19,20 248:8
334:25
**analyst** 178:21
179:19
**analyzed** 295:23
296:6
**analyzing** 39:20
327:11
**Angeles** 225:12
285:17
**angle** 192:21
**animals** 174:14
**annals** 186:2
**Annotated** 259:8
**announces** 156:24
**answer** 10:14 12:8
13:22 15:10 18:9
22:10 23:5,23,25
24:3,7,19,22
27:11 29:24 43:2
45:14,25 46:10,12
46:24 62:6 63:4
73:2 79:14 84:6
85:21 103:7
104:11,20 105:12
111:7 112:7 113:1
115:4 124:5
139:13 141:4
192:25 198:21,23

199:3,7,10 200:13
201:1,6,19,23,24
202:1,4,6,20
209:24 218:22
219:14 230:12
233:10 236:4,12
241:17 242:13
248:15 252:1
257:12 279:24
283:5 284:11
291:14,18 292:23
292:24 313:25
321:5,8 329:9
330:13,14 337:19
338:1 339:9
342:17,22,24
343:1 345:18
352:13
**answered** 18:10
112:18 271:15
292:14,22 326:11
328:9 345:17
**answering** 23:19
221:7
**answers** 22:1,6,14
22:24 24:11,14
25:4 63:10 104:9
175:6 338:21
**anticipate** 220:1
356:19
**anticipating** 220:18
343:4
**anticipation** 82:24
**anybody** 14:13
66:15,15 95:10
145:13 168:19
169:1,6,17 170:4
171:25 205:8,13
217:5 227:9
256:12 260:8
292:12 298:15
306:13,14 311:13
339:19 340:3
**anymore** 15:16
**anytime** 275:9
276:6 333:10
**anyway** 10:8

136:20 151:14
180:25 254:17
337:7
**apart** 152:15
160:17 176:7
179:12 186:25
208:19
**apologize** 239:14
293:17
**apparent** 164:13
**apparently** 149:9
198:1 253:22
261:15 265:20
284:17 334:18
**appeals** 12:15,24
13:1,3,7 77:3,5
**appear** 33:1 153:4
253:21,21
**appearances** 80:6
**appeared** 63:17
206:4
**appears** 9:6,13
37:13 151:19,20
206:20 207:2,4,12
207:17,20 213:8
245:13 321:14
**Apple** 20:8
**applicable** 264:1
**application** 181:21
**applies** 273:13
310:24
**apply** 34:7 72:8
182:11 269:15,21
269:25 311:1
**applying** 34:7
279:14
**appointed** 72:17
77:20
**appointment** 71:10
72:23
**appreciate** 123:7
179:24 181:2
314:20 354:12
**approach** 155:24
163:17
**approaches** 226:10
**appropriate** 65:17

139:24,25 140:2
200:5 241:2
272:25 294:3
314:23 325:15
355:8,8,10
**appropriately**
157:14
**approved** 205:22
**approximately**
77:1 126:9 167:25
214:4 250:7
**approximation**
212:25
**April** 43:9 46:18
73:12 148:21
314:11
**area** 70:1 107:15
116:21 129:25
135:25 137:5
142:9,16 168:19
168:23 169:1,6,21
169:25 170:1,5,13
170:17 171:21
172:7 177:12
206:8 214:8
231:12,14,16
240:20 248:6
266:2 276:24
288:12 315:6
323:22 334:3
357:12
**areas** 74:24
**Arey** 2:9
**argue** 244:9
**arguing** 268:14
**argument** 31:3
146:11,13 245:17
311:6 358:2
**arisen** 170:24
**arises** 249:8
**Arizona's** 270:20
**arm** 141:25 207:15
229:16 339:10
340:14
**armament** 121:21
**armed** 166:17
291:11 302:7

343:6
**arms** 324:23
**aroma** 170:25
**arrest** 120:15 251:5
260:8 264:25
267:1,4 282:17
**arrests** 16:22 260:6
**arrival** 44:20
**arrived** 100:2
165:12 346:22
**arrives** 155:21
**art** 75:9 130:22
147:18
**article** 184:18
185:5,25 186:1,9
187:6,6,12 188:2
188:4,8,12,25
196:13 197:2
223:20 224:21
236:24 239:3
246:21,22 247:12
257:2 286:17
287:14 299:19
300:21 301:24
302:12 304:17,19
305:1,2,5,9
306:15 308:12
309:4,9,11 310:25
312:4
**articles** 132:22
225:13,14 308:22
**articulate** 190:11
203:12
**articulated** 120:4
**aside** 109:12
**asked** 7:24 8:10
16:5 21:24 22:4,4
22:5,20,20 24:12
24:21,22 25:2,22
26:5,7,8,10 39:3
44:11 45:7 46:7
64:23 66:15 83:22
113:5 117:12
155:15 162:3
163:1 168:25
181:12 184:22,24
198:20 200:15,21

201:4,5 216:21
231:8 269:18
271:14 284:3,10
292:13 300:13
326:10 334:3
**asking** 7:12 13:18
13:20 18:14 22:8
22:9,25 23:10
45:17 54:24 83:24
91:25 94:24,25
104:12,17 106:18
111:6 117:18
119:8 122:16
178:24 200:1
203:23 209:5,8
216:9 219:8
224:18 239:4,18
240:5 262:19
265:8,11 271:5
284:5 291:2
322:22 327:8,10
341:12 347:10
354:19
**asks** 46:1 156:20
**aspect** 226:4
**aspersions** 207:11
**ass** 258:2
**assault** 101:16
127:6,10 183:8
**assaultive** 288:1
289:1
**assembled** 205:15
**assess** 118:21,23,25
289:3
**assessed** 252:7
**assessing** 118:20
188:17 285:18
**assessment** 100:21
285:22 287:15
**assessments** 153:25
**assign** 160:11
**assignment** 6:8,9
**assist** 71:6
**assistant** 71:13,22
72:3
**assistants** 71:24
**associated** 11:10,11

11:12 87:11
234:22
**association** 80:3
**associations** 57:14
57:15
**assume** 58:5 106:18
110:18 181:8
196:13 212:21
240:4,24 256:15
306:13 313:4
315:2
**assuming** 19:22
20:15 135:16
170:7 218:12
238:11 240:3
288:11 332:22,23
**assumption** 218:22
**assumptions** 170:7
172:2
**assure** 33:22 99:22
246:25 256:22
**attachments** 61:11
62:15
**attack** 301:17
**attacked** 52:13
**attacker** 302:7
**attempt** 111:11,16
355:14
**attended** 177:3
**attending** 97:3
**attention** 14:3
**attorney** 6:4 7:22
26:20,25 43:16
53:25 59:9 63:15
63:18 64:8 71:1,5
71:6,8,9,13,14,22
71:23 72:2,4,6,15
72:15,17,19 73:24
77:21 79:4,6
93:14 137:10
139:1 148:19
149:1,5 150:8
151:14 152:8
187:22 218:23
254:13 313:5,8
314:8,17 319:22
**attorneys** 57:25

82:23
**atypical** 191:13
**audible** 193:17
**audio** 84:23 85:4
137:20 151:4
152:10 315:1
**audio/video** 60:25
151:5 152:11
**auspices** 7:21 48:5
**authored** 253:23
254:6 256:10
356:14 357:4
**authority** 230:20
231:13,16 303:7
**authorized** 95:14
**automatic** 170:25
**automobile** 231:25
**available** 106:2
107:19 229:10
249:10 328:11
**average** 229:24
231:22 240:7
242:12 243:7,9,18
243:19,22 244:6
244:11 245:25
246:9 302:1
**averaged** 244:13
**avoid** 109:25
257:15
**Avoiding** 257:13,23
**aware** 112:15 172:8
176:12 193:1
227:8 266:9
267:20
**axis** 285:22
**Ayoob** 302:22
303:1

**B**

**B** 3:7 214:24
216:16,16,18
219:19 238:2
**B-1** 3:9 219:22
222:13,14 359:16
359:16
**B-101** 1:21
**B-2** 3:10 219:22

222:14,17 359:16
359:17
**B-3** 3:11 219:22
222:15 359:16,18
**baby** 171:3
**back** 5:9 9:4 10:24
12:4 15:13 32:9
42:15 43:8 47:13
49:16 58:16 59:24
62:12 69:2,10
91:12 103:6
123:22 124:1
125:1 127:15,16
141:8 142:24
152:2 159:19,20
164:2 166:4 173:8
173:9 223:15
224:16 227:14
246:22 247:1
276:15 280:19
293:13 296:21
305:17 312:17
313:15 319:3
320:20 323:14
324:5 330:1 331:2
331:20 336:22
338:14
**background** 20:11
21:4 69:4,7 120:7
155:14 164:13
**Backing** 338:16
**backup** 350:13
**bad** 167:8
**balancing** 126:19
**ballistic** 107:16
108:18 128:1
**ballistics** 109:12
**ban** 174:13
**bank** 296:18
**bantering** 278:12
**bar** 76:11
**Bare** 61:6
**bargaining** 55:1
**barrel** 195:12
**base** 176:22 177:2
326:2
**baseball** 133:23

**based** 16:25 30:9
66:20 77:6 120:9
146:23 172:5
187:12,15,16
218:22 286:4
298:9 308:17
314:18 333:13,21
**basic** 252:24
254:18,19,22
**basing** 152:4
**basis** 18:16 99:24
160:21 240:11,23
250:22,23 251:24
271:18 290:19
327:23,24
**beat** 186:8
**beats** 178:15 182:3
182:10,19 183:15
185:17 186:15,19
187:6,9 189:4
192:12 194:22
195:25 196:9
197:2 245:6
316:10 319:22
**beautiful** 91:14
**becoming** 76:21
**beefy** 129:9,13
**beep** 208:9
**began** 133:12
**beginning** 26:14
43:4 69:10 143:13
143:14 355:3
**begins** 303:6
**behalf** 50:19 51:25
52:19,24 53:9
360:13
**behaving** 288:25
319:16
**Behle** 77:9
**being's** 254:24
255:9
**belief** 252:14
271:13 273:10,11
290:1 298:6
**believe** 7:2 8:7 9:24
10:16,24 14:11
19:17 20:5,5 21:9

21:18,22 24:16
25:7,11,20 26:15
31:18 32:21 34:18
36:8 37:25 44:2
44:25,25 49:10
52:1,2 55:24 58:2
58:19,25 59:25
61:17 62:3 63:3
63:18 65:2,3
66:12,24 80:5
82:4 83:20 101:17
102:21 103:22
108:4 110:1,23
111:15 113:2
114:12 117:2,4
128:10,11 133:14
134:22 142:3
145:12,16,17
148:24 149:3
155:9,18 156:11
156:16 159:17,25
160:4 161:8 163:1
168:1 169:5,14
170:17 175:16,21
175:23 176:20
183:12 184:6
185:7,7 189:11,15
189:17 190:7
192:13 196:12
208:5 212:24
214:6 218:7,13,17
218:25 227:1
228:7,10,11,22
238:4,11 251:6
252:9 254:7,18
260:10 267:6
268:4,23 269:8
270:2 271:9 272:5
274:15 275:10
278:7,13 279:7
280:9,12 290:4
305:21 306:14
307:23 309:14
314:5,9 315:9
316:22 317:16
318:12 324:2,11
324:21 325:24

326:1 327:14
330:25,25 334:20
349:22 350:6
351:25 354:24,25
357:17
**believed** 98:23 99:6
153:3 218:9
**believes** 58:8 142:4
246:18 267:2,3
**believing** 294:15
**bell** 62:2
**bells** 293:3
**benefit** 34:23
217:22
**Benjamin** 2:14
4:17,17 44:16
45:24 57:25 61:6
94:10 102:1,4
104:4,8,11,14
108:1 111:21
117:9 157:15,21
158:3 162:15
163:3,8 164:15
165:8,20 167:11
167:15 172:10
176:1,24 210:25
211:6,9,15 215:16
216:3 221:19,23
223:1,7 235:17
247:15 251:8,12
251:18,23 252:12
252:18,21,23
259:25 264:8,11
264:14 266:20
268:8,12,16,20,22
268:25 270:9,11
271:14 273:15
283:4,11 285:5
286:22 289:13
298:17 303:18,21
309:25 315:14
339:22 340:23
346:25 347:10
351:17 358:6,11
358:15,24 359:3
360:9
**best** 15:15 23:11

163:6 287:15
305:7 312:11
319:16 352:13
**better** 23:5 97:6
138:7 163:14,14
163:17 175:3
178:9 319:18
322:8 347:14
**beyond** 90:23
192:11 286:13
300:20 355:25
**bicycling** 169:8
**big** 77:9 221:11
280:6 289:8
**biggest** 77:8
**bill** 90:12 179:11
179:11
**billed** 312:22
**bills** 87:13,20
**binder** 359:23
360:1
**binders** 32:15
**binding** 53:24 54:1
55:3,22
**biomechanic**
181:14
**biomechanics**
226:18
**bird** 174:3
**bit** 32:2 88:11 92:4
99:22 105:6
118:22 162:14
167:5 296:24
313:9 320:19,21
349:4
**black** 277:12,13
**blank** 274:12,21,24
**blanking** 307:12
**blanks** 186:25
187:13 194:19
274:20 301:10
**block** 129:23
130:25 131:5,6,11
131:19 167:9
279:5 314:1,4
**blocking** 168:18
**blow** 138:11

**blue** 32:14 47:8
**boards** 71:9
**bodily** 260:12
262:10 267:7
270:3 272:7,8
274:22 275:11
**body** 213:4,9,20
**bones** 101:15
**book** 88:18 148:8
213:2 223:17
261:13,14 299:18
299:18
**booklet** 211:11
**books** 253:1,9
**bootleg** 194:3,7,11
227:21,25 229:3
231:21 238:10
241:10
**boring** 74:3
**born** 186:15
**bottom** 11:22 114:2
155:2 233:13
299:11 313:20
320:24 333:2
**Boudreau's** 156:12
**bound** 354:24
**box** 2:4,10 243:17
301:16
**boy** 232:16 267:25
**brand-new** 80:15
258:8
**break** 5:9 65:20
66:3 68:20 142:21
196:19 211:21,25
223:7,9 358:19
**Brian** 127:13
**brief** 89:11 103:12
**briefly** 6:6 9:4,19
21:22 76:1 95:2
285:14
**Brigham** 69:16
76:19
**bright** 312:21
**bring** 7:24 8:11
73:25 205:7
**bringing** 310:23
**brings** 218:10

**broad** 47:16,16
  81:1 105:18
  284:17
**broken** 101:15
**brought** 8:14 80:9
  84:8 211:1,2
  335:13
**Brown** 119:22
**Browns** 313:20
**bruises** 101:15
**buddy** 23:11
**budgeting** 71:10
**building** 7:15,17
  164:4 166:17
  192:24 292:16
**bullet** 109:18,19
  130:1,8 174:14
  257:12 273:6
  314:4
**bullets** 118:5
  130:25 135:1,4,12
  174:5
**bumper** 316:6
**bumps** 84:11
**bureau** 81:9,12,15
**bureaucratic** 71:11
**bureaus** 81:11
**bus** 145:25
**business** 190:14
  228:9,10
**button** 208:14
  339:5
**buzzer** 193:13
  194:1 195:10
  229:14 237:7
  238:19
**Byron** 2:19
**BYU** 69:13,16

**C**

**C** 2:1 4:1
**caboodle** 359:9
**cadet** 69:13
**calculated** 118:12
**calculation** 80:4
  126:18
**calf** 194:9

**Calgary** 224:6
**caliber** 109:18,18
  130:13
**California's** 270:22
**call** 21:17,21 24:11
  24:15 26:15 30:11
  49:17 70:14,14
  74:14 91:13
  125:10 132:20
  134:24,25 157:12
  158:17,18 159:21
  160:20 161:11
  162:3,5,13 193:8
  241:9 272:25
  273:1 277:10
  289:4
**called** 5:3 36:20
  63:7 74:21 75:5,6
  75:8 119:10 129:5
  136:3 161:4
  181:17 193:9
  227:21 232:11
  234:1 267:2
  273:19 276:22
  277:10 281:11
  290:2 300:17,22
  305:1 308:1
**calling** 136:6 194:4
**calls** 42:19,20,22
  156:25 194:3
  322:17
**camera** 150:25
  154:23
**Campbell** 18:24
  35:18 58:3
**cams** 20:16
**Canada** 223:21
  224:4,6,17 246:19
**cans** 258:4
**capable** 134:20,22
  135:17,19 166:17
  202:16 203:13,14
  227:10,11
**capacities** 147:5
**capacity** 57:21
  79:15
**cape** 319:13

**captain** 285:17
**caption** 11:8 238:8
  362:11
**captioned** 14:8
**captured** 217:9
  244:1 245:19
**car** 86:12 97:9
  129:14 191:5,8,11
  192:24 212:12
  213:22 214:14
  231:24 295:4
  316:6 338:22
  343:16
**car's** 213:24,25
**care** 24:8 49:7
  88:15 263:2 273:3
  353:19
**career** 119:10
**carefully** 86:7
  190:10
**Carol** 300:14
**carried** 25:22 157:4
**carry** 132:11
**carrying** 88:20
**cars** 170:15 213:23
  258:11
**case** 10:12 12:8,11
  12:15,21 13:15
  15:1,20 16:2,6
  18:6 20:21,23
  21:1 26:12,20,22
  27:3 28:11,22
  35:3 42:5 43:8
  44:21 45:11,23
  46:4,8 50:8 51:22
  52:12 55:6,18
  61:14 63:16 64:17
  65:12 79:22 83:6
  83:7,12 84:2
  87:11 95:25 98:8
  100:6,18 103:1,23
  104:3 105:20
  106:5,12,16
  110:12,22 113:10
  115:20,23 121:8
  121:15,19 124:18
  126:3,9 128:24

133:14,15,16,19
  134:10 136:20
  137:16 139:24
  141:7,19 145:4,15
  161:19 167:24
  172:19,21 173:8
  182:10 188:23
  189:2 194:16
  195:19,22 196:15
  197:11 198:1,1,8
  198:13 204:25
  208:13,17 217:24
  224:14,17 226:11
  226:21 227:11
  228:1 236:2 237:3
  237:17 245:5
  248:8 259:3,10
  261:16 265:5,22
  267:13 269:11,14
  269:16,22,25
  271:10 272:11,19
  272:23 277:5
  281:19,22 282:6
  284:18,19 285:2
  289:8,12 305:21
  305:24 306:7,16
  306:17 307:8,22
  307:25,25 308:2,3
  310:2,13,14,19,24
  311:6,17,18,20,25
  326:4,7 327:20
  330:21 332:24
  340:22 350:15,16
  354:10 361:1,1
**cases** 12:16 13:7
  15:1,3,6 43:25
  51:25 52:5,6,8,10
  52:10,11,16,18,21
  72:7 79:20 81:7
  81:15 82:10,15,24
  83:10,17 104:24
  119:24 226:11
  249:7 266:11
  272:3 288:7
  301:14 305:20
  310:18 311:1,2
  336:12

**cashed** 80:22
**cast** 207:11
**catch-up** 233:5
**catching** 150:19
**cause** 119:10,20
  120:6,6,13,14,14
  120:18,23 123:23
  146:21 208:15
  231:9 251:4,6,21
  251:22 252:7,9,14
  260:12 263:10
  265:7 267:6,10
  268:4,5,6,8,14,19
  269:8 270:2 271:8
  271:13 272:5,17
  275:9,19 276:2,6
  278:6,13 279:6
  280:8,12 281:2
  282:17 307:14
  310:4,8 325:3
**caused** 173:7,9
  289:21
**causes** 208:15
**causing** 208:2,8
**CCR** 1:25 361:2
  362:22
**CDs** 85:5
**cell** 293:4
**center** 6:10,12,13
  6:24 42:23,24
  334:5,6,11,13,14
**centered** 289:6
**certain** 14:22 19:17
  25:8 38:8 126:20
  183:18 197:18
  300:20 332:3
  344:17
**certainly** 9:11
  39:14,24,24 40:11
  54:22 56:24 57:20
  57:20 84:6 93:9
  93:15 94:8 97:13
  98:10,18 109:6
  118:3 119:11,21
  120:20 125:19,24
  127:13 129:17
  132:16,18 135:13

165:17 169:6
170:17,18 174:7
185:24 195:4
226:3 230:12
231:13,15 240:6
252:5 263:12
270:6 271:17
275:16 282:4
294:1 297:10
314:17 317:4
331:24 333:20
335:23 344:18
347:6 358:4
**certainty** 190:8
346:16,18,19,21
**CERTIFICATE**
361:4 362:1
**certification** 81:20
132:10,11 228:25
**certified** 25:23
132:7 178:20,25
179:18 180:2
189:21 210:18
228:19 362:5
**certify** 180:1
361:18 362:7
**cetera** 5:10 46:3
**chair** 74:5,20 194:6
**chairperson** 74:3
**challenge** 287:4,5
**challenged** 149:3
**champion** 300:3
**change** 30:14,24
31:7 67:3 68:16
108:19 171:2
200:14 212:7
222:22 251:15
291:21 300:23
314:24
**CHANGE-COR...**
361:9
**changed** 68:6 76:4
256:12
**changes** 65:9,14
66:12 113:13
**changing** 142:7
**chapter** 18:19

**characteristics**
191:17,18
**characterization**
121:15 170:10
289:16
**characterize** 64:11
**characterized**
121:12
**charge** 90:18,20,22
146:21 248:3
**charged** 79:2
**chase** 80:2
**check** 4:22,22,24
80:22 352:17
**checked** 145:14
**checks** 87:22
**chief** 56:10 70:19
70:25 72:2 77:20
78:10 80:12 81:10
197:25 209:11
254:9
**chiefs** 57:18 72:3
**child** 171:3
**chocolate** 261:20
**choice** 88:14
147:24 262:20
**choke** 180:12
**chose** 333:5
**circuit** 12:14,15,24
13:1,3,7 77:5
305:24 308:2,3,23
310:14
**circulate** 190:12
205:20
**circumstance**
162:17
**circumstances**
97:11,17 105:24
108:9 126:20,21
131:19 139:23
162:13 166:3
168:4 174:8
194:23 208:16
255:16,19 278:4
279:10 299:1
346:9 355:8
**CIT** 177:9

**cite** 18:19 132:3
178:5,7 310:25
312:2
**cited** 307:25,25
310:14 311:3
**citing** 308:23 309:4
**city** 1:20,22 4:8
5:19,21 69:25
70:6,7 74:7 78:5
80:5,11,11 91:14
**civil** 47:19 72:21
73:1 79:11 80:17
119:24 281:14
285:25
**civilian** 52:12 236:1
316:15 325:4
**civilly** 307:7 310:3
**claim** 17:6 63:3,7
184:17,21,24
185:11,24 219:10
**claimed** 83:12
216:22
**Claims** 63:8
**clarification** 28:17
179:25 185:2
252:20 255:15
310:6
**clarify** 13:25 185:4
233:1
**clarifying** 27:10
158:4
**Clark** 76:18
**class** 257:9 258:5
258:17 275:5
276:19,20
**classes** 132:7,11
235:10 258:15
301:3
**clear** 67:18,22,24
81:23 91:6 112:17
122:23 160:18
188:15 217:14
220:8 221:9
232:24 276:9
342:20 349:21
354:15 356:3
**clearly** 220:16

230:10
**clenched** 288:12
**clerked** 77:3,5,6
**client** 43:18 44:2,8
54:12 77:15
118:23 187:21
271:4
**client's** 77:15
**clients** 55:15,16,18
58:10 360:14
**clip** 134:25
**clock** 193:9,15,21
195:15 198:2,6
207:2,9,18 231:22
**clocks** 193:16
**clockwise** 173:18
**close** 96:19,24
107:14 118:10
146:18 184:19,19
185:7,7,25 186:1
187:7,7 188:21,22
192:6,9 197:20
204:9 256:23,24
261:18 288:23
299:16,16 301:24
301:24 350:17
**closed** 353:7,14,20
356:23
**closely** 161:10
**closer** 301:13
**closing** 245:17
288:12 293:9
**club** 301:15
**clue** 23:23
**clues** 288:18
**CNBC** 127:8
**cocked** 215:14
**code** 259:8 262:14
263:24 266:25
267:3 271:21
272:10 276:18
**coffee** 170:25
**cognitively** 321:21
**cohort** 204:17,19
204:21,23 205:15
**cohorts** 205:4
**cold** 150:19

**colleagues** 190:13
**collection** 59:1
**collective** 55:1
**college** 235:9
**colored** 48:23
**come** 5:9 47:13
51:15 66:8 67:2
68:3 91:12,23
123:22 156:25
165:2 183:5
186:18 196:4
197:17 203:20
339:15,18 340:2
343:5,25 345:11
348:3
**comes** 33:20 64:10
224:25 246:21
272:10 342:7
**coming** 118:11
152:4 165:18
247:1 293:22
316:3,14 320:9
323:13,15 324:4,6
324:8 341:25
**command** 138:7,7
149:17 266:17
295:16 321:24
**commanded**
147:12
**commanding**
152:17
**commands** 137:12
138:2,5 150:12
152:24 290:10
291:9 294:7,22
295:2 329:4,8,13
329:17 330:19,20
330:24
**comment** 40:9
134:16 200:4,22
202:14 227:9
239:4,19 282:5
**comments** 34:18
221:2 225:13
336:21 347:9
**commission** 74:4,4
74:6,20,21,22

commit 101:20
164:9
committed 267:7
268:5 269:9 279:7
280:12 282:10,13
committee 190:17
190:17 203:17
204:11
committing 146:12
common 58:9
109:12 144:15
178:14 229:12
333:23
communicating
176:18
communication
137:12 139:21
142:2 163:6
communications
42:22 102:23
163:21 322:6
community 172:9
235:9
company 53:5,8,12
55:11 56:11,12
73:16 228:5,7
compare 242:22
complainant 81:17
complaint 37:8,11
63:3 161:12
complete 131:6,10
202:21 219:13
230:9 346:18
353:3
completed 16:3
completely 138:25
153:25 313:25
complex 191:14
complicated 239:25
component 56:25
comported 45:12
comportment
121:22
comprised 53:6
72:2
compulsion 8:8
303:8

computer 19:16
20:9 247:17
computer-aided
362:15
concede 146:13
concept 117:1
137:2 182:3
186:14 187:8
188:21 189:1,3
259:22 260:1
268:19 276:10
concepts 11:9,12
14:4 120:12 257:5
262:24 271:2,7,8
concern 101:1
358:8,15
concerned 97:23,24
155:20 290:6
343:23 356:22
concerning 80:25
97:4
concerns 127:2
208:9 219:9
conclude 13:8
30:15 287:12
325:8 329:19,21
concluded 64:18
265:25 294:2
317:12 323:23
325:13 360:17
concluding 354:6
conclusion 49:9
64:20 101:7
142:18 150:11
151:16 242:22,22
255:11,13 269:17
271:11 285:12
287:6 301:13
309:20 327:11
335:4,21 351:20
351:22
conclusions 30:13
30:24 31:6,7
45:10,15,21 46:2
46:5,19 64:25
92:6,14 95:1
139:1 156:14

197:18 208:17
288:15 313:11
condition 54:10
conditioner 173:13
conditions 107:15
191:21 205:16
condo 172:14
conduct 44:12 45:5
45:11,23 52:20
79:2 146:10
189:24 205:9,18
282:12
conducted 204:15
210:3,12 242:18
245:23
conducting 209:11
257:24
conducts 190:8
confidence 330:18
confident 30:7 57:5
65:17 82:5 150:24
181:11 246:10
confidentiality
49:2 57:24
confidentially 49:2
confined 107:15,17
confinement 183:8
conflating 347:12
conflicting 215:21
conforms 265:15
confounding 179:5
confront 101:25
confrontation
164:3 226:11
confrontations
231:4,5
confronted 18:16
293:23
confused 73:7
206:13
Connor 281:11,11
282:24 285:4
286:5
conscious 317:2
Consent 63:11,13
consequences
139:7 258:25

consider 26:1,1
86:22 87:16 175:2
316:21,22 334:25
consideration
39:14 116:14
considered 57:4
95:17 146:9
248:16 271:17
282:12 313:10
321:20 335:6,7
consistent 18:12
23:3 47:18 177:10
282:12 313:10
321:20 335:6,7
consistently 319:16
consists 183:7
constitutes 362:16
constitutional 17:1
17:24
construction
109:15
consult 57:12
consultant 55:6
contact 161:6
173:14 356:12
contain 112:1
contained 53:21
56:1 63:11 86:20
134:20
containing 135:4
containment 137:3
contains 41:19
contaminates
215:20
content 20:5
contents 361:7
contest 144:18
context 70:24 73:1
77:14 120:13
150:3,4,5,7,14
151:1 230:9
243:23 272:18
276:11,13,15,16
279:13 331:24
332:22,23 343:12
contexts 81:9
contiguous 91:1
contingencies
122:6

continua 285:11,14
285:20 286:2,6,9
continue 10:19
18:22 57:7 67:23
112:21 114:19
123:21 308:8
continued 115:5
144:9 152:24
continuing 85:15
85:18 294:23
continuum 285:20
286:16,18 288:25
303:5
contract 53:14,16
53:19,20,22,24
54:3,6,13 55:2,3
55:23,25 57:2
82:16
contracts 55:22
Contractual 52:25
contracture 207:1
207:14
contradict 154:5
contrary 138:14
contrast 191:10
288:1,24
control 105:25
107:12 191:17,18
204:15 208:7
controlled 205:16
controlling 206:11
208:2
controls 206:9
208:5 242:1,19
245:24 246:7
controversial
223:21
conversation 50:4
162:7,23 173:1
conversing 95:22
convey 280:15,18
280:20
Cook 20:17 93:18
102:18 106:9
109:4 114:3,15
124:7,25 150:22
154:23 155:9

