# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **VICKI MCKENNEY,** individually, and as Next Friend of Stephen McKenney, and as Personal Representative of the Estate of Stephen McKenney, | ) ) ) ) ) | |
| | ) | |
| **Plaintiff,** | ) ) | |
| v. | ) | **2:15-cv-00073-JDL** |
| | ) | |
| **NICHOLAS MANGINO,** | ) ) | |
| **CUMBERLAND COUNTY, and** | ) ) | |
| **TOWN OF WINDHAM,** | ) ) | |
| **Defendants.** | ) | |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Vicki McKenney brings this action against Defendants Nicholas Mangino, Cumberland County, and the Town of Windham alleging claims arising out of the fatal shooting of her late husband, Stephen McKenney, by Mangino, a Deputy Sheriff employed by the Cumberland County Sheriff's Office.[1]  ECF No. 3-2 at 1. Defendants have moved for summary judgment on all claims.  ECF No. 43; ECF No. 45.  For the reasons explained below, I grant the Town of Windham's motion to dismiss, and grant in part and deny in part Deputy Mangino and Cumberland County's motion to dismiss.

---

[1] For the sake of clarity, this opinion will refer to the Plaintiff as "Mrs. McKenney" or "McKenney" and to her deceased husband as "Stephen."

# I. FACTUAL BACKGROUND

On April 12, 2014, Windham Police Officers James Cook and Seth Fournier were dispatched to the McKenney residence in Windham, in response to Mrs. McKenney's call to the police indicating that her husband was possibly suicidal. Officers Cook and Fournier were advised by dispatch that Stephen wanted to shoot himself, that the residence contained multiple firearms that were not locked up, and that Stephen had become increasingly "physical" or "aggressive" with Mrs. McKenney.

Officers Cook and Fournier arrived at the McKenney residence at approximately 6:20 a.m. and parked their cruisers in the driveway. Cumberland County Sheriff's Deputy Nicholas Mangino also responded to the residence to serve as backup to the Windham officers, arriving shortly after Cook and Fournier. Deputy Mangino had a civilian riding along with him in his cruiser at the time he responded to the call, though he did not advise the Windham officers of that fact. The civilian remained in Mangino's cruiser throughout the incident.

Officers Cook and Fournier met Mrs. McKenney in the driveway and she informed them that her husband was emotionally disturbed and had "snapped" that morning after months of dealing with severe back pain. She also told the officers that the guns were located in a back bedroom, while her husband was in the front room, and that there was no one else in the house. There are two doors leading into the house: a front door and a door leading from the house into the garage. The overhead garage door was open when the officers arrived. The house is part of a condominium development, and is connected to an adjacent home.

Approximately one minute after arriving at the house and speaking with Mrs. McKenney, the officers entered the house to make contact with Stephen. Officers Cook and Fournier entered through the door to the garage, while Deputy Mangino entered through the front door. Fournier was armed with a Taser, while Cook and Mangino carried their drawn service pistols. The officers announced their presence to Stephen by saying "police department" and requested him to "come out." Approximately 30 seconds later, Stephen appeared on the far side of the living room from where the officers were taking cover behind a wall in the front hallway, approximately 12 or more feet from the officers. Stephen was holding an object in his right hand, and when asked by the officers what the object was, he replied ".357 Magnum." The officers told Stephen to put the gun down, and told him that they wished to get him help. At this point, Officer Fournier holstered his Taser and drew his handgun, based on his belief that a Taser was not an appropriate response to the threat posed by Stephen's firearm. McKenney contends that the Taser would have been an appropriate response to the threat. Throughout the encounter inside the house, Officers Cook and Fournier kept their service pistols by their sides at the "low ready" position, and never aimed their firearms at Stephen. Stephen likewise never pointed his gun at any of the officers while inside the house.

The officers decided to back out of the house, and Officer Cook told Stephen that they were "going to go outside" and would call him. The officers left the house through the door to the garage and met Mrs. McKenney, who was waiting outside. As the officers left the house, Deputy Mangino headed down the driveway to his

cruiser and advised the others that he was going to get his long gun. Cook directed Officer Fournier to put Mrs. McKenney in his cruiser and take her away for her safety. Mrs. McKenney was distraught and in tears. Approximately 10 seconds after the officers left the house, Officer Fournier was escorting Mrs. McKenney to his cruiser when he observed Stephen in the doorway leading from the house to the garage and alerted the other officers to Stephen's presence. Fournier then put Mrs. McKenney in his cruiser, backed out of the driveway, and drove to a cul-de-sac at the end of the street, a few hundred yards from the McKenney residence. From this location, Fournier was the only officer on the scene who had a view into the McKenneys' garage.

At this point, Officer Cook had retreated behind the McKenneys' house and Deputy Mangino had taken cover behind his cruiser, which was parked at the end of the driveway away from the house. Officer Fournier could see Stephen throughout the incident. From his position behind his cruiser, Deputy Mangino could see Stephen at times, but also relied on Fournier to relay information about Stephen's location. The civilian in Mangino's cruiser remained crouched down in the front seat throughout the incident. Officer Cook was dependent upon Fournier to relay information about Stephen's location and activities. Shortly after the officers left the house, Sergeant James Boudreau of the Windham Police was dispatched to the scene, in response to a request from Officer Cook. Cook also informed Fournier that he was to transport Mrs. McKenney away from the scene as soon as another unit arrived to replace him.

Approximately two minutes after the officers left the inside of the McKenney residence, Officer Fournier saw Stephen, who was still holding his handgun, come out of the house and head in the direction of Officer Cook, who was at the rear of the building. Fournier radioed to Cook and told him that Stephen was "heading right toward you." At this time Officer Cook, who was behind the building, did not know the exact location of either Deputy Mangino or Stephen, but heard Mangino yell three times at Stephen to "drop the gun." The parties agree that Stephen had a vacant stare and acted as though he had not received or acknowledged the commands to drop the gun. ECF No. 61 at 12, ¶ 62. For the next two to three minutes, Stephen walked around in the driveway in the vicinity of Officer Cook's cruiser and the garage area, and he entered and exited the house several times. It is disputed whether, as the Town of Windham claims, this forced Officer Cook to retreat further to the rear of the building to avoid being seen by Stephen. During this time, Officer Fournier kept Mangino and Cook apprised of Stephen's location and activities, including at one point telling Deputy Mangino to "stay down, he's looking right at you." At one point, Stephen pointed his gun up into the air, and Deputy Mangino asserts that he thought Stephen was pointing the gun at him. Mangino said he wanted to move his cruiser from its position on the street in front of the residence, but Fournier advised him to "hold tight, he's back at the front of the garage."

Officer Cook retreated further along the back of the house to the adjacent street, where he met with Sergeant Boudreau and Sergeant Marc Marion of the Cumberland County Sheriff's Office, who arrived at the scene approximately five

minutes after the officers had first exited the house. Their position on the adjacent street did not afford them a view of Deputy Mangino, Officer Fournier, or Stephen, so Cook explained where each person was located. Shortly thereafter, Windham Police Officer Ernest MacVane arrived at the scene, and was directed by Sergeant Boudreau to block traffic on the adjacent street to prevent any vehicle from accessing the street where the McKenney house was located.

