# United States Court of Appeals
## For the First Circuit

No. 17-1378

VICKI McKENNEY, individually and as next friend of
STEPHEN McKENNEY, and as personal representative of the
ESTATE OF STEPHEN McKENNEY,

Plaintiff, Appellee,

v.

NICHOLAS MANGINO,

Defendant, Appellant,

CUMBERLAND COUNTY ET AL.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

Peter T. Marchesi, with whom Cassandra S. Shaffer and Wheeler & Arey, P.A. were on brief, for appellant.
Jamesa J. Drake, with whom Drake Law, LLC, Amber L. Tucker, and The Law Office of Amber L. Tucker, LLC were on brief, for appellee.

October 6, 2017

**SELYA**, <u>Circuit Judge</u>. This is a tragic case in which a man died at the hands of a police officer who was trying to do his job. The underlying suit alleges, in relevant part, that the officer violated 42 U.S.C. § 1983 through the precipitous use of deadly force. In a pretrial ruling, the district court held that the officer was not entitled to qualified immunity at the summary judgment stage. <u>See</u> <u>McKenney</u> v. <u>Mangino</u>, No. 2:15-cv-00073, 2017 WL 1365959, at *13 (D. Me. Apr. 12, 2017). The officer challenges that ruling. After careful consideration, we dismiss portions of this interlocutory appeal for want of appellate jurisdiction and otherwise affirm.

## I. BACKGROUND

Because we are tasked with reviewing a summary judgment ruling, we rehearse the facts in the light most hospitable to the nonmovant, consistent with record support. <u>See</u> <u>Foote</u> v. <u>Town of Bedford</u>, 642 F.3d 80, 82 (1st Cir. 2011).

On April 12, 2014, a clear, sunny day in Windham, Maine, plaintiff-appellee Vicki McKenney called 911 at 6:14 a.m. to report that her husband, 66-year-old Stephen McKenney, was threatening suicide and had been "aggressive" and "physical" with her. She told the dispatcher that her home contained firearms. Within a matter of minutes, Windham police officers James Cook and Seth Fournier arrived at the McKenney residence and met Mrs. McKenney (who was standing outside). She explained that her husband had

- 2 -

been experiencing severe back pain and had "snapped" that morning. Almost immediately thereafter, a Cumberland County deputy sheriff, defendant-appellant Nicholas Mangino, drove up in his cruiser to serve as backup.

The three officers entered the front room of the house at 6:22 a.m. and encountered McKenney, who appeared to have a gun in his hand. When asked what he was holding, McKenney replied ".357 Magnum." Although the officers twice directed McKenney to put the gun down, McKenney did not comply. Still, he never pointed his weapon at any of them inside the dwelling, nor did he utter anything resembling a threat.

The officers retreated outdoors, leaving McKenney inside the house. Officer Fournier placed Mrs. McKenney in his patrol car, which he then drove to a cul-de-sac at the end of the street a few hundred yards away. He maintained a clear line of sight, though, to the garage and driveway of the McKenney home. Meanwhile, the defendant, armed with his AR-15 rifle, his Taser, and pepper spray, took cover behind his cruiser (which was parked roughly 100 feet from the McKenneys' garage).[1]

The defendant peeked over his car from time to time to observe the garage and driveway, while simultaneously receiving

---

[1] For the sake of completeness, we note that Zachary Welch, a civilian who had been invited by the defendant as a ride-along, was crouched in the defendant's parked cruiser.

- 3 -

updates about McKenney's movements from Officer Fournier. Between 6:24 a.m. and 6:31 a.m., McKenney ambled nonchalantly around and about his open garage, driveway, and house. He entered and exited the dwelling around six times during that seven-minute span. At about 6:26 a.m., McKenney left the house with his gun dangling from his hand. The defendant yelled at him three times to "drop the gun." A few seconds later, McKenney — who was approximately 100 feet away from the defendant — raised the gun over his head.[2] By all accounts, McKenney had a vacant stare and appeared "not at home" mentally. In short order, he lowered the gun without firing it and continued to weave haphazardly into and out of his house between 6:26 a.m. and 6:31 a.m.