160:5 323:16
324:7
**Cook's** 152:12
**copied** 9:3 59:6,23
60:1 261:12
**copies** 58:15 59:14
68:12 87:23 211:1
222:11,12 230:7
354:17 359:20
360:2,8
**cops** 75:18
**copy** 10:3,7,25
32:21,22 41:17
47:10 49:9,10
53:14,16,18 58:13
88:13 196:20
211:2,3 212:6
264:11 359:8
360:15
**copyright** 203:19
204:12
**core** 205:14
**Corporation** 74:8
**correct** 7:8 11:13
12:17,25 13:2
15:2 19:2,24,25
21:6 29:17 30:4
31:12 32:16 33:8
33:16 34:9 36:21
37:4 39:1 40:20
43:7,16 44:5 48:6
52:18 55:19 56:4
56:5,22 62:21
63:12 64:5,14,15
65:4,10 67:5
70:16 72:22 76:12
82:20 83:4,8,9
84:2 90:10,16
91:3,5 92:14
93:10 94:3,18,19
95:7,20 99:12
100:10,23 101:11
101:21 102:13
103:6 104:2 106:5
107:5 108:9
116:18 119:16
120:24 125:4

126:3,10 130:8
134:21 135:22
136:10 137:25
143:24 147:5
148:22 151:16
152:6 158:23
160:24 161:2
162:1,11 170:8
172:6 174:6 175:6
175:12,16 177:23
180:4 183:9
184:19 187:19
188:3,7 189:22
192:4,19 195:17
197:5 200:11,12
207:21 213:4,6,23
220:18 228:6
229:19 231:24
232:1 245:25
254:15,16,25
256:6 257:21
258:16 259:10,17
260:9 261:16,21
265:5,24 273:9
276:14 277:24
278:1,2,25 279:12
279:17 281:8,20
282:2,24 285:6
286:24 288:8
293:23 295:4,7,20
301:8 302:21
303:23 305:23
306:5,6 308:10,19
311:15 315:1
318:4,24 319:18
320:2 323:4 328:1
328:7 334:9
348:20 350:5
361:19
**correction** 91:21
**corrections** 6:22
48:9 65:9 75:19
75:20 361:7,17
**correctly** 307:22
**correspondence**
37:13,13
**counsel** 3:16 4:10

8:6 29:5 40:9
58:8 62:9 78:19
79:13 82:12 123:7
219:13 230:7
246:23,23 314:17
352:23,25 354:17
354:18 360:14
**Counsel's** 245:11
**counseled** 333:25
**country** 16:24
17:20 18:13
267:25
**county** 1:10 2:7
4:16 9:14 37:24
38:5 39:11 41:25
42:5 43:18,22,22
43:25 44:3 61:10
62:6 70:7 74:5,6
74:16,19,22,24,25
77:20,21,25 79:4
93:2,8 148:21
177:18 214:13
308:1,2 362:3
**couple** 14:9 20:6
35:2 67:11 74:17
115:17 143:12
178:6 190:9
209:20,25 215:21
256:18 299:5
314:7 357:9
**couplet** 189:20
**course** 14:6,8,10
22:10 35:6 50:15
59:20 76:7 151:11
177:4,9 180:21
211:8 212:5 223:4
224:20 229:2
254:19 274:18
275:21,23 276:19
277:18 280:20
283:25 287:22
350:13
**courses** 7:13 15:18
179:21 257:4
301:2
**court** 1:1,20 4:7,19
5:8,11 12:15,22

12:24 13:1,3,7
16:25 17:21 27:6
31:16,19,19,22
33:20 36:23 47:23
61:8 63:5,5 65:15
77:3,5 78:6,13,13
78:15 79:11 80:6
80:18 86:21 90:7
90:9,19 119:23
120:4,17 225:3
267:22 270:12
272:4,11,22 277:2
277:15,20,21
278:3,11 279:11
279:17 280:7,23
280:24 284:7,12
284:19 305:20
306:2 307:18
308:4,9,15,23,23
309:4,15 310:17
311:1,12,19,20
337:22 353:16,25
355:17 356:24
**Court's** 307:17
308:11
**court-based** 8:8
**courtroom** 267:15
**courts** 12:14 15:2,4
15:7 120:16,17
225:6 249:7 252:5
261:18 272:15
**cousins** 255:2
**cover** 48:19 105:19
107:19 108:8,8,14
109:6,8 110:4
111:18 112:21,22
115:4,7,8,10,12
123:6 129:5,5,9
129:18,25 130:6
130:11,15,16,24
131:4,4,7,16,20
131:21,25 167:14
167:22 182:15
183:25 184:4,9
188:5 192:19,22
192:22 214:13
298:23 302:2

314:1 341:6,16
**covered** 106:9
213:20
**covering** 110:3
**create** 78:12 296:4
**created** 75:3 128:3
163:23
**creating** 252:3
**creation** 203:7
**credentials** 225:4
**credibility** 153:21
153:25 156:9
159:16
**credible** 156:17
158:12 159:24
**credit** 128:4
**creeped** 316:5
**crime** 145:11 146:1
146:12,21 251:5
251:20 276:4
279:7 280:13
281:18,19,20
282:10,13,17
**crimes** 78:11,11
**criminal** 17:15
77:13,14,18 78:21
79:2 145:14,19,21
146:3 150:10
258:19 276:18,19
276:20 279:14
**crisis** 162:19,21,22
163:1 176:17
177:3
**critical** 34:2,6,8
205:14
**criticism** 64:12
200:19
**criticisms** 34:17
64:7,9 208:21
**criticize** 247:13
**critique** 89:16
203:2,13
**critiques** 34:17
45:10 46:2,5
**cross** 226:16
**cross-examination**
356:16

**cruiser** 117:3 118:8
**cruisers** 20:16
**crux** 346:15
**CSR** 1:25 361:2
362:22
**CTY27** 155:21
**cue** 293:10,11
301:16
**cues** 288:19,19
289:4,11,18,21
291:4,7 292:7,11
294:14,18 296:9
296:13 298:2,9
321:23 346:19
348:22
**cul-de-sac** 115:19
162:1
**Cumberland** 1:10
2:7 4:16 9:14
37:24 38:4 39:11
41:25 42:5 43:22
44:3 61:10 62:6
93:2,7 148:21
177:18
**curious** 88:10
**current** 6:8 72:19
72:20 126:4 220:8
285:25
**currently** 5:24
**curriculum** 177:8
177:10
**custody** 56:17
**custom** 64:14
**customarily** 34:14
**cut** 80:2 210:5
286:12
**cutter** 301:17
**CV** 69:5

**D**

**D** 3:1 4:1
**damaged** 101:10
**damages** 79:12
**Dan** 4:12 253:15
336:25 349:16
**dang** 80:23
**danger** 95:19,19

96:8,17 97:13,16
98:19 116:10,14
116:17 117:4,7,17
125:20,21 216:11
252:10 298:25
302:8 308:16
325:6 326:21
328:23 344:5
**dangling** 141:24
142:11 145:7
249:13 289:10,19
324:22 340:20
**Daniel** 2:3,3
**dark** 124:9,11,14
124:16
**darn** 131:11
**dash** 150:25
**date** 14:9 28:8 45:7
254:4 361:2
**dated** 48:19 94:7
224:23
**day** 21:6 24:20
39:21 73:12,15
90:14,14,15,15,21
91:4,22 98:3
119:24 263:11
291:21 293:23
349:8 355:4
361:22 362:20
**day-to-day** 18:15
**days** 90:20,21
191:23 314:12
326:16 327:3
328:14 331:7
337:3
**dead** 120:3,3 216:1
297:15
**deadline** 354:9
**deadly** 15:19 17:12
18:5 25:10,15
52:10 79:8 83:7
83:14,20 106:17
106:25 117:19
118:24 148:20
226:5 231:4,12
251:15 252:5,6,10
258:15,17 259:23

260:11 262:8
266:3,12 267:4
270:20 271:18
273:5,7,21 274:3
274:4,23 275:8,8
275:11 276:3,5
278:4 279:12
288:7 291:19
293:9,20 294:17
306:4,9 307:18
308:7 311:13
325:23 336:16
344:6 346:10
347:11,11,22
348:23 351:24
**deal** 181:23 226:17
**dealing** 190:4
208:25 226:7,7
268:9,9,14 272:20
**deals** 286:7
**dealt** 17:12
**death** 46:19 51:6
51:11,19 52:7
83:14 186:8
255:10 260:12
262:9 267:7 270:3
271:9 272:6,8
274:22 275:10
278:8 279:9
280:10,14 291:6
292:10 320:11
328:22 346:6
**deceased** 111:20
159:4 165:1 188:2
188:12,13,13
**December** 362:20
**decide** 246:24
298:3
**decided** 265:17,17
271:3 277:25
287:16
**decides** 250:20
**decision** 12:21
121:20 152:4
249:10 250:17
276:24 278:23,23
283:1,3 295:25

317:2 325:14
**decisions** 17:21
153:21 248:24
338:3
**declare** 361:5,18
**declined** 80:5 224:2
**decrease** 96:16
97:12 126:7 166:1
**decreased** 97:16
**deemed** 71:13
**deer** 174:3,12
**deescalate** 162:14
165:13
**deescalating**
164:14,21 165:18
**deescalation** 165:5
165:15
**defeat** 131:3
**defeated** 267:5
**defects** 208:11
**defend** 264:6
**Defendant** 2:7,13
9:7 62:5,13
**defendants** 1:12
4:16 61:9
**defended** 78:25
**defending** 47:20
**defense** 57:23 58:5
58:10 262:2
352:25 354:18
**define** 120:13
130:17,19
**defined** 204:16
257:7 259:13
**definitely** 349:12
**definition** 52:7
119:20 196:12
**definitions** 136:13
256:21
**deflect** 130:12
**degree** 66:13 70:12
76:11 181:14
182:1 350:10
**delay** 196:23
**delivering** 301:19
**delivery** 6:21
**demonstrate**

141:14
**demonstrated**
184:7
**denied** 162:9
**Dennis** 300:2 301:1
301:24
**denying** 239:6
**department** 1:11
5:25 6:2 42:1,10
45:6 46:22 62:20
62:25 69:14,15,20
69:23 74:18 79:10
79:25 81:10 98:4
154:23 156:25
186:10 286:1
**Department's** 9:7
44:13 45:22 62:14
**departments** 50:20
51:10 53:10
**depend** 6:7 177:8
**depending** 22:6
50:8 65:9 90:25
**depends** 97:18
215:24
**depicting** 219:5
**deployment** 106:1
**deponent** 211:3
265:18 361:18,21
**deposition** 1:15
3:10 4:5 7:25
23:10 32:22 33:6
34:1 35:1,5,25
36:14 59:17 67:5
67:6,9,13 68:4,10
69:1 90:7,9
123:16 142:23
143:3,3 153:11
198:16,18,24
199:3,16 200:2,3
200:9 201:21
202:10,11,17
216:21 217:12,15
219:24 220:9
223:14 242:6
250:15 252:16
265:15 297:23
312:16 336:21

352:21 353:1,4,7
353:14,15,18,20
354:7,23 355:7,16
355:19 356:22
358:21 359:14,18
360:15,17
**depositions** 66:8,24
67:1 90:7,19
169:2
**deputy** 6:23 14:12
21:2,18,23,24
30:10 42:13 49:17
71:14 72:2 74:6
77:20 78:10 94:17
95:5 102:18 114:3
121:20 124:7,25
135:17 140:23,25
141:17 142:2,4
143:16 144:11
147:12 148:1,1,21
149:18 151:23
152:24 153:3
166:13 271:18
290:15 291:8
293:9 294:24
297:20 324:1
326:13 327:21
328:11,17 330:24
342:5 343:1
346:16 348:8
**deputy's** 155:15
**derive** 287:8
**describe** 12:19 32:4
32:18 190:22
**described** 58:25
98:17 103:9
187:18 241:20
**description** 3:8
228:4 229:3
**design** 190:13
191:14 203:12
204:14 209:5,8
**designated** 61:23
71:21 337:19
**designation** 45:16
86:21 88:22 89:10
357:16

**designed** 241:24
263:13 300:15,15
**designee** 356:10
**desired** 197:12
**detail** 191:7 289:4
**details** 22:1
**Detective** 151:7
**detectives** 75:18
**detentions** 16:22
**determination** 88:4
**determinations**
46:20
**determine** 15:18
38:5,9 39:10
95:16 189:25
192:11 194:22
195:16 248:8
282:7 292:2
**determined** 39:15
100:22 101:2
178:2
**develop** 358:2
**developed** 106:6
299:21 300:1
**development** 57:12
231:11
**device** 105:25
107:12 157:3
206:16
**devise** 155:24
**devised** 101:24
102:7 157:4
**dgl@danlilley.com**
2:6
**diagrams** 85:9
**dialogue** 24:20
26:13,15,17 27:8
**diaper** 171:2
**dicta** 310:18 311:5
311:22
**dictate** 36:15
**dictated** 48:7
**died** 51:20
**difference** 99:17,18
103:2 120:5
197:22 233:3
234:16 242:3

245:21 266:2,4
319:1,3
**differences** 176:7
266:14
**different** 20:3,6
24:21 35:2 70:17
72:13 74:17 99:8
103:16 158:6,14
163:19 187:4
189:1 191:23,23
203:18 204:25
218:11 226:16
241:24,24,25,25
241:25 242:18,19
242:19,19 244:12
245:21,22,23,23
245:24,24 246:7,7
246:7,8 262:18
283:13 286:3
296:5 312:6 328:4
328:4 331:22,23
331:23,24,24
332:2 336:19
**differently** 182:7
**difficult** 97:2
120:12
**difficulty** 165:3
**dig** 123:19,24
217:15 218:14
**digress** 10:20 43:14
180:23
**direct** 24:25 162:22
259:6,14 261:2,3
**directed** 291:19,19
**direction** 107:22
111:20 120:15
141:18 179:18
216:24 217:9
218:16,18 219:6
248:10 321:7,9
333:22 340:3
341:8
**directions** 168:13
**directly** 141:6,16
144:11 248:10
271:23 306:3
308:5,21 309:1,18

310:18 355:22
**disadvantage**
133:21
**disagree** 85:17
92:11 149:23,25
150:2 170:9,10
182:12 201:25
289:15 296:2
298:13
**disagreement** 80:4
337:1
**disarm** 149:18
**disc** 86:17 142:19
200:11
**discern** 281:22
**disciplines** 226:16
**disclose** 46:1 54:15
**disclosed** 54:16
**disclosures** 61:9
**discover** 328:16
**discrete** 14:10
191:1
**discuss** 21:8,11
95:2 264:7 284:21
284:23
**discussed** 15:21
20:20,23 21:1,4,5
21:14 25:7 50:2
95:21 96:7 177:20
203:7 205:5
257:10
**discusses** 12:20
**discussion** 21:20
25:11 114:19
178:10 203:8
279:13 283:25
285:23,24 287:24
289:6 305:16
307:4,5,6 309:11
312:6 354:4 359:7
**discussions** 45:3
309:10
**dishonestly** 207:21
**dispatch** 42:19,23
155:15 290:3
**dispatcher** 98:22
99:3,3 161:18

**dispatchers** 43:6
**display** 306:2 307:2
307:16 308:4,24
308:25
**dispute** 114:9
115:24 164:8
**disputes** 114:10,12
333:17
**disqualified** 224:19
**dissimilar** 183:3
335:9
**distance** 111:25
126:2,22 128:4,15
130:4 131:16,18
168:3 183:15,19
187:19,20,21
188:1 214:2 220:3
288:12 299:1
300:6,10 301:6,6
302:2 333:12
**distances** 182:15
183:21 192:14
301:11,12,13
**distinct** 44:1 246:6
**distinction** 33:10
231:18 241:22
**distinguish** 46:4
52:9
**distinguished**
151:3
**distracting** 33:18
293:5
**distraught** 99:7
**distressed** 23:8
**district** 1:1,2 47:23
47:23 75:4 86:21
86:21
**divider** 41:14
**Division** 6:4 71:1
**Docket** 1:4
**doctors** 255:3
**doctrine** 280:21
**doctrines** 252:3
**document** 9:20,21
10:21 11:3,7,8
12:11 13:12 18:20
32:20,25 34:12

38:2 40:20 41:18
41:18,19 47:10
48:19,20 54:12
55:10 62:10,22
63:19 67:19 84:5
150:18,21 151:2
152:8 153:7
220:22 230:6
232:4 238:10
240:17 356:5,5
**documentation**
9:15,15 209:23
236:6
**documented**
191:18,20
**documents** 3:12,13
3:14,15 8:9 9:6,9
9:13 10:14,19
11:6,9,11 15:3,8
16:17 27:1 31:5
35:25 36:3,10,12
36:13 37:7,20
39:23 41:20 42:18
43:1 49:23 50:8,9
60:12 88:18 90:5
143:12 230:15
234:22 354:16
355:15 356:1
357:4,9,10 359:15
359:22,25 360:12
**dog** 52:13
**dogs** 52:6
**doing** 24:5 33:4
56:9 146:7 172:22
177:24 197:4
202:16 207:21
236:21 262:6
271:1 286:8 298:9
301:7 302:15
310:22 312:10
334:19 337:1
**dollars** 4:23 80:15
90:8,9,14,21 91:8
91:11,12
**domestic** 96:12
97:5 100:25 164:8
**Don** 253:7,8,9

**Donna** 18:24 35:18
58:3
**door** 102:12,12
146:19 173:2,2
296:19
**double** 261:20
**doubt** 161:20
328:24
**dozen** 169:24
**dozens** 170:18
**Dr** 179:11 181:5,6
181:7,13,20 195:1
203:6 205:7 210:3
210:13,16
**drafts** 83:25
**dramatic** 233:3
**draw** 115:15
191:11 235:15
242:21,22 327:10
**drawing** 203:11
303:11 304:4
**drawn** 95:1 102:19
102:25 113:6,14
113:21 114:4,10
114:15,15 124:8
164:10,14 165:4
165:19 303:17,18
303:19,23 304:8
325:9
**drew** 325:17
**driver** 145:25
**driveway** 129:19
131:14,23 141:10
141:24 142:5,10
143:19,23 144:5
144:13,14,16,20
145:8 146:6
213:10 249:13,19
250:2,3,5,6 291:6
291:13 292:17
294:18,21 316:2,9
316:19 317:3,11
318:19,22 323:24
324:9,16 329:13
329:15 330:20
341:21,25 342:11
343:2

**driveways** 170:15
**driving** 146:5
258:11
**drone** 213:18
**drop** 97:2 138:3,4,8
138:8,11 147:13
147:16 148:2
152:25 153:4
160:17 266:18
291:9 294:7,22
295:2,16 296:22
320:25 321:1,1
323:17,20,23
324:3,12
**drop-dead** 352:23
**dropping** 321:18
321:24 322:13
343:15
**drove** 98:15
**drug** 78:11,12,13
**Drummond** 2:14
**due** 124:16 133:22
**duly** 5:3
**duplicate** 62:8
**duplicates** 41:19
**duplication** 64:2,3
**duties** 6:5 71:3
**duty** 262:6
**DVD** 20:7
**dwellings** 109:16
**dynamic** 107:18
**dynamics** 108:19

**E**
**E** 2:1,1 3:1,7 4:1,1
41:1
**earlier** 35:6 124:5
149:2 175:6,6
203:7 212:10
218:10 241:13
268:6,17 293:23
299:2 307:6 335:6
343:5
**early** 21:9 93:25
285:16
**easier** 88:17
**easiest** 235:10

**easily** 109:14
**East** 1:21
**easy** 97:1 287:8
356:14
**ebenjamin@dw...**
2:17
**Ed** 4:17 44:16 61:5
265:2 347:14
355:12,24 357:2
358:5
**edged** 300:7 301:16
**edges** 134:14
**editorial** 40:9 221:1
304:13,14
**Edward** 2:14
**effect** 16:22 247:24
**effective** 105:5,7
108:18 112:3
126:15 129:25
138:11 166:14
167:7,22 287:17
301:19
**efficiencies** 126:19
**efficient** 24:2
**effort** 11:15 158:20
195:11 258:5
**eight** 77:24 304:21
304:23 307:9
**either** 20:21 40:13
53:4,6 59:5 61:3
64:14 100:4
104:20 107:13
110:10 129:7
138:16 184:1,1
194:11 213:2
215:9 216:23
220:5 223:4
226:25 321:15
322:14 332:3
338:2 352:25
355:20
**electronic** 19:3
33:2 105:25
107:12
**element** 132:11
136:17 219:25
297:6

**elements** 71:5
289:8
**elicited** 356:20
**eliminate** 335:12
336:3,4 337:12
351:2,7,15 352:10
**eliminated** 205:17
**eliminating** 337:9
352:3
**elk** 174:11
**email** 60:21,24 61:5
**embarrassed** 274:7
**embraces** 182:2
**emergency** 42:2
**emergent** 290:5
**Emily** 1:25 361:2
362:5,22
**emotional** 164:7
**emotionally** 206:5
206:6 339:3
343:16
**employed** 57:8
**employees** 53:8
**employer** 55:5
72:20
**employment** 51:13
53:3,18,20,21,23
54:2,4,5,5,11,13
55:2,23,24 56:1
57:6 73:14,23
77:11
**employs** 53:5
**encompassed** 87:10
**encounter** 77:16
**encouraging** 289:3
**endures** 57:6,6
**enforcement** 6:18
15:21 42:20 53:7
55:16 56:17 69:9
71:6 74:18 75:16
75:22 76:3 82:25
96:9,13 107:24
108:16 110:7
112:3 130:23
175:10 181:23
182:4 195:25
225:21 227:3,5

230:20 231:1
256:6 257:15
262:16 286:3
302:19 305:7
**engagements** 355:4
**engine** 129:14,23
130:25 131:5,6,11
131:19 167:9
314:1,4
**ensure** 327:23
**entered** 75:1 102:9
156:23
**entertainment**
248:4
**entire** 8:11,15
13:21 14:8 67:22
84:9 150:18,21
312:4 334:20
**entirely** 25:8 36:10
163:18 230:11
271:22 301:9
**entirety** 47:25
67:20
**entitled** 20:1 202:6
273:21 274:3
279:19,20 285:12
**entity** 44:1 74:22
**entrance** 155:13
156:23
**entries** 155:19
**entry** 94:18 155:1
163:16
**envelope** 248:19
**equivalent** 256:2
**equivocal** 345:9,20
**erroneous** 64:19,22
64:25 65:3
**error** 92:15 220:16
222:21
**errors** 64:8 314:16
315:1
**escalate** 165:14
**escalating** 164:12
164:20 285:21
304:10
**escalation** 165:16
**escape** 153:25

265:1,4 267:1,5
268:10,13 271:20
272:4,10 276:3
**escapee** 272:20
**espouse** 16:19
**Esq** 2:3,8,14
**essence** 244:2,4
**essentially** 12:13
15:1 21:6 70:14
72:21 154:2 175:5
190:14 197:3,16
243:1 286:16,19
**estate** 1:6 4:13
**estimated** 292:9
**et** 4:6,7 5:10 46:3
**evacuated** 169:25
**evaluate** 282:6
**evaluated** 282:11
316:21
**event** 13:6 15:12
19:14 56:4 80:24
104:5 135:10
148:18 195:8
216:2 234:9 244:9
323:12 341:7
353:3
**events** 15:6 22:21
24:13,21 46:17
126:21 191:22
206:15 248:17
**everybody** 165:1
212:17 213:1
313:4
**evidence** 106:14
108:2 111:22
137:11 138:13
141:11,20 142:12
150:8 152:16,16
152:17,22 154:4
168:14,20,21
169:13,16,20,23
170:3,6 171:15,18
172:3,5 177:11,16
218:21 222:10
224:8 247:22
267:16 331:10
339:24 350:15

**evidence-based**
172:3
**evolving** 248:17
**exact** 22:8,10 55:11
100:20 123:24
158:6 159:5
181:14 274:20
**exactly** 53:4 55:14
99:4 144:6 185:9
318:19 343:7
356:2
**examination** 3:3
5:14 90:5 192:17
**examine** 20:14 27:1
314:18
**examined** 170:13
**examining** 151:2
**example** 52:11
131:6 191:2 194:2
234:23 241:5
259:14 294:4
**exceeded** 136:25
**exceedingly** 105:9
105:13 139:5
**excerpts** 93:2
**excessive** 81:7
259:4 308:19
309:3,19
**exchange** 97:19
**exchanged** 24:20
**excited** 338:10,23
339:3 343:16
**exclude** 290:16
**excluding** 293:13
**exclusively** 152:9
**excuse** 27:14,24
28:8 82:13 83:11
122:13,15 137:4
138:22 150:1,18
152:23 178:7
200:24 229:22
262:4 273:20
316:25 319:20
323:18 335:8
349:20
**excuses** 258:24
**execute** 190:15

**executed** 195:13
241:24 298:16
333:24
**execution** 76:4
191:13 197:11
203:14 206:3
**executive** 56:10
**exempt** 258:19
**exercise** 254:3
300:15 301:11
**exercising** 171:1
**exhaustive** 22:14
83:23
**exhibit** 3:8,9,10,11
3:12,13,14,15
83:22 84:22 87:10
89:5 211:7,11
213:16,17 222:14
222:14,14 358:21
359:10,10,11,11
359:16 360:13
**exhibits** 3:16
148:17 212:19
214:22 355:15,19
359:14,14
**exist** 171:7 252:23
**exited** 338:17,18
**exonerated** 150:9
**expect** 29:23 46:3,7
256:12 347:14
**expected** 47:22
153:15
**expense** 59:8
**expenses** 90:13,25
91:19
**experience** 80:17
109:17 177:5
234:10
**experienced** 162:19
322:22
**experiences** 50:12
**experiment** 186:22
186:23 197:4
198:2,15,17,19
199:14 200:3,10
200:23 201:19,20
201:21 202:15

203:1,3,13,16,18
204:14,14 205:10
206:10 209:5,9
228:2 233:15
239:16
**experimentation**
203:4,5
**experiments**
188:25 209:17
242:18
**expert** 26:12 28:11
28:24 29:8,20
45:16 47:4 50:12
50:15 53:9 55:5
61:23 81:6 82:6
82:13 83:13 88:21
89:9 92:6 104:23
153:21 196:15
200:1,2,4 223:22
230:24 231:2
264:21 265:23
270:1 327:11
337:20 356:10,17
**expertise** 109:12
**experts** 65:8
**explain** 9:3 27:4
57:16 105:6 179:8
**explained** 26:23
112:22
**explaining** 9:1
**exploration** 205:1
**explored** 146:15
203:10
**exploring** 108:20
**exposed** 183:1
257:25
**exposure** 13:9,14
13:20
**express** 182:6
**expressed** 30:13
125:18
**expressing** 29:3
348:17
**expression** 185:19
**extended** 229:16
238:20
**extensive** 175:11

287:24
**extent** 45:14 46:1,9
104:4 113:20
135:21 163:25
245:12
**external** 199:19
201:7
**extra** 343:14
**eye** 34:2,7 118:19
237:15 352:2
**eyes** 221:14