Officer Fournier continued to apprise the other officers of Stephen's location and activities. He also spoke with Mrs. McKenney, who was still in his cruiser, about the police wanting to make phone contact with Stephen, and conveyed the phone number she provided to Officer Cook. Approximately one and a half minutes after Cook met with Sergeants Boudreau and Marion on the adjacent street, Officer Fournier reported that Stephen was right inside the front of the garage. Thirty seconds later, Fournier radioed to Deputy Mangino and said "I can't tell, but he might be pointing that," and told Mangino to be careful. Thirty seconds after that, Fournier observed Stephen walking down the driveway in the direction of Deputy Mangino's cruiser, as Mangino continued to crouch on the opposite side of his vehicle and the civilian continued to crouch in the front seat. Throughout this time, Deputy Mangino had his rifle aimed at Stephen.

Officer Fournier radioed Deputy Mangino that Stephen was "walking toward your car right now." As Stephen was walking down the driveway, he had a vacant stare and appeared to be "not at home" mentally. ECF No. 61 at 15, ¶ 75. He walked down the driveway in a nonchalant manner, and held his handgun dangling at his

side.  *Id.* at 15, ¶ 77.  Stephen did not raise his gun or point it in the direction of Mangino's cruiser; nor did he make any sudden or evasive movements.  *Id.* at 15, ¶¶ 78-80.  Approximately six minutes had elapsed since Stephen raised the gun above his head by the garage, and Deputy Mangino thought that Stephen pointed the gun at him.  It had also been approximately six minutes since Deputy Mangino ordered Stephen three times to drop his gun.  ECF No. 61 at 16-17, ¶¶ 86, 88.[2]

Officer MacVane, who had parked his cruiser on the adjacent street to block traffic, took his patrol rifle and began walking between houses toward Deputy Mangino's cruiser.  As he approached, Officer MacVane saw Stephen walking from his home and down the driveway in the direction of Mangino's cruiser.  MacVane was approximately 100 feet from Stephen at this time.  Because Stephen continued to walk in the direction of the cruiser, Officer MacVane believed that Stephen was going to kill Deputy Mangino.  McKenney contends that this belief was not reasonable. When Stephen was approximately halfway down the driveway, Officer MacVane stopped walking and aimed his patrol rifle at Stephen.  At the same time, Deputy Mangino came around to the front of his vehicle and fired his rifle two times in quick succession at Stephen, who fell to the ground.  The first shot missed Stephen, but the second shot struck him in the head and killed him.  Stephen's gun remained at his side at the time he was shot.

---

[2] The Defendants assert that there is evidence that Deputy Mangino gave additional commands to Stephen to drop his gun.  The Defendants concede, however, that this fact is disputed, and recognize that it is therefore not part of the summary judgment record of undisputed facts.  ECF No. 45 at 11 n.7.

To summarize the events leading up to the shooting, after the officers spoke with Stephen inside and then left the McKenney residence, they first saw Stephen in the doorway leading to the garage at approximately 6:24 a.m. They observed Stephen walk in and out of his house and around the driveway for approximately seven and a half minutes, between 6:24 a.m. and 6:32 a.m. At approximately 6:26 a.m., Deputy Mangino yelled at Stephen three times and ordered him to drop his gun. A few seconds later, Mangino observed Stephen raise the gun over his head, and thought Stephen was pointing the gun at him. Approximately five minutes later, at 6:31 a.m., Officer Fournier radioed to Deputy Mangino and said "I can't tell, but he might be pointing that." At 6:31:30 a.m., Stephen began walking down the driveway in the direction of Deputy Mangino's cruiser. Deputy Mangino testified that Stephen was walking nonchalantly, and held his gun dangling down by his side. Stephen did not make any sudden movements or point the gun in the direction of Mangino's cruiser. At 6:31:41 a.m., Deputy Mangino fired two shots at Stephen, hitting him once and killing him. At the moment he was shot and killed, Stephen was 69 feet away from Deputy Mangino.

Officer MacVane approached Stephen as he lay on the ground and observed that he had a firearm in his right hand. MacVane asserts that the gun was cocked and loaded, but McKenney contends that the gun was not cocked. Stephen was in lawful possession of his gun at all times leading up to the shooting. Officer MacVane removed the gun from Stephen's hand, handcuffed him, and then rolled him over so he could begin resuscitative efforts, but quickly realized the shooting was fatal.

Approximately ten minutes elapsed between the time the officers first arrived on the scene, and when Deputy Mangino shot Stephen.

## II. LEGAL ANALYSIS

The Complaint[3] asserts a total of ten claims against Defendants: (1) violation of the Fourth Amendment's prohibition on use of excessive force, under 42 U.S.C. § 1983; (2) violation of the Maine Civil Rights Act, 5 M.R.S.A. § 4682; (3) violation of the Fourteenth Amendment's due process guarantee, under § 1983;[4] (4) negligence, based on violation of the duty to protect; (5) violation of the Fourth Amendment for failure to train law enforcement officers, under § 1983; (6) violation of the Americans with Disabilities Act;[5] (7) assault; (8) intentional infliction of emotional distress; (9) negligent infliction of emotional distress; and (10) wrongful death under 18-A M.R.S.A. § 2-804. ECF No. 3-2. Defendants have moved for summary judgment on all claims. ECF No. 43; ECF No. 45.

### A. Summary Judgment Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). In making that determination, a court must view the evidence in the light

---

[3] The Plaintiff amended her complaint once in state court before the Defendants removed the case to federal court. For simplicity's sake, this opinion refers to the operative First Amended Complaint as "the Complaint."

[4] McKenney confirmed at oral argument that she is not pressing her Fourteenth Amendment claim against the Defendants stated in Count III of the Complaint. This claim is therefore waived, and this opinion will not address it.

[5] Plaintiff's ADA claim is asserted against the Town of Windham and Cumberland County, but not against Deputy Mangino. ECF No. 39 at 2.

most favorable to the non-moving party. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations and quotations omitted).

Local Rule 56 defines the evidence that this court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment. First, the moving party must file a statement of material facts that it claims are not in dispute, with each fact presented in a numbered paragraph and supported by a specific citation to the record. *See* Loc. R. 56(b). Second, the non-moving party must submit its own short and concise statement of material facts in which it admits, denies, or qualifies the facts alleged by the moving party, making sure to reference each numbered paragraph of the moving party's statement and to support each denial or qualification with a specific citation to the record. Loc. R. 56(c). The non-moving party may also include its own additional statement of facts that it contends are not in dispute. *Id.* These additional facts must also be presented in a numbered paragraph and be supported by a specific citation to the record. *Id.*

Third, the moving party must then submit a reply statement of material facts in which it admits, denies, or qualifies the non-moving party's additional facts, if any. Loc. R. 56(d). The reply statement must reference each numbered paragraph of the non-moving party's statement of additional facts and each denial or qualification must be supported by a specific citation to the record. *Id.*

The court may disregard any statement of fact that is not supported by a specific citation to the record, Loc. R. 56(f), and the court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*; *see also, e.g., Packgen v. BP Exploration, Inc.,* 754 F.3d 61, 70 (1st Cir. 2014); Fed. R. Civ. P. 56(e)(2). Properly supported facts that are contained in a statement of material or additional fact are deemed admitted unless properly controverted. Loc. R. 56(f).