At approximately 6:31 a.m., Officer Fournier radioed to the defendant that McKenney, who was still dangling his firearm and walking leisurely, was in front of the garage. Fournier stated: "I can't tell, but he might be pointing that, so be careful." Within seconds, McKenney began walking (still in his

---

[2] At his deposition, the defendant testified that he believed that McKenney was pointing the weapon in his direction. Because we are reviewing a summary judgment ruling, however, we recount the facts in the light most favorable to the nonmovant (here, the plaintiff). See Foote, 642 F.3d at 82. The district court seems to have assumed the truth of the fact that the defendant "reasonably believed" that McKenney "had pointed his gun at him." McKenney, 2017 WL 1365959, at *12. Any such assumption was, of course, made only for the sake of argument; otherwise, it would have been unwarranted. The court was obliged to view the summary judgment record in the light most hospitable to the plaintiff. See Foote, 642 F.3d at 82.

driveway) in the direction of the defendant's parked cruiser. He was not making any sudden or evasive movements and was not pointing his gun at anyone. Officer Fournier alerted the defendant that McKenney was "walking toward your car right now." When McKenney had reached a point 69 feet away from the cruiser, the defendant fired an errant shot at McKenney's central mass. Seconds later, he fired a second shot at McKenney's head, which struck and killed McKenney. None of the officers had warned McKenney that they would use deadly force if he refused to drop his weapon.

We fast-forward to February of 2015, when Mrs. McKenney, qua plaintiff, suing individually and as the personal representative of McKenney's estate, brought a civil action in a Maine state court against the defendant and several other persons and entities.[3] As relevant here, the plaintiff sued the defendant under 42 U.S.C. § 1983, which authorizes suit against any person who, while acting under color of state law, violates another person's federally assured constitutional or statutory rights. See Kalina v. Fletcher, 522 U.S. 118, 123 (1997). Specifically, the plaintiff's complaint alleged that the defendant's use of deadly force transgressed McKenney's Fourth Amendment right to be free from unreasonable seizures.

---

[3] Given the narrowly circumscribed scope of this interlocutory appeal, it would serve no useful purpose to enumerate the other parties and causes of actions limned in the complaint.

The action was seasonably removed to the federal district court. See 28 U.S.C. §§ 1331, 1441(a). Following pretrial discovery, the defendant sought summary judgment on, inter alia, qualified immunity grounds. See Fed. R. Civ. P. 56(a).

The district court denied the motion. Construing the record in the light most favorable to the plaintiff, the court ruled that a rational jury could find that it was unreasonable for the defendant to believe that McKenney "posed an immediate threat to the safety of the [defendant] or others at the time he was shot." McKenney, 2017 WL 1365959, at *12. In explaining this ruling, the court noted that at the time of the shooting, McKenney was ambulating nonchalantly around his driveway with his gun dangling by his side and was nearly 70 feet away from the defendant's cruiser. See id. By the time the defendant pulled the trigger, it had been approximately six minutes since the defendant thought he had seen McKenney pointing the gun at him. See id. Viewing the facts in the requisite light, the court concluded that a rational jury could find that the defendant "had ample opportunity to observe [McKenney's] actions and movements over the course of several minutes, and acted with knowledge of all of the relevant circumstances." Id. Other facts, such as McKenney's suicidality, the fact that the last order directing him to drop his weapon had come approximately six minutes earlier, and the fact that no one had ever warned McKenney that deadly force

- 6 -

would be used if he failed to comply with the officers' orders, "militate[d] against the reasonableness" of the defendant's use of deadly force. Id. In a nutshell, the court below held that on the plaintiff's supportable version of the facts, an objectively reasonable police officer would have understood, at the moment the shot was fired, that employing deadly force against McKenney would contravene clearly established law. See id. at *12-13.

This appeal ensued. Notwithstanding the general prohibition against interlocutory appeals, see 28 U.S.C. § 1291, the defendant asserts that we have jurisdiction because his appeal rests on a denial of qualified immunity and his arguments are purely legal. See Johnson v. Jones, 515 U.S. 304, 319-20 (1995); Camilo-Robles v. Hoyos, 151 F.3d 1, 8 (1st Cir. 1998).

## II. ANALYSIS

A district court may only grant summary judgment when the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Schiffmann v. United States, 811 F.3d 519, 524 (1st Cir. 2016). We review rulings granting or denying summary judgment de novo. See DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005).