**F**

**face** 16:2 192:19,19
**faced** 18:6,6 109:13
351:23
**facilities** 56:17
**facility** 7:14,15
48:12
**fact** 26:19 38:12
50:2,22 64:3
65:13 102:24
103:22 108:22
111:12,18 112:1
112:19 113:13
117:20 118:7,7
121:24 127:17
129:24 131:15
149:8 157:3
161:14 162:25
163:23 164:1
168:16 174:14
176:9 182:15
183:3 185:14
186:14 195:2
196:2 206:13
218:15 222:3
240:3 249:11
274:17 280:15
285:1 288:17,19
299:21 306:15
326:8 328:15,16
330:25 335:8
345:8 348:18
349:11
**factor** 97:10 133:20
165:4,5,6

**factors** 97:11
121:20 132:17
181:22 203:6
208:11 226:18
231:3 290:14,24
**facts** 50:5,7 64:16
64:18,22 92:8,13
97:1 106:6,19
107:2,3 110:1
112:6,9,19 118:19
139:18 140:6
154:15 157:3
166:2,11 175:3
179:5 188:22
269:22 279:20
285:12 291:21
293:25 297:16
310:19 328:3,6,11
328:15,18,21
332:3 341:18
342:2
**factual** 99:24
103:16 327:23,24
**factually** 339:16
**failing** 294:23
**failure** 306:7
**fair** 29:1,3 30:20
47:6,7 92:9
120:19 126:17
127:24 145:8
146:11,13 155:17
173:25 192:16
242:5 316:18
317:12 320:17
335:21 350:23
357:8
**fairly** 26:13 35:4
65:17 174:19
191:13 192:6
211:14 259:6
292:25 315:13
**fame** 184:18,21,24
185:12,24
**familiar** 59:5 62:4
70:1 181:18
183:13 272:15
286:11

**familiarity** 13:13
**families** 37:20
60:12
**family** 77:15
162:20
**famous** 186:1 257:2
**fantastic** 113:2
**fantasy** 114:20,21
114:25 115:2
**far** 7:7 15:2 109:22
118:7 122:14
126:24 128:9
170:20 182:18,24
198:8 234:21
252:3 253:10
318:13 333:11
334:5 347:21
356:22 357:23
**fashion** 66:17
116:4 142:13
187:2 205:4 215:9
297:15 341:8
**fast** 237:6
**faster** 18:1 133:8
174:25 213:14
235:15
**fatal** 351:8
**fault** 242:16
**faux** 188:13
**favor** 125:11
**fear** 293:20 317:6
320:10 325:22
347:22 351:14
**feared** 290:7
**feasible** 273:6
**federal** 47:19 145:1
145:5 225:3
261:15,17 263:5
263:14,15,18
265:19 266:1,10
267:13 273:13
279:16
**fee** 86:23 88:9
89:25 90:4,13,24
92:1
**feedback** 315:6
**feeding** 171:3

**feel** 202:15 269:1
355:9
**feeling** 214:2
**fees** 87:2
**feet** 105:8 126:8,9
126:25 127:4,5,22
128:15,19 129:25
130:12 131:12
167:23,25 168:1
183:17 186:25
187:22 192:7,11
214:3 301:6,12
302:4,5,7
**fellow** 95:23 325:5
**felony** 267:7 268:5
269:9
**felt** 216:20 225:14
325:14
**fence** 272:21
**field** 105:17 190:13
203:15 225:20
227:3,5,10 230:20
230:25
**fields** 166:16
168:10
**Fifth** 77:5
**fighting** 288:11
**figure** 102:16
249:21
**file** 8:11,15 9:15
35:18,20,24 36:13
48:2 64:3 84:9
**filed** 79:17
**files** 14:11 51:7
60:9
**filing** 61:8 66:21
**fill** 274:11,21
**fill-in-the-blank**
275:3
**filled** 261:20
**final** 222:18
**finalize** 30:17
**finally** 83:21
324:14 341:6
**find** 64:17 89:24
137:20 148:9,19
172:18 255:3

313:12 349:23,24
350:11 357:22
**finding** 137:15
149:23 237:19
302:17 341:15,15
**findings** 66:9 81:16
137:1 149:4,5
151:3 197:3,9
**finds** 129:6
**fine** 59:19 65:24
66:6 68:3 122:11
202:21 221:23
268:23 356:25
359:2
**fingerprints** 215:20
**finish** 13:22 33:4
40:15 43:12 66:4
67:9 92:20 203:21
236:11 241:17,18
242:13 243:5
249:3 261:5 274:1
304:22 306:21
**finished** 67:18
131:8 201:13
202:24 204:8,9
210:9 236:14
244:18 349:4
352:16
**finishing** 150:19
**fire** 56:17 121:21
131:5 166:16
168:10,12 188:9
191:9,12 229:17
229:22 234:14
238:21 243:17
287:21 289:11
291:18 300:11
317:10,17 319:12
**firearm** 126:15,16
127:19 131:16
134:19 141:5,6
157:6 188:14
194:17 208:15
215:5,14 216:23
217:4 309:18
316:11 319:23
324:20 338:11

339:12,15,19,21
340:2,17,20 341:1
341:5,8,14,20,24
342:14 343:6,14
**firearms** 97:4
128:14 134:17
155:14 175:24
192:3 193:3 245:1
300:2 301:2 306:3
308:5 309:1
319:17
**fired** 109:19 137:15
195:16 301:20
333:8 349:12,17
350:3,8
**firing** 134:22
135:18,19 229:12
229:16 238:20
240:9 248:22
290:17,19 301:20
**firm** 76:24 77:9,9
**first** 5:3 9:6,8 12:7
12:14,14,15,24
13:1,2,3,6 32:18
32:20,20 47:10
58:8 62:7,14 70:2
72:15 92:22 95:4
100:2 102:9
103:13 106:24
115:9 148:10,11
148:12 149:19
151:24 161:12
164:2,3 174:24
190:10 195:17
210:23 227:15,21
234:23 235:1,3
237:8 238:10
239:9 247:5,12
256:19 259:19
334:15 338:16
350:3,17 355:23
**fists** 288:12
**fit** 208:22
**five** 37:24 39:19
200:14 269:15,15
**flat** 90:24
**flawed** 112:6,9,23

**fled** 145:11
**fleeing** 284:19
**flesh** 107:8
**flip** 176:14
**flipped** 157:13
**floor** 8:22
**Florida** 172:17
173:16,17
**fly** 91:7
**focus** 273:22
**focuses** 152:9
**folder** 33:1,2 47:8
**folks** 10:4 145:21
169:22 172:16
173:2,5 195:24
202:22 226:16
235:13 260:4
357:11
**follow** 48:21
174:20 205:10,10
230:16 269:5
343:9
**follow-on** 307:6
**follow-up** 22:6 26:8
50:9 232:10
**followed** 26:15
39:11,13 203:11
205:23 307:5
**following** 303:4
319:13,15
**follows** 5:5 259:11
274:8
**Fools** 73:12
**force** 3:12,13,14,15
6:9,11,14,15,18
6:23 10:10 15:19
16:1,4,9,11,22
17:12 18:5 25:10
25:15,19 40:2
52:5,10,10,11
57:13 69:19 79:8
81:7 83:7,15,20
104:3,18 106:1,17
106:25 117:19,19
118:24 148:20
175:16 177:13
178:20,20 179:9

179:10,18 180:2
181:17 182:18
183:2,19 184:8
210:17,22 225:21
226:5 227:17
228:4,19,19 231:4
231:12,16 250:20
251:6,11,12,16
252:5,6,10 254:9
257:11,13,16,23
258:15,17 259:1,4
259:24 260:11,12
262:2,3,4,5,8,11
266:3,12 267:4
270:20 271:18
273:5,8 274:3,5
274:23 275:8,9,11
276:3,5 278:5
279:12 281:14,14
285:14,18,19,22
286:2,6,8,19,20
287:15 288:7,24
291:19 293:21
294:17 303:5,11
303:12,15 304:4,5
304:9 305:1 306:5
306:9 307:3,18,20
308:7,14,19 309:3
309:19 311:14
312:7 317:7
325:23 336:16
344:6 346:10
347:11,11,22
348:24 351:24
359:15
**forced** 264:25
285:11
**Ford** 80:16
**foregoing** 361:6,19
362:9,16
**forever** 261:21
337:4
**forgive** 64:24 82:8
166:9
**forgot** 134:17
**form** 9:15 22:17
29:22 31:5 34:3

35:12 38:19 54:8
56:23 80:9,10
88:20 98:5 99:10
101:5,12 102:4
103:20 105:22
106:13 107:16
109:1 112:4,11
117:8,23 119:1
120:9 122:10,12
123:5 124:20
129:11,21 130:9
133:1 135:15
136:11 139:9
140:12 151:17
152:20 153:16
154:6 156:7 165:7
177:14 186:3
194:24 198:9
215:16 216:3
224:7 225:7,22
226:13 248:13
249:17 250:9,24
251:14 252:17
255:14 266:5
270:10 273:15
275:14 278:16,22
296:15 306:10
309:23 317:14
318:6 320:3,15
330:7 332:13
335:19 336:6
342:3 344:7 346:8
351:17 356:6
**formal** 359:14
**format** 232:4
**formats** 35:2
**formed** 30:12 31:10
**former** 179:15
**forth** 53:11 75:18
75:22 85:9 362:10
**forthwith** 360:15
**fortunately** 174:22
**forward** 320:19
**Foster** 300:14
**found** 28:22 35:6
37:1 137:11 224:5
302:1 314:15

**foundation** 117:10
117:24 162:15
163:3 164:16
165:8 172:10
176:1 186:4
198:10 217:19
218:20 222:5
224:7 225:8,23
230:8 235:17
248:14 266:20
289:14 317:15
322:7 325:12
326:25 330:6
332:14 334:22
340:24 341:10
347:1 351:10
**four** 51:8 52:24
53:3 82:19,23
149:11 359:18
**Fournier** 20:17
93:19 102:19,24
103:12 107:23
109:4 112:16
113:5 114:4,16,22
117:3 124:8 125:1
142:3 151:22
155:10 157:5
160:6 161:25
162:4 249:23
292:10
**Fournier's** 106:8
**fourth** 16:21 93:1
93:24 104:5
137:14 200:25
218:25 219:4
314:10 353:25
359:17,19
**framed** 24:12
**frames** 104:13,13
149:10 222:1,2,3
233:13
**frankly** 183:20
262:24
**fraught** 92:15
114:20
**free** 27:7

**freeze-frame** 292:2
**Friday** 1:17 361:2
**friend** 1:5 299:25
  337:3
**friends** 305:15
  352:18
**front** 10:24 14:7
  18:23 89:9,19
  102:12 281:6
  313:1 316:7,20
  318:2,10,10,20,25
  319:2,3,4,9 320:1
  320:2,6 334:14,18
  334:19 335:7,13
  335:16
**full** 53:4 69:22
  73:16 98:17 316:6
  353:12 362:16
**full-time** 53:2
  73:23
**functional** 105:2
**functioning** 135:16
**functions** 75:20,21
**fundamentalist**
  296:18
**fundamentally**
  112:23
**furnish** 196:22
**furnished** 67:4
  106:7 196:13
**further** 88:7 116:12
  116:21 117:7
  316:10 317:3
  324:14 325:3,19
  326:20 358:1,2
**future** 68:3 348:19

**G**

**G** 2:3,3 4:1
**gain** 125:18 126:13
**garage** 100:4,4,5
  102:12 137:13
  155:13 156:24
  323:14,15 324:5,6
**Garner** 276:23
  278:1,11 279:16
  280:6,16 285:4

**gearing** 288:20
**gee** 57:14
**general** 6:4 7:22
  16:10,11 22:4
  23:1,2 50:5,6
  63:18 64:8 71:1,5
  71:6,9,14,14,22
  71:23 72:2,6,15
  72:16,18,20 73:24
  92:5,9 93:14
  96:14 126:4
  128:21 133:15
  134:2,13 145:9
  148:20 149:1
  150:8 151:15
  152:8 162:17
  165:14,15 206:8
  213:5 225:6 233:3
  254:13 258:25
  262:5 273:19
  274:4 275:8 276:5
  290:22 313:5,8
  314:9,17 336:17
**general's** 59:9
  63:16 71:8 137:10
  139:1 149:5
  187:22
**generalities** 23:14
  190:6
**generally** 27:10
  39:1 126:18 134:9
  139:21 162:23
  163:9 172:8 183:7
  230:20,25 231:17
  243:23 254:25
  255:8 273:18
  277:18 290:24
  319:7,13 322:8
**generals** 72:4
**generous** 120:21
**genesis** 187:8 189:3
**gentleman** 44:15
  159:10 254:14
  356:13
**gentlemen** 254:15
  312:10
**geography** 295:12

**getting** 23:7 44:5,6
  56:21 102:16
  161:23 171:2
  180:18 221:14
  257:16 263:10
  285:15 299:14
  314:1 315:6
  321:23 322:4
**Gibb** 1:25 2:19
  361:2 362:5,22
**gist** 22:9,9,10
**give** 9:4 19:7 22:14
  27:25 42:15 58:16
  59:24 62:11 65:18
  69:21 70:4,22
  73:11 77:1 138:2
  139:6 152:24
  160:11 180:11
  193:17 201:1,5
  202:18,20 212:5,9
  218:16 266:11
  277:3 291:7
  304:20 313:17
  355:24 356:15
  358:25
**given** 49:1 64:14
  83:3 84:25 85:10
  86:1,4 87:20
  97:19 107:7
  116:14 131:15
  182:13,15 192:25
  195:2 222:10
  229:4 242:25
  245:25 246:5,8,9
  273:7 275:4
  290:10 294:7,22
  295:16 329:9
  332:9 352:13
  360:13
**gives** 132:17 153:13
  212:25 330:18
**giving** 50:6 151:2
  264:19 329:3
**glass** 221:5
**glasses** 221:18,19
**gleaned** 282:24
**gloves** 216:6

**go** 8:25 10:23 17:23
  22:18 33:3 35:21
  37:5,15,18 40:24
  41:14 48:22 55:9
  65:23 67:11,17
  69:5,6 70:10
  76:17 85:3 90:3
  92:18 98:12 99:22
  101:24 102:17,24
  103:6,12 111:13
  122:14 124:1
  134:14 136:16
  143:5 152:2 157:5
  157:5,9 160:3
  164:17 166:4
  168:7 169:9
  178:19 185:22
  189:14 195:10
  197:22 198:6
  204:10 208:9
  216:12 221:11
  243:15 246:22
  253:3,6 254:19
  256:18,21 258:1
  261:4,25 263:16
  267:24 270:11,17
  276:15 279:4
  280:19 287:23
  293:7 298:10
  299:5 305:17
  312:10,21,24
  314:4 325:10
  328:8,9 333:10
  336:22 337:7
  338:5 349:3
  353:16 355:1,12
  356:24
**goal** 310:25
**goes** 12:16 31:19
  90:12 106:8
  127:18 191:24
  194:1 236:24,24
  239:10 308:14
  317:10 338:9
  346:19
**Gohn** 61:20 88:22
**Gohn's** 89:7

**going** 8:2,23 9:2
  10:3,7 11:23
  15:13 18:1 22:16
  23:4,14,23 26:11
  28:10 29:7,15,15
  29:19,20 32:2
  41:11 45:13,21
  48:24 49:9,16
  59:14,22,23 60:20
  65:23 66:4 67:12
  69:10 80:13,14
  88:19 89:12 91:13
  92:18 94:23,24
  98:11,13 99:21
  101:20 105:5,18
  111:21 112:25
  113:4,25 118:23
  122:1,2,9 123:19
  128:7,10 130:19
  133:23 142:15,19
  143:6 151:12
  157:5,11,12
  159:20 163:6,16
  164:2,8,15 167:20
  172:20,22 179:17
  180:11,18 190:15
  190:18 199:2,2,5
  200:13,21 201:10
  203:20 211:6,17
  213:1 216:2
  219:18,20 221:6
  222:11 223:10
  224:3 225:15
  230:12 235:24
  240:22 244:9
  247:18 250:19,21
  251:7 255:21
  261:7,25 262:22
  263:16 264:7,11
  264:15,17 268:8
  271:7 272:21,25
  273:25 285:23
  288:22 289:11
  292:2,10 294:17
  296:17 298:3
  304:22 309:8
  312:9,12 313:14

314:7 315:2,13
317:2,10 319:12
320:19,20 323:14
324:5 325:2,10,19
326:5,20 328:13
328:22 336:15,24
337:2,17,18 338:7
343:10 346:25
347:3 348:22
352:20 353:1,16
354:8 355:4,18
356:23 357:25
358:6 359:5
**good** 5:16 28:17,17
57:2 60:11 67:12
92:7 96:9,13
100:13 111:17
130:15 131:11,20
146:4 162:12,23
167:14,17 172:23
199:21 201:15
247:14 285:10
298:22 335:16
356:19
**gotcha** 271:1
**gotten** 211:3
**governed** 267:13
**grabbed** 343:14
**Graham** 281:11,11
282:24 285:4
286:5
**grand** 76:5 180:20
**grandchildren**
84:20
**great** 60:10 347:19
**greater** 74:5,19,22
183:17 192:14
301:12
**greatest** 286:20
**gross** 236:18
**ground** 140:11
141:6,12,21
146:16 168:7
213:19 289:20
335:15
**group** 14:8 63:11
74:10 180:3

191:17,18
**groups** 57:13,16,17
57:19,22 204:15
**grown** 305:12
**guard** 175:20
209:10 239:12
**guess** 23:10 24:1
35:9 36:20 50:16
54:20 70:15 73:7
108:7 109:24
113:25 115:17
117:16 120:9
125:10 127:15
134:25 150:9
151:7 166:9
174:25 214:20
227:8 233:23
259:9 312:8 331:5
338:19 355:11
**guessed** 302:5
**guessing** 122:7
296:9
**guilty** 181:2 251:20
**guinea** 235:10
**gun** 110:3,10,20
111:1 112:17
114:4,10,14,15,22
121:17 126:23,24
127:5 133:6 138:9
138:11 140:10
141:12,21,24
142:11,13 145:4,6
147:13,16 148:2
149:20 151:24
153:4 158:25
159:11 160:17
163:16 186:24
187:13 188:9
194:2,8,18 195:11
196:10,10 198:4,5
217:9 218:1,15,17
219:6,11 233:16
235:3,23 237:6,18
245:1 249:13,19
289:9,19 290:11
290:12 296:22
297:4,5,10,15

298:14,21 299:10
301:8,10 303:11
303:12 304:4,5
306:13,14 307:8
307:12 309:17
311:13 320:25
321:1,1,24 322:13
323:17,24 324:3
324:12 333:7,11
333:16 338:10
339:8 342:11
346:20 350:15
**gunfire** 206:7
**guns** 96:11 98:17
102:19,25 107:21
108:13 111:19
164:6,10,14 165:4
165:19,25 173:24
176:10 196:8
303:17 304:8
334:1 357:12
**guru** 226:12
**guy** 182:2 225:20
231:7 234:7
264:22 297:24
317:10 339:8
**guys** 180:18 212:16
338:14

------

**H**

**H** 3:7
**habit** 153:10
**half** 148:10 233:15
243:1 311:8
**halfway** 213:9
316:8 324:16
**hallway** 107:18
**Hampshire** 72:10
**hand** 62:12 106:8
112:16 113:7
114:4 127:20
194:19 324:21
339:21
**handed** 13:11
39:19
**handgun** 106:3
113:6 126:23

130:1 131:13
144:22
**handguns** 105:20
106:10 113:14,14
113:21 114:4
124:8 193:3,5
**Handing** 4:24 38:2
39:23 43:1
**handle** 77:25
**handled** 78:6 254:4
**hands** 84:10 215:23
**handsome** 305:12
**handwriting** 35:14
**happen** 120:24,24
120:25 122:2
163:10,12,13
174:2 250:19
294:17 296:24
298:3 337:2 344:9
348:19
**happened** 21:5
22:5 23:1,2 24:13
24:23 26:4,8
68:13 157:10
158:19 161:21
163:15 173:2
290:16 291:16
294:8,9,11,14
334:17 343:7
**happens** 174:10
228:1 235:3
331:25
**happy** 91:23
167:19 284:21
**hard** 129:8 356:14
359:8
**harm** 272:8,8 278:8
278:14 279:8
280:10,14 325:3
**Haskins** 305:22
306:16,17 307:3,8
310:12
**hate** 336:22
**hats** 147:4
**he'll** 190:12,15
296:12,22
**head** 51:3 100:9

113:18 118:9,10
138:12 147:6
191:8 224:13
266:16 272:14
**heading** 280:6
292:16 333:22
**heads** 228:14
**healthy** 302:1
**hear** 21:25 30:25
127:13 153:15
169:1 247:2,4,25
321:16 322:14
**heard** 105:17
125:17 140:8,8
151:4 152:10
153:2,14 163:24
189:17,17 224:17
224:24 225:11
226:21 227:6,9
272:3 322:20
**hearing** 31:2
**hears** 142:2 153:9
206:6
**hearsay** 224:8
225:8 230:10
**Hebdo** 311:5
**heightens** 98:18
**held** 4:7 77:21
166:15 178:10
249:19 310:3
354:4 359:7
**help** 157:11 159:7,8
159:12 160:20
161:1 162:22
208:11 213:13
220:22 247:10
356:8
**helped** 78:12
**helpful** 210:24
**helps** 128:5 349:16
**hereof** 362:11
**hidden** 167:13
**hide** 129:6 207:5,6
207:7,8,10,12
**hiding** 314:1
**high** 65:18 239:11
239:12 243:10,18

344:18
**highchair** 171:4
**highlighted** 219:25
**Highlights** 150:21
**hint** 19:7 275:5
**hired** 88:2 264:21
356:12
**historical** 290:19
**historically** 291:16
**history** 35:9 186:2
291:10 293:12
**hit** 174:5,15 312:24
335:15,17 339:4,4
**Hmm** 190:2
**hold** 4:21 73:18
89:23 135:1 181:1
211:24 232:13
236:10,10,21
241:16,16 242:8
242:14 261:4
267:15,15 313:16
349:15
**holding** 107:14
133:5,6 186:23
207:18 301:15
**hole** 289:12
**Holland** 310:13
**Hollywood** 239:11
**holster** 229:8
**home** 77:7 97:9
102:9 164:5,5
171:2 172:7 264:6
290:9 307:10
312:25
**homes** 169:24
170:15,19
**homicide** 254:25
255:3,6,9,10
**honest** 211:4 234:3
242:7
**honestly** 60:9
248:25 323:17,18
**honesty** 242:9,15
243:12
**honor** 355:5
**hood** 316:4,7
**hope** 15:14 148:8

166:9 247:1
**hoped** 113:25
**hoping** 92:19
**horn** 277:10
**Hornbook** 277:11
**hot** 154:2
**hour** 5:10 24:17
90:5,20 313:13
**hours** 67:11 312:22
353:6
**house** 86:13 98:17
108:14 110:21
111:13 112:2
115:7 125:1 141:8
141:9 142:9
147:17 158:14
161:13 164:14
165:2,24 172:14
176:10 213:4
218:18 219:11
250:4 293:15,21
293:22 295:3
303:16 320:20
338:9,18 341:14
341:19 342:7
343:6 347:2
**houses** 171:16
**Houston** 77:7
**How's** 240:25
**Huh** 221:24
**human** 181:22
226:6,18 231:3
254:24 255:9
346:5
**humor** 258:13
**hundred** 115:17,18
126:8,9,25 127:4
127:5,22 131:12
297:1
**hundreds** 169:24
170:18 234:4
296:4
**hunt** 174:4
**hunting** 174:3,3,3
174:13
**hurry** 215:24
**hurt** 100:21,23

116:4 117:21
118:16
**husband** 98:23
99:6
**husband's** 101:1
**hypothesis** 190:11
190:12 192:15
203:8,9,9
**hypothetical** 15:5
106:19 107:2,7,8
109:25 110:14,19
112:6 114:20
115:3,5 139:19
140:1 194:15
218:23 292:24,25
293:11 294:19
296:6
**hypotheticals**
113:3 295:23
296:5

**I**

**idea** 19:7 87:7
159:3 162:23
193:25 247:14
321:1 354:3
**identical** 205:4
265:25 352:14
**identification**
222:15 359:12
**identified** 93:5
151:3 168:22
169:22 217:3
219:4 220:6,15
264:17 331:9
359:22 360:12
**identify** 210:25
265:2 295:12
355:14
**identifying** 264:24
**ignore** 327:19
**ignored** 291:9
**ill** 96:13
**illegal** 146:8
**illegally** 146:7
**illness** 97:5
**illustrate** 233:2

**imaginary** 317:11
**imagine** 71:24
338:23
**immediate** 41:6
137:5 169:25
282:22,23 283:9
283:20 306:4
308:6 309:21
336:16
**immediately** 106:1
**imminent** 41:4
252:10 272:6,8
293:20 298:25
317:7 325:23
344:5,5 347:22,22
**impact** 186:10
300:7 301:15
313:10
**impending** 344:17
**impetus** 198:1
**important** 39:9
160:10 245:20
328:6,10
**importantly** 354:22
**impose** 174:16
**impossible** 264:18
**impression** 14:5
124:10
**improper** 347:14
**impropriety** 45:5
46:20 47:5
**impute** 207:3
**inaccurate** 102:20
220:10
**inappropriate**
46:11 104:7 123:1
230:11 336:22
347:9
**inches** 64:4
**include** 36:13 99:1
106:2 281:1
303:15 328:16
345:2
**included** 233:1
271:8 302:23
**including** 16:22
23:7 55:25 59:2

65:8 94:16 120:16
137:11 185:15
266:13 301:12,12
324:1
**income** 73:25
**incomplete** 202:20
**inconsistent** 16:23
**incorporated** 74:25
**incorrect** 40:10
**increase** 96:16
97:12 126:6
164:25 165:5,25
307:2
**increased** 130:5
131:14 304:8
**incredibly** 180:21
**incur** 59:8
**independent** 350:7
**independently**
102:9
**index** 10:23 11:5
**indicate** 88:6
174:21 314:14
357:3
**indicated** 84:4
117:14 124:13
239:2 352:22
355:3
**indicates** 159:10
**indicating** 14:10
29:14 218:2 354:1
**indication** 101:16
111:10 168:18
176:10 350:18
**indicative** 146:2
**individual** 237:23
243:7
**individually** 1:4
35:22
**individuals** 133:13
**industry** 56:20
**ineffective** 107:19
109:21
**inescapable** 309:20
**inescapably** 306:4
308:6
**information** 13:21

30:6,9,16 40:22
62:19 65:10 70:5
98:11,24 102:17
124:12 155:13
176:5 201:8 202:8
205:24 206:21
247:2 249:9 257:6
290:4 293:8
294:20 305:7
330:10,17 356:10
356:13
informed 96:11
ingredient 309:2
ingredients 308:18
inimical 55:15,17
initial 61:8
initials 253:25
254:1
initiated 21:21
initiatives 71:7
injection 180:22
injured 101:10
272:20
injury 260:13
262:10 267:8
270:4 271:10
274:22 275:11
307:13,15 308:16
inputs 327:20
inquiry 190:5
308:19 309:3
355:9
inside 115:7 152:12
157:10 158:14
insofar 13:16 52:7
62:24 149:25
209:10 298:7
instance 19:13
98:21 146:20
instances 128:24
institute 3:12,13,14
3:15 179:11,19
181:17,20 182:19
183:2 210:17,22
227:17 228:5,12
228:20 231:23
359:16

institutional
190:16,17 203:16
204:11
instruct 45:14 46:9
46:12 337:18
instructed 54:10
55:21 178:13
229:13 238:17
instructing 84:18
202:3,5,7
instruction 177:20
instructions 55:4
instructor 181:21
instructors 229:1
256:8
instruments 193:16
insurance 56:20
57:14
intellectual 242:9
242:15 243:12
intellectually 242:6
intend 47:2 66:19
intensity 175:24
intensive 234:22
236:6
intent 47:15 83:23
158:20
Interaction 232:11
232:24
interactions 232:25
interest 58:9
interested 158:24
159:2,19 191:25
199:4 284:14
315:6
interesting 266:25
267:19 305:4
interests 55:15
interfere 252:15
interfering 336:20
interior 109:20
interlude 201:12
342:7
intermittently
317:21,22
internal 41:17 42:4
93:8

internally 48:11
Internet 210:19
232:8 234:11
246:12,15 253:22
305:6 356:11
357:7,10,14,22
358:17
interpose 27:10
interpretation 17:1
247:13 319:9
interpreted 320:5
interpreting 17:22
interrogatories
62:7,15,16
interrupt 24:5
interrupted 23:17
interrupting 85:16
219:14
interruptions
109:25
intervention
176:17 177:3
interview 26:14
59:4 94:16,17,20
94:21 147:20
249:25 250:14
332:18
interviewed 14:15
15:13
interviews 42:20
90:6
introduce 303:8
introduced 21:23
introduction 33:15
inventory 8:24
31:25 37:16 43:12
58:18 177:25
investigation 6:3
41:17,25 63:16
71:1 138:17
150:11 152:9
154:5
investigations 64:8
81:12,14
investigative 71:4
investigator 60:15
149:24 151:15