**B.** **Claims against the Town of Windham**

**1. Claims under § 1983 and the Maine Civil Rights Act**

McKenney asserts that the Town of Windham's conduct during the incident that led to her husband's death violated the Fourth Amendment to the United States Constitution, as well as the Maine Civil Rights Act, 5 M.R.S.A. § 4682 *et seq.* ECF No. 3-2 at 6-12. Windham asserts that there is no basis for liability on the part of the Town in the evidentiary record and that it is entitled to summary judgment in its favor.

As an initial matter, I note that the outcome of McKenney's claim under the Maine Civil Rights Act will follow from the disposition of the federal constitutional claims under 42 U.S.C.A. § 1983. *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA."). I therefore address the § 1983 claims first.

Count I of McKenney's Complaint alleges that the Defendants violated Stephen's Fourth Amendment rights by using excessive force against him. It is

undisputed that the only physical force applied to Stephen by any Windham officer occurred after the shooting, when Officer MacVane handcuffed Stephen and removed the gun from his hand. *See* ECF No. 51 at 7, ¶¶ 74-75. For liability to attach to Windham, McKenney must show that one of the Windham officers violated Stephen's constitutional rights. *See Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) ("If, however, the officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable.").

Viewed in the light most favorable to the Plaintiff, there is no factual basis in the record for finding that any of the Windham officers used excessive or unreasonable force against Stephen. The only force used by a Windham officer was when Officer MacVane handcuffed Stephen, removed his gun from his hand, and turned him over to begin resuscitative efforts. ECF No. 51 at 7, ¶ 75. The actions taken by Officer MacVane do not rise to the level of excessive force required to violate the Fourth Amendment. *See Fernández-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 327 (1st Cir. 2015) (finding no excessive force where officer, pursuant to "standard police practice," shoved suspect against wall and handcuffed her).

Based on the foregoing, the Town of Windham is entitled to summary judgment on Count I of the Complaint.

Count V of the Complaint asserts a failure to train claim against Windham under the Fourth Amendment. ECF No. 3-2 at 10-12. McKenney contends that Windham's failure to adequately train its officers amounted to deliberate indifference to the rights of the persons with whom the officers came into contact. ECF No. 52 at

8.  It is established, however, that "the inadequate training of a police officer cannot be a basis for municipal liability under section 1983 unless a constitutional injury has been inflicted by the officer or officers whose training was allegedly inferior." *Calvi*, 470 F.3d at 429.  As discussed above, the undisputed facts establish that none of the Windham officers violated Stephen's constitutional rights.  Thus, because the Town of Windham cannot be liable on a failure-to-train theory, it is entitled to summary judgment on Count V of the Complaint.

As mentioned above, McKenney's claim asserted in Count II under the Maine Civil Rights Act is controlled by the outcome of her § 1983 claims.  *See Berube*, 506 F.3d at 85.  Because I conclude that the Town of Windham is entitled to summary judgment on the § 1983 claims asserted against it, the Town is also entitled to summary judgment on Count II of the Complaint.

### 2.  Americans with Disabilities Act Claim

Count VI of the Complaint alleges that Windham discriminated against Stephen and denied him benefits and services due to his status as a disabled individual.  ECF No. 3-2 at 12-13.  Windham responds that there is no evidence that Stephen's disability played a role in any denial of benefits, and that the emergency circumstances exception to the duty to accommodate applies in this case.  ECF No. 43 at 16-18.

To make out a claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, McKenney must show that Stephen was discriminated against or not provided services "by reason of his disability."  *Buchanan v. Maine*, 469 F.3d

158, 176 (1st Cir. 2006) (quotation marks omitted); *see also Higgins v. Reed*, 2012 WL 3150813, at *12 (D. Me. Aug. 2, 2012) (granting summary judgment where plaintiff failed to show that challenged actions were motivated by animus on account of plaintiff's mental illness). McKenney does not point to any specific facts in the record that suggest that the Windham officers treated Stephen as they did *because* he was disabled. *See* ECF No. 52 at 8-10; *cf. Vincent v. Town of Scarborough*, 2003 WL 22757940, at *24 (D. Me. Nov. 20, 2003) ("While one could speculate that the standoff might have been resolved differently [had officers taken further steps to accommodate suspect's disability], one can only reasonably conclude that the officers trained their weapons on [the suspect] because he was carrying a high-powered rifle in a crowded shopping plaza—not because of misperceptions stemming from his disability.").

Moreover, any duty the officers might have had to accommodate Stephen's disability did not arise until after the emergency the officers faced had ended. *See Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 73 (D. Me. 2006) ("[T]he duty to reasonably accommodate does not come into play until the area is secure and there is no threat to human safety"). The area in question was not secure in this case, as Stephen was carrying a gun and had ignored commands to drop his weapon. Therefore, a duty to accommodate Stephen's disability did not arise before he was fatally shot.

For the foregoing reasons, the Town of Windham is entitled to summary judgment on Count VI of the Complaint.

### 3. State Law Tort Claims

Counts IV and VII to X of the Complaint assert state law tort claims, including negligence, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, and wrongful death. Windham asserts that it is immune from all of these claims due to the protections of the Maine Tort Claims Act, 14 M.R.S.A. § 8103. ECF No. 43 at 19.

The Maine Tort Claims Act provides that "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." 14 M.R.S.A. § 8103 (2016). "Governmental entities" are defined by the statute to include political subdivisions, such as cities and towns. 14 M.R.S.A. § 8102(3) (2016). The Maine Tort Claims Act contains a limited number of exceptions to immunity, which are to be "strictly construed." *New Orleans Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 5, 728 A.2d 673. These exceptions are for torts related to: (1) the use of vehicles, machinery, and equipment; (2) public buildings; (3) discharge of pollutants; and (4) road construction and street cleaning or repair. 14 M.R.S.A. § 8104-A(1)-(4) (2016). McKenney does not explain how the claims she asserts fit within any of the exceptions to immunity, and the record does not provide a basis for inferring that any exception applies.[6] Windham also has not waived its tort immunity through the purchase of liability insurance. Windham is a member of the Maine Municipal

---

[6] Although Officer Fournier used a car to transport Mrs. McKenney away from the scene prior to her husband's shooting, such incidental use of a vehicle does not implicate the vehicle exception to immunity under 14 M.R.S.A. § 8104-A(1). *See Day's Auto Body, Inc. v. Town of Medway*, 2016 ME 121, ¶ 9, 145 A.3d 1030 ("we have made clear that the mere fact that a vehicle or piece of equipment or machinery is involved in the conduct that allegedly caused harm does not, in itself, implicate the exception to immunity").

Association Property and Casualty Pool, and its liability insurance coverage is limited to areas where it is not immune from tort liability. ECF No. 43 at 21-22. The parties agree that this insurance does not provide coverage for the instant suit. ECF No. 51 at 7, ¶ 71. Windham's immunity under the Maine Tort Claims Act is therefore preserved. *See Doucette v. City of Lewiston*, 1997 ME 157, ¶ 10, 697 A.2d 1292. The Town of Windham is therefore entitled to summary judgment on Counts IV and VII to X of the Complaint.

## C.    Claims against Deputy Nicholas Mangino

### 1.    Claims Under § 1983 and the Maine Civil Rights Act

As discussed above with respect to the claims against the Town of Windham, the outcome of McKenney's Maine Civil Rights Act claim, asserted in Count II of the Complaint, will be determined by the disposition of her claims asserted in Count I under § 1983.[7] *See Berube*, 506 F.3d at 85.