Subject to only a handful of carefully circumscribed exceptions, our appellate jurisdiction is restricted to review of

- 7 -

final orders and judgments. See Johnson, 515 U.S. at 309-10. Consequently, an interlocutory order denying summary judgment is typically not appealable when first entered. See 28 U.S.C. § 1291; Plumhoff v. Rickard, 134 S. Ct. 2012, 2018 (2014).

But an exception to the general requirement of finality is potentially applicable here. Qualified immunity is a doctrine that shelters government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Courts long have recognized that qualified immunity consists of both an immunity from suit and an immunity from damages. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Thus, claims of qualified immunity ought to be resolved at the earliest practicable time. See Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987). Consistent with this principle, we have held that, notwithstanding the absence of a final judgment, we have jurisdiction to review interlocutory rulings implicating qualified immunity as long as those rulings are purely legal in nature (say, a ruling that a given body of facts will support a claimed violation of clearly established law). See Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 1995) (citing Johnson, 515 U.S. at 316-17). But we may not review, on interlocutory appeal, an order denying qualified immunity "to the extent that [the order] turns on either an issue of fact or an

issue perceived by the trial court to be an issue of fact." Id. By virtue of this prohibition, we lack jurisdiction to consider a defendant's argument "that the facts asserted by the plaintiffs are untrue, unproven, warrant a different spin, tell only a small part of the story, and are presented out of context." Díaz v. Martínez, 112 F.3d 1, 5 (1st Cir. 1997).

It follows that defendants who invoke our limited power of interlocutory review to redress denials of qualified immunity must be prepared to accept the facts in the light most favorable to the plaintiff and "develop the argument that, even drawing all the inferences as the district court concluded a jury permissibly could, they are entitled to judgment as a matter of law." Cady v. Walsh, 753 F.3d 348, 359-60 (1st Cir. 2014). In other words, an appellant must explain why he is entitled to qualified immunity even if one assumes that the district court properly analyzed the facts.[4] See id. at 361; see also Morse v. Cloutier, 869 F.3d 16, 25 (1st Cir. 2017).

Having erected this jurisdictional framework, we turn next to the qualified immunity standard. When a defendant invokes

---

[4] The Supreme Court has carved out an isthmian exception to this rule, instructing courts to disregard the nonmovant's version of the facts if that version is "blatantly contradicted by the record." Scott v. Harris, 550 U.S. 372, 380 (2007); see Penn v. Escorsio, 764 F.3d 102, 105 n.2 (1st Cir. 2014). Here, however, the defendant does not argue that this exception applies and, in all events, the record belies its applicability.

qualified immunity, an inquiring court typically engages in a "two-step pavane." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017). First, the court must determine "whether the plaintiff's version of the facts makes out a violation of a protected right." Id. Second, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (quoting Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015)). This second step is itself divisible into two components. To begin, the plaintiff must point to "'controlling authority' or a 'consensus of cases of persuasive authority'" that broadcasts "a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Id. at 76 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). Then, the court must evaluate "whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." Id. These inquiries are carried out with the understanding that qualified immunity is meant to shield "all but the plainly incompetent or those who knowingly violate the law." White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam)).

Before proceeding further, we lay the relevant constitutional foundation. Here, the background law is supplied by the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer's use of deadly force is deemed a seizure under the Fourth Amendment, and such an extreme action is reasonable (and, therefore, constitutional) only when "at a minimum, a suspect poses an immediate threat to police officers or civilians." Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003) (per curiam) (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)).

Timing is critically important in assessing the reasonableness of an officer's decision to use lethal force. Our case law is "comparatively generous" to officers facing "potential danger, emergency conditions or other exigent circumstances," and we have fashioned "a fairly wide zone of protection" for the police in borderline cases. Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (citing Graham v. Connor, 490 U.S. 386, 396-97 (1989)); see Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007). But that zone of protection has shifting boundaries. Everything depends on context, and the use of deadly force, even if "reasonable at one moment," may "become unreasonable in the next if the justification for the use of force has ceased." Lytle v. Bexar Cty., 560 F.3d 404, 413 (5th Cir. 2009). Put another way, "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999).