152:4 315:9
326:16 329:1
333:3,4 339:6
345:23
investigators 42:4
81:16
invitation 354:13
invite 354:11
involved 43:6 52:22
74:10 77:17 80:25
83:20 84:2 96:17
119:9 184:8 189:1
191:19 228:24
231:3 236:19
246:11 259:3
involves 6:9 306:4
308:6
involving 14:4 52:6
52:13 79:8 82:10
83:6,14 267:7
272:4 279:8
280:13 284:19
307:18
iPhone 84:15,19
irony 180:22
irrelevant 183:21
issue 47:3 97:23
142:8 151:25
154:10 156:5
159:15 160:13
162:17 220:18
265:4,7,10 267:14
309:8,10,11 312:3
330:21 338:24
issues 10:10 15:19
16:21 17:4 18:5
95:18 108:10
119:9 164:7,7
190:4 203:19,19
204:12 222:21
269:16 288:7

J

J 76:18
jail 75:21
James 150:22
154:23

jetlag 154:20
job 6:6 57:10,11
72:14,22,22,24
73:9,11 78:8,9
269:4,5
jog 38:13
jogging 166:19
169:9 170:5
171:13,21
John 72:18
join 102:5 157:17
235:18 266:21
286:25 298:18
309:25 347:3,17
358:7,14,15
joinment 358:10
joint 57:23 58:4
joke 261:19
jokes 258:5
Joseph 60:14
judge 47:3,3 74:7
77:6 336:23
judgment 164:20
165:22 222:4
judicial 338:2
July 93:25 94:7,8
jump 287:6
jumps 64:11
junctures 294:4
June 93:25
jurisdiction 72:6
119:25 280:17
jurisdictions 252:4
justice 80:19 286:1
justification 255:12
258:18,21,24
259:20 260:2
266:18 276:17
280:21 290:18
292:3 293:19
320:10 337:11
346:23
justifications 255:7
justified 31:12
117:20 224:15
271:4 293:14,18
295:19 297:13

346:10 348:24
349:2
**justify** 294:15
346:5
**Justifying** 259:23
**juvenile** 78:16

**K**

**keep** 5:8 12:3 29:19
32:4 35:3 37:20
60:12,20 84:13
85:15 105:17
143:21 190:18
199:2 258:5
264:14 279:18
312:19 315:13
321:10 337:1
338:7 349:5
**keeps** 348:14
**Ken** 1:15 3:2 5:2,18
60:2 254:9 361:5
361:18,21
**Kenneth** 4:5 69:1
142:23 223:14
312:16
**kept** 144:4
**kick** 215:14 216:11
**kicked** 215:9,11
296:19
**kid** 299:10 307:9
307:10
**kill** 121:24,25
122:1 174:15
288:10 296:10,11
296:12 297:2
298:1,2 316:14
320:9
**killed** 51:21 161:1
177:13 260:9
**killing** 166:18
259:23 271:4
294:16
**kills** 117:5
**kind** 6:20 28:19
52:16 54:4 66:11
82:6 89:8 92:18
98:11 101:16

131:3,4 133:24
138:5 153:9,13
175:23 206:17
213:17 231:20
236:18 245:5
256:6 257:15
276:15 288:2,6
316:5 358:9
**kinds** 35:8 165:12
239:10 348:15
**kit** 359:8
**knee** 108:24
**knew** 95:10,24
294:20 325:5
339:9 343:22,24
345:10 348:2
**knife** 186:24
187:14 188:15
301:8,17
**Knock** 210:7
**knocked** 32:8
**know** 14:20 16:8
19:15 21:16 26:22
27:19 28:5,6,13
31:2,4 34:5 38:11
38:25 40:18,23
42:14 43:18,24
44:1,4,7 50:14,17
54:25 55:20,20
56:9 57:4,20 60:5
60:18 61:16 62:8
66:25 67:7,25
68:2,12 71:18
72:3 77:22 78:4
80:10 82:20 83:19
84:7,19 88:15
93:22,23 95:9,25
96:1,24 98:2,7
99:14 101:6,9
103:1 108:21
109:3 110:15,22
111:12 112:10,17
113:5,8,10,11
114:9,15,16,16,25
115:16,20,23
116:1 117:13
118:13,17 119:6

122:2 123:24
125:17 127:6,17
128:13 129:7
130:18 132:1,9,16
133:11,14,16,19
134:15,18,18,24
135:24 137:16
141:19 144:8,24
144:24 145:15,16
146:9,23 147:15
150:19 151:8
153:17,18 154:24
155:7 158:16
160:6,17 161:14
161:19 164:11,18
164:19 169:3
171:4 172:19,25
173:3,8,9,12,13
173:13,19 174:4
175:22 176:2
177:22,25 178:3,3
178:4,4,25 179:17
180:13,15 183:5
183:20,20 185:23
186:5,19,20
189:19,20 190:9
192:10,13 193:6,7
193:23,24 194:25
201:9 205:13
207:3 209:20,25
210:1,2,9,11
222:1 224:2,9,12
224:24,25 226:14
226:14,19,24,24
227:2,4,5 228:8
228:23 231:7
237:21,22,24
238:1,2 243:6
244:23 247:5
248:7 250:14,18
252:4 253:9
254:22 256:1
259:10 262:19
265:11,14 266:2,3
267:22,23,24
269:13 270:18,23
273:17,17 278:17

279:3,23 285:9
287:14 288:13
296:16 298:7
300:13,25 306:20
308:17 310:24
315:23 316:10,12
316:12 318:9,9,19
319:2,21 320:4
321:23 322:16,19
323:15,17,19
324:7,22 326:9,12
329:18 330:14
332:15,24 333:1
333:12,19 334:23
337:14 338:12
339:11,16 340:15
346:1,7,14 347:13
348:6,14 350:5,17
356:15 358:13
361:6
**knowing** 164:5
**knowledge** 14:22
14:24 38:8 42:11
145:13 337:21
**known** 96:8 234:12
302:17,18,18,21
328:17 357:5,12
357:20
**knows** 290:16
**knuckles** 84:11
**KRW** 253:25
256:15 359:25

**L**

**L-e-x-i-p-o-l** 56:13
**La** 21:19
**labeled** 86:18
216:16
**lack** 222:5
**lacking** 218:20
**Lake** 1:20,22 4:8
5:21 74:5,6,16,19
74:22,24,25
**landline** 161:13
**language** 261:12
262:25 266:25
272:15,22,23

277:3,4 286:5
307:11 308:11
310:10,11
**laptop** 253:10
**large** 41:16 76:24
**largely** 263:23
**Largest** 70:6
**late** 263:10 313:12
349:7,8
**Latimer** 77:9
**launch** 301:17
**law** 2:3 6:18 12:9
12:12 15:21 17:1
17:24 28:24 42:20
45:12 53:7 54:23
55:16 56:16 69:9
71:6 74:7,17
75:15,16 76:3,10
76:11,17,18,24
77:2,8,10,11,13
77:14,16,18 82:25
96:9,13 107:24
108:16 110:6
112:3 120:3,12
130:23 144:25
145:1,5 175:10
181:22 182:4
195:24 225:6,21
227:3,5 230:20,25
256:5 257:15
261:13,14,15,16
262:15,15,17,21
263:4,14,14,15,18
265:19,19,20,25
266:1 267:13,13
269:6,15,15,21
273:12,13 274:16
276:11,19,20
277:11 279:14
280:20 282:7
283:7,15 284:3,11
284:15 286:3
293:19 302:19
305:7 320:10
336:4,9 337:10,20
346:23
**lawfully** 144:13

lawns 170:15
laws 265:18
lawsuit 30:8 79:17
  281:14
lawyer 76:21 80:21
  88:2 172:4 332:10
  332:17,24
lawyer's 88:1,1
lawyers 83:11
  99:15 119:17
  172:4 310:20
layers 109:14
Leach 253:8,8
lead 78:19 107:23
  290:4 330:24
leading 46:18
learn 310:17
learned 98:16,17
learning 84:17
  275:24
leave 67:9 135:10
  188:22 238:25
  255:21 273:4
  287:25 352:17,21
  352:23 353:4,15
  359:4
leaves 137:5 197:12
led 285:19
left 141:9,22 142:9
  143:9 201:14,17
  213:23,24 223:8
  250:4 273:23
  292:16 338:8
  354:23 355:2
  356:22
leg 324:22
legal 2:19 31:3
  57:11 70:24 76:20
  76:23 105:2
  144:20,22 145:6
  251:13 252:3,21
  255:11,13 260:1
  269:17 271:12
legality 203:19
legally 30:22
legislative 71:7
legislatively 75:3

legitimate 252:6
length 189:25
lengthy 191:14
  354:16
let's 9:12 18:22
  23:25 40:25 43:12
  46:15 47:8 59:23
  66:3 82:23 90:19
  92:3,20 94:23
  99:20,22 102:3
  113:24 115:14
  120:2 123:14,21
  124:1,2,3,22
  126:8,25 132:20
  147:9 152:2 154:9
  154:21 166:4,11
  173:21 174:24
  178:5 181:1 194:2
  196:23 197:22
  210:4 211:15,24
  211:24 219:17,19
  232:16 242:10
  243:15 248:2
  252:25 253:18,18
  255:23,23 256:18
  261:4 262:1 273:4
  275:6 277:19
  279:4 281:10
  292:8 305:17
  320:23 337:7
  338:6,13 343:11
  349:3,3,3 356:4
lethal 104:18
  177:13 180:22
  250:20 251:6
letter 18:24 19:7
  35:17 48:17,18
  49:13 60:14
  277:12,13 285:19
letting 316:9
level 165:25 262:18
  306:9
levels 70:17 109:12
  205:1
levity 258:12
Lewinski 179:11
  179:12 180:2

181:5,6,13,20
183:6,14 184:1
189:18,21 192:10
195:1 197:17
203:4,6 205:7
209:15 210:3,13
224:19 225:4,14
229:5 230:19
234:19 236:23
239:17 246:17
247:18 357:14,17
Lewinski's 193:20
210:16 228:5
234:10
Lexipol 53:13
  56:13,15 57:16,22
  73:17
Lexipro 56:12
liability 56:22
  150:10 257:13,23
  257:25 258:20
  310:9
liable 307:7 310:4
licensure 81:20
lies 310:4,8
Lieutenant 178:14
  179:7,13,15,21
  185:5,10,23
  188:24 189:15
  300:1
life 254:24 316:13
  320:8 325:6
  326:21 328:23,23
  351:14
light 107:15
likewise 42:9
Lilley 2:3,3 3:3
  4:12,12,21,25 5:7
  5:12,15 8:13 10:3
  10:7,9 22:22
  23:16 30:1 32:13
  33:24 34:4 35:15
  38:2,22 40:12
  43:1 45:17,19
  46:11,14 57:1
  59:6,11,14,17,20
  59:21 60:7 65:16

65:20 66:1 68:19
69:3 84:14 85:6
85:14,19 87:15,19
88:8 94:12,14
98:9 99:13 100:15
101:8,13 102:2,10
103:21 104:1,6,9
104:13,16 106:4
106:15,20 108:5
109:2 110:16
111:23 112:8,12
113:23 117:15
118:1 119:7
120:22 121:6
122:5,11,14,15,19
122:25 123:3,8,9
123:12,13 124:21
129:12,16 130:2
130:14 132:24
133:3 134:5
135:20 136:15,22
137:23 138:20,23
139:3,15 140:4,14
142:15 143:1
151:11,13,18
152:21 153:19
154:8 156:8
157:19,23 158:1,8
161:17 162:24
163:4,11 164:22
165:9,23 167:12
167:16 172:11
173:4 176:3,23
177:1,15 178:11
180:13,24 181:1,4
181:24 185:3
186:6 195:7
198:12,20 199:1,5
199:9,21,23 200:1
200:6,7,20,23
201:2,5,12,16,18
201:24 202:3,7,9
202:13 203:22
204:1,3,4,6,7
211:2,10,20,24
212:3,8,16,20
215:2,3,17 216:4

217:13,18,20
219:2,16,18
220:11,14,21
221:1,3,6,9,21,24
221:25 222:6,9,19
222:24 223:3,9,16
224:11,20 225:1
225:10,19 226:1
226:20 230:3,16
230:18 233:12,21
234:18 235:20
236:9,13 237:12
238:24 239:1,8,14
239:21,24 240:2
240:12,15,19,24
241:12 242:4
243:8 244:3,18,20
245:9,14 246:3
247:7,16,23 248:1
248:5,20 249:4,22
250:10 251:1,10
251:15,19 252:8
252:15,22,25
253:5,9,12,17
255:5,18 260:5
261:6 264:9,13,19
264:25 265:3
266:7,23 267:14
267:18,21 268:2
268:11,13,18,21
268:23 269:2,5,7
270:14 272:1
273:16,23,25
274:2 275:18
276:1,8,12 278:18
278:24 280:1
282:1,8 283:6,14
283:17,22 285:7
286:23 287:2
289:17 291:1
292:6,15,19 293:3
293:6 294:10
295:10 297:3,11
298:11,19 303:2
303:20,22 304:1
304:22,24 306:11
306:24 309:12

310:16 311:9
312:1,8,18 313:7
314:20,24 315:2,4
315:15 317:18
318:7 320:7,13,16
322:10,21 323:3
325:16,21 326:14
327:1,6,10,16
330:3,9,16 331:4
331:11,14 332:1
332:16 334:2,24
335:20 336:1,8,13
336:20 337:2,7,8
337:15,23 338:4
339:18,21 340:1
341:3,17 342:9
343:8 344:8,11,20
345:4,21 346:12
347:5,8,13,16,19
347:20 348:1
349:18 351:11,21
352:8,16 353:7,11
353:14,19,23
354:6,25 355:17
356:4 357:2,8,20
358:4,9,13,22
359:2,20,23 360:1
360:2,5,7
**limit** 201:22,24
**limitations** 205:5
**limited** 73:25
107:20 228:20
239:4 284:24
**limiting** 290:23
**line** 93:7 225:15
286:18 291:18
317:11 325:9,18
338:15
**linear** 129:24
130:12 167:23
285:21
**lines** 175:1 301:25
339:2
**list** 93:12 256:23
**listed** 64:8 93:14
**listen** 17:25 33:19
162:21 189:12

**listened** 156:14
**listening** 171:10
**lists** 14:9
**lit** 124:17
**litigation** 47:21
80:25 82:25
**little** 32:2 38:13
72:13 92:3 105:6
142:16 152:2
167:5 182:14,22
190:10 213:9
221:14 235:15
253:4 258:4,12,13
261:19 299:10,14
304:13 312:10
313:9 316:7
320:19 349:4
**live** 59:4 169:24
170:19 172:3
255:9
**lived** 96:19
**living** 246:16
**loaded** 107:14
187:13 194:18
294:21
**location** 155:14,16
**log** 154:23
**logic** 170:11,12
171:6 175:25
**long** 24:15,17 57:2
57:6 69:8,9 113:1
119:24 126:23,24
127:5 139:5,22
149:19 151:24
163:16 168:3
188:9 248:8
273:23 312:25
333:11,16 334:1
338:17 354:8
**longer** 113:25
116:2 183:19
188:1 199:3 274:9
312:10
**look** 9:4,17 10:17
11:18 16:15 19:4
32:2 35:4 36:7
40:3,11,25,25

42:25 46:15 47:8
48:1 49:5 51:7,12
62:9 63:4,20
84:10,23 86:7,8
89:21 92:3 93:21
99:23 113:24
123:14 124:4
136:9 143:12
147:9 148:5,8
154:18,21 155:1
158:10 161:10
166:11 170:23
196:14,16,24
204:13 210:4
211:13,18 213:1
213:12 214:19
216:14 219:17
220:25 221:17
223:17 233:13
238:9,13 240:16
243:9,14 244:12
253:23,24 255:23
269:14 272:11
275:6 277:19
279:18 299:5
312:21 313:14
315:5,11 321:6
327:22 338:13
349:15,23
**looked** 9:19,24
10:16 19:11,20
28:7 36:8 39:24
39:24 40:14,16
41:20 65:15 86:6
93:15,19 123:16
140:6,6,7 147:25
177:7 197:4,6,8
251:2 270:18,20
270:22 282:5
317:13
**looking** 10:22,23
11:4,14 12:7,20
12:23 15:20 20:17
32:14 83:13 89:24
95:3 108:24 210:9
217:1 253:14
279:5 288:23

313:19 320:5
321:9,10 334:19
335:7 345:7,8
**looks** 12:8 213:17
254:3,7 255:24
256:20
**loose** 136:3,6
166:15,23 168:17
**Los** 225:12 285:17
**lose** 328:22
**losing** 328:23
**lost** 35:9
**lot** 18:1 23:4,14
63:24 64:2 131:21
131:22,25 148:16
180:9 185:14
244:10 329:14
352:24
**lots** 164:6 264:17
**loud** 20:10
**Louisiana** 264:4
**love** 261:21
**low** 107:15 120:21
243:10,18 244:6
**low-light** 124:13
**lower** 344:16
**lug** 356:7
**lumped** 89:8
**lunch** 5:10 92:19
92:20 123:20
142:21 143:2

**M**
**MacVane** 20:24
68:10 93:18 153:2
153:8 154:1 215:8
**MacVane's** 358:20
**Madam** 5:7
**mag** 343:15
**magazine** 135:3,4,6
185:6
**magazines** 135:2
**magnifying** 221:4,5
**Magnum** 109:13,19
314:3
**mail** 58:2
**main** 78:8

**Maine** 1:2 2:5,10
2:16 16:4,8,10,20
17:15,15 18:4,18
18:20 43:23 47:23
54:25 63:8 72:10
86:22 91:7,14
93:14 131:2
144:24,25 264:1
282:6
**Maine's** 270:23
**maintain** 76:6
114:19
**major** 56:25
**majority** 119:22
301:14,14
**makers** 129:2
**making** 167:4
188:15 205:16
223:1,3 252:19
267:1 269:17
308:22 336:21
347:8 355:9
**male** 302:1
**man** 25:1 132:25
132:25 139:6
160:17 163:6
177:13 181:12
236:8,19 238:7
244:24,24 246:10
260:9 265:23
271:3 292:8
296:10 301:7,8
**man's** 164:5,14
330:20
**management** 56:15
56:19,25 57:14
**maneuver** 112:3
**Mangino** 1:9 3:10
4:6 9:16,23 14:5
14:12 15:17 21:2
21:18,23,24 26:23
27:10 29:8 30:4
30:10 31:10,15
38:6 40:19 42:13
43:11 49:17 61:9
62:5 93:18 94:17
95:5,11,22 96:18

97:24 98:15 100:3
102:18 106:10
114:3,9,14 117:5
117:19 118:24
121:8,10,10,17,24
123:14,22 124:7
124:25 126:10
128:2 132:17
134:7,24 135:13
136:24 137:4,9
138:18 139:5
140:11,23,25
141:17,23 142:2,4
143:16,21,23
144:6 147:12
148:1,1 149:18
150:9 151:23
152:24 153:3
154:3 155:16,22
166:13 167:7
168:2 175:10,25
176:24 177:2
178:13 214:2
216:19 217:2,11
218:8,17 219:5
220:9 222:2
237:16 245:2
248:9 250:6,17
271:18 289:9,12
291:5,6,8 292:12
293:14,18 294:15
294:18,24 295:2
297:5,15,20,22
298:22,22,24
313:3 314:8
315:10,24 316:20
324:1,6,15 326:13
327:21 328:11,17
330:24 331:11
332:7 338:8 342:5
343:1 346:16
348:8,8 361:1
**Mangino's** 13:9
14:11 29:16 43:15
67:4 86:12 121:20
135:17 149:19
151:24 219:23

248:22 290:15
295:4 313:14
332:23
**Mankato** 179:10
181:15
**manner** 84:4
167:13 255:10
**mantra** 185:14
186:15 245:6
**manual** 9:21 93:2
135:18
**manuals** 56:16
**March** 299:22
300:1
**Marchesi** 2:8 4:15
4:15 8:2,4 10:6
21:17,22 22:16
26:21,22 27:14
29:7,10,14,19,22
30:2,11 31:21
33:23 34:3 35:12
38:19 40:8 43:17
43:20 44:7 45:4
45:13,25 47:20
48:18 49:14 50:3
50:4 56:23 57:25
59:7,12,16,18
60:2,6 84:3 85:2
85:12 87:16 88:3
94:9 98:5 99:10
100:14 101:5,12
102:5 103:20,24
105:22 106:13,18
108:3 109:1
110:13 112:4,11
113:19 117:8,23
119:1 120:8 121:3
122:4,9,13,15,20
123:2,7,10 124:20
129:11,15,21
130:9 132:23
133:1 134:3
135:15 136:11,21
137:17 138:19,22
138:25 139:9
140:12 151:9,17
152:20 153:16

154:6 156:7
157:17 161:15
165:7 172:24
177:14 180:11,17
181:10 184:22
186:3 194:24
198:9,20 199:5,8
199:20,22,25
200:6,20,24 201:3
201:9,15,22,25
202:5,8,12 203:21
203:24 204:3,6
211:8,16 212:2
217:10,16,19
218:19 219:12
220:7,13,17 221:1
221:6,10,25 222:7
222:16,23,25
223:2,4 224:7,18
224:22 225:7,17
225:22 226:13
230:2,5 233:8,19
234:17 235:18
236:3,11 237:11
237:20 238:23
239:1,13,18,22
240:11,14,18,22
241:1,18 243:5,24
244:17,19 245:8
245:11,16 247:3
247:21 248:3,13
249:3,17 250:9,24
251:14,17,24
252:13 253:3,7,14
255:1,14 261:5
264:23 266:5,21
267:12,17,19
268:1,7 269:4
270:8,10 271:12
271:16 275:14,22
276:7,11 278:16
278:22 279:22
281:23 282:3
283:16,21 286:25
289:14,24 290:21
292:4,13,18,21
293:24 295:5,7

296:15 297:8
298:5,18 306:10
306:21 309:6,23
311:4,23 313:6
314:14,22,25
317:14 318:6
320:3,12,15 322:7
322:17 323:2
325:12,20 326:10
326:25 327:5,8,12
330:2,6,12 331:3
331:9,12,15
332:13 333:18
334:22 335:19,22
336:6,10,18,25
337:5,14,17,25
339:17,20,23
340:24 341:10
342:3,22,24 344:7
344:10,13,25
345:16 346:8
347:3,6,15,17,25
349:16 350:7
351:10,18 352:7
352:20 353:9,13
353:17,21 354:12
355:2,23 356:25
357:3,19,25 358:5
359:8,13,21 360:4
360:6,11
**Marchesi's** 18:25
31:20 58:3 84:8
**Marginal** 2:15
**Marion** 93:18
**mark** 72:18 219:18
**marked** 154:10
219:19 222:15
253:20 264:16
359:11
**marks** 68:22
259:18,20
**Mars** 246:16
**mass** 302:22 303:1
334:6,11,13,14
**match** 203:5
**matches** 203:3
**material** 13:9,11,14

14:6,21 16:16
19:8 27:22 28:1,4
28:6 66:12 352:24
**materials** 16:13
17:6,18 36:17,23
60:17 109:15
256:9,12 263:13
**math** 233:22 234:7
345:1,7
**matter** 4:5 8:11,15
43:7,8 44:13
47:20 49:21 77:17
80:1 88:7 164:1,8
166:9 228:22
288:17 299:23
301:10 326:8
350:22
**matters** 43:24
160:6 173:12
**maxim** 178:14
**maximum** 105:8
189:16
**Mayo** 300:14
**Mays** 300:14
**McDonald** 305:22
**McKenney** 1:4,4,5
1:6 4:6,13,14 20:2
31:12 46:19 98:15
98:22 100:1,3
101:25 103:15
105:21 107:23
108:25 110:9,20
115:16 117:6,20
118:10 121:9,10
121:16,17,22
124:9 136:24
137:4,12,13 138:3
140:9,24 141:5
143:15,18 144:4
147:13,25 148:2
149:18 150:12
153:3 155:12
161:9,12 166:15
168:9 173:6
175:23 176:9,20
214:3,16 215:10
216:1,22 218:1

219:6,10 235:25
248:11,22 249:11
250:1 251:3,5
281:21 282:7
290:2,6,10,11
291:4 292:8,11
293:2,21 294:4,14
294:21 295:16
297:14,20 298:21
303:15 310:2
317:8 321:16,20
323:23 324:2
340:21 341:1,7,13
341:20,25 342:7
342:14 343:5
350:14,18 361:1
**McKenney's** 118:5
170:21 215:5
295:3 304:8
**McKenneys** 172:16
**mean** 6:11 18:8
34:5 40:24 53:1
54:2 74:11,12
79:14,16 86:5
87:9 92:10 99:7
99:14 101:14
103:8 105:10,12
106:23 108:11
112:13 116:19
119:12 124:15,16
130:18,22 133:22
144:12 146:18,20
151:19 155:16
167:17,18 168:11
175:22 182:23
186:7 204:22
207:16 227:7
232:2 243:23
248:21 249:8
260:22 262:12
263:25 270:18
277:9 280:15
291:21 300:8
312:20 319:2,5,7
319:25 320:5
329:16 335:24
338:18 344:19

347:21
**meaning** 31:15
42:3 130:24
251:11 260:3
301:20 316:20
339:7
**means** 54:20 75:11
119:13 150:24
154:24 237:15,22
243:20 246:12
248:25 258:19
297:18 334:17
351:15 358:14
**meant** 47:16 81:15
195:21 262:13
280:18,20
**measure** 281:13
**measured** 229:12
281:16
**measurements**
168:1 232:12
**measuring** 191:1
**measurment** 214:6
**media** 19:3 33:2
**medical** 204:24
**meet** 275:12
**meets** 195:20
346:22
**Mel** 196:15 226:22
**Melvin** 20:2 32:23
**member** 76:11
77:15 162:20
**memoranda** 36:16
**memorandum** 84:1
**memorialization**
84:1
**memorialize** 36:16
**memorialized**
35:13 37:5 153:6
**memorize** 274:17
275:7,20 276:10
278:20
**memorized** 40:6,14
274:10 275:3
**memory** 34:21,22
36:19,25 38:13,14
38:23,25 49:16

51:16 52:1 248:18
330:1,5 331:2,6,7
331:19 350:3
**mental** 97:4 163:7
164:7 165:2
**mentally** 96:13
**mention** 134:18
**mere** 120:18 121:4
344:15
**merely** 307:8
**merit** 74:4,4,6,20
74:20,21
**mess** 15:15
**message** 321:12
**met** 45:1 227:1
253:8
**metadata** 20:14
**method** 203:10
208:22,23 209:1
**methodology** 195:9
**methods** 216:10
285:22
**Michael** 151:7
**microphone** 32:8
**middle** 129:19
174:23 175:9
305:19 315:23
**mile** 170:14 322:1
**military** 175:12
335:8
**milliseconds**
233:23 234:1,4
**mince** 99:15
**mind** 51:15 59:18
64:10 67:2 158:17
218:12 224:25
290:15 295:14
300:23 303:21
325:18 337:6
351:16
**minds** 293:1
**mindset** 325:25
**mine** 88:14 212:11
254:8 306:25,25
**Mine's** 148:16
**minimized** 205:17
**minimum** 90:8,9

204:17,19,21,23
**minute** 46:15 103:6
189:8 212:4,7
249:15 311:8
**minutes** 24:17
44:19 65:21,24
66:5 88:11 113:9
137:14,21 138:17
139:20 140:3
149:14 201:14,17
211:23 213:14
215:1 248:12
273:24 291:10
304:21,23 312:22
354:9,23 355:2
**misapprehending**
223:5
**miscellaneous** 59:1
**Mischaracterizes**
106:14 339:22,23
**mischaracterizing**
268:9
**misconduct** 78:18
81:25 82:3
**misdemeanor** 78:6
78:15
**misled** 179:23
**mispaginated**
232:22
**misperception**
331:19
**misread** 220:3,12
**misreading** 179:4
281:23
**misrepresenting**
218:20
**missed** 253:12
350:4,5
**missing** 289:8
297:6
**misstates** 106:14
108:1 138:25
139:10
**misstating** 111:22
243:11 298:5
**mistaken** 142:4
**misunderstood**