Count I alleges that Deputy Mangino violated Stephen's rights under the Fourth Amendment by using excessive force against him. ECF No. 3-2 at 6-7. Mangino argues that he is entitled to qualified immunity on this claim. ECF No. 45 at 5.

A law enforcement officer is entitled to qualified immunity from claims brought under § 1983 unless the plaintiff can show: (1) that the officer violated the plaintiff's constitutional rights; and (2) "that these rights were so clearly established that a

---

[7] Count V of the Complaint, which asserts a claim for failure to train, does not, by its terms, apply to Deputy Mangino. Count III, which asserts a claim under the Fourteenth Amendment's due process guarantee, has been waived.

reasonable officer should have known how they applied to the situation at hand." *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 23 (1st Cir. 2016). Courts have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Deputy Mangino focuses his argument on the second, "clearly established" prong. ECF No. 45 at 7-8. The clearly established prong itself encompasses two questions: (1) whether the contours of the right were sufficiently clear; and (2) whether a reasonable defendant, acting under the specific facts of the case, would have understood that he was violating the right. *Hunt v. Massi*, 773 F.3d 361, 368 (1st Cir. 2014). The Supreme Court recently stated that "it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation omitted). Instead, the "clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Furthermore, courts are only to consider facts that were "knowable to the defendant officers." *Id.* at 550.

Thus, the question presented here is whether a reasonable officer in Deputy Mangino's position would have understood that it violated the Fourth Amendment to use deadly force against an apparently disturbed and suicidal individual who was walking in the direction of the officer while carrying a loaded gun dangling at his side, was approximately 70 feet away from the officer, had been warned approximately six minutes earlier to drop his gun, and who the officer believed had briefly pointed his

gun at the officer approximately six minutes earlier. To answer this question, it is necessary to survey the case law and determine the contours of Stephen's Fourth Amendment right to be free from the excessive use of force. Clearly establishing the existence of the right does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Pauly*, 137 S. Ct. at 551.

Deputy Mangino asserted at oral argument that the Supreme Court's recent decision in *Pauly* stands for the proposition that in order to demonstrate that the law was "clearly established," a plaintiff must identify a published opinion addressing nearly identical facts that concludes that an officer violated the Constitution. In *Pauly*, the Supreme Court stated:

> The panel majority [of the court below] misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment. Instead, the majority relied on *Graham*, *Garner*, and their Court of Appeals progeny, which—as noted above— lay out excessive-force principles at only a general level. Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent. For that reason, we have held that *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case.

> This is not a case where it is obvious that there was a violation of clearly established law under *Garner* and *Graham*. Of note, the majority did not conclude that White's conduct—such as his failure to shout a warning—constituted a run-of-the-mill Fourth Amendment violation. Indeed, it recognized that this case presents a unique set of facts and circumstances in light of White's late arrival on the scene. This alone should have been an important indication to the majority that White's conduct did not violate a "clearly established" right. Clearly established

> federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed.

*Pauly*, 137 S. Ct. at 552 (quotations and citations omitted). The Supreme Court faulted the lower court for failing to identify a case with similar factual circumstances, but did so in the context of discussing the "unique set of facts and circumstances" presented by the case. *Id.* Because Officer White's conduct did not amount to a "run-of-the-mill" constitutional violation, a case with similar facts would be required to put the officer on notice that his conduct violated clearly established law. *Id.* Moreover, the "similar circumstances" language used by the Supreme Court does not support Mangino's assertion that a case with "nearly identical" facts is required. According to Merriam-Webster, "similar" means "having characteristics in common." *Similar*, Merriam-Webster Dictionary (online edition 2017), https://www.merriam-webster.com/dictionary/similar. The Oxford English Dictionary defines "similar" as "[h]aving a marked resemblance or likeness; of a like nature or kind." *Similar*, Oxford English Dictionary (online edition 2017), http://www.oed.com/view/Entry/179 873?redirectedFrom=similar#eid. It is possible for a case to analyze similar circumstances without presenting a nearly identical factual scenario. And cases analyzing similar circumstances can clearly establish a right even without addressing a nearly identical factual scenario. Indeed, the Supreme Court gave no indication that its decision in *Pauly* was intended to repudiate the proposition that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

As a practical matter, the standard advanced by Deputy Mangino fails to account for the reality that the factual circumstances of each case are, by their nature, unique, and two cases seldom involve nearly identical facts. Courts should therefore look to cases that analyze similar circumstances, such as whether a suspect is armed, the suspect's conduct and proximity to the officer, and warnings given by the officer, to determine whether a reasonable officer would be on notice that his or her actions in a particular factual scenario would fall outside the bounds of the Constitution. A case presenting a nearly identical alignment of facts is not required so long as the existing cases would enable an officer, as a matter of reason and common sense, to understand that his or her conduct in a specific situation crossed the constitutional line. Accordingly, I turn to consider the relevant precedent.

**a. Case Law**

In *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the Supreme Court held that the use of deadly force was constitutionally unreasonable where the suspect poses no immediate threat to officers or others. *See also Estate of Bennett v. Wainwright*, 548 F.3d 155, 175 (1st Cir. 2008) (noting deadly force only justified in cases where "an individual posed a threat of serious physical harm either to the officer or others") (internal quotations omitted). Starting from this baseline, the question becomes whether a reasonable officer would have understood that the circumstances facing Deputy Mangino did not justify the use of deadly force, such that the use of that force was unconstitutional. The application of *Garner*'s general rule to specific factual situations by the courts helps to illuminate this inquiry.

In *White v. Pauly*, the Supreme Court held that an officer was entitled to qualified immunity after shooting the plaintiff's decedent, Pauly. 137 S. Ct. at 552. Two officers responded to Pauly's house late one evening following a report that Pauly's brother had been engaged in a road rage incident and was intoxicated. *Id.* at 549. The officers demanded that Pauly and his brother come outside, but failed to identify themselves as police officers. *Id.* at 550. The two men instead armed themselves, and shouted "[w]e have guns." *Id.* A third officer, who was not aware that the men had not been told that they were confronting police officers, arrived on the scene at the moment when one of the men yelled that they had guns, and took shelter behind a stone wall. *Id.* A few seconds later, Pauly's brother stepped out the back door of the house and fired two shotgun blasts, while screaming loudly. *Id.* A few seconds after that, Pauly opened a front window and pointed a handgun in the direction of the third officer. *Id.* One of the first officers to arrive shot at Pauly but missed, and then the third officer shot and killed Pauly. *Id.* The Court held that the third officer's conduct did not violate clearly established law, despite his failure to shout a warning before using deadly force, in light of the "unique" circumstances surrounding the officer's late arrival on the scene. *Id.* at 552. The Court went on to say that clearly established law does not prohibit a reasonable officer who arrives late to an ongoing police action from assuming that proper procedures were followed before his arrival. *Id.* The Court expressed no opinion on whether the other two officers on the scene were entitled to qualified immunity. *Id.* at 552-53.