- 11 -

Among other things, a suspect's physical proximity and the speed of his movements are highly relevant to this inquiry. See Kirby v. Duva, 530 F.3d 475, 482-83 (6th Cir. 2008); Walker v. City of Orem, 451 F.3d 1139, 1160-61 (10th Cir. 2006). When feasible, a police officer must give some sort of warning before employing deadly force. See Garner, 471 U.S. at 11-12; see also Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005) (concluding that officer violated Fourth Amendment by firing "extraordinarily quickly" and without "adequate warning" at armed man whose gun was "pointed downwards"). Moreover, federal courts have afforded a special solicitude to suicidal individuals in lethal force cases when those individuals have resisted police commands to drop weapons but pose no real security risk to anyone other than themselves. See Weinmann v. McClone, 787 F.3d 444, 450 (7th Cir. 2015) (collecting appellate precedents holding that, as of 2007, clearly established law prevented police officers from employing "deadly force against suicidal people unless they threaten harm to others"); Mercado v. City of Orlando, 407 F.3d 1152, 1160-61 (11th Cir. 2005) (similar).

Here, the defendant concentrates on the second step of the qualified immunity paradigm and faults the district court for failing to identify a sufficiently similar case that would have served to place him on notice that his use of deadly force violated

- 12 -

clearly established Fourth Amendment law.[5] In his view, the contours of the relevant Fourth Amendment law were so blurred at the time that he shot McKenney that he is deserving of qualified immunity. We have jurisdiction to consider this purely legal asseveration. See Johnson, 515 U.S. at 316-17; Morse, 869 F.3d at 24.

Jurisdiction notwithstanding, this argument lacks force. Although the district court frankly acknowledged that it could not find "[a] case presenting a nearly identical alignment of facts," McKenney, 2017 WL 1365959, at *9, such an exacting degree of precision is not required to thwart a qualified immunity defense.

To be sure, "the clearly established law" employed in a qualified immunity analysis "must be particularized to the facts of the case." White, 137 S. Ct. at 552 (internal quotation marks omitted). This instruction fits hand in glove with the Supreme Court's warning that, when dealing with qualified immunity, we should not over-rely on precedents that are "cast at a high level of generality." Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam). Even so, there need not be "a case directly on point" to satisfy the second step of the qualified immunity paradigm. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); see Anderson, 483

---

[5] In this appeal, the defendant does not challenge the district court's finding of a constitutional violation at step one of the qualified immunity paradigm.

- 13 -

U.S. at 640; Limone v. Condon, 372 F.3d 39, 48 (1st Cir. 2004). The test is whether existing case law has "placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. In some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." United States v. Lanier, 520 U.S. 259, 271 (1997). What counts is whether precedents existing at the time of the incident "establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule." Alfano, 847 F.3d at 76; see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam); Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The Court's landmark decisions in Graham and Garner, which articulate generalized standards for excessive force liability under the Fourth Amendment, "do not by themselves create clearly established law outside an obvious case." White, 137 S. Ct. at 552 (internal quotation marks omitted). But taking the facts and the reasonable inferences therefrom in the light most favorable to the plaintiff, the threat presented lacked immediacy and alternatives short of lethal force remained open. Seen in that light, this was a case in which the feasibility of a more measured approach was apparent. Moreover, the district court did precisely what the Supreme Court has instructed courts to do: it focused on "the specific context of the case." Brosseau, 543 U.S.

at 198 (internal quotation marks omitted). With that context in mind, it relied on well-settled precedents addressing the lawfulness of using deadly force against an individual who was suicidal, armed, slow in gait, some distance away from the officer, and had received no commands or warnings for several minutes. See McKenney, 2017 WL 1365959, at *9-11. We conclude, without serious question, that the precedents identified by the district court and those discussed supra gave the defendant fair warning that, if the facts were as the plaintiff claimed them to be, his use of deadly force against McKenney offended clearly established Fourth Amendment law — and an objectively reasonable officer would have realized as much. Therefore, the district court properly concluded that the absence of a precedent on all fours was not dispositive.

In an effort to dull the force of this reasoning, the defendant makes a series of factbound arguments. Most notably, the defendant repeatedly insists — contrary to the inferences drawn by the district court — that he reasonably perceived McKenney as an imminent danger at the time of the shooting, such that he was left with no real choice but to fire his weapon. In turn, he urges reversal in light of evidence that he maintains the district court either overlooked or insufficiently considered. These facts include data points such as that McKenney had ignored police commands to drop his loaded weapon, had at one time raised his

gun, and was approaching the defendant (and the unarmed civilian in the defendant's cruiser) at the time he was shot.