209:4
**mitigate** 96:16
97:12 125:14,20
125:21 126:13
128:5
**mitigation** 128:23
**mitigators** 129:2
**mix** 193:4
**Mm-hmm** 17:8
172:6 258:3
261:22
**mobile** 60:24
**model** 287:13,15
**modifications** 65:9
65:14
**modifies** 66:9
**modify** 209:24
**moment** 4:21 9:18
9:18 10:15,18,20
19:5 43:13 47:12
49:5 50:23,24
89:23 97:19
111:14 146:11
159:21 217:7,8
218:4 240:4
292:22 306:13
313:17 326:13
329:24 331:1
346:17 348:7,7
350:11
**moments** 41:23
331:23
**Monday** 281:15
**Monica** 181:8
**month** 185:9
**morning** 5:16 28:7
44:19 167:21
168:15 281:15
**motion** 218:2 233:4
233:5
**motives** 207:4
**move** 99:20 124:22
142:15 154:9
173:21 178:6
248:2 281:10
320:19 349:4
**moved** 7:17,20

117:2 142:12
173:6,13 338:12
**movement** 207:15
229:11 233:5
**movements** 191:2
**movies** 334:8
**moving** 142:5
174:21 193:14
320:23
**MSNBC** 127:8
**multiple** 109:14,20
191:22,23 271:16
294:7
**municipal** 70:18
74:8
**municipalities**
70:13,14 74:25
**murder** 72:7
254:25 255:4,10
255:13
**muscles** 207:1,13
207:14
**music** 20:10,12
33:10,17 200:17
**musical** 33:15
**Muslim** 296:18
**mutual** 75:1
**mutuality** 58:9
**MVR** 154:23
**Myers** 313:20

**N**

**N** 2:1 3:1 4:1
**Nah** 145:3
**name** 4:12,15,17
5:17 53:12 62:2
132:3 193:10
229:4 241:11
333:4 362:19
**named** 56:12
**names** 4:10 357:21
**nanoseconds**
290:17
**narrative** 245:19
**narrow** 107:15,17
260:2 315:13
**national** 175:20

177:10 262:18
**nationally** 270:7
**native** 20:7
**nature** 26:2 41:1
84:1 96:4 129:18
177:18
**nauseam** 281:20
282:5
**near** 344:17
**nearby** 97:9
**nearly** 291:10
**necessarily** 54:7
57:21 144:6
147:19 255:4
319:10
**necessary** 262:4,5,9
267:4 274:24
275:12 358:3
**need** 9:2 10:3,7
15:8 36:5,7 49:9
58:15 59:6 67:22
67:25 150:4 205:3
205:5 221:20
222:11 247:17
312:25 333:12
354:20 358:2
**needed** 30:17
197:15 325:5
339:9 340:14
**needs** 197:14
**negotiator** 162:19
162:21,22 163:1
**neighbor** 173:16,17
**neighborhood**
24:16 170:4
250:12
**neighbors** 166:18
169:9 173:14,16
**neither** 160:25
**never** 39:15 57:4
78:15,16 79:16,16
80:20 81:25 82:3
95:17 110:20
125:17 127:6
131:6,6 136:24
137:4,4 140:10
161:4,6 162:25

163:2 176:8 178:2
213:2 227:9 230:6
295:14 297:5,14
301:3 303:21
332:9 337:5
**Nevertheless** 8:10
**new** 72:10 77:6
84:15 259:22,22
286:9 288:4
**Nicholas** 1:9 3:10
4:6 9:16 61:9
62:5
**night** 355:1
**nine** 140:3 250:7
292:8 307:9
**Ninety-four** 212:24
**Ninety-one** 234:2
**Ninth** 305:24 308:2
308:3
**nitpick** 124:3
**NM** 315:9
**nobody's** 211:17
**Nods** 100:9 113:18
147:6
**noise** 208:15
**noisy** 352:18
**noncareer** 72:23
**nonchalantly**
141:23 142:10
249:13 289:10,20
324:17
**noncompetitive**
55:12
**noncompliance**
291:11
**nondeadly** 52:5,10
52:11
**nondisclosure**
54:11 55:12
**nonexhibit** 355:15
355:25
**nonharm** 54:12
**nonlegally** 260:4
**nonlethal** 25:18
52:15 104:3
**nonpartisan** 72:23
**nonpolice** 43:6 95:6

96:3
**nonresponsive**
291:11
**nonsubstantive**
222:21
**nonsurprise** 19:14
**nonthreatening**
191:4
**Nope** 338:25
**norm** 134:13
**normally** 193:19
**Northeastern** 72:10
**Notary** 361:24
**notation** 359:25
**note** 95:5 154:13,17
**noted** 83:21 222:8
233:9 235:19
361:7
**notes** 34:11,11
36:15 38:24 64:13
83:25 84:13 94:24
349:19 359:22
362:14
**notice** 63:2,7,21
**noticed** 65:6 88:10
**notions** 27:5
**November** 1:17 4:9
19:9 32:23 73:22
361:2
**novice** 241:7
**nuance** 99:8,9,12
124:17
**nuanced** 124:3
**nuances** 146:16
**number** 21:24
34:15 41:19 48:20
61:11,11 70:17
71:8 74:24 81:9
96:15 97:11
109:11 119:4,8
135:12 161:7,9,10
161:13 168:13
171:20 174:16
181:12 187:3,16
193:15,23 203:6
203:18,18 204:12
205:3 208:21

212:18,23 214:23
216:6 226:15,15
246:9 249:14,15
249:20 256:8
266:11,13 285:19
285:24 290:12
294:1,3 295:6,8
295:15,21 299:7,9
299:11 301:1,3,11
302:10 313:17
323:25 327:20
334:16
**numbered** 214:21
214:22
**numbers** 304:20
360:13
**NV** 361:2

**O**

**O** 4:1
**o0o** 1:3 4:2
**oath** 362:12
**obey** 266:17
**object** 22:16 40:8
45:13,24 102:1,4
103:24 104:4,14
105:22 106:13
111:21 112:11
113:19 117:9
120:8,9 122:9,11
123:5 124:20
138:19,22 139:9
140:12 145:22
151:17 156:7
157:15 161:15
162:15 163:3
164:15 165:8
167:11,15 172:10
186:3 215:16
216:3 217:10
218:19 224:7,22
235:17 240:20,22
240:25 245:8,11
251:8,9,12 252:13
252:16,18 268:8
270:9 271:12
286:22 292:4

309:23 337:14
346:25
**objecting** 112:13
217:17 222:16
230:5
**objection** 8:4 29:22
33:23 34:3 35:12
38:19 40:8 56:23
84:3 85:2,12,15
85:18 87:17 98:5
99:10 100:14
101:5,12 103:20
108:1,3 109:1
112:4 117:8,23
119:1 121:3 123:3
123:10 129:11,15
129:21 130:9
132:23 133:1
134:3 135:15
136:11,21 137:17
152:20 153:16
154:6 163:8 165:7
165:20 172:24
176:1 177:14
194:24 198:9
199:23 219:12
220:19 225:7,17
225:22 226:13
230:13 233:8,19
234:17 235:18,19
237:11,20 238:23
238:24 239:22
240:11,14,18
243:24,25 247:3
248:13 249:17
250:9,24 251:14
251:17,23 252:12
252:16 255:1,14
259:25 266:5,20
268:7 270:8
273:15 275:14,22
276:7 278:16,22
279:22 281:23
282:3 283:4,11,16
283:21 285:5
286:25 289:13,14
289:24 290:21

292:13,21 293:24
295:5 296:15
297:8 298:5,17
306:10 309:6
311:4,23 317:14
318:6 320:3,12,15
322:7,17 323:2
325:12,20 326:10
326:25 327:5,12
330:2,6,12 331:3
331:9 332:13
333:18 334:22
335:19,22 336:6
336:10,18 337:25
339:20,22 340:23
340:24 341:10
342:3 344:7,13,25
345:16 346:8
347:4,18,25
351:10,17,18
352:17 354:8
**objections** 104:7
123:1 222:8,9
236:3 241:1
251:18 256:23
268:25
**objective** 286:4,4
**objectives** 245:24
256:19 257:7
259:12,12 275:24
**obligations** 52:25
**observed** 293:2
324:20
**obstructing** 202:9
**obtain** 57:23
**obtained** 161:8,11
205:24
**obviate** 96:16 97:12
**obvious** 47:1
276:13
**obviously** 28:8
43:10 75:21
194:19
**occasion** 78:14
**occasionally** 78:5
**occasions** 123:5
132:15 181:12

187:3 281:8
290:12
**occupation** 5:22
**occur** 139:8
**occurred** 160:25
**occurs** 251:3
**odds** 118:12,14
126:7
**offer** 45:4,21 46:3,7
47:4 337:19
**offered** 57:16 177:9
**offhand** 70:22
**office** 1:10 4:7 9:14
18:25 37:14,24
38:5 39:11,14
48:6,12 59:9
61:10 62:6 71:5
72:1 77:7 93:2,8
148:19 149:5
214:4 223:18
297:24 315:3
338:6
**officer** 5:23 18:15
20:24 25:16 29:4
39:10 51:5,22
56:11 57:17 69:17
70:16 74:4,10,11
74:12,15,21 75:9
75:12,14,14,24
76:3 78:17,25
79:11 81:21 82:2
96:3 102:18,24
103:12 106:9,10
114:15 117:3,5
124:7 125:12
127:18,23 129:5
130:3 133:18
142:3 146:25
150:22 151:22
152:12,25 153:1,2
154:23 162:4
172:5 175:2,15
182:17 183:25
184:3,8 188:14
190:4 191:11
193:5 194:17
195:12,14 198:5

228:2 233:6
234:12,15,24
235:2,2,4,25
236:8 237:4,14,24
238:1 240:8,9
241:23 244:22
249:9,23,23 251:7
258:25 259:4
267:2,3,5 269:8
270:2,4 278:4,5,6
278:6,8 279:6,11
280:10,11 281:15
281:17 283:23
288:4 294:2
295:19,25 301:18
301:18,20,20,21
303:7 307:7,10
310:3,9 318:23
320:14 322:23
337:12 346:6
**officer's** 52:20
81:18 266:17
307:19
**officer-subject**
232:11,24,25
**officers** 6:18,22
10:11 17:16 20:21
42:12 43:6 44:13
45:6 46:21 47:6
50:19 51:11 75:6
75:7,8,17,19,20
75:20,21 79:24
81:7,8,12,24
82:10 83:14 95:23
98:14 100:1,8
101:23 102:8
103:13 105:19
106:2 107:17
108:13,22 110:11
110:21 111:15,19
112:15 114:3
115:6 116:15
124:8,25 125:3
126:4,20 131:1,3
135:25 140:23
155:8,24 159:6
160:9,14,24 161:3

165:2,11 166:15
169:14,19 170:2
170:23 171:22
181:23 185:15,16
185:18 191:19,19
208:25 229:6,10
229:13 234:25
235:5,14 238:12
238:17 282:11,22
283:18 286:4,10
288:14 289:3
290:1,4,11 293:1
294:20 303:6,16
304:7 308:16,17
333:25 334:7,10
341:15
**offices** 2:3 53:11
78:10
**officials** 6:22
**oftentimes** 92:14
133:25
**oh** 19:19 41:14
61:12 75:25 88:23
91:17 119:24
138:15 154:15
179:14,20 192:23
196:4 197:19
203:20 206:24
211:10 219:17
227:18 231:10
232:14,16 267:19
299:12 300:20
304:22 337:2
**okay** 5:22,24 6:5,15
7:4,16 8:14,21
9:12 10:2,17 11:6
11:6,18 12:3,13
12:19 13:24 15:9
19:1,19 21:11,20
22:7 23:22 29:6
31:24 32:6,20,24
33:5,11 34:17,22
35:16 36:5,19
37:3,5,15 40:3,18
41:10 42:14 43:19
44:9 47:8,12,14
48:8,16 49:4,5

52:9 58:21 59:5
59:16 60:6,8,11
60:16,20 61:1,1
61:12 62:4,9 63:1
63:23 65:5,13
66:22 67:10 69:12
69:17 70:1,8,19
71:2,20 72:5,12
72:25 73:4,13,18
75:13,23 76:9,17
76:20 77:2 78:22
78:24 79:23 80:24
81:19,22 83:21
85:15 86:11,15,19
88:23 89:2,14,18
89:20 91:10 92:3
92:4,18 94:6
99:20 100:13
101:9 103:11
104:22 105:14
107:6 108:6
113:24 114:24
115:14,25 116:11
116:20 117:5
122:19 123:12,25
124:22 125:25
127:12 128:2
131:8 132:13,16
134:15 137:6,9
138:15 141:15
142:15 143:10
146:4,25 147:10
147:22 148:18
151:6,21 152:2
153:5 154:1,14,18
154:21 155:11
156:13,19 158:16
159:9,18 160:7,10
160:25 166:4,7,23
171:5 172:20
173:11,21 174:13
176:13 177:5
178:5 179:6,14,20
180:24 184:21
185:13,25 186:7
189:3,10 190:23
191:25 192:16

193:19 194:10,12
197:9 200:16,18
200:20 201:4,9,9
201:18 202:19,21
204:20 207:19
209:22 213:12
215:13 217:18
219:7 226:24
227:14,20 230:2
231:6,18 232:3,21
234:6,9,20 238:6
238:9 242:11
244:9,17 246:4,14
246:17 248:2
249:23 250:13
254:21 255:6,12
255:20 256:5
258:1,9,12,18
260:6,19 263:2,6
265:2,13 266:14
268:1,3 269:24
270:15 272:3,24
273:4,25 275:6
277:19 279:2
280:4 281:1
284:12,16 287:7
287:25 288:10
291:25 294:25
295:11 297:17,18
299:5,13 302:14
302:24 303:3,18
303:21 311:20
312:8 313:18,24
314:2,6 315:19
316:3,24 318:12
318:15 319:1,19
323:7 328:19
333:2 334:12,25
335:5,10 336:2
338:13 340:5,7,12
343:20 349:7,9
354:6 357:8,19
old 132:25 133:6,7
133:8,9,17 168:7
244:24 277:4
307:9
older 277:7

once 21:11 200:17
200:17 205:15
238:12
One's 180:10
one-half 302:6
ones 11:19
online 240:16
open 131:14,24
143:8 148:11
214:8 258:6
352:21 353:4,15
353:18 356:22,23
360:16
operated 179:11
operates 181:16
operating 6:9 37:23
38:4 39:12
operation 333:24
operational 56:16
opine 269:18
opinion 31:10 68:6
89:14 279:19
328:7
opinions 27:2 31:6
31:7 45:4,21 47:4
68:17 86:23 89:15
225:16 327:25
328:4 337:19
opportunity 162:9
196:14,16 202:23
217:11 239:6
354:19,20 355:24
357:6,23,23
opposed 214:13
236:1 260:3
opposite 223:2
308:25 309:16
310:3
option 104:3 105:7
105:20 106:17,23
108:16,20 322:13
options 106:1
oral 55:2,2,4
362:18
orally 54:10
order 42:16 60:10
61:2 76:6 126:13

141:15 189:25
274:11,18 275:20
295:24 357:6
ordinance 75:22
Oregon 21:19
organization 6:8
organize 33:4
orientation 213:7
original 187:5,6
188:17,21,24
220:2,23 302:12
originally 173:6
275:16
originate 63:18
originated 189:16
Orleans 77:6
ought 247:12
276:20 341:16
348:9
outline 14:8 259:11
275:24
outlined 17:18
outlines 16:10
outside 7:13,18
45:15 90:15
111:14 137:13
159:21 176:9
177:16,19 202:17
217:5 264:3
overall 279:13
overlay 242:20
oversaw 81:11
oversee 6:21 71:4
overseeing 81:14
oversimplification
288:21
overtime 80:4,5
overwrought 206:5
206:6
owned 172:15

_____
P
_____
P 2:1,1 4:1 61:6
P.A 2:3,9
p.m 360:18
P.O 2:10
packet 85:8

pad 34:11
page 3:2,8 10:16,24
12:20,23 13:1,2,4
13:6 14:3,7 41:14
48:23 89:9,21,22
90:1,2,3,4 92:22
93:13 94:18,23
95:3 114:2 124:2
124:23,23 143:5,6
143:6,7,8 147:9
148:11,18,24
154:13,16,17,19
154:21,22 157:13
166:5,12 174:21
174:23 176:13,16
178:6,12,18 220:8
232:9,9,15,17,20
232:23,23 237:8
237:13 256:11
261:3 299:7,9,11
304:25 305:18
313:17,19,23
314:6 315:5,12,16
320:22,24 323:7
324:14 327:22
329:1 330:15
332:21 333:2,9
338:5,14 339:2
343:9 349:14
PAGE-LINE 361:9
pages 3:10 9:25
48:20 178:6
196:19 210:18,20
315:12 359:18,23
paid 44:5 87:5,14
357:24
pain 99:7
pale 321:11
pamphlet 236:18
paper 109:22 205:6
205:21 285:17
349:21
paragraph 58:8
84:22 87:1 95:4
98:16,22 99:21
102:15 124:4
143:13,14 149:4

155:6 159:18
163:21,25 174:24
179:23 305:19,19
327:14,15
**paralegal** 18:25
58:3
**paraphrases**
263:23
**parcel** 116:18
**Pardon** 85:25
197:7 201:16
222:24
**parenthetical**
237:22
**Park** 74:7
**parked** 118:9 162:1
**parlance** 56:19
**Parsons** 77:9
**part** 30:25 39:9
46:6 53:5 54:13
73:16 80:13 90:14
90:15 114:21,24
116:2,18 129:23
184:7 212:18
213:16 228:11,12
239:4 257:8
264:20 276:19,20
283:24 285:16
341:16
**part-time** 73:24
**partial** 67:5
**partially** 117:20
**participants**
183:24 184:3
187:4 188:17
205:3
**participate** 41:24
**participated** 14:12
182:24 195:5
238:2
**participating** 26:21
**particular** 6:7
10:12 11:24 14:3
18:20 27:3,4
39:19 73:5 101:23
117:1 132:1
133:19 144:11

151:1 153:6 176:8
189:2,20 219:10
226:4 232:1,7
236:7 237:3
242:21,23 248:18
269:10 311:6
319:5 322:5 348:4
**particularly** 92:6
126:21 160:11
165:1 222:17
343:23
**parties** 314:15
**parts** 13:12
**partway** 100:4,5
**party** 73:6
**pass** 274:12,18
275:20 276:19
**passageway** 124:9
124:11
**passed** 275:5
**passenger** 95:7,20
95:24
**pathologist** 255:3
**paths** 171:21,22,23
172:1
**pathways** 166:20
169:10 170:6
171:14,20
**patience** 142:17
**patrol** 175:11
**pattern** 50:3
103:16 113:13
183:3 285:1
**Paul** 332:20,21
**pause** 153:13
218:16 221:8
253:16 354:5
**pay** 14:2 57:7 80:5
336:24
**paying** 59:15,18
**payment** 87:4
**pbear@wheelerl...**
2:11
**peace** 74:4,9,11,15
74:21 75:7,9,14
75:14 81:12
**peer** 191:14 203:8

203:8 205:21
209:17,21 210:14
**peers** 190:16
205:20
**pen** 34:15 84:12
**penalty** 361:18
**pencil** 216:5
**pending** 355:7
**penetrate** 109:19
**penetrating** 166:17
**pentothal** 180:15
**people** 23:7 26:24
82:25 84:18 95:23
133:24 138:3
169:24 170:19,24
171:13,16 173:23
173:24 174:5
181:23 185:14
192:2,18 193:13
195:25 226:17
235:8 237:1
238:13 241:9
242:19 244:14
245:23 246:8,16
256:6 262:22
276:10 277:25
278:20 287:5,12
298:4,9 300:15
325:5 331:18
332:2
**peoples** 241:25
**perceive** 321:16
**perceived** 308:16
309:24 310:10
351:23
**percent** 250:3
297:1
**percentage** 27:25
**perfect** 167:17
256:2 273:2
298:23 359:24
**perfectly** 200:4
**performance**
181:22
**performed** 300:16
**performing** 53:9
**performs** 232:11

**perimeter** 136:4,7
136:10,18,19,25
137:2 166:15,24
168:16 333:6,10
333:15,20,24
339:10 340:15
**period** 78:12
137:21 139:22
337:13
**perjury** 361:18
**permits** 47:3 82:16
**permitted** 123:4
199:24
**perpetrated** 281:21
**person** 51:19,21
52:20 56:6 96:8
96:10,10 105:21
107:14 110:2
120:6 122:7
127:25 131:7
132:3 133:5 154:2
164:12 186:23,24
187:13,14 190:1,1
190:3 191:2,3,4,8
194:1 196:9,10
226:25 233:16
235:23 237:18
240:7 244:25
245:1 258:19
262:3 266:19
288:19,25 300:12
301:14 303:12
304:5 309:17,18
320:11 346:5
348:10
**personal** 1:5 94:17
94:20 109:17
**persons** 42:21 53:7
97:20 166:18
168:22 176:18
306:3 308:6 309:1
330:23
**persuade** 138:5
**Peter** 2:8 4:15
49:13
**PG** 315:8
**phenomenon** 11:10

**philosophy** 29:2
**phone** 21:17 24:11
30:11 39:2 42:22
59:1,2 94:21
161:6,9 299:25
**phones** 293:4
**phonetic** 61:6,20
**photograph** 3:9
212:21 216:24
217:2,5 294:6
359:17
**photographs** 66:11
86:1,2,4,9,9,11,12
212:17 253:19
**phrase** 31:2 186:15
186:18 187:11
270:13 278:12
322:2
**phrased** 104:19
**phraseology** 338:3
**physical** 100:13
278:8,14 279:8
280:10,13
**pick** 262:7 316:16
**picked** 14:2 215:19
216:24
**picking** 215:20
**picture** 213:15
215:4 216:14,15
216:18,18 217:22
218:1,24 219:23
219:24 221:12,15
229:16,22 238:21
239:15 241:9
243:17 305:2,4,10
**pictured** 237:23
238:7
**pictures** 143:25
220:4 227:16,17
239:11 240:13
247:19
**piece** 131:20 253:4
**Pier** 2:4
**pigs** 235:10
**pile** 61:4
**Pine** 21:19
**pink** 37:18,19

pinpoints 219:5
**Pinto** 80:16
**pistol** 126:25
  127:20 128:16
  131:23 300:3
**pistols** 128:14
**pivot** 168:12
**place** 8:4 32:9
  116:8,22 129:6
  165:22 229:8,13
  234:8 238:17
  342:13,14 362:10
**placed** 163:24
  362:11
**placement** 229:5
**placing** 344:15
**plainly** 141:1
**plaintiff** 51:5 52:1
  52:19,24 55:18
  79:17,18,20,22,23
  80:17
**plaintiff's** 9:8 55:6
  62:6,14 352:23
  354:17 360:14
**plaintiffs** 1:7 2:2
  51:10 52:3 53:10
  82:9,23 83:11
**plan** 45:2 101:24
  102:7,23 103:11
  156:2 157:4
  190:14,14 191:14
**plane** 91:22
**play** 19:16
**played** 20:7
**player** 20:7,10
**players** 133:23
**playing** 20:11,12
  33:17 133:24
**pleaded** 147:12
**pleading** 147:14,17
**pleadings** 37:8 63:6
  63:10
**please** 4:10,20,21
  5:8 13:22 24:7
  42:25 70:5 122:23
  198:23 203:21
  211:19 236:3,11

241:17,18 243:5
249:3 252:15
261:5 306:21
331:14 347:5,5,5
347:13,13
**pleases** 208:3,6
**pleasure** 49:14,20
  91:25
**plenty** 354:7
**plow** 168:7
**plus** 80:7 91:18,19
**PO** 150:22
**point** 9:24 10:16
  27:9 29:7,10
  40:22 49:1,22,25
  62:22 76:9 81:11
  87:5 101:23 103:4
  103:7,8,9 110:13
  115:7 117:2
  131:15 132:1
  134:7 136:12
  140:17 141:20
  142:1 144:3,11
  160:4 161:8
  163:17 173:22
  193:1 195:11
  222:4 241:15
  245:3,20 250:4
  263:17 291:20
  296:6 297:10
  301:6 306:12,14
  308:21,22 309:17
  309:19 315:24
  316:18 317:9,17
  318:14,16,18,19
  318:22 324:1
  325:9 339:19
  340:2 341:1 342:5
  343:3 346:22
  347:2,7 348:24
  349:1,9 350:14
  358:7 359:1
**pointed** 107:21,22
  110:20 111:19
  140:10 141:11,16
  141:21 194:18
  198:5 216:23

217:9 219:11
289:20 297:5,19
298:15,24 303:19
312:5 316:12
319:23
**pointing** 110:10
  111:1 141:5 217:5
  218:9,15,16,17
  219:6 296:20
  297:4 303:12
  304:4,5 306:3
  307:8 308:5,24
  309:1 311:13
**points** 129:14
  132:21 218:1
  241:10 294:1
  295:9,15,22 296:5
  307:12 310:9
  323:25
**police** 1:10 5:23,25
  6:21 9:7 10:11
  16:4,8,11,20
  17:16,20 18:4,18
  18:20 25:12,15
  27:3 29:3 42:1,10
  42:23 44:12 45:6
  45:22 46:21 47:6
  50:19,19 51:5,10
  51:10,22 53:10
  57:15,17,22 62:13
  62:20,25 69:14,15
  69:17,20,23 70:16
  70:18,19 74:12,18
  75:5,6,8,12,24
  78:17,25 79:10,11
  79:24,25 80:3
  81:1,20,24 82:2
  82:10 83:10,14
  98:14 127:18
  133:18 135:25
  146:25 150:22
  151:22 154:22
  155:8 156:24
  160:19 162:12
  164:21 165:11
  168:17 172:5
  175:14 182:16

183:25 184:3
185:15,16 186:2
186:10,11 190:3
193:5 195:12,14
197:25 208:25
209:11 213:4,22
213:22,24 215:13
223:21 224:15
228:1 231:16
234:12 235:3,5,13
235:25 236:8
237:2,3,24 238:1
240:8 254:20
255:8 256:8 257:8
257:14 259:4,13
259:22 274:16
279:11 285:17
287:18 288:4
318:23 319:14
320:14 322:23
329:18 332:9
333:23 337:12
346:6
**policies** 37:22 39:6
  39:13,16,25 57:13
  177:20,23,24
**policing** 74:23 75:2
**policy** 39:18 53:8
  56:16 93:2
**political** 72:22
**pool** 301:16
**pools** 57:14
**poor** 181:12 215:13
  215:13 285:8,12
**popped** 316:6
**populated** 170:16
**portfolio** 86:3,5
**portion** 12:7 14:2
  27:24 67:12,21
  152:8 312:24
**Portland** 2:4,5,16
  91:7,13,23
**pose** 24:8
**posed** 46:23 218:23
  271:9 300:9
**poses** 270:3 272:5
  274:21 275:10

278:7,14 280:9
**position** 7:22 29:16
  29:21 30:7,16,22
  31:2 56:8 66:13
  71:2 77:19,20,21
  108:12,23 116:24
  125:2,6 173:18
  191:4,9 194:6
  202:25 203:1
  213:18 215:14
  218:11 227:21,25
  229:4,5,12,14,16
  231:21 238:10,18
  238:20,20 241:11
  335:2 339:11
  340:16 341:5,15
  341:24 342:6
  343:4 353:18,19
  355:6
**positioned** 117:22
  118:9
**positions** 73:18
  86:12 194:5
**positive** 81:15
  160:21
**possessing** 145:6
**possession** 93:9
**possessive** 28:19
**possibilities** 119:3
  335:25 345:3
  348:4
**possibility** 56:21
  57:5 98:18 108:15
  120:19 121:5,16
  216:13 322:14
  332:6 343:22,25
  344:4,9,15,22,24
  345:11,13 348:3
  356:19
**possible** 59:25
  95:19 119:12
  120:6,23 138:1
  165:3 205:18
  323:6 355:15
**possibly** 116:4
  117:21 121:9,24
  122:1 123:23