The First Circuit held that officers who used deadly force against the plaintiff in *Berube v. Conley* were entitled to qualified immunity. 506 F.3d at 85. The plaintiff in that case, Berube, attempted to commit suicide while parked in his truck in a vacant lot. *Id.* at 81. After being interrupted, he drove to the local police station and began smashing the windows of police cruisers with a large hammer, while yelling and screaming. *Id.* A female officer confronted Berube and yelled at him to put the hammer down, an order which he ignored. *Id.* Believing that Berube was about to attack her with the hammer, the officer fired her gun at him until he fell to the ground. *Id.* At the time she fired the shots, Berube was approximately ten feet from her, and had the hammer raised. *Id.* Two other officers, hearing the first officer's yell and the gunshots, arrived on the scene. *Id.* They did not know which person had fired the shots. *Id.* Berube was lying on the ground with his back to the officers, his hands not visible. *Id.* The officers ordered him to stay down and show his hands, but Berube instead rolled toward them and attempted to rise, still holding the hammer. *Id.* The officers thought that the metallic object they saw in his hands was a gun, and that Berube was positioning himself to fire at them. *Id.* The officers ordered him again to stop moving, and when he did not comply, they fired on him until he stopped trying to get up. *Id.* The incident took place in the dark on a rainy night, and approximately ten seconds elapsed between when the first officer called for help and when the officers stopped firing. *Id.* The court determined that the officers were entitled to qualified immunity because their actions were reasonable given their need to "mak[e] a split-second judgment on a rainy night" in response to the "tense and uncertain

situation" and the need to "neutralize the threat they perceived from Berube." *Id.* at 85.

In *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994), officers were determined to be entitled to qualified immunity following the shooting of a man armed with two knives. At 9:00 p.m., two officers were sent to investigate a domestic violence report at the home of the plaintiff, Roy. *Id.* at 693. Roy's wife advised the officers when they arrived that Roy had been drinking and was armed with two knives which he threatened to use against any police officer who approached him. *Id.* A third officer arrived on the scene intending to serve Roy with a summons stemming from an unrelated complaint by another woman who Roy had struck earlier in the day. *Id.* When the third officer attempted to serve the summons and advise Roy of his *Miranda* rights, Roy became upset, said "I'll show you," and went into his home and retrieved two steak knives. *Id.* The officers drew their weapons and ordered Roy to put down the knives, but Roy continued to advance on them with the knives in his hands while flailing his arms. *Id.* The officers retreated, attempting to distract Roy and repeating their warnings that he drop the knives. *Id.* Roy then made a "kicking-lunging motion" toward two of the officers, one of whom shot him twice, seriously injuring him. *Id.*

The court found that the officer's decision to shoot Roy rather than retreat further or use non-lethal means to subdue him, while possibly "mistaken" or "wrong," was nonetheless constitutional under the qualified immunity doctrine. *Id.* at 696. The court noted that the officers had good reasons for thinking Roy capable of assault;

in addition to his attempt to lunge at the officers with the knives, Roy had been implicated in two separate assaults that day, and his wife had warned the officers that he had threatened to use his knives against the police. *Id.* at 693, 696.

In *Partlow v. Stadler*, 774 F.3d 497, 503 (8th Cir. 2014), a divided panel of the Eighth Circuit held that officers were entitled to qualified immunity after shooting and severely injuring the plaintiff, Partlow. At the end of a night of drinking, Partlow locked himself in his apartment with a shotgun, having decided to end his life. *Id.* at 499. His aunt contacted the police, who responded to the scene and positioned themselves outside the apartment building. *Id.* at 500. As the officers prepared to make contact with Partlow, he came out of the front door of the building, carrying the shotgun. *Id.* The officers yelled at him to drop the gun. *Id.* In response, Partlow made a quick motion with the gun, which all four officers interpreted to be Partlow raising the gun and aiming it at the officers. *Id.* The officers opened fire, shooting Partlow multiple times. *Id.* Partlow and a witness claimed that he was attempting to put the gun down in response to the order from the officers when they opened fire. *Id.* The court held that even if the officers were mistaken about Partlow's intention when he quickly moved the gun, any such mistake was objectively reasonable in light of the circumstances, including the fact that "[m]ere seconds" had passed between the moment Partlow "forcefully pushed open the door" and the moment the officers believed he aimed the gun at them. *Id.* at 502-503.

In *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015), the Seventh Circuit ruled that a police officer was not entitled to qualified immunity following the

shooting of the plaintiff, Weinmann.  Following an argument with his wife, Weinmann went to his garage, drank half a bottle of vodka, and threatened to kill himself with a shotgun.  *Id.* at 446.  His wife called the police, and a deputy sheriff responded to the call.  *Id.*  The officer, who had been told that Weinmann had access to a long gun, looked in through the windows of the garage, but did not see Weinmann.  *Id.*  He then knocked on the door to the garage, but received no answer.  *Id.*  The officer did not try to speak with Weinmann, but instead kicked in the door and entered the garage.  *Id.*  According to Weinmann, he was sitting in a lawn chair with the shotgun lying across his lap.  *Id.* at 447.  The officer contended that he perceived the shotgun as being pointed in his direction.  *Id.*  The officer then opened fire on Weinmann, hitting him four times.  *Id.*  The court rejected the officer's argument that he had an objectively reasonable belief that he was in imminent danger, holding that any such belief on the officer's part was unreasonable under the circumstances.  *Id.* at 449.  The court further held that a suicidal person's right to be free from the use of deadly force unless they threaten to harm others was clearly established by existing precedent.  *Id.* at 451.

In *Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005), the Eleventh Circuit held that an officer was not entitled to qualified immunity following the use of deadly force against the plaintiff, Mercado.  Mercado became suicidal after an argument with his wife, tied a telephone cord around his neck, and cut himself with a kitchen knife.  *Id.* at 1154.  His wife called the police, and later told the two officers who responded to the apartment that Mercado had a knife.  *Id.*  The officers

attempted to talk to Mercado through the door to the apartment, but after twenty minutes entered the apartment with Mercado's wife's permission. *Id.* Mercado was sitting on the floor, holding the knife. *Id.* The officers ordered Mercado to drop the knife at least two times, in both English and Spanish, but did not warn him that they would use force if he refused to drop the knife. *Id.* Less than a minute after Mercado ignored the order to drop the knife, one of the officers fired a "less-lethal" polyurethane baton launcher at Mercado's head, a use of force that the court deemed to be deadly. *Id.* at 1155, 1160. Mercado suffered serious head injuries as a result. *Id.* at 1155. The court determined that the officer's use of deadly force was unconstitutional and "violated the clearly established principle that deadly force cannot be used in non-deadly situations." *Id.* at 1160. The court also held that the use of deadly force in this situation was so obviously unlawful that the constitutional violation should have been obvious to the officer, notwithstanding a lack of case law. *Id.*