But there is a rub: the defendant's characterization of the summary judgment record collides head-on with the district court's synthesis of the facts. The defendant either ignores or gives unduly short shrift to evidence that was central to the district court's conclusion that, on the version of the facts most hospitable to the plaintiff, the defendant had "ample opportunity to observe [McKenney's] actions and movements" before pulling the trigger and that the defendant's decision to shoot McKenney was "unreasonably precipitous." McKenney, 2017 WL 1365959, at *12-13. These facts include McKenney's suicidality, the slowness of his gait, the clear visibility, the fact that six minutes had elapsed since any officer had last ordered McKenney to drop his weapon, the fact that nobody had warned McKenney that deadly force would be used if he failed to follow police commands, and the six-minute gap between when McKenney raised his gun skywards and when the defendant pulled the trigger. Rather than accept arguendo that McKenney never came close to pointing his gun in the defendant's direction, the defendant devotes much sound and fury to the proposition that he reasonably perceived McKenney to be aiming his weapon at him. In short, the defendant has woven factbound arguments regarding both the immediacy of the threat posed by McKenney and the feasibility of less drastic action into

- 16 -

the warp and woof of his challenge to the district court's qualified immunity analysis. Such an intertwining of disputed issues of fact and cherry-picked inferences, on the one hand, with principles of law, on the other hand, places these arguments beyond our jurisdictional reach on interlocutory appeal. See Cady, 753 F.3d at 359-60; cf. Whitfield v. Meléndez-Rivera, 431 F.3d 1, 8 (1st Cir. 2005) (concluding that the question of whether a suspect appeared threatening before officer employed lethal force was properly resolved by the jury).

To sum up, the precedents make pellucid that the most relevant factors in a lethal force case like this one are the immediacy of the danger posed by the decedent and the feasibility of remedial action. See Garner, 471 U.S. at 11-12; Whitfield, 431 F.3d at 8; Young, 404 F.3d at 23. Taking the facts in the light most amiable to the plaintiff (as the law required it to do), the district court concluded that a rational jury could reasonably infer both that McKenney did not pose an imminent threat and that viable remedial measures had not been exhausted. The court also concluded that these facts should have been obvious to an objectively reasonable officer in the defendant's position. Although the defendant invites us to adopt a spin on the summary judgment record different from that taken by the district court, we lack jurisdiction to accept that invitation under Johnson and its progeny. See Goguen v. Allen, 780 F.3d 437, 455-56 (1st Cir.

2015) (dismissing appeal for lack of jurisdiction when "defendants repeatedly ignore[d] evidence, and reasonable inferences therefrom" on which the court below premised its interlocutory denial of qualified immunity); Penn v. Escorsio, 764 F.3d 102, 110 (1st Cir. 2014) (dismissing appeal from interlocutory denial of qualified immunity after "peel[ing] away the facade by which" defendants portrayed "purely factual disputes" as legal arguments); Cady, 753 F.3d at 361 (concluding similarly when defendant failed to concede arguendo that the court below "was correct in its determinations regarding what inferences were permissible on the summary judgment record"); Díaz, 112 F.3d at 5 (dismissing appeal for lack of jurisdiction when defendant merely attempted to take "a different spin" on the facts). Accordingly, we dismiss the defendant's factbound challenges to the district court's order for lack of jurisdiction.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we dismiss the appeal in part for want of appellate jurisdiction and otherwise affirm the district court's denial of summary judgment. Costs shall be taxed in favor of the plaintiff.

Of course, our words here are not the end of the matter. The pretrial denial of qualified immunity is but "a way station in the travel of a case." Camilo-Robles, 151 F.3d at 9. Depending on the facts proven at trial and the inferences drawn by the jury,

- 18 -

the defendant may or may not ultimately prevail on his qualified immunity defense.[6] We hold today simply that the defendant's purely legal challenge is devoid of merit and that his factbound arguments are inappropriate for interlocutory appeal.

**So Ordered.**

---

[6] We recognize that the defendant faced a challenging situation. On this scumbled record, though, it is for the jury to decide whether McKenney presented a sufficiently serious and imminent threat, such that the defendant's ultimate decision to use lethal force was objectively reasonable or, at least, belongs within the "zone of protection" afforded to police officers in borderline cases. Roy, 42 F.3d at 695.

- 19 -