250:19 296:10,11
  297:25
POST 81:14
Post-it 154:11,17
postdates 305:5
pot 170:25
potential 55:15,17
  61:14 97:4
PowerPoint 256:1
  257:19,21 272:24
  281:12 299:15
  359:24
PowerPoints
  255:24,25 273:1
practical 70:25
practice 64:14
  77:10,13 96:13
  97:7 162:12
practiced 76:24
  77:8,11,14,17
  78:16
practices 319:16
practitioners
  203:15
preceded 191:13
precedes 196:3
precept 18:8
precise 133:12
  249:20 260:2
  295:12 338:3
precisely 22:3
  24:10 205:4
  288:16 328:2
precision 161:16
preconceived 27:5
predates 30:3
predicated 308:15
predict 296:22
  297:1 298:9
  348:15,18
predicted 341:12
predicting 296:9
  297:22,22 343:4,5
prediction 348:22
prefer 120:25
  201:7 212:12
preferable 165:16

preliminary 30:12
  31:6,7
premeditated
  325:10 351:20
  352:2
premise 252:24
premised 17:21
prepare 156:20
prepared 47:24
  48:5 105:25
  317:17
preposition 10:13
prescribed 266:10
presence 303:6,7
present 2:18 50:23
  50:24 290:15
  300:7 332:11
  354:14
presentation
  254:18 255:25
  260:23 262:15,21
  263:19 275:17
  359:24
presented 95:20
  175:4 254:19
  262:15 287:22
  289:10
presenters 14:9
presents 274:22
  282:22 283:20
preserve 34:19
pressure 304:9
presumably 235:14
presume 38:7
pretend 188:13
  301:8,8
pretty 48:2 65:11
  65:19 74:3 118:6
  118:10,16 130:15
  131:11,20 167:14
  167:17 168:3,3
  172:23 257:10
  261:18 335:16,25
  352:14
prevailed 80:19
prevent 56:20
  262:9 267:4

preventing 267:1
  271:20
previous 50:12
previously 84:4
  87:17 233:8
  235:19 239:23
pride 166:9
primarily 56:16
  57:12 77:11
  285:21
primary 107:13
  354:14
principal 127:2
principally 231:4
principle 18:7
  195:19,22,23
  276:17 301:4
  310:23
principled 203:9
principles 16:18
  17:17,19 18:2,15
  185:18 280:24
print 238:15 239:9
  246:22
printed 36:2
prior 19:9 31:11
  44:19 49:16 82:18
  82:19,21 83:5
  94:3,5,8 122:23
  146:6,10 266:11
  273:7 290:17
  294:20 301:18
  341:25 352:25
  354:19
Prison 272:21
private 60:15 79:6
privilege 57:24
probabilities 119:4
  345:2
probability 118:20
  118:21,23,25
  120:17,19 344:18
  344:21,23 345:14
probable 119:10,12
  119:13,20 120:5
  120:13,14,14,18
  123:23 146:21

231:9 251:4,6,21
  251:21 252:7,9,14
  267:6,10 268:4,5
  268:6,14,19 269:8
  270:2 271:8,13
  272:5,17 275:9,19
  276:2,6 278:6,13
  279:6 280:8,11
  281:1 282:17
  344:12
probably 12:6
  15:14 36:7 61:16
  85:10 91:10 96:14
  122:8 132:18
  134:9 140:2
  148:17 155:5
  189:12 215:19
  216:1 242:16
  243:20 247:4,8
  248:11 253:5
  265:20 287:13
  296:12 298:2
  302:11 312:8
  313:15 334:20
problem 108:7
  173:8,10 220:2
  244:2,4 247:11
  253:12 296:8
  297:21 321:22
  322:3 346:13
  354:14
problems 163:7
procedure 39:18
  47:19 163:14
  164:21
procedures 37:23
  38:4,17 39:4,7,7
  39:12,13,17
proceed 35:3
  211:15
proceeding 58:11
proceedings 221:8
  253:16 354:5
  362:9,13,18
process 27:16
  205:23
processed 321:21

processing 322:5
produce 8:8
produced 35:25
  36:9 83:24 85:22
  88:5 352:24 360:1
product 256:16
Production 9:8
profession 302:19
professional 57:15
  362:6
professor 181:15
professors 345:1
program 179:9
  181:16
progressive 285:20
prohibition 54:4
prohibits 53:8
projectile 109:14
  130:13
promising 312:20
Promote 285:11
promoting 286:8
pronoun 28:20
pronounce 333:4
pronounces 61:21
proper 116:7
  134:15 135:3,16
  319:14
properly 296:1
proposed 203:17
  285:18
proposition 92:9,11
  96:14 126:5
  128:22 133:15
  134:2 165:14,15
  290:22 298:8
  306:23 307:1
propriety 39:20
  45:5 46:20 47:5
prosecute 78:11
prosecuted 78:17
prosecuting 82:2
prosecutions 78:1,7
prosecutor 77:25
  146:24 225:2,12
protect 76:6
protected 73:2

**protecting** 117:7
**prove** 182:19
**provide** 27:2 47:18
  87:12,25 88:4
  129:24 162:19
  238:14 239:3
  247:15 360:14
**provided** 8:6 14:6
  27:2 60:17 65:15
  98:25 230:7
  239:24 243:3
  289:25 352:25
  354:18 358:18,18
**provides** 56:15
  74:23 131:20
  293:20
**providing** 239:19
**province** 337:22
**provision** 54:12
**Provo** 69:20,20,23
  69:24
**provoke** 262:11
**proximity** 118:4
  121:21
**psha** 205:13
**psychologist**
  181:25
**psychology** 182:1
  235:10
**public** 76:6,8 81:10
  282:23 283:23
  361:24
**publication** 191:24
  205:22
**published** 185:6,8
  187:12 234:10
  299:23
**Pulire** 151:7,9,10
  151:11
**pull** 229:7 233:14
  237:14,17 241:6
  244:22 245:2,2
**pulled** 198:7
  242:17,17 296:20
  358:17
**pulling** 195:15
  237:18

**punchy** 299:14
**puncture** 109:14
**pure** 112:5 169:11
  171:19 327:2
**purported** 241:8
**purports** 219:22
  237:8
**purpose** 116:22
  265:23
**purposes** 5:7 32:1
  47:20 114:18
  180:22 246:8
  355:9
**pursuant** 63:8
**pursue** 88:6
**push** 193:13
**pushes** 208:14
**put** 12:4 15:13
  19:16 42:15 58:16
  59:24 60:22,22
  61:3 88:20 104:5
  116:20 119:4
  126:2,8 127:4
  128:4 129:2 130:4
  135:1 137:19
  159:10 180:14
  181:10 212:18
  214:24 223:18
  229:20 244:15
  247:18 262:10
  275:4,16 281:4,18
  290:11,12 293:13
  308:11 313:1
  334:14 350:12
  355:20,20 356:6
  358:16
**putting** 32:8 116:22
  124:15 215:23
**puzzling** 206:3

**Q**

**qualifications**
  128:21
**quarter** 170:14
**quarterbacking**
  281:16
**question** 12:8 17:2

17:23,25 18:10
22:9,12,17 23:20
24:7,8,19,21 25:2
25:17 27:11 36:11
40:15 42:9 43:3,4
45:20 46:1,23,25
47:1,16 64:23
81:1 84:6 86:3
95:17 104:15,19
105:12,23 106:21
106:22 107:10
111:6,8 112:5
120:10 122:10,16
122:24 133:12
136:23 139:10,13
142:7 149:2 150:6
157:2,7 171:12,12
172:12 182:14,22
187:10 198:21
199:4,7,10 200:25
201:4 202:1,6
214:25 217:17
218:19 230:15
240:25 244:17
245:12,12 251:13
252:24 264:8
269:11 274:12
275:3,5 279:24
280:3 284:15
286:13 291:2,14
292:24 293:16
296:7 300:9,13
303:19,24 307:13
309:24 320:24
321:6 324:5
329:25 330:13
331:13,15 340:11
340:13 343:24
345:17 346:16
347:1 353:23
354:11
**question-by-ques...**
  240:23
**questionable** 35:7
**questioning** 100:21
  353:5
**questions** 13:18

21:24 22:1,3,4,6,7
22:12,20,21 23:5
23:13 24:9,12,23
24:24,25 25:25
26:5,5,7,8,9 27:7
27:9,12 83:24
113:1 115:6 124:6
184:23 202:23
221:7 228:3
230:13 257:11
268:15 331:24
352:19 353:8,10
354:20 358:7,25
**quibble** 344:19
**quick** 134:1
**quickly** 65:19
  191:3 229:15
  238:19 338:12
  350:13
**quit** 133:24 142:16
**quite** 118:22,22
  128:3 130:23
  138:8 155:11
  157:13 161:24
  241:4 246:10
  252:2 270:21,22
  276:13 285:24
  296:24 314:9
  320:21 356:14
**quotation** 259:17
  259:20
**quote** 258:20 259:7
  259:15 261:2,3
  265:6 273:12
  277:15 301:23
  308:19 309:14
**quote/unquote**
  142:11 302:8
  346:1
**quoted** 271:23
  272:16,18,22
  350:25
**quotes** 263:23
  278:21
**quoting** 302:11
  308:8

**R**

**R** 2:1,14 4:1
**radio** 95:22 102:23
  137:11 142:2
  152:6
**radioed** 151:22
**radios** 329:18
**raise** 191:9 196:10
  198:4 208:15
  229:15,21 237:6
  238:19 243:16
  298:21 350:14
**raised** 151:16 222:8
  294:5 341:8
**raises** 47:2
**raising** 141:5 240:9
**ran** 149:9 343:1
**range** 107:14 141:6
  170:20 192:6,9
  241:14 242:24,25
  243:3 246:1
**rare** 105:9,11,13
**razor** 301:17
**reach** 164:19 306:8
  306:9 335:4
  344:23
**reached** 45:15 46:2
  46:5 64:21 101:7
**reaching** 57:5
  64:20 312:19
**react** 240:8
**reaction** 19:13,13
  178:15 182:4,10
  182:20 183:15
  184:12 185:17
  186:15,19 187:9
  189:4 192:12
  194:22 195:20,25
  196:9 197:2 233:5
  233:14 237:14,17
  240:4 241:23
  244:22 245:2,3,5
  316:11 319:22
  321:4
**read** 9:20 14:20
  27:15 33:6 38:6

40:19 62:1,17,22
63:15,17 67:22
68:1,14 89:7,11
99:21 103:10
133:10 143:11
147:11 148:3
149:21 153:11
155:4 168:24
169:2 174:25
176:20 177:22
178:1 182:18,25
190:24 193:21
203:12 205:12
209:23 217:12,13
220:21 222:18
223:25 225:2,13
228:3 231:20
233:7 238:8,15
247:12 267:25
270:21,22 272:19
286:17 287:5,14
302:9 317:8,16
318:13,14 340:5,9
340:13 341:9,12
343:11 350:10
352:5,12 361:6
**readily** 229:9,9
**reading** 58:12
62:19 67:23 114:2
114:5 155:17,25
229:18 230:4
258:22 288:3,3
316:18 317:12
339:13 340:18
344:2 346:2 351:3
351:7
**ready** 239:11
300:11 318:4
**Reagan** 332:20,21
**real** 221:15 301:10
352:18
**reality** 113:3
153:10
**realize** 13:16
**realized** 166:14
**really** 23:13,17,21
27:7 37:9 57:4

66:25 76:4 80:20
91:15 97:18
110:19 116:14,25
130:22 136:19
137:1,3 152:16
153:14 167:18,19
188:25 195:21
206:14 214:11
227:6 241:19,19
257:18 264:17
265:7,14 286:12
287:21 292:24
296:3 298:25,25
299:19 309:7
310:22 314:20
349:5
**realm** 78:16 117:4
117:17 163:19
312:7
**reappeared** 330:5
**rear** 156:24
**reason** 128:11
134:6 144:25
156:16 175:21,23
326:24 328:24
333:15 361:9
**reasonable** 107:10
108:16 170:17
174:16 175:2
252:14 271:13
281:17 282:12
295:22 298:6
**reasonableness**
281:13 286:5
**reasonably** 262:3,3
262:4,9 267:2,3
274:24 275:11
294:2 341:13
**reasons** 34:16
82:11 83:2 115:24
117:6 212:10
229:7 327:3
**recall** 8:1 10:11
15:25 16:3,5,18
16:20 17:5,14,17
18:3,17 20:4,8
21:21 22:3,19,24

24:13,23 25:4,17
25:23 26:6,9,20
33:15 40:21 53:4
64:20 82:5 83:16
87:6 94:1 99:11
100:19 102:22
103:2 109:5
110:23 137:18
147:19,21 157:9
159:5,6 160:5
169:3 172:25
184:18 185:8
194:4 215:8,11
227:13 228:21
236:5,7 250:8
277:5 282:25
307:9,22 327:23
331:22 357:18
**recalled** 216:21
**receive** 19:6 24:11
65:10
**received** 19:8,9,22
27:23 28:7 30:10
66:7 76:10 82:22
356:11
**receiving** 321:12
**recess** 68:24 223:12
312:14
**recitation** 157:2
**recite** 276:21
**reckless** 215:18
**recognize** 175:3
230:19 231:15
232:4 242:24
254:5 304:17
**recognizing** 242:15
303:6
**recollection** 9:25
350:7
**recommended**
163:10
**reconvening** 355:7
**record** 4:11 8:5
23:6 35:10 61:5
64:4 68:23 69:2
87:18 103:22
106:14 139:10,12

140:19,22 141:13
142:20,24 145:14
145:18,19,21
146:3 147:14
148:22 177:21
178:10 181:10
211:1 213:16
218:20 222:20
223:10,15 232:24
254:23 277:22
312:12,17 314:15
324:15 331:10
353:13 354:4,15
355:12 356:2,6
359:5,7,13 360:9
360:12 362:17
**recorded** 42:23
139:21 290:13
**recording** 19:18
137:20 150:25
151:5 152:11
163:24 315:1
331:18
**recordings** 83:25
329:18
**records** 51:13
**recruit** 288:4
**recruited** 236:25
237:1
**recruits** 258:8
259:22
**reduce** 56:21
**refer** 198:22 199:18
214:23
**reference** 11:9
34:20 124:24
202:16 220:20
**referenced** 17:4
49:21
**referencing** 272:12
**referred** 81:13
181:19 248:23
354:16 355:16
356:1,5 357:5,11
357:15
**referring** 10:14
63:19 156:3

158:18 219:24
222:2
**refers** 10:24 13:1,3
14:4 194:7
**refine** 190:11
**reflect** 356:2
**reflected** 31:8
280:24
**reflects** 361:8
**refusing** 266:17
**regard** 6:20 10:10
13:8 16:1 18:4
25:10 33:25 38:3
42:5 45:2,4,11,22
46:17 58:11 72:14
82:6 86:19 87:4
89:18 93:1,7,13
103:5 123:23
128:2 160:1,18
161:23 172:7
184:17 186:22
196:25 197:24
200:10 202:25
225:21 234:9
237:13 248:6
337:9 339:1 356:9
**regarding** 49:20
230:15
**Regardless** 244:23
**Registered** 362:6
**reiterate** 230:14
**related** 42:22 74:17
152:10 181:8
185:18 310:19
**relates** 62:19,24
**relating** 15:3 60:21
60:24
**relationship** 233:2
**relative** 86:13
**relatively** 120:21
270:20 342:5
343:3
**Relax** 210:10
**Relevance** 225:8,23
267:14
**relevant** 136:20
137:1,3 210:23

239:12 268:24
308:18 309:3
**reloading** 134:23
135:19
**rely** 314:25
**remain** 18:9 360:16
**remaining** 65:22
140:3 215:1
304:21
**remains** 24:22
**remedy** 208:11
**remember** 17:5
18:2,11 22:7
24:10,19 39:3
55:11,14 63:13
80:6 99:4 100:20
136:6 158:5,6,13
162:5,7,10 167:2
181:13 184:10
192:15 227:23
249:21,25 272:23
274:20,25 281:3
283:13 305:14,16
316:3 329:6,12,14
329:23,23,24
331:1,7 343:15
351:3,7
**Remind** 302:25
**remote** 118:6 119:5
**remotely** 105:13
**removal** 37:11
63:12,14
**removed** 116:9,12
116:13 215:9
**removing** 294:19
**repeated** 187:3
191:16
**repeating** 64:24
82:8
**repetition** 203:14
**repetitions** 187:17
**rephrase** 150:6
352:13
**rephrased** 342:25
**replicated** 191:21
**report** 27:6,20
30:12,13,18 31:8

31:15,22,23 34:19
34:24 35:2 36:12
47:11,16,18,24
49:6 62:1 63:17
64:18 65:5,7,14
66:8,16,21 88:13
89:18,22 92:3,22
93:8,14 94:4,5,7
94:15 95:18 96:7
98:12 99:24
103:17 113:22
118:22 123:21
124:1,4 136:5
137:10 143:4
148:12,20,25
149:19 151:19,24
166:4 178:7,12
179:2 189:5
250:15 288:6,14
288:18 289:4
357:17
**report's** 89:3
**reported** 1:25
111:16 242:1
290:7 361:2
**reporter** 4:19 5:8
5:11 252:20
255:15 310:6
353:25 355:17
362:6,6
**REPORTER'S**
362:1
**reporting** 1:20 4:8
151:2 257:11
285:8,11,13
288:14
**reports** 23:3 90:5
98:25 124:12
**represent** 4:11,13
4:16,18 155:7
161:21,22 172:21
197:1 214:3
216:25 218:8,13
**representation**
97:9
**representative** 1:6
71:8

**represented** 35:19
82:9,12 150:2
278:20 332:10
**representing** 26:25
222:1
**represents** 195:4
**reputation** 226:25
227:2,12
**request** 8:5 9:8
84:9 87:16 360:14
**requested** 4:23
360:8
**requesting** 84:5
**requests** 82:22
83:15,17
**require** 353:2
**required** 8:6 249:9
**requirement**
266:10,12 287:19
356:15
**requires** 292:25
**research** 204:24
210:2,12,14
231:11 241:21
242:1
**reservation** 240:6
**reserve** 65:8 175:19
314:22 358:1
**reserved** 191:7
**reservist** 175:16
**reside** 5:20
**residence** 98:15
338:17
**residential** 109:16
**resistance** 289:1
**resisting** 288:2
**resort** 106:24
**resorting** 106:24
**respect** 16:21 84:4
124:16 133:22
137:7 203:7
230:14
**respectable** 205:9
**respective** 58:10
**responded** 351:24
**responding** 155:15
**responds** 195:14

**response** 10:18
11:1,12 196:3
206:17 241:6
300:12 322:4,9
326:6 329:25
**responses** 9:7 24:24
62:14
**responsibilities** 6:6
71:3,11,12,19
73:25
**responsible** 264:22
264:23
**responsive** 23:12
**rest** 18:12,13 167:6
**restaurant** 91:15
**restricted** 6:25 7:5
7:10,11 145:5
180:22
**restricting** 57:3
**restrictions** 55:25
174:19
**restrictive** 174:19
**result** 50:6 52:8
76:21 184:10,12
332:4
**results** 182:25
208:2
**retain** 45:3
**retained** 3:16 26:24
26:25 29:5 43:15
43:17,19 44:6,11
**retainer** 86:19,25
87:2
**retention** 45:3
**retired** 53:7 179:15
209:10
**retirement** 70:23
70:24 172:8
**retreat** 191:11
262:6
**retrieve** 357:7
**retrieved** 343:2
**return** 131:5
191:12 203:11
**review** 13:14 15:8
27:6 28:4 36:22
44:11 46:6 49:23

66:16 82:24 83:10
190:16,17 191:14
191:24 203:8,17
203:17 204:11
205:21 239:6
249:16 281:22
350:21 353:2
354:19
**reviewed** 11:7 18:3
18:17 20:18 27:21
27:23 28:1,9 30:6
33:25 36:17 38:17
41:18 49:25 68:5
83:17 93:10
209:17,21 210:15
217:23 239:5
271:10
**reviewing** 10:11
11:6 28:22 62:10
64:16
**revoke** 81:18
**revolver** 109:13,19
135:19
**revolvers** 106:11
**Reyes** 72:20
**Ricker** 12:21
**rid** 287:21
**ride-along** 95:6,14
95:20,24 96:3,10
97:16,19,22
316:15
**rider** 325:4
**riding** 98:3
**rifle** 127:19,25
128:6 130:5
135:17 175:3,11
248:10 298:23
318:23 319:8
335:9 342:6 343:2
**rifles** 128:18 176:9
193:3 299:1
**right** 8:17 10:1
13:5 23:19 29:13
31:24 33:21 34:25
43:2,12 48:22
49:8,23 54:14,16
54:18,19 56:9

58:13 60:18,22
61:17 64:1 65:8
74:16 77:2,2 80:8
80:23 85:7 87:3
88:16,17 89:3,19
91:8,20 92:13
93:15,19 94:21
100:2 103:14
106:5 111:22
112:14 115:14
121:8 124:14
125:23 128:9
131:8 142:16
144:13,17,19,20
144:22 146:17
147:7 148:3
149:21 155:11,22
156:4 158:3,16,21
161:24 171:24
172:20 174:9,18
176:4,13 179:2
180:10 182:5
191:6 194:18
211:9 213:23,25
214:1,17 218:4,13
219:17 221:3
224:25 232:6
233:7 234:1
235:12 236:25
240:24 244:4,19
247:23 249:11,14
258:20,22 259:1,2
260:15,23 265:10
274:5 277:12,22
279:16 281:6
284:25 285:9
296:19 298:12
299:18 300:4
303:19 305:21
307:9 309:5
314:22 315:16
317:20 318:2
324:21 328:10,12
328:13 331:6,8
332:25 341:4
342:10 347:17
348:2,6,7,14

352:15,20 353:9
353:12 357:25
358:1,14
**rights** 145:4 285:25
**ring** 62:2 201:15
**rise** 344:4
**risen** 309:18
**risk** 56:15,19,25
57:14 125:15
126:14 128:6,23
129:1 174:5,7
308:16 309:24
**risks** 126:7
**road** 263:16 289:9
289:19
**roads** 168:18
**robber** 296:18
**Robinson** 308:1
**role** 27:9 31:20
75:23 76:4,5
**Ron** 56:7
**room** 8:17 66:16
360:10
**rooms** 171:1
**rotation** 78:14
**rough** 19:7 32:21
67:7,8 354:2
**roughly** 233:24
**round** 229:17,22
238:21 240:9
243:17 335:14
**rounds** 134:23
135:7,18 301:19
**route** 253:3,7
**routine** 26:13,18
**Roy** 198:5
**RPR** 1:25 361:2
362:22
**rubber** 186:24
187:14
**Ruben** 76:18
**rude** 293:5
**rule** 47:19 145:9
223:6 274:4 275:8
276:5 283:24
300:17,22 301:4
302:20

**rule-based** 8:8
**rules** 8:7 47:19
224:8 247:22
267:16,25
**run** 146:16
**rush** 353:3

---

**S**

**S** 2:1 3:7 4:1
**S.W.A.T** 185:6
**safe** 116:23 166:14
167:7 302:6
339:11 340:16
341:5,15,24 342:5
342:13 343:3
**safer** 116:22
**safety** 81:10 115:22
116:8 163:16
174:19 203:19
**Salt** 1:20,22 4:8
5:21 74:5,6,16,19
74:22,24,25
**sample** 233:1
**sat** 269:13
**save** 22:2 211:25
268:24
**saw** 33:8 84:7
140:8 169:14,19
170:2,23 171:7,22
171:23,25 198:19
199:15 200:10,15
217:25 335:15
340:5 350:4
**saying** 7:6,9 18:11
18:11 24:18 48:4
67:8 69:9 108:7
110:24 111:3,6
112:14 118:2,3,14
143:21 152:3
157:15,19 158:13
158:13 159:6
178:22 204:5
207:20,23 208:1,4
225:3 261:10,11
264:14 268:16,18
274:18,19 280:5
294:13 295:1,19

295:21 307:21,24
309:4,16 311:12
311:24 317:9
321:17 333:3
337:12 346:24
348:14 349:5
**says** 12:24 37:8
47:22 49:19 55:13
55:14 93:1 143:15
149:8,14 151:21
154:3 155:21
159:19 201:6
220:9,24 221:3,12
224:4 232:25
237:4,25 238:10
238:11,22 239:25
240:1 242:12
243:14,18 254:9
256:19 257:11,12
257:23 258:2,18
261:14 273:5
274:4,23 278:23
278:23 287:25
288:10 297:23
299:15,21 300:22
301:23 307:11
313:20 314:11
315:24 316:14
317:25 318:2,17
319:21,23 320:1,8
321:25 323:8
324:5,6 325:1
328:21 329:2,5,11
332:21 333:3,3,9
334:4,12 335:10
335:11 336:2,2
339:1,6 341:4
343:9,13,17,20
345:22,23 346:14
348:2,11
**scale** 344:16
**scanning** 288:12
**scared** 250:18
316:13 320:8
325:7 326:21
328:22
**scenario** 109:24

110:2 182:23
187:17 234:13
**scenarios** 241:20
**scene** 86:11 95:10
96:3,10,19 97:3
116:3,18 145:11
163:2 165:12
281:17
**schedule** 88:10
89:25 90:4 92:2
**school** 54:22 76:10
76:17,18 77:3
145:25
**science** 3:12,13,14
3:15 178:20 179:9
179:10,19 180:3
181:17 182:18
183:2,19 184:8
204:24 210:17,22
226:18 228:5,19
228:19 231:16,17
359:15
**scientific** 196:2
203:10 205:1
208:22,23 209:1
226:9
**scientifically**
209:13
**scientist** 205:9,11
**scooched** 108:23
**scope** 45:15 286:13
**screen** 275:4
**script** 162:20
**scripting** 184:7
**se** 55:18,21
**Sean** 72:20
**search** 17:3 120:14
231:9
**seat** 154:2
**seated** 191:2,3,5,7
191:9 194:6
**second** 12:23,25
13:4,6 47:1 84:22
89:21 90:1 93:13
98:16 143:17
145:1 155:2 163:5
174:23 232:9,23

233:24,25 242:3
243:1 247:5 249:8
249:10 256:23
280:11 282:21
313:16 335:18
349:15,20 350:18
350:24 351:1,8,13
352:9
**secondary** 107:13
**seconds** 137:14
138:18 139:20
149:15 150:13
151:21 223:8
229:25 233:17
234:13,14 237:18
241:7 243:1,2,10
243:20 244:5,21
244:21 248:11
249:14,20 250:7
292:9 302:6
**secret** 210:20
240:17
**section** 10:18 40:25
41:1 274:11
285:25 286:6
307:14 310:5,7,8
**sections** 271:21
**security** 76:7
209:10
**see** 9:2,10 10:25
11:1,7,8,11 12:16
16:15 27:20 38:1
39:22 41:22 54:14
59:7 61:12 65:7
67:3 84:11 86:2,5
92:20 98:13 99:23
100:12 101:10
102:18 114:3,5
124:7 139:24
141:1,3 147:13
148:6 149:1,3,12
155:2,25 156:21
159:13,14,22
169:6 170:23,24
178:16,22 179:22
184:6 188:20
200:11 205:23

207:1,14 210:21
212:14 213:17,20
213:22 214:1,8,19
215:6 217:4 220:1
220:23,24 221:15
221:21,21 223:20
223:23 224:23
229:18 230:1,4
231:18 232:17
233:18,20 237:6
240:17 241:2,8,14
243:2 252:25
253:25 256:25
262:6 263:16
265:21,24 280:23
282:5 287:23
313:16 319:8
323:10 324:18,24
339:13 340:6,18
343:17 344:2
346:2 348:8,9,16
349:19,25 357:22
**seeing** 17:14 101:3
226:10 228:21
238:4
**seeks** 129:6
**seen** 16:10,17 17:6
31:5 33:9,12,12
38:21 66:11,20
67:6,12,19 68:10
86:9,13,16 89:13
105:16 109:18
131:2 141:13
145:3 168:21
183:18,23 190:20
192:14 193:17,22
195:6,13 209:20
211:17 212:22
231:23,23 232:1,5
236:6 250:15
270:12 323:1
326:4,7 327:19
336:11,14,19
338:2
**segregate** 11:16
13:19
**segregated** 11:20