In *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013), the Fourth Circuit held that officers were not entitled to qualified immunity following the shooting of the plaintiff, Cooper. Cooper was at home with his cousin late one evening, and after a long afternoon of drinking and using drugs, the two men got into a heated argument. *Id.* at 155. A neighbor called the police, and two officers arrived at the house around 11:30 p.m. *Id.* The officers did not have any information about whether Cooper was armed or otherwise dangerous. *Id.* They arrived at the house without engaging their sirens, and saw Cooper's cousin, who had been standing on the back porch, enter the

home. *Id.* They approached the home on foot, and heard an argument inside. *Id.* One of the officers tapped on a window with his flashlight, but did not identify himself as a police officer. *Id.* In response to the tap on the window, Cooper uttered an obscenity and peered out the back door, but saw nothing. *Id.* Cooper called out for anyone in the yard to identify themselves, but the officers did not respond. *Id.* The officers had approached the yard behind the house, and were advancing toward the porch when Cooper came out the back door carrying a shotgun, which was pointed toward the ground. *Id.* When the officers saw Cooper with the gun, they opened fire on him, without giving any warning. *Id.* at 156. The officers claimed that Cooper burst out of the door with the gun raised and fired a shot, but the court accepted Cooper's version of the events for purposes of resolving the qualified immunity question. *Id.* at 156 n.4. The court held that the officers, by firing on Cooper without warning while his gun was pointed at the ground, had violated his clearly established "right to be free from deadly force when posing no threat." *Id.* at 160. The court stated that "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force," *id.* at 159, but also noted that "an armed suspect need not engage in some specific action—such as pointing, aiming, or firing his weapon—to pose a threat," *id.* at 159 n.9. The court also found it significant that the officers never identified themselves, and that no reasonable officer could have believed that Cooper was aware the police were present when he stepped outside with his gun. *Id.* at 159-60.

In *Glenn v. Washington Cty.*, 673 F.3d 864, 878 (9th Cir. 2011), the Ninth Circuit reversed a grant of summary judgment in favor of officers who shot and killed the plaintiff's decedent, Glenn, holding that the officers' use of force had violated the Constitution, though the court did not reach the "clearly established" prong of the qualified immunity analysis. Glenn, an 18-year-old male, returned home late one night from a football game, obviously intoxicated and agitated. *Id.* at 867. After getting into an argument with his parents, Glenn became violent, damaging property in the house and the driveway. *Id.* Glenn then took out a knife and held it to his own neck, threatening to kill himself. *Id.* His parents called the police, informing them that Glenn was very drunk and threatening to kill himself with a knife. *Id.* The first officer to arrive approached Glenn, who was standing in the driveway near his parents and a friend, and aimed his gun at him. *Id.* at 868. Glenn was not acting violently, but was standing still by the garage with his knife held to his own neck. *Id.* The officer ordered Glenn to "drop the knife or I'm going to kill you," but the court noted that Glenn may not have heard or understood the command due to his intoxication and the fact that many people on the scene were yelling at once. *Id.* A second officer arrived on the scene and likewise ordered Glenn to drop his knife, while aiming a gun at him. *Id.* The officers also ordered Glenn's parents and friend to get away from Glenn and either get behind the police or go into the house. *Id.* at 868-869. A third officer arrived with a beanbag gun, a "less-lethal" weapon consisting of a shotgun loaded with lead shot contained in small cloth sacks that are capable of causing death or serious injury if they hit a sensitive area, and one of the other officers

directed him to fire the beanbags at Glenn. *Id.* at 869, 871. When Glenn was hit with the beanbag rounds, he tried to escape and take cover by moving in the direction of the house, and the other two officers opened fire with their semiautomatic weapons, hitting Glenn eight times and killing him. *Id.* The court rejected the officers' argument that their use of force was justified by an objectively reasonable belief that Glenn posed an immediate threat to his parents, who were inside the house. *Id.* at 879. The court held that the officers' use of force was unreasonable because of the lack of evidence that Glenn posed a threat to anyone but himself at the time he was shot. *Id.* Despite the fact that Glenn had a weapon that he refused to drop, the court held that it was not reasonable to think he posed a threat to the officers or any bystanders because he had not made any threatening statements or movements. *Id.* at 875. The court also found the officers' response unreasonable in light of the fact that Glenn was clearly emotionally disturbed. *Id.* at 875-76.

### b. Analysis Regarding Deputy Mangino

In light of the case law described above, a reasonable officer should have understood that using deadly force against Stephen in the particular circumstances presented by this case would violate the Fourth Amendment. Based on Stephen's words and actions, it was not reasonable to believe that he posed an immediate threat to the safety of the officer or others at the time he was shot. *Compare Weinmann*, 787 F.3d at 447 (force not justified where plaintiff was holding shotgun across his lap) *with Roy*, 42 F.3d at 693 (force justified where plaintiff verbally threatened officers and lunged at them with knives). Stephen was walking nonchalantly down the

driveway with his gun dangling by his side. Stephen never made any threats to the officers, and although Deputy Mangino believed that Stephen had briefly pointed his gun at him earlier, Stephen did not point his gun at Deputy Mangino or any of the officers in the minutes immediately preceding the shooting. Crediting Deputy Mangino's assertion that he reasonably believed Stephen had pointed his gun at him when Stephen was standing in front of the garage, that fact would not justify the use of deadly force approximately six minutes later. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (noting that an officer who is faced with a threat that may justify use of deadly force "does not retain the right to shoot at any time thereafter"). Furthermore, Stephen was approximately 69 feet away from Deputy Mangino's cruiser at the time he was shot. The lack of close physical proximity further undermines the immediacy of the perceived threat posed by Stephen. *Compare Berube*, 506 F.3d at 81, 85 (use of force reasonable where plaintiff was "charging" at officer from ten feet away).

In addition, Deputy Mangino was not forced to make a split-second decision on less than perfect information in a rapidly changing situation at the time he shot Stephen, ECF No. 61 at 20, ¶ 110, unlike several of the officers that were found to be entitled to qualified immunity. *See, e.g., Pauly*, 137 S. Ct. at 550; *Berube*, 506 F.3d at 83-84; *Partlow*, 774 F.3d at 502. This incident took place in the morning on a sunny day. The officers had briefly spoken with Stephen inside his home, and observed him walk around his driveway and enter and leave his house numerous times over the course of approximately seven minutes leading up to the shooting.

Unlike the officers in *Berube*, who were confronting an unknown situation on a dark and rainy night, and were forced to act within seconds without complete information about whether the plaintiff was armed and posing an immediate threat, *see Berube*, 506 F.3d at 83-84, Deputy Mangino had ample opportunity to observe Stephen's actions and movements over the course of several minutes, and acted with knowledge of all of the relevant circumstances.

Furthermore, as he walked down the driveway in the direction of Deputy Mangino, Stephen was not warned that he would face deadly force if he failed to drop his gun. While Stephen was told by the officers to drop his gun inside the house, and Mangino yelled three times at Stephen to drop his gun when Stephen was standing outside by the garage, the last order was given approximately six minutes prior to the use of force. The Cumberland County Sheriff's Office's Standard Operating Procedure on the use of deadly force states that "[i]f feasible, the deputy must give some warning prior to the use of deadly force." ECF No. 41-54 at 5. Yet at no time did the officers warn Stephen that they would use force if he did not comply with their orders. *See Mercado*, 407 F.3d at 1154 (noting that officers failed to warn plaintiff that they would use force if he did not drop weapon, in context of finding use of force unreasonable); *see also Irish v. Maine*, 849 F.3d 521, 527-28 (1st Cir. 2017) (emphasizing the importance of police protocols and standard practices in evaluating whether an officer is entitled to qualified immunity).