12:8 13:12
**segregation** 13:16
**seizure** 17:3
**seizures** 16:23
231:9
**select** 50:14
**selected** 13:17
**selection** 110:5
**self-defense** 255:7
**sell** 180:21
**seminal** 276:24
**semiretired** 227:7
**send** 31:19 217:15
246:21,23 326:5
355:22
**sending** 31:16,18
**sends** 31:22
**senior** 57:11 71:12
**sense** 16:12 76:5
77:18 78:21,22
109:13 265:19
**sensible** 164:21
**sensitive** 162:17
**sent** 58:2
**sentence** 163:15
175:9,9 343:21
**separate** 34:11
54:12 58:10
179:12,22 246:6
**separated** 37:20
**sequence** 11:24,25
12:4,4 154:22
206:15 341:22
342:13,16 343:10
**sergeant** 153:1
156:12 163:22
189:16 300:12
**series** 42:19 188:24
204:25 309:9
**serious** 260:12
262:10 267:7
270:3 271:10
274:22 275:11
278:7,14 279:8
280:9,13
**serve** 55:5 74:19
76:6

**served** 8:6 71:7
78:13 81:6
**service** 58:17 72:22
72:24 73:2 75:4
106:11 175:12,18
**services** 29:9,15
56:15,18 57:16
74:23
**serving** 76:7
**set** 9:6,13 36:10
37:7 62:7,14
80:16 103:16
259:11 333:6,10
333:20 339:10
340:15 362:10
**setting** 174:2,3
231:24,25 333:14
**setup** 194:21
**seven** 23:17 77:24
200:14 302:2
305:25 353:5
**seven-hour** 353:25
**seventh** 306:1
338:15
**severity** 281:18
**Shakes** 51:3 224:13
**shape** 100:13
**shared** 230:6
**sharpen** 293:16
**sharper** 182:22
**she'd** 100:21
**sheets** 37:19
**sheriff** 44:1,3 74:6
148:21
**sheriff's** 1:10 9:14
37:24 38:5 39:11
61:10 213:24
214:14
**sheriffs** 6:23 53:10
**shield** 107:16
**shielding** 108:18
**shifted** 122:17
**shifting** 163:18
**shirt** 296:24
**shit** 353:12
**shoot** 98:23 99:6,18
118:24 121:9

127:22 133:7
138:4 190:1,3
234:13 250:21
251:22 266:19
288:20 289:21
294:3 296:23,25
307:12 318:4
325:14,15 334:7
334:10,13 337:11
346:20
**shooter** 10:18 11:1
11:8,12 14:4
128:16 131:22,25
183:16 188:1,4,8
234:11 241:7
**shooting** 29:16
31:12 39:20 82:15
96:20 129:8 136:1
183:7 223:21
224:15 291:25
293:14,19 295:19
307:4 310:15
311:7,10,16,21
312:6 314:12
320:11 334:6
345:25 346:5,7,11
347:7 348:9,14,24
349:2
**shootings** 52:22
**short** 68:24 162:25
223:12 285:15
312:14 347:21
**shorthand** 362:5,14
**shortly** 337:18
**shot** 3:11 25:1
116:4 121:10,16
144:4 146:7,22
161:3 167:25
173:24,24 187:21
193:9,15,16,21
195:15,16 207:2,9
207:18 214:2,9
224:16 231:22
291:6 292:10
294:12 297:15,20
311:25 325:1,8
326:24 327:3

334:15,15,19
335:18 346:17
350:3,4,5,17,19
350:24 351:1,8,8
351:9,13 352:2,9
**shots** 134:20
137:15 349:12,17
350:8
**shoulder** 213:1
**shouted** 148:1
296:21
**shouting** 153:2
**show** 103:23 132:2
143:24 206:22
210:16 211:17
212:14 297:25
308:14
**showed** 50:9 356:1
**showing** 88:21
230:8
**shown** 86:2 294:5
**shows** 256:4
**shuffle** 12:5
**Shurtleff** 72:18
**sic** 256:23
**side** 75:19 142:11
143:23 144:1
145:7 183:11
194:2 212:23
235:24 244:24
249:14,19 258:5
289:10,19 312:21
316:5 340:21
341:2 345:14,14
**sides** 57:3
**sideways** 60:4
**sight** 127:20 229:16
229:22 238:21
243:17 319:9
320:2,6 334:14,21
335:13,16
**sighted** 237:14,22
241:5,9
**sights** 237:15,15
298:24 316:7,20
317:20 318:3,11
318:13,20,23,25

319:3,4,5,6,11,18
320:1 334:18,19
335:7 350:9
**sign** 65:18 80:10,12
217:12,13
**signal** 193:17
**signatory** 81:17
**signed** 48:14 53:17
57:24 222:18
**significance** 74:9
96:2,5,6
**significant** 77:15
121:20 133:20
204:13 266:4
**signist** 178:20
**similar** 15:19 16:1
16:6 17:19 18:5
18:16 20:13
105:21 165:12
177:6 184:4
187:17 188:23
193:2 217:25
226:7 235:24
237:16 262:25
264:5 285:3 294:5
310:12 336:5
**similarities** 188:20
**similarly** 203:15
**simple** 46:22
138:10 172:12
241:4 261:11
327:2
**simplified** 259:7
**simply** 22:8 26:4,23
34:22 107:18
108:8 126:8 138:8
141:1 170:6
185:16 217:16
220:19 234:24
239:15 240:19
319:6 331:16,20
353:4 355:6
357:21 358:1
**sinister** 348:23
**sir** 5:16 7:12 13:20
17:3 18:10 19:12
20:19 21:3,7,25

23:4 24:4,7 29:21
33:19 35:16 38:2
40:22 44:17 47:7
60:9 62:18 65:20
68:21 86:7 91:25
93:4,6,11 94:22
95:9 99:4 104:17
105:1,4 112:17
113:4 114:14
118:18 119:19
124:14 134:6
142:6 147:21
149:7,16 150:4
165:18 166:1
169:21 170:4
172:2 173:22
175:7,13,19 178:8
180:6 183:5
190:18,18 196:4
199:2 200:8
202:14 203:20
210:8 216:7 219:8
236:21 241:16
242:5 243:4,10
244:5 245:15
246:17,20 260:18
260:25,25 261:4
265:9,9 269:24
270:25 279:15,19
282:9 284:3,14
285:2 289:7 293:7
296:25 297:10
298:4 299:17
305:6 306:8,19
307:24 312:19
330:10 340:10
343:23 345:5,7
346:6,23
**sirens** 258:11
**sit** 24:18 40:18,23
210:12,13
**site** 90:5 334:5
**sitting** 8:20
**situated** 203:15
**situation** 18:16
25:19 108:19
112:1 124:13

125:4 132:19
162:14 164:12
165:13,18 177:6
206:9 242:2,21,23
268:10,13 271:20
276:4,4 285:1
290:3,5 298:22
303:8 304:9
348:23
**situations** 16:2,6
165:13 242:24
248:23 291:22
323:1 357:13
**six** 134:20,22
137:21 200:14
312:22 314:12
326:16 327:2
328:14 331:7
**size** 127:21
**skating** 219:21
**sketches** 85:9
**skew** 208:2
**skewed** 112:20
**skills** 34:8
**skinnier** 305:11
**skip** 178:6
**sky** 217:6
**SLCPD** 300:2
**slender** 37:10,12
**slice** 318:10
**slide** 256:4 259:14
359:24
**slides** 263:22
**slight** 301:14
**slightest** 66:13
**slightly** 158:14
182:6
**sloped** 334:16
**so-called** 194:15
237:5 239:11
**sodium** 180:14
**Solano** 308:1
310:13
**solely** 152:9 205:24
**solved** 222:10
**somebody** 47:2
52:14 96:12

127:20 165:24
174:15 206:17
208:14 246:15
259:23 292:9
**someone's** 130:25
**something's** 119:5
**somewhat** 213:18
274:7
**soon** 59:25 180:18
295:1,18 314:9
338:8
**SOPs** 177:18
**sorry** 9:23 23:8
28:16 49:6 61:18
67:17 77:12 91:17
91:20 94:12
136:17 141:15
180:8 189:14
209:4 210:6,8
212:5 229:23
232:20 255:17
273:22 275:1
284:16 289:25
299:12,24 311:10
312:10 315:19
338:6 342:19
349:21
**sort** 207:4 247:10
**sorts** 37:11 57:15
**soul** 169:21
**sound** 125:2,6
149:19 151:24
170:24 206:16
207:18 317:6
**sounds** 137:25
259:3
**soundtrack** 20:11
**source** 64:17
147:23 169:3
189:19 202:17
210:20 249:25
263:2,3 305:7
**sources** 199:19
331:10
**south** 1:21 70:6
76:19
**space** 304:8

spaces 131:24
speak 57:13,17
    109:11,17 113:22
    155:12 190:6,7
    201:10 208:14
    235:15 270:23
    353:21 358:11
speaking 49:14,20
    58:19 104:6
    162:20
speaks 193:15
special 6:3 73:23
    75:4,20,21
specialist 181:15
specially 176:17
specific 6:19 15:25
    17:2 18:2,14
    22:13,20,24 24:13
    24:24,24 25:4,9
    25:17 26:6,9
    30:18 31:9 85:24
    101:7 140:20
    149:10 262:20
    291:3
specifically 26:6
    62:20 134:10
    178:13 197:13
    215:12 226:17
    357:16
specificity 94:2
specifics 22:25
    23:13 54:3 133:13
    171:13
speculating 152:15
speculation 169:11
    171:19 322:18
    327:9 330:11
spell 303:1
spend 244:10
spent 81:9 91:19
spin 124:15
split 249:7,10
split-second 248:24
    250:22
spoke 21:22 30:10
    100:19 102:8
spoken 42:12 43:11

57:22
sports 133:24
spot 115:17
spots 220:16
spring 185:8
sprinted 338:11,22
    341:20
square 167:23
Squibb 239:25
stabbed/or 301:21
stack 10:14 37:12
    37:17,22 41:13,16
    42:18 62:5 63:2
    63:22
staff 257:8
staged 205:25
stance 288:11
stand 134:6
standalone 242:18
standard 37:23
    38:3 39:11 81:12
    120:21 252:7,13
    270:6 271:12
    281:17 298:6
    306:8 336:17
    344:5 346:23
standing 7:14
    129:19 194:8
    301:15
standpoint 110:7
stands 123:10
    283:5 327:12
    338:1 342:17
stare 288:11 321:8
    321:25 322:1
start 5:9 8:25 9:1
    65:6 69:8 102:3
    131:13 134:8
    155:5 193:13
    273:22 313:15
    314:6 345:25
    346:7,11 348:13
started 69:12,13
    73:15 122:16
    141:23 142:10
    276:16 287:21
    291:5 296:20

297:9,12,14
298:21 329:15
335:14 342:14
starting 206:14
    294:6 315:11
starts 316:1,2,19
    318:17,18,22
    342:8
state 4:10 6:22,25
    7:3,18,21 55:1,3
    55:23 71:24 72:6
    72:8 75:9 90:25
    91:15 131:1 145:5
    179:10 181:15
    230:13 265:19
    272:21 276:18
    280:17 286:10
    362:2
stated 13:2 82:11
    110:23 139:17
    198:25 237:23
    306:2 308:4
    327:14
statement 29:1
    47:7 95:5 99:5
    114:13 126:17
    127:24 133:12
    145:8 150:1
    159:16 167:6
    168:9 173:25
    176:14 182:8
    269:23,24 277:17
    296:14 297:23
    299:24 303:4
    304:12 313:1,3,5
    313:20 314:19
    316:18 332:9
    338:6 345:23
    348:13 350:23
    351:25
statements 94:25
    99:23 140:22,22
    140:24 152:23,25
    265:16 304:6
    313:9 314:8,16
    330:22,23
states 1:1 12:22

16:25 17:21 47:23
58:7 72:11 90:15
90:16 91:1 119:23
120:16 263:14
264:2,3 266:13
270:19,24 277:21
279:17 280:7,23
280:24 284:12
286:1
stating 166:11
    298:8
status 73:2
statute 75:10 261:1
    261:2 265:7
    270:20,24 336:12
    338:2
statutes 252:5
    264:4 280:22,25
statutory 71:10
    266:12
stay 261:7 360:10
step 190:10 286:21
Stephen 1:5,6 4:13
    124:9 143:15
    149:18 156:25
    157:10 159:7,11
    159:20 162:6
steps 205:10,14
Steve 151:23
stick 301:16 317:25
stimulus 196:3
    206:7,12,18 208:3
    208:5,7 249:8
    331:23
stipulate 349:17
stop 9:18 33:3
    43:13 47:12 130:8
    130:12,24 138:6
    143:17 211:5,13
    264:25 267:9
    270:5 278:10
    293:3 316:15
    326:3
stopped 58:22
    216:20 315:25
straight 144:9
straighten 15:16

straightened 148:7
strategy 67:1
stray 174:5,14
street 2:9 75:18
    144:10 173:17
    229:10
stress 164:25 165:4
    165:5,25
strict 55:4
strike 38:16 44:9
    65:6 93:12 251:3
    301:18
striking 111:25
strong 134:1
    166:16 168:9,10
    229:8
strongly 240:16
struck 118:5
    301:22
structure 86:23
    141:22
strychnine 261:20
student 274:10
students 235:9,12
    237:2,2,3 274:9
    274:16 275:20
    276:16 280:16,18
    280:21 281:12
studied 118:19
    190:9 204:17
studies 132:2
    181:21 204:25
    244:12 245:21,22
studio 194:6
study 182:25 184:8
    184:25 197:11
    204:12 205:2
    208:12 238:14
    245:4 246:6,21
stuff 10:4 59:10
    159:1 190:25
    212:4 267:25
    346:4 356:7
subject 10:12 80:1
    84:3 87:17,25
    89:16 125:9,10
    132:20 140:10

152:18 183:17 194:16 233:4 241:22 317:7
**subjected** 247:25
**submit** 27:6 67:13 173:23 250:11
**submitted** 92:24
**subpoena** 8:5
**subpoints** 280:8
**subscribed** 361:22 362:19
**subsection** 271:23
**subsequent** 65:10 65:13 66:20
**subside** 291:20
**substance** 24:10,19 207:24 222:22 223:5
**substantial** 27:24 138:13
**substantially** 16:6 17:18 112:6 131:15 170:16
**substantive** 220:16
**substantively** 33:14
**successfully** 274:11
**successor** 72:18,19
**Sucrets** 212:12
**sudden** 294:16
**sue** 80:11
**sued** 51:5,10 56:21 79:10,16,21 257:16
**suggest** 104:11 112:22 115:3 140:17 141:7 145:4,20 154:4 156:6 169:18 170:16 173:15 225:14 235:24 237:16 240:16 243:19 244:5,10 245:4 247:19 257:19,21 298:20 305:13 356:24
**suggested** 103:23 133:5 145:18

149:2 237:1 245:5 277:20 278:3 279:11
**suggesting** 96:25 97:21 104:9 110:25 113:20 209:13 220:10,20 236:22 257:22 263:3 288:4 314:3 321:15 322:12 341:6
**suggestion** 332:4
**suggestions** 166:10
**suggests** 124:17 171:6 332:3 345:13 352:1
**suicidal** 165:3
**suicide** 101:20 164:9 165:3 261:20
**suing** 53:10 80:11 80:12 81:24
**Suite** 1:21 2:15
**suited** 175:4 245:16
**suits** 82:10
**sum** 80:17 86:23
**summarize** 81:22
**summarized** 239:16
**summarizes** 175:5
**summary** 30:20 89:11 274:3,15 275:8 276:3 282:19
**summer** 21:9
**superior** 357:23
**support** 29:16 30:7 30:16 50:8 141:4 265:22 328:7 336:9
**supportable** 28:23
**supported** 28:23 169:13
**supporting** 29:20 92:8
**suppose** 12:22 97:8 136:13 153:17,18

215:25 253:2 296:3 346:15
**supposed** 54:15 358:24
**Supreme** 12:22 16:25 17:21 119:23 120:4,16 277:2,20,20 278:3 279:17 280:7,23 280:24 284:12,19 308:23 310:17
**sure** 7:19 30:21 39:23 43:1,24 48:2,25 51:17 63:14,14 65:12 68:10 83:7,22 92:1,25 102:6 103:5,5 106:7 107:1,3 111:9 115:18 116:19 117:11 121:5,7 130:18 131:2 139:12 144:8,15 144:21 145:9,17 147:1 165:21 167:18 168:5 181:18 184:15,25 185:4 187:10 195:21 202:18 205:16 206:12,13 208:24 209:19 211:11,20 212:2 214:5 220:7 227:8 227:13 234:3 241:14 243:13 246:11 248:16,25 251:25 256:17 257:10 258:14,23 259:21 263:20 264:13 265:8 269:2 275:2 282:15 291:24 300:19 302:16 304:6 305:21 307:1 308:13,20 310:21 313:25 323:5 326:18

329:19,22 330:22 331:16 334:16 342:4,20 343:13 345:24 349:24 353:5 356:11 357:18
**surface** 129:25
**surprise** 271:1
**surprised** 300:25 332:19
**surrounding** 166:19 169:10 170:5,19
**survived** 52:2,3
**suspect** 66:23 125:10,23 126:2 126:10 129:7,18 131:12 132:20 133:6 134:19 135:6 142:9 147:5 158:12 161:20 182:8 193:5 194:16,18 195:11 224:16 225:4 233:16 234:13,14 234:24 237:5 240:8 264:3 267:6 268:4 269:9 270:3 271:9 272:5 275:10 278:7,13 279:7 280:9,12 282:13,21 283:19 284:20 300:6 315:25 316:19 318:18,24 338:12
**suspect's** 126:16 128:8 155:14
**suspected** 145:11
**suspects** 131:4
**suspend** 352:21
**suspended** 355:7
**Swallow** 72:19
**SWAT** 244:25
**swear** 4:20,25
**sworn** 5:4 361:22
**synopses** 234:21 242:17 245:22

**synopsis** 163:23 236:18 241:21 242:2
**synopsize** 262:13
**synopsized** 259:6
**system** 20:8 60:25 151:1,5 152:6,11 228:12 263:5 286:3

**T**

**T** 2:8 3:7
**tab** 37:7 154:11 212:15 223:17 274:8 359:25
**table** 203:11
**tactically** 125:2,6
**take** 11:23,24 17:7 20:17 23:14 28:21 29:11,13 30:22 32:3 34:1 38:24 40:4,13 43:2,5 46:12,25 49:19,22 50:3 54:8 65:20 66:3,5,25 68:19 71:23 78:5,14 87:20 88:14 96:10 131:4 136:16 151:25 156:5 159:15 160:13 173:22 190:15 191:3 200:2 211:20 219:19 227:14 237:4 241:23 242:20 257:14 269:14 272:11 277:3,8 291:17 312:25 317:4 318:5 319:4 319:7 321:14 325:6 329:7,16 334:21 335:3,3 338:24 342:20 352:6
**taken** 1:17 27:3 32:23 49:7 64:13 68:4,24 85:20

115:16,22 116:7
116:20,21 142:21
173:23 181:22
203:16 213:3
218:4,25 223:12
235:8 312:14
361:2 362:9,13
**takes** 190:1 234:11
237:18 354:9
**talk** 34:6 42:3,6
58:22 66:25 84:16
92:22 95:19
136:13 178:13
189:12 199:14
200:8 211:12
243:11 260:11
262:5,8 263:13,15
263:18 277:2
285:8 313:9
354:10
**talked** 15:17 27:22
28:11 29:14 30:2
30:3 38:11,15,18
39:2 42:6 43:5
44:15,23 61:13,20
88:11 93:3 99:2
100:8,12 143:6,10
147:11 177:17
205:12 227:22
229:6 241:13
252:6 268:6,17
281:19 299:2
335:6 355:18
**talking** 6:16 31:11
49:12 101:3
111:13 127:9
129:13 141:8
142:6 143:3
157:25 167:24
171:16,17 176:19
187:5 194:8
198:18,18 205:8
210:22 227:11
231:10 242:2
256:20 263:4,22
267:12,24 271:2
277:21 284:18

287:1 288:5,13
305:20,22 306:18
307:17,19 310:2
310:23 311:18
315:8 328:12
331:11 332:2
348:3 349:2
**talks** 12:13 49:14
149:6,9 171:12
201:6 262:2
309:24
**tape** 68:22 142:22
149:9 187:22
220:2 223:13
312:9,15
**target** 334:3 335:17
**targeted** 142:5
**targeting** 140:24
290:2
**tase** 103:15
**Taser** 25:22 52:14
102:25 104:24,25
104:25 105:19
106:8 107:24
108:12 110:2,6
111:25 112:16
113:6,15 114:16
114:22 156:20
157:6
**Tasers** 25:21
104:23 105:5,6
**tasing** 104:2
**taught** 7:13 16:9,24
17:19 104:25
105:16 125:3
126:1,20 132:14
132:14 185:15,18
257:7,9 301:2
334:7,10 351:6
352:10
**Taylor** 198:5 206:1
**teach** 138:2,6
195:23,24 196:2,5
196:8 256:8 257:4
257:5 262:21
265:12,22 286:3
287:16,18

**teaches** 132:11
**teaching** 7:20 18:8
162:18 231:11
256:3,5 259:12
265:15 276:10,16
285:18,22 287:12
287:15
**teachings** 18:3
**team** 233:15 244:25
**technical** 43:23
**technique** 105:18
107:25 177:4
**techniques** 7:20
176:18
**teen** 254:11
**telephone** 21:17,23
24:15 26:14 38:15
38:18 158:19
161:5 173:3
**television** 127:9,14
**tell** 5:4 6:15 21:20
26:11,23 27:11,18
28:10 29:3,4 50:7
50:11,15,18 54:20
70:10 74:1 76:14
79:20 97:15
101:18 113:4
117:1 167:20
179:6 190:22
197:21 198:14,17
200:9 202:25
216:21 236:16,23
246:15,18,20
248:17 249:20
256:14 269:13,20
270:19 272:14
281:12 289:2,18
300:23 302:25
345:2 362:12
**telling** 28:14 104:8
120:1 140:23
153:3,22 201:25
257:14 262:20
287:11 288:18
323:16 326:15,16
**tells** 159:20 324:1,2
**Temple** 2:9

**ten** 44:19 65:21,24
66:5 148:1 215:1
291:10 321:3
323:9 324:2
**ten-year-old**
307:10
**Tennessee** 276:22
277:25 278:11
279:15 280:6,16
285:3
**tentative** 348:5
**Tenth** 310:14
**term** 7:5,9 28:12,14
28:15,18 32:21
41:4 70:24,25
75:9 127:11
130:21,22 135:3
147:2,20 228:21
249:7 272:17
289:5,7 302:22
**terms** 55:24 71:19
80:14 81:24 82:2
100:1 116:3
120:18 134:17
135:12 156:9
177:17 196:8
213:3 225:4,15
248:11 331:17
338:2
**terrorist** 296:18
**test** 182:17 183:13
183:15,24 187:3,5
190:15,19 191:16
191:25 192:2
195:13 204:2
205:20 232:10
251:13 252:21
274:12 275:23
281:13 283:19
**tested** 205:3 262:22
262:24,25
**testified** 5:5 50:18
51:4,9 52:16,19
52:23 81:3 82:7,9
94:21 104:24
108:21 109:4
112:15,16 121:25

224:14 225:6
249:24
**testify** 55:18 83:13
83:18 89:12
153:21 225:5
246:19 249:24
**testifying** 57:3
215:8 216:19
**testimony** 82:7
90:7,10,19 140:9
189:9 224:5
282:19 313:14
350:10 356:20
361:8 362:17
**testing** 182:24
183:1,11,19,21
190:14 191:15,22
192:14 195:5
205:16,19 226:9
301:7,25
**tests** 183:6 189:25
190:8 192:9 194:5
195:3 210:16
228:23
**Texas** 119:22
**Thank** 5:12 9:17
32:12,17 37:5
41:11 48:16 63:1
68:21 76:2 82:14
90:3 142:17 178:9
215:2 303:22
314:20
**Thanks** 41:12
42:17 158:3
**then-Sergeant**
300:10
**theory** 31:3 286:7,8
**Thereabouts** 64:6
**thereof** 361:7
362:18
**thesis** 308:22
**thick** 63:25 64:4
**thicker** 148:16
**thigh** 229:8,11,14
238:18
**thin** 115:10 253:4
**thing** 23:11 33:18

49:12 78:15 99:22
129:5 160:16,23
197:17 231:20
239:9 268:17
271:1 273:3 287:8
288:6 332:8
343:15
**things** 6:20 7:24
26:1 35:8 37:11
41:1 67:2 86:24
87:11 92:23
100:16 125:22,25
126:12 134:25
153:9 157:10,16
157:20,22,24,24
157:25 158:22
159:2 160:18
163:23 176:15
177:18 212:6
216:7 225:5 231:8
231:22 239:10,12
288:2,18 291:22
299:2 310:18
328:16 347:12
348:15 354:10
358:16,20
**think** 8:23 10:4
13:4 15:13 26:19
27:24,25 28:5
32:8 33:17 35:23
38:12 41:10,22
42:14 43:14,18
46:23 55:1,14
58:16,22 59:3,3
61:2,21 62:11
63:22 64:23 68:11
68:19 75:17 80:12
80:14 82:7 84:25
85:13,20 87:1,9
88:24 89:3,19
92:9,25 93:3 94:7
100:20 102:6
106:16,22 112:18
112:23 116:7,9,11
116:13,17,23
117:6,18 119:15
124:24 127:8

130:15 132:3,10
134:9 135:8 136:4
142:16 143:4,8
144:10,15 145:3
145:21,24,25
146:11,16,24
148:16 149:15
150:14 153:1,24
154:10 155:11,16
156:10 158:11,18
158:19 159:24
166:5 170:1
175:19 182:1,3,6
185:10 187:11
193:9,10 194:3,3
197:4,9,11,14
203:3 204:8
208:16 209:12,15
210:24 211:13
215:11 217:1,4
218:4 222:9 224:4
225:20 226:2
227:15 228:16
230:11 236:25
247:14,17,18
249:20,24 252:1
254:7,22 260:24
261:17 262:13,18
263:12 264:22
265:17 266:10,15
269:11,20,22,25
271:6,7,19,24
272:2,19,22 273:2
274:23,24 275:15
277:14,14 278:19
283:12 287:14
288:15 292:9
296:17 302:11,22
304:3 305:1 312:9
313:15 314:15
321:25 325:3
328:2,3,8,8
329:24 330:1,5
331:2,5,21 333:21
336:23 341:11
342:4 345:1 347:1
348:18,19 349:1,6

350:23,25 351:4
352:16,17 353:15
356:21
**thinking** 16:20
34:7,8 36:17
112:23 117:14
158:18 316:13,13
320:9 326:13,15
326:19
**third** 53:6 93:1
220:21 232:20,23
247:6 250:3
281:16 305:19
315:23
**Thirty-five** 154:20
**Thornton** 60:15
**thought** 36:2 41:15
50:7 89:25 116:25
117:13 137:22
140:23 158:17,25
163:7 209:4,9
218:17 250:1,19
269:16 271:3,6
277:7 297:24
315:20 333:14,20
333:21 351:12
**thoughts** 322:5
**thousand** 4:22 90:8
90:8,9,13,21 91:2
91:8,11,11,20
322:1,1
**thousand-yard**
288:11
**thousands** 296:4
**threat** 175:4 270:3
271:9 272:6
274:22 275:10,12
278:7,14 280:9
282:22 283:9,20
300:7 306:4
307:15,18,19
308:6 309:21
310:10 335:12,12
336:3,4,5,16
337:10,12 348:8,9
351:2,7,15,24,24
352:10

**threatened** 278:5
279:8 280:13
336:25
**threatening** 310:11
**threats** 199:8
**three** 68:12 100:1
102:11 110:21
113:14,21 149:10
155:24 156:23
164:11 175:1
187:25 196:19
210:20,24 278:4
**three-part** 281:13
283:19
**throw** 224:3
**thrust** 78:8,9
**Thumbs** 32:11
**tie** 51:14
**tighten** 182:14
**till** 125:22
**time** 14:9 19:23
22:2 23:15 27:21
30:2,3,10 32:3
33:20 41:8,11
44:24 49:1 51:4
53:5,5 56:10
57:20,21 65:17
68:23 69:1 71:25
72:1,16,17 73:13
73:16,17 77:1
78:12 91:19 93:23
93:23,24 94:15
98:2 104:5,13,13
110:5,13 111:17
119:9 123:21
129:8 136:1
137:13,14,21
139:5,22 142:19
142:24 149:6,10
151:22 168:15
174:6,6,10,10,11
190:1 191:10
192:17 198:6
202:10 211:4,20
212:1,6 214:9,9
216:19 217:23
218:14 219:24