Stephen's apparent emotional and mental distress is also a factor that militates against the reasonableness of Deputy Mangino's use of force. *See Glenn*,

673 F.3d at 875-76 (noting that government's interest in using force is diminished when dealing with a mentally ill individual).  Mangino knew that Stephen was suicidal, Mrs. McKenney had informed the officers that Stephen had "snapped" after months of dealing with back pain, and the officers acknowledge that Stephen appeared to be "not at home mentally."  *See* ECF No. 61 at 15, ¶ 75.  Deputy Mangino also acknowledges that when he had yelled at Stephen to drop his gun, Stephen had a vacant stare, "and it was like he was not receiving Mangino's message."  ECF No. 61 at 12, ¶ 62; *see Glenn*, 673 F.3d at 875 (finding significant the fact that plaintiff's decedent may not have heard or understood command to drop weapon).

Finally, Deputy Mangino's use of deadly force was unreasonably precipitous when viewed in context with the officers' prior attempts to gain Stephen's compliance. Deputy Mangino yelled three times at Stephen to drop his gun as Stephen stood by the garage.  Over the course of the next six minutes, no attempts were made, verbally or otherwise, to persuade Stephen to drop his gun.  There is no Constitutional requirement that the police use the least intrusive means available to respond to a situation, but the availability and feasibility of non-lethal force options is a factor that courts consider in assessing the reasonableness of a use of deadly force.  *Cf. Roy*, 42 F.3d at 696; *Glenn*, 673 F.3d at 876.  Here, the fact that Deputy Mangino progressed from a verbal command shouted from a distance to the use of deadly force six minutes later, without any intervening attempt to gain Stephen's compliance, militates against finding that his use of deadly force was reasonable.

The established case law discussed above demonstrates that Stephen had a right to be free from the use of deadly force at the time he was shot by Deputy Mangino. As Stephen walked down his driveway, holding his gun down at his side, he did not present a sufficiently serious and immediate threat to justify the use of deadly force. He had made no threats or threatening movements, was not pointing his gun at anyone, was approximately 69 feet from an officer crouched behind his cruiser, and did not fail to heed any warnings or orders immediately before the shooting. Viewing the summary judgment record in the light most favorable to McKenney, Stephen's clearly established rights under the Fourth Amendment were violated.

This conclusion does not diminish the danger associated with the situation confronting Deputy Mangino. Stephen appeared mentally unstable and was carrying a firearm that he had refused to drop. On this record, there is no question that the potential threat posed by Stephen was serious. At the time Stephen was shot, however, that threat was not immediate. The clearly established law on this point is such that a reasonable officer would have understood that the threat posed by Stephen did not justify deadly force. Deputy Mangino's subjective belief to the contrary does not alter this analysis. *See Weinmann*, 787 F.3d at 449 ("It does not matter for purposes of the Fourth Amendment that [the officer] subjectively believed that his life was in danger. The test is an objective one, and taking the facts as [the plaintiff] presents them, it is not met."). Deputy Mangino is therefore not entitled to qualified immunity.

Based on the foregoing, Deputy Mangino is not entitled to summary judgment on Count I of the Complaint. Accordingly, he is also not entitled to summary judgment on Count II, which alleges a violation of the Maine Civil Rights Act.

## 2. State Law Tort Claims

Deputy Mangino argues that he is entitled to discretionary function and intentional act immunity from McKenney's state law tort claims (Counts IV and VII to X) under the Maine Tort Claims Act. ECF No. 45 at 13-14. A law enforcement officer's use of force is a discretionary act, but immunity under the Maine Tort Claims Act is inapplicable to the extent that an officer's conduct is so egregious that it exceeds the scope of his or her authority. *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 183 (D. Me. 2009). "The Law Court has clarified that the standard for deciding whether an officer accused of use of excessive force is entitled to MTCA immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim." *Id.* (citing *Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281). Therefore, because Deputy Mangino is not entitled to summary judgment based on qualified immunity from McKenney's Fourth Amendment claims, he is also not entitled to immunity from her state law claims under the Maine Tort Claims Act.

## D. Claims against Cumberland County

### 1. Claims under § 1983 and the Maine Civil Rights Act

Count I, which alleges excessive force in violation of the Fourth Amendment, does not apply to Cumberland County. A municipality is not vicariously liable for its

employees' actions; it can only be held responsible for its own illegal acts. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). McKenney does not argue that Cumberland County itself somehow used excessive force against Stephen. *See* ECF No. 50 at 21-22. Therefore, Cumberland County is entitled to summary judgment on Count I of the Complaint.

Count II asserts a violation of the Maine Civil Rights Act. The outcome of this claim is governed by the disposition of McKenney's claims under § 1983, and therefore will be determined by the viability of her federal claims. *See Berube*, 506 F.3d at 85.

As noted earlier, Count III, which alleges a violation of the Fourteenth Amendment, has been waived by the Plaintiff and summary judgment will therefore be granted in favor of Cumberland County.

Count V alleges a violation of the Fourth Amendment under § 1983 for failure to train police officers. Cumberland County asserts that McKenney must demonstrate a pattern of similar past violations in order to sustain a failure-to-train claim. ECF No. 45 at 20; ECF No. 60 at 9 n.7. But this assertion is contradicted by the precedent Cumberland County relies on. *See Thompson*, 563 U.S. at 63-64 (noting that a single incident may be enough to support liability where that incident is an obvious consequence of a failure to train). Indeed, the hypothetical situation posited by the Court in *Thompson* as an example where a single incident could support liability for a failure to train involved a city arming its police officers but failing to properly train them regarding the constitutional limitations on the use of deadly force. *Id.*

In order to impose § 1983 liability on a municipality, a plaintiff must show that the municipality's deliberate conduct was the moving force behind a constitutional violation. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). As noted above, liability cannot be imposed on a municipality under a respondeat superior theory. *Id.* at 403. To be successful, therefore, a claim that a municipality has violated the Constitution through its failure to train its employees requires a showing that the failure to provide training demonstrated "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Thompson*, 563 U.S. at 61 (quotation omitted). Deliberate indifference is a "stringent standard of fault," which requires proof that the municipality disregarded a known or obvious consequence of its actions. *Id.*

Here, McKenney argues that Deputy Mangino's "action beats reaction" training, his training to "stop and eliminate the threat," and his alleged lack of training on dealing with suicidal individuals evinced a deliberate indifference on the part of Cumberland County because it created an obvious risk that Deputy Mangino would violate a citizen's Fourth Amendment rights. ECF No. 50 at 21. McKenney also suggests that Cumberland County's custom of allowing deputies to decide for themselves whether to bring civilian ride-alongs to a potentially dangerous scene contributed to Deputy Mangino's decision to shoot Stephen. *Id.* at 21-22.

As an initial matter, the record does not support McKenney's assertion that Deputy Mangino did not have training on dealing with suicidal individuals. In his deposition testimony, Mangino stated that he had received crisis intervention

training, which included training on how to handle suicidal individuals. ECF No. 41-35 at 61-62, 235:10-236:18. While Deputy Mangino apparently did not follow Cumberland County's Sheriff's Office policy that a "CIT deputy," if available, be called in to all situations involving subjects suspected to be mentally ill, ECF No. 61 at 26, ¶ 137, Deputy Mangino's failure to follow a policy that Cumberland County had in place cannot be a basis for liability on the part of the County, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989) (noting that a mistake made by an adequately trained officer does not provide a basis for holding a municipality liable).

The record also does not support McKenney's assertion that Cumberland County's policy or custom regarding civilian ride-alongs amounts to deliberate indifference to Stephen's constitutional rights. While it is undisputed that the presence of the civilian ride-along contributed to Deputy Mangino's decision to shoot Stephen, the causal connection between the custom and the constitutional harm is too attenuated to support liability on the part of Cumberland County. *See Canton*, 489 U.S. at 391 ("the identified deficiency . . . must be closely related to the ultimate injury"). It was not foreseeable that the custom regarding ride-alongs would result in an exercise of deadly force against a person who did not pose a threat to the officers, the civilian, or anyone else. To hold otherwise would require too much prescience from the County. Stephen's death was far from the sort of "highly predictable" consequence of the ride-along policy that is needed to show deliberate indifference on the part of the County. *See Thompson*, 563 U.S. at 71.

Cumberland County argues that it did not provide the "action beats reaction" training that McKenney objects to, contending that this training was provided by the Maine Criminal Justice Academy. ECF No. 60 at 10. In support of this argument, Cumberland County cites to Deputy Mangino's deposition testimony, where he stated that "[g]iven my training and experience that I've had at the academy, et cetera, I've been trained that action beats reaction." ECF No. 41-35 at 28, 102:25-103:2. Deputy Mangino was not asked, and did not explain, what his use of the phrase "et cetera" refers to. *See id.* Given that the facts must be viewed in the light most favorable to the plaintiff at this stage, I find that this statement does not establish that Cumberland County had no involvement in Deputy Mangino's "action beats reaction" training. Especially in light of Deputy Mangino's use of the word "experience," it is plausible to infer from this evidence that the "training and experience" that Mangino referenced in his testimony includes his training and experience with the Cumberland County Sheriff's Office, and does not simply refer to the training he received at the Academy.

The question, then, is whether the training Deputy Mangino received on "action beats reaction" and "stop and eliminate the threat" was a moving force behind the alleged constitutional violation, and demonstrates deliberate indifference on the part of Cumberland County to Stephen's constitutional rights. *See Brown,* 520 U.S. at 403-04; *Thompson*, 563 U.S. at 61. McKenney argues that Deputy Mangino was trained to use deadly force in situations where such force was not justified by an immediate threat, and to that extent the training created an obvious risk of

constitutional violations. ECF No. 50 at 21. In his deposition testimony, Deputy Mangino explained that his decision to shoot Stephen when he did stemmed from his training that action beats reaction, and that it was proper for him to try to stop and eliminate the threat. ECF No. 41-35 at 28, 102:25-103:2; 29, 104:9-20; 29, 106:5-11; 30, 108:24-109:6; ECF No. 41-36 at 17, 56:13-17. This testimony provides evidence of the causal connection needed to establish municipal liability under a failure-to-train theory. *See Canton*, 489 U.S. at 391 (noting that plaintiff "must still prove that the deficiency in training actually caused" the constitutional violation). Deputy Mangino himself identified his training as the reason behind his decision to use deadly force against Stephen at the moment he did. Drawing all inferences from the evidence in favor of the Plaintiff, as I must at this stage, there is adequate support in the record for the conclusion that Deputy Mangino's inadequate training caused the violation of Stephen's constitutional rights.

It is important to note that it is quite possible that the training provided by Cumberland County was in fact appropriate and adequate, and that Deputy Mangino simply misunderstood or misapplied his training. The record includes Cumberland County's policy regarding the use of deadly force. *See* ECF No. 41-54. But Cumberland County has not made this argument, and does not point the Court to any evidence in the record suggesting that Deputy Mangino incorrectly applied his training. At the summary judgment stage, where I must view the evidence in the light most favorable to the Plaintiff and draw all reasonable inferences in her favor, it would not be appropriate to draw this inference in favor of the County. Given the

record and the arguments made by the parties, I instead must assume, for purposes of this motion, that Deputy Mangino's training was inadequate, rather than misapplied.

If, as discussed above, Deputy Mangino violated Stephen's Fourth Amendment rights when he shot him, it is plausible to infer from the evidence that his training was the moving force behind his decision to employ deadly force at a time when Stephen did not pose a sufficient threat to justify that force. Furthermore, a failure to adequately train police officers on the situations that justify the use of deadly force creates an obvious risk that an officer will violate the Constitution. *See Canton*, 489 U.S. at 390 n.10 (suggesting that failing to train police officers on the use of deadly force could be characterized as deliberate indifference to a highly predictable violation of constitutional rights); *see also Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 796 (9th Cir. 2016) (reversing grant of summary judgment to county on single-incident failure to train claim because inadequacy in training of social workers was so likely to result in constitutional violation as to constitute deliberate indifference); *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 739-40 (6th Cir. 2015) (reversing grant of summary judgment to county on single-incident failure to train claim because risk of constitutional harm arising from allegedly deficient training of prison medical staff was "obvious"); *Thomas v. Cumberland Cty.*, 749 F.3d 217, 225 (3d Cir. 2014) (reversing grant of summary judgment to county on single-incident failure to train claim because alleged deficiency in prison staff's training created high likelihood of constitutional violation). Therefore, there is sufficient evidence in the record to

support the inference that Cumberland County may be liable for failing to adequately train Deputy Mangino.

Based on the foregoing, Cumberland County is not entitled to summary judgment on Count V of the Complaint. Cumberland County is accordingly not entitled to summary judgment on Count II. *See Berube*, 506 F.3d at 85.

## 2. Americans with Disabilities Act Claim

As discussed above with respect to the claims against Windham, McKenney's claims under the ADA must fail, both because the undisputed facts do not support an inference that Stephen was discriminated against or denied any service "by reason of" his disability, *see Buchanan*, 469 F.3d at 176, and because the emergency circumstances exception to ADA liability applies in this case, *see Estate of Buchanan*, 417 F. Supp. 2d at 73. Cumberland County is therefore entitled to summary judgment on Count VI of the Complaint.

## 3. State Law Tort Claims

Finally, as discussed with respect to Windham, the state law tort claims alleged by McKenney do not fit within any of the narrowly-construed exceptions to the tort immunity granted to municipalities by the Maine Tort Claims Act. *See* 14 M.R.S.A. § 8104-A(1)-(4). Cumberland County has not waived this immunity through the purchase of liability insurance; the parties agree that its insurance coverage specifically excludes from coverage tort claims from which the county is immune. ECF No. 49 at 3, ¶¶ 26-29. Therefore, Cumberland County is entitled to summary judgment on Counts IV and VII to X of the Complaint.

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

- Defendant Town of Windham's motion for summary judgment (ECF No. 43) is **GRANTED**.

- Defendant Nicholas Mangino's motion for summary judgment (ECF No. 45) is **GRANTED** with respect to Counts III and V, and **DENIED** with respect to Counts I, II, IV, VII, VIII, IX, and X.

- Defendant Cumberland County's motion for summary judgment (ECF No. 45) is **GRANTED** with respect to Counts I, III, IV, VI, VII, VIII, IX, and X, and **DENIED** with respect to Counts II and V.

**SO ORDERED.**

Dated this 12th day of April 2017.

　　　　　　　　　　　　　　　　　　　　**/s/ Jon D. Levy**
　　　　　　　　　　　　　　　　　　　　**U.S. DISTRICT JUDGE**