220:20 223:15
229:24 231:22
238:14 239:2
240:1,7 242:12
243:9,18,18,18,19
244:10,11 245:25
246:7 247:10
248:19 250:4
264:20 274:9,10
284:24 286:9,21
287:22 290:18
291:5,23,23,25
292:1,8,12,16
293:15,21 296:5,6
297:20 301:19,21
302:5 308:17
312:17,25 314:10
314:23 318:10
319:17 325:15
330:4 331:25
336:23,23 337:1,5
338:19 340:20
347:11 348:4
349:25 351:1,13
352:9,23 353:22
354:2,7,14 355:8
362:10
**time's** 285:15
**timeline** 248:17
**times** 5:9,9 19:23
51:9 148:2 187:25
191:23 200:14
229:21 241:25
242:18 245:23
249:12 271:16
312:5 321:2,3
323:9,19,20 324:2
324:11
**timing** 150:7
233:14,16 248:7
**tine** 254:11,12,13
**tinkered** 20:15
**tires** 80:16
**tissue** 109:21
**title** 10:21 11:8
44:7 55:11 71:16
185:6 310:7

**titled** 12:11 37:23
  40:1 150:21
**titles** 71:18
**today** 7:25 18:1
  40:23 58:17 60:1
  75:24 76:3 84:8
  87:18 177:21
  185:11 238:14
  241:13 248:18
  268:6 269:18
  352:24 353:1
  354:17 358:19
  360:1
**token** 170:1
**told** 7:10 16:3 23:2
  26:4 28:13,21
  29:6 31:14 56:6
  70:2 98:22 116:16
  123:4 147:16
  157:10,16,21,23
  157:24 159:3,10
  160:14,16,23
  167:21 171:25
  219:3 220:11
  290:12 323:23
  339:5 351:1,2,12
  358:19
**tone** 201:15
**tool** 107:13
**top** 14:4 143:13,14
  157:14 176:16
  178:18 225:20
  226:3,19 239:1
  258:2 264:20
  266:15 272:14
  318:17 323:10
**Tort** 63:8
**total** 80:17 86:23
**totally** 246:5
**town** 2:13 4:18
  5:19 69:24 77:9
**towns** 70:15
**track** 5:8 151:4
  152:11
**traditional** 75:17
  77:18 302:2 303:5
**trained** 25:13

125:12,14,19
131:3 162:18
175:14,15 176:17
188:14 196:11
235:13,25 248:10
260:4 334:13
**trainer** 300:2
**training** 6:9,11,13
  6:20,21,24 9:14
  9:15,21 14:12
  15:18,21,25 16:4
  17:18 18:20 21:5
  25:6,7,9,15 81:13
  128:13 175:10,11
  175:24 176:11
  177:6,12,19
  182:16 186:11
  254:3,19 316:10
  319:17 333:13,21
  333:24 335:8,11
  336:2,3 350:25
  351:5,6,12 352:1
  352:10
**transcribed** 315:3
  362:15
**transcript** 219:25
  221:13 222:17,19
  328:13 352:12
  355:21,21 359:18
  361:6,6,7 362:16
**transcription**
  314:16 361:19
  362:15
**transcripts** 42:19
  42:21 58:20 59:2
  59:3,4 93:17
**transition** 126:22
  127:3 287:22
**transitioned** 53:2
  73:22
**transmission** 159:9
**transmissions**
  156:6,11,15
**transmits** 35:18
**transmittal** 18:24
  35:17 48:17,20
**transpire** 126:22

**travel** 90:13,13,14
  90:21 91:4,18,22
**traveling** 90:24
**treadmill** 171:1
**trial** 35:4,5 47:3
  247:1 356:18,20
**tribunal** 52:21 90:6
**tried** 183:14 198:4
  223:17
**trigger** 194:20
  195:15 198:7
  233:14 237:14,17
  241:6 244:22
  245:2,2 296:21
**triggering** 207:17
**triggers** 206:17
**trip** 70:2
**troopers** 6:22
**trouble** 23:7
**truck** 248:9
**true** 105:15 113:15
  113:17,18 114:13
  124:18 125:24
  128:17 134:10,10
  139:4 140:1 141:2
  185:16 196:12
  217:21 274:9
  312:23 332:3
  348:17,18 349:5
  361:19 362:16
**truffles** 261:21
**truly** 269:14 361:7
**truth** 5:4,4,5
  153:22 220:25
  362:12,12,13
**try** 12:3 23:25
  28:19 59:23 60:10
  61:18 126:1,12,14
  138:5 165:13
  180:21 182:13
  242:10 243:19
  273:25 311:6
  315:13
**trying** 23:11 43:23
  52:9 92:1 102:16
  119:4 125:8,11
  134:14,14 142:8

146:18,24 154:14
181:1 182:19
192:11 196:9
207:4,7,10,12
208:1 242:5,6,8
242:14,20 244:5
245:4 260:8
265:21 291:13
342:12 353:2
358:20
**Tucker** 19:18,19
  20:2 32:23 35:18
  35:20 37:14
  181:19 196:15,25
  197:24 198:4,5,24
  201:20 206:1,4,19
  206:20 226:22
**Tucker's** 33:6 34:1
  202:17 209:5
**Tueller** 132:4,10,21
  133:4,10,11 180:1
  183:6,14 184:1,17
  185:5,10,23
  186:22 188:12
  189:15,16 257:4
  300:2,10,21 301:1
  301:24 357:15,15
**Tueller's** 178:14
  179:13,16,21
  188:4,21,24 257:2
  299:18 300:12
**turn** 9:12 11:21,21
  69:4 78:5 94:23
  125:8,11,22
  148:24 191:8,8
  227:14 232:9
  253:18,18,20
  323:7 329:1
  355:11
**turned** 60:4 83:2
  121:17
**Turning** 343:17
**twenty** 223:8
**Twenty-four**
  201:14
**Twenty-six** 315:18
  315:19

**twice** 115:4 133:17
**two** 32:14 33:9
  58:15 98:14 100:2
  102:7,12,25
  103:13 105:19
  107:21 108:13
  110:2 111:19
  113:14 116:15
  128:3,24 133:13
  135:25 147:4,5
  149:10 155:19
  157:10,12,16,20
  157:21,23,25
  158:21 159:2
  160:20 164:11
  184:22 210:18
  213:22 214:22
  233:2 234:20,25
  241:23 249:15
  280:8 281:8
  301:19 303:16
  345:8,20 347:12
  349:12,17 350:8
  358:21
**two-word** 326:5
**type** 76:23 77:10
**types** 78:1 191:1
**typical** 26:18 71:11
  128:16,16 129:24
  130:1 138:7
  161:20 182:17
  190:24 194:21
  195:1,2
**typically** 26:13
  27:18 65:11 81:13
  86:25 109:15
  126:11 127:25
  174:11 191:1,16
  191:21 258:7
  288:25 333:25,25
  334:10
**typing** 48:4

---
**U**

**U.S** 86:21
**Uh-huh** 19:4 114:6
  167:1

**Uintah** 77:21
**ultimate** 44:2
**ultimately** 30:21
  31:4,20,23 52:2
  205:21
**umbrella** 75:15
**un** 183:3
**unable** 137:20
**unarmed** 95:6
**unauthorized** 98:4
**unclear** 277:22
**uncontested** 113:11
  113:12
**uncorrected** 32:22
**undercover** 130:18
  130:20
**underlying** 92:7
**Undersigned** 58:8
**understand** 17:3
  18:8 23:16 37:21
  58:4 76:10 85:14
  85:17 88:12 89:1
  92:1 96:18 98:10
  99:25 100:6,17
  101:22,24 102:7
  102:11 106:12,21
  106:22 109:23
  110:9,12 113:2
  134:12 137:9
  140:9 145:10
  166:8,25 188:16
  198:8,13,14 204:5
  222:6,6,20 227:25
  234:16 236:2
  237:9,19 238:22
  238:24 245:10,15
  245:18 252:2
  254:21 262:23
  264:18 270:25
  279:21 280:19
  286:14 291:15
  307:21 308:12
  316:17 317:1,19
  322:15 323:9
  324:9,10 325:17
  332:7,8,17 338:10
  340:22,25 341:11

341:18,22 342:16
  346:14 350:16
  352:5 356:4 359:3
**understanding**
  8:12 13:13 31:22
  36:1,9 83:18
  107:1 122:21
  152:7,14 228:17
  236:17,19 269:21
  286:21
**understands**
  206:12
**understood** 41:3
  80:20 147:16
  313:25 322:20
**unduly** 139:22
**uneducated** 119:17
  119:18 244:25
**unfolded** 22:21
  43:8 46:18
**unfortunately**
  221:13 336:15
**Unified** 74:18
**uniformed** 303:7
**unincorporated**
  74:23
**unique** 263:25
**Unit** 150:23
**United** 1:1 12:21
  16:25 17:21 47:22
  119:22 120:16
  277:21 279:16
  280:7,23,24
  284:12 286:1
**universal** 265:18
**university** 69:16
  76:19 179:10
  181:15,16 228:11
  228:13
**unlawful** 251:11
**unlimited** 233:1
**unlock** 339:4
**unnecessary** 221:2
**unravels** 183:3
**unread** 220:8
**unrelated** 246:6
**untrue** 222:25

**update** 12:9,12
  66:17
**urged** 124:25
**use** 7:5,6,9 10:10
  15:18 16:1,4,9,11
  16:22 17:12 18:5
  18:7,15 25:10,15
  25:18,23 28:12,14
  28:15,18,19 39:18
  40:2 52:14,14
  57:12 60:25 73:1
  84:19 86:25 87:2
  88:19,20 89:9
  91:10 104:25
  105:2,3 109:24,24
  112:21 115:5
  117:19 118:24
  127:11,14 132:9
  147:4 148:20
  161:15 164:3
  193:8 201:7 212:4
  216:2 225:21
  230:5 244:25
  254:9 257:13,23
  258:25 259:3,4
  260:14 266:11
  267:10 271:18
  272:15,17,23
  273:7 276:2 278:4
  279:12 283:12
  285:11,14,19
  286:2,2,6,8
  288:24 290:7
  297:14 303:5
  305:1 307:2,19
  309:19 317:6
  325:23 331:17
  333:25 344:23
  346:4 347:10,22
  357:12
**uses** 31:23 195:10
  235:12 272:4
  280:7 297:25
  307:11 310:10
  344:22,22
**usual** 56:19
**usually** 55:25 90:2

119:15 192:6
  193:2,4 195:10
  235:5 272:6
**Utah** 1:22 4:8 6:4
  7:1,7,13,18,21
  69:25 70:2,25
  73:2 75:15 77:4
  81:10 254:13,20
  259:8 261:15
  262:14,15,15,18
  262:21 263:5,23
  263:25 265:6,20
  265:25 266:13,25
  267:2,11,12
  269:14,15,21
  271:21 272:10,21
  273:12 274:16
  276:11,18 279:14
  279:17 280:17,20
  280:22,25 286:10
  287:18 362:2,3

---

**V**

**v** 1:8
**vacant** 172:16
  321:8
**vacuum** 292:25
**vacuuming** 293:8
**vague** 38:12 293:17
**valid** 89:15 197:9
  206:10 208:17
**validity** 203:9
  204:13 205:2
**value** 164:19
  165:22 248:4
**values** 215:21
**variables** 205:18
**variants** 96:15
  261:17
**varies** 174:7
**variety** 62:15 195:2
  229:7
**various** 19:23
  20:16 42:21 71:4
  88:18 186:10
**vehicle** 96:22 97:3
  129:24 143:24

152:12 167:10
  213:3 294:24
**vein** 195:4
**ver** 329:3
**verbal** 273:6
  307:19 329:4,8,12
  329:17 330:19,19
  330:24
**verified** 14:13
**vernacular** 260:3
**versa** 345:6
**verse** 18:19
**version** 59:11 219:9
  220:8
**versions** 33:9
**versus** 4:6 19:13
  20:2 119:22
  124:16 127:20
  132:19 240:4
  276:22 277:25
  278:11 279:16
  280:6,16 281:11
  281:11 282:24
  285:3,4 286:5
  305:22 308:1
**viable** 104:2,18
  105:20 106:17,23
  110:24
**vibrant** 285:24
**vice** 345:6
**vicinity** 96:23
  103:14
**Vicki** 1:4,4 4:6,13
  98:22 155:12
**victim** 133:17
  250:20 252:10
**video** 3:11 19:18
  20:2,4 33:8,9,13
  35:2 84:24 85:4
  140:25 141:3
  184:7 197:6,8
  205:25,25 217:23
  217:25 219:1,4
  220:15 359:19
**videographer** 2:19
  4:4,19 32:7,11
  65:18,21 68:22,25

140:3 142:18,22
201:14,17 211:22
215:1 223:8,10,13
273:24 304:21
311:8 312:12,15
331:18 359:5
**videos** 20:6,10,12
195:6 238:4
**videotape** 68:25
198:19 200:3
206:22 216:20
331:19 356:21
359:17,19
**videotaped** 1:15
4:4 142:23 209:12
223:14 312:16
**videotapes** 19:2
140:7
**view** 65:1 75:23
127:10 134:7
152:5 250:2
304:10
**viewing** 140:25
**views** 67:3
**violence** 96:12 97:4
97:5 100:25
**violent** 78:11
291:12
**visible** 100:3 229:9
**visit** 6:23 167:19
**visits** 90:6
**VLC** 20:10
**vs** 361:1

**W**

**W12** 155:6,9,15
156:19,24 159:20
160:8,12
**W26** 155:6,9
156:20,25
**wait** 103:6 212:3
247:23
**walk** 144:5 294:6
318:17
**walked** 141:24
290:9 341:21
**walking** 131:23

140:11 141:9
142:10 143:18
144:4,10 145:7
146:6 166:19
168:19,22 169:9
170:5 171:13
249:12,18 250:5
289:9,19,20 291:5
291:8,13 294:18
294:21 298:15
316:2,19 318:18
318:21 323:16,24
324:7,17 325:18
329:15 330:20
342:8,15
**Wallentine** 1:15
3:2 4:5 5:2,18,19
69:1 142:23 143:2
223:14 254:10,17
312:16 361:5,18
361:21
**walls** 108:22,24
109:20 166:18
**wane** 291:22
**want** 8:24 21:25
22:13,13 23:14
28:13,15 32:3
35:21 54:22 65:20
67:21 69:5,6
70:10 80:13 81:23
84:23 88:14 98:12
99:15 113:19
115:15,15 120:8
122:18,21 123:20
124:3 136:16
139:2 143:5
158:10,11 159:7
168:7 176:20
178:8 180:15
182:22 186:8
196:24 199:14
200:9,25 201:18
203:2 207:3,11
211:4,12 212:14
220:24 221:4,10
221:17 238:13
241:23 244:12

249:5 255:22
256:21 258:12
265:11,14 272:11
279:23 284:8,10
292:1 302:9
303:18 313:8
314:14 319:12
326:3 339:3
342:20 349:9,10
349:20 353:15,23
354:15 355:21
356:2,23 358:13
360:10
**wanted** 351:14
**wanting** 205:9
**wants** 159:11
198:21,22 201:1
217:14 246:24
355:25
**war** 255:7
**warm** 258:7
**warned** 223:21
**warning** 139:6
266:11 273:5,7
**warnings** 137:20
**wasn't** 39:9 111:5
124:14,16 133:17
146:11 173:7
210:8 216:2
267:20 299:22
304:11 307:3
313:25 325:2,9,19
331:12,13 332:10
347:11 358:17
**waste** 41:11 123:21
**WatchGuard**
150:22,25 151:4
152:6,11
**water** 180:15
**Waterville** 2:10
267:23
**wax** 291:22
**way** 2:15 15:14
19:6 36:16 38:9
44:12 46:23 50:25
60:2,9 66:9,12
68:16 72:9 89:7

89:14 101:11
116:20 118:8
121:13 144:13
180:17 181:5
186:22 194:11
200:25 201:1
202:2 203:4,12
210:19 220:1
225:15 232:8
237:1 245:6 253:5
257:24 265:2
270:13 286:13
315:24 316:21,23
341:9 352:1,5
356:8,14 357:5
**ways** 215:22
**we'll** 8:25 9:2 10:18
12:3 15:11 23:9
102:17 111:13,13
125:10 135:10,10
142:16 171:16
188:22 200:8
202:21 211:11,25
219:19 247:1
349:25 355:19
356:24
**we're** 8:23 9:2
15:19 17:25 18:6
23:4 68:23 69:2
83:23 91:6 134:12
134:13,13,14
142:19,24 159:7
167:24 180:17
223:9,15 226:7
252:2,2 261:7
263:16 264:15
276:9 279:5
288:23 289:5
305:15 310:23
312:8,9,12,17,19
347:6 353:24
355:18 356:3
359:5
**we've** 7:2,17 49:6
92:24 143:10
168:6,25 177:17
177:20,23 210:22

227:1 229:6
249:12 278:12
281:19 320:20
336:14 337:1
**weak** 221:14
**weapon** 107:14
127:6,10 138:3,4
138:8 141:16
152:25 166:17
170:21 191:3,9,12
229:5,7,11,13,15
229:21 238:18
240:9 243:16
266:18 278:5
289:11 290:7
291:9,9 293:9
294:5,7,22,23
295:2,17 296:20
297:19 300:7,11
301:15,16 307:2
307:16 310:9
321:18 333:5
**weapons** 52:15
126:19 135:17
193:2 238:20
306:2 308:5
**wear** 147:4 221:18
221:19
**wears** 291:21
**website** 244:16
**weeks** 358:21
**Welch** 93:18 95:7
95:10 97:2 98:3
**Welch's** 96:22
**welcome** 40:11
314:18
**well-being** 101:2,19
**well-defined**
130:23
**well-known** 357:11
**well-tended** 170:15
**well-trained** 175:2
**well-used** 171:22
**went** 34:10 36:11
42:22 76:10 77:4
164:2 177:24
229:14 237:7

238:19 338:16
341:19 357:21
**weren't** 171:9
358:18,18
**Western** 90:15,16
91:1,15
**whatsoever** 14:21
68:7 139:21
168:15,19 177:16
183:13
**Wheeler** 2:9
**When's** 51:4 337:5
**whistles** 293:4
**Whoop** 258:2
**wide** 131:14 166:16
168:10,10
**wife** 162:13
**Wilkerson** 56:7
**Williams** 127:13
**willing** 87:15 154:3
160:5
**Windham** 1:10
2:13 4:18 9:7
42:1,9 44:12 45:6
45:22 46:21 47:6
62:13,20,24 98:14
102:8 148:22
154:22 155:8
160:9
**window** 191:11
296:19
**windows** 170:24
**wish** 15:16 155:4
298:1
**withdraw** 43:3
89:23 134:15
150:5 165:10
280:2 284:9,16
298:20 299:24
338:7
**witness** 4:20,24,25
5:3 8:3,7,10 11:6
22:19 26:12 28:11
28:25 29:4,8,23
32:7,12 35:13
38:20 39:23 40:10
45:14,16 46:10

47:4 50:12 53:9
55:5 56:24 60:4
61:23 65:23 68:21
81:6 82:13 84:7
85:4,13 88:21
92:6,6 94:11 98:7
99:11 101:6 102:6
104:10 105:24
108:4 110:14
112:5 117:11
119:2 120:11
121:4 122:16,20
129:22 130:10
133:2 134:4
135:16 136:12
137:18 139:11
140:13 151:10
153:17 154:7
157:18 158:5
162:16 163:9
164:18 165:21
172:25 176:2
180:20,25 181:11
184:23 186:5
194:25 198:11,24
199:7 201:1,1
202:1 211:17,18
218:24 219:13,15
224:9,23 225:9,18
225:24 226:14
230:9,12 233:11
233:20 236:4,5
237:21 239:3,6,19
241:3,19 243:6
244:1 245:18
247:4 248:16
249:18 250:25
251:25 253:2
255:2,16 260:1
264:21 265:23
266:6,22 270:12
271:17 275:15,23
278:17 279:23
282:4 283:5,12
285:6 289:15,25
290:22 292:5,23
293:25 295:6,8

296:16 297:9
298:7 302:25
303:23 306:22
309:7 310:1,7
311:5,24 314:18
317:16 320:4
322:8,19 325:13
326:12 327:13
330:8,13 331:16
332:15 333:19
334:23 335:23
336:7,11,19
337:18,20 338:1
340:25 341:11
342:4,23,25
344:14 345:1,19
346:9 351:19
352:22 354:20
355:3,13 356:2
357:4,24 358:16
359:3 361:4,6
362:11
**witnesses** 61:14
83:13 140:8
153:23 168:25
**woken** 171:3
**woods** 166:19
169:10 170:6
171:14,21
**Woodsum** 2:14
**word** 18:7 89:9
112:21 132:9
147:17,23 164:3
237:5 243:15,15
256:2 259:21
260:14,15,17,19
260:22,23 262:20
273:2 275:19
281:1 282:23
283:13 318:5
324:18 343:4,23
344:22,22 352:6
359:24
**words** 11:1 22:8,11
23:17 55:14 74:11
96:25 99:1,15
100:20 112:13

121:18 123:25
159:3,5 161:16
166:21 196:5
235:21 243:9
261:9 262:21
275:13,25 280:7
297:25 300:4
308:4 326:22
336:11,14 345:8
345:20
**work** 48:10,10 53:9
75:21 76:20,23
178:19 179:16
181:19 195:19
205:11 215:13
226:10 254:14,15
256:16 355:18
**worked** 20:9 51:25
53:4 70:13,16,17
70:18 73:16 81:16
**workforce** 53:6
**working** 44:4 57:21
73:15 91:19
335:16
**works** 20:9 27:16
128:24 226:10
331:19
**world** 18:12 130:23
172:4
**world-class** 300:3
**worried** 101:18
**worth** 108:20
**wouldn't** 7:5,9
28:12,16,16,19
29:3,24 35:10
64:13 83:18 97:6
109:6,21 111:17
118:6,16 128:11
138:12 144:25
146:2,20 163:5,5
166:1 185:24
256:12 331:16,17
351:19 356:18
**wound** 334:8
**WPD** 150:22
**wrap** 154:21
**write** 34:16 65:11

84:12 166:13
274:13,21 275:13
305:9
**writing** 31:15 47:15
94:3,5
**writings** 83:25
87:10 356:16
**written** 30:12 49:13
55:10 264:22
272:10 273:6
**wrong** 114:14
120:3 170:12
193:10 201:3
268:21 277:12
287:10 288:3
299:22
**wrongful** 51:5,11
83:13
**wrote** 89:13 94:15
166:22 184:18,25
185:5 236:23
260:20 274:4,5
275:7,15 285:17
286:17 304:17,25
305:5

---
**X**
**X** 3:1,7 285:21

---
**Y**
**Y** 285:21
**yard** 302:2
**yards** 115:17,18
302:2
**yeah** 37:15 40:1
48:11 51:12 54:2
60:20 62:11 69:21
84:21 91:2,18
104:14 117:9
120:11 125:16
127:17 137:25
144:1 145:23
146:9 148:11
154:12 163:22
179:9 180:13
194:10 209:7
211:8,10 216:8

221:11 223:9
232:17 253:5
263:18 269:2
285:9 287:4 304:2
304:3 305:5 313:6
321:9 323:5,9,13
333:1 341:23
**year** 21:10 77:3,4
94:1,9,11 174:11
307:9
**years** 17:7 18:4
50:25 51:8 52:24
53:3 70:18 73:17
77:23 80:7 81:9
82:19,21,23
132:15 133:6,7,8
133:8 184:6 245:7
269:15,15 285:24
**yelled** 296:21
320:25
**yelling** 323:20
**you's** 88:2
**young** 69:16 76:19
132:25 244:24
259:22

_____

**Z**
**Zach** 339:5
**Zachary** 93:18 95:7
**zone** 96:8 116:9,13
116:17 166:14
167:8 302:8

_____

**0**
**04101** 2:16
**04112-4803** 2:5
**04901** 2:10

_____

**1**
**1** 3:12 15:2 49:23
58:13 68:22
148:11,18 161:1
183:8 240:10
359:10,14
**1-4** 3:16
**1.88** 241:15 243:2
246:2

**1/100** 242:3
**1:14** 142:24
**10** 178:6,12 192:7
**10:27** 68:23
**10:42** 69:2
**100** 167:25
**12** 72:3 148:21
150:23
**12:06** 142:19
**12th** 43:9 46:18
314:12
**14** 94:12 211:22
213:14 312:22
**1434** 149:6
**145** 213:16 359:23
**15** 94:11,12,13
192:7 312:24
**1500** 90:23 91:17
**17** 155:20
**172** 3:10
**174** 220:8
**175** 3:10
**180-degree** 192:21
**18th** 314:11
**1960s** 119:23
285:16
**1976** 277:6
**1979** 69:11,14
80:16
**1982** 69:18 80:3
**1983** 184:18 299:22
300:1 307:14
310:5,8
**1984** 185:8
**1987** 76:16
**1990** 76:16

_____

**2**
**2** 3:13 19:9 40:25
64:4 68:25 94:18
95:3 142:19 161:4
222:13 240:10
304:25 305:18
332:21 359:10,14
**2/10** 256:15
**2:15-cv-73-JDL** 1:4
361:1

**2:43** 223:11
**2:55** 223:15
**20** 1:17 105:7 183:8
187:19 192:7,11
353:24 361:2
**2000** 274:25
**2001** 77:22
**2005** 70:23
**2010** 254:4 257:7,9
275:2 359:25
**2013** 224:24
**2014** 12:11 43:9
46:18 70:25 73:12
94:3 148:21
**2015** 1:17 4:9 19:9
48:19 49:13,15
61:6 94:10 361:2
361:22 362:20
**207** 2:5,11,16
**20s** 134:1
**20th** 4:8
**21** 186:25 301:5,6
302:4,5,7
**21-foot** 183:8
187:19,20 300:17
300:22 302:20
**22** 48:19 49:12
**222** 3:9,10,11
**23** 90:2,3,4
**24** 201:17
**243** 1:21
**24th** 94:8
**25** 105:8 133:6,8
137:14 138:18
139:20 149:15,15
**250** 90:20
**26** 47:19 299:12
313:19,23 314:6
315:5,21,22
**27** 2:9 159:19
163:16 320:24
**28** 323:7
**29** 327:22 329:1
354:9,23
**2nd** 32:23 73:22

_____

**3**

**3** 3:14 94:23 124:2
142:22 166:13
201:12 222:13
359:10,14
**30** 80:7 135:4,7
154:19 301:12
333:2
**30-round** 135:6
**30s** 133:24
**31** 333:9
**32** 148:25 154:15
154:16 338:5
**33** 338:14
**34** 315:12,19,20
343:9
**35** 154:13,17,19
273:24
**357** 109:13,18,19
130:8,13 134:21
314:3
**36** 354:24 355:2
**360** 192:21
**37** 154:22
**376** 2:10
**38** 109:18
**39** 2:4

_____

**4**
**4** 3:15 124:23 143:6
223:13 359:11,15
**4:25** 312:13
**4:38** 312:17
**40** 250:3
**400** 1:21
**42** 310:7
**45** 24:17
**4803** 2:4

_____

**5**
**5** 3:3 143:5,6,7,8
147:9 166:5 299:8
304:25 305:18
312:15
**5/10** 233:24
**5:20** 352:22
**5:28** 359:6
**5:38** 360:18

**50** 128:15,19
183:17 264:1
270:24
**54** 233:17,22
234:13 237:18
241:7 244:21
245:3
**54/100** 233:24
**55** 241:14 243:1
246:1

_____

**6**
**6** 61:6 137:14
138:17 139:20
149:14 166:12
220:3,6 312:25
352:23
**6.25** 137:24 150:13
**6.31** 220:9
**6:31** 221:13
**600** 2:15
**621:19** 155:6
**622** 155:20
**622:17** 155:1
**622:20** 155:20
**622:46** 156:19
**65** 133:7,8
**69** 168:1 187:22
214:3

_____

**7**
**7** 174:21,23 302:2
**7-hour** 312:24
**70** 127:4 212:15
214:3
**709** 361:2
**71** 253:20
**72** 304:20 360:1
**72-2-402** 271:21
**75** 223:17
**76** 277:7
**76-2-402** 259:7
267:3
**76-2-404(a)** 260:24
**772-1941** 2:16
**774-6206** 2:5

## 8

**8** 176:13,14 220:2,4
  220:5,5,11,15
**8:31** 220:24 221:3
  221:12
**80-minute** 65:18
**80s** 277:5
**84** 2:15 299:22,23
**84111** 1:22
**873-77771** 2:11

## 9

**9** 151:21
**9:05** 1:18 4:9
**911** 42:20 99:3
  161:11
**92** 229:24 233:22
  234:14 243:10,20
  244:5,16,21 246:1
**94** 359:23
**9th** 362